Page 1

1                 UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                   JACKSONVILLE DIVISION

3

4     LUKE NGUYEN,

5              Plaintiff,

6

      -vs-              Case No:  3:21-cv-00173-MMH-MCR
7

8     UNIVERSITY OF ST. AUGUSTINE
      FOR HEALTH SCIENCES, LLC,
9

              Defendant.
10    _____
11              Videotaped Deposition of
                    LUKE PHUOC NGUYEN
12
              Taken on behalf of Defendant
13
                      Pursuant to
14     Notice of Taking Plaintiff's Video Deposition

15

16    DATE TAKEN:  Thursday, May 19, 2022
      TIME:        9:30 a.m. - 5:10 p.m.
17    PLACE:       Riley Reporting & Associates, Inc.
                   1300 Riverplace Boulevard, Suite 610
18                 Jacksonville, Florida  32207

19

        Examination of the witness taken before:
20                  Renee B. Farhat
             Registered Professional Reporter

21

22

23

24

25

Page 2

```
 1        A P P E A R A N C E S
 2
 3
 4    KIMBERLY DODSON, Esquire, (via Zoom)
 5       The Law Office of Keith Altman
         33228 West 12 Mile Road, Suite 375
 6       Farmington Hills, Michigan  48331
         kimberly.dodson@kaltmanlaw.com
 7
         appearing on behalf of Plaintiff.
 8
 9
10
11    SAMANTHA GIUDICI BERDECIA, Esquire,

         Alexander, DeGance, Barnett, P.A.
12       1500 Riverside Avenue
         Jacksonville, Florida  32204
13       samantha.giudici@adblegal.com
14       appearing on behalf of Defendant.
15
16
17    ALSO PRESENT:
         Gavin Boyd-Goodrich, Videographer
18       Jacques Barbe, Videographer
19
20
21
22
23
24
25
```

Page 3

```
 1            I N D E X
 2   WITNESS                        PAGE
 3   TOMAS JOSE NSANG SILEBO
        Direct Examination by Ms. Berdecia. . . . . .  7
 4      Cross-Examination by Ms. Dodson . . . . . . . 209
        Redirect Examination by Ms. Berdecia. . . . .216
 5      Recross-Examination by Ms. Dodson . . . . . .217
 6            - - -
 7        DEFENDANT'S EXHIBITS
 8   Number      Description       For Identification
 9   Exhibit 1    Acceptance Packet          18
10   Exhibit 2    Courses Transcript         21
11   Exhibit 3    Leave of Absence Request        28
12   Exhibit 4    Email String, KAL 1-3        30
13   Exhibit 5    Email, 9/15/16, USA/Nguyen 122-123    31
14   Exhibit 6    Program Change Request Form       33
15   Exhibit 7    Email, 4/11/18, USA/Nguyen 991     46
16   Exhibit 8    Email, 4/14/18, USA/Nguyen 994-995   50
17   Exhibit 9    Email String, USA/Nguyen 990       52
18   Exhibit 10   Email String, USA/Nguyen 1061-1064  54
19   Exhibit 11   Email String, USA/Nguyen 48-51      58
20   Exhibit 12   Email String, USA/Nguyen 1022-1023   59
21   Exhibit 13   Email String, USA/Nguyen 1052-1053   62
22   Exhibit 14   Fall 2018 Mock Clinic Syllabus    66
23   Exhibit 15   Email String, USA/Nguyen 987-989   76
24   Exhibit 16   Email String, USA/Nguyen 1014-1015  78
25   Exhibit 17   Email String, USA/Nguyen 88-90    80
```

Page 4

```
 1
            I N D E X (cont'd)
 2
 3        DEFENDANT'S EXHIBITS
 4   Number      Description     For Identification
 5   Exhibit 18   Email, 12/6/18, USA/Nguyen 1037     82
 6   Exhibit 19   Email String, USA/Nguyen 1047     85
 7   Exhibit 20   Voicemail                97
 8   Exhibit 21   Voicemail                97
 9   Exhibit 22   Email String, USA/Nguyen 1145-1150  98
10   Exhibit 23   Email String, KAL 52-53       101
11   Exhibit 24   Email String, USA/Nguyen 95-96    109
12   Exhibit 25   Email String, USA/Nguyen 1054-1055  114
13   Exhibit 26   Email String, USA/Nguyen 1011-1012  115
14   Exhibit 27   Email String, KAL 43        117
15   Exhibit 28   Email String, USA/Nguyen 1084-1085  118
16   Exhibit 29   Email String, KAL 56-58       120
17   Exhibit 30   12/21/18, Notice of Dismissal Letter
                  USA/Nguyen 1065          125
18
     Exhibit 31   Email, 12/31/18, USA/Nguyen 1072    127
19
     Exhibit 32   Email, 1/2/19, KAL 47-48       127
20
     Exhibit 33   Email, 1/14/19, USA/Nguyen 1111-1112 136
21
     Exhibit 34   Email, 1/17/19, USA/Nguyen 1076    137
22
     Exhibit 35   Email String, USA/Nguyen 1073-1074  138
23
     Exhibit 36   USA 2018-2019 Fall Student Handbook 142
24
     Exhibit 37   Fl Economic Advisors, LLC Report
25                KAL 319             183
```

Page 5

```
 1
            I N D E X (cont'd)
 2
 3        DEFENDANT'S EXHIBITS
 4   Number      Description     For Identification
 5   Exhibit 38   Interrogatories          196
 6   Exhibit 39   Plaintiff's Objections and Responses
                  to Defendant's First Set of Requests
 7                for Production         202
 8   Exhibit 40   Complaint              202
 9
            - - -
10
11        PLAINTIFF'S EXHIBITS
12   Number      Description       For Identification
13   Exhibit P1   Fl Economic Advisors
                  Damages Compilation        207
14
     Exhibit P2   Baptist Behavorial Health Report
15                3/5/19             208
16
            - - -
17
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1    THE VIDEOGRAPHER: Good morning. Gavin
2 Boyd-Goodrich, videographer.
3    We are now on the video record. Please be
4 aware the microphones are sensitive and can pick
5 up whispering, private conversations, and
6 cellular interference.
7    Please silence all cell phones or place them
8 away from the microphones, as they can interfere
9 with the deposition audio. Audio and video
10 recording will continue to take place unless all
11 parties agree to go off the record.
12    We are here recording live at Veritext, 1300
13 Riverplace Boulevard, Suite 610, Jacksonville,
14 Florida, 32207, for the video deposition of Luke
15 Nguyen. The time is 9:30 a.m. The date is
16 Thursday, May 19th, 2022.
17    Would all counsel please state their
18 appearance for the record, and the witness will
19 be sworn in.
20    MS. BERDECIA: Samantha --
21    MS. DODSON: Kimberly Dodson – go ahead.
22    MS. BERDECIA: Samantha Giudici Berdecia for
23 the University of St. Augustine.
24    MS. DODSON: Kimberly Dodson for the
25 plaintiff.

Page 7

1    THE COURT REPORTER: Can you raise your right
2 hand, please.
3    THE WITNESS: (Complies.)
4    THE COURT REPORTER: Do you solemnly swear
5 the testimony you're about to give will be the
6 truth, so help you God?
7    THE WITNESS: I swear. I do. I don't know
8 what the terminology is. But, yes.
9         LUKE NGUYEN,
10 having been produced and first duly sworn as a
11 witness on behalf of Defendant, and after responding
12 "I swear; I do; Yes" to the oath, testified as
13 follows:
14         DIRECT EXAMINATION
15 BY MS. BERDECIA:
16  Q  Good morning, Mr. Nguyen. We met briefly.
17 But for the purposes of the depo and for the record,
18 my name is Samantha Giudici, and I represent the
19 University of St. Augustine in a lawsuit that you
20 filed against the university.
21    Have you ever had your deposition taken
22 before?
23  A  No.
24  Q  Just a couple of ground rules. We have the
25 court reporter here, and she is taking down

Page 8

1 everything that anybody says. And so for purposes
2 of the record and to make her life easier, speak
3 your answers. Try not to nod your head, say uh-uh,
4 uh-huh. Those don't translate very well into the
5 record. So try to speak your response with a yes or
6 a no; okay?
7  A  I will try to the best of my ability.
8  Q  We'll remind you. Trust me.
9    Let me finish my question. In a normal
10 conversation, you might anticipate where I'm going.
11 You might already know what the answer to the
12 question is. Again, it makes it easier for the
13 court reporter if I can finish and complete my
14 question prior to you answering so that the
15 transcript is very clear. Understand?
16  A  I understand.
17  Q  Your counsel might object to my questions.
18 There are times where she might not agree with the
19 way I'm asking something for a number of reasons.
20 If she does object, unless she specifically
21 instructs you not to answer the question, you would
22 then answer the question after her objection. Okay?
23  A  I understand.
24  Q  If you don't understand my questions, feel
25 free to ask me. If you answer the question, I'm

Page 9

1 going to assume that you understood what I was
2 asking.
3  A  I understand.
4  Q  And we can take a break at any time, if you
5 need a comfort break, restroom break, to get water.
6 The only thing I ask is that if I have a question
7 pending, that you answer that question that's
8 pending prior to us taking a break. We will break
9 for lunch and that type of thing, so we're not
10 trying to exhaust you or push through anything. So
11 if you do need a break, just let me know.
12  A  I understand.
13  Q  Can you state your full name for the record.
14  A  My name is Luke Phuoc Nguyen.
15  Q  And have you gone by any other names?
16  A  No.
17  Q  What's your address?
18  A  ████████████████████████
19
20  Q  How long have you lived at that address?
21  A  Approximately three years.
22  Q  Do you have any plans to move in the future?
23  A  Not at this time.
24  Q  Do you own or rent?
25  A  We own.

3 (Pages 6 - 9)

Page 10

1   Q   And how long have you owned -- owned that
2   house or location?
3   A   Approximately the three years we've lived in
4   it.
5   Q   What's your date of birth?
6   A   ▮▮▮▮▮▮▮.
7   Q   And do you live with anyone?
8   A   I live with my wife, and I live with my
9   daughter.
10  Q   What's your wife's name?
11  A   That would be Nichole Nguyen.
12  Q   And what's your daughter's name?
13  A   Reina, R-e-i-n-a, Nguyen.
14  Q   Is your wife employed?
15  A   Yes.
16  Q   Where?
17  A   Bank of America.
18  Q   And is that here in Jacksonville?
19  A   Yes.
20  Q   What did you do to prepare for your
21  deposition today?
22  A   I have spoken to my lawyer, who basically
23  gave me the ground rules.
24  Q   Don't tell me anything that she -- that your
25  lawyer said.

Page 11

1        So you spoke to your lawyer.  Did you talk to
2   anybody else about the deposition today?
3   A   No.
4   Q   Did you review any documents?
5   A   Other than what I have, no.
6   Q   When you say what you have, what documents
7   did you look at?
8   A   My emails.
9   Q   Do you recall what specific emails you looked
10  at?
11  A   Emails for when and where the deposition was
12  going to be.
13  Q   Did you look at any emails from the time that
14  you were a student at the University of
15  St. Augustine?
16  A   Yes.
17  Q   And which emails of those did you look at?
18  A   The emails pertaining to my dismissal.
19  Q   And when you say pertaining to your
20  dismissal, what do you mean by that?
21  A   The actual letter of why I was dismissed from
22  the university on, I believe, January 13th of 2019.
23  Q   And did you look at any other documents?
24  A   No.
25  Q   Are you currently taking any medication?

Page 12

1   A   Yes.
2   Q   What medication are you currently taking?
3   A   I am currently taking medication prescribed
4   by my psychiatrist for my ADHD and generalized
5   anxiety disorder.
6   Q   Do any of the medications that you're taking
7   affect your ability to understand my questions?
8   A   To my knowledge, no.
9   Q   Do any of the medications that you're
10  currently taking affect your ability to answer my
11  questions?
12  A   To my knowledge, no.
13  Q   Where did you go to high school?
14  A   Tampa Bay Technical High School.
15  Q   And when did you graduate?
16  A   May 2001.
17  Q   What did you do after you graduated from high
18  school?
19  A   I attended the University of West Florida.
20  Q   Did you start at the University of West
21  Florida in August of 2001?
22  A   Yes.
23  Q   How long did you attend the University of
24  West Florida?
25  A   Until December of 2005.

Page 13

1   Q   Did you earn a degree from the University of
2   West Florida?
3   A   Yes.
4   Q   What was that degree?
5   A   It was a degree in psychology and a minor in
6   social work.
7   Q   What did you do after you graduated from the
8   University of West Florida in December of 2005?
9   A   I went home.  My grandmother required a
10  caregiver.  And I was her caregiver until her
11  passing in 2009.
12  Q   When you were your grandmother's caregiver,
13  did you do that full time?
14  A   Yes.
15  Q   So you didn't have a job -- did you work at
16  all from 2005 to 2009?
17  A   Part time as a personal trainer, until her
18  complications made me unable to hold that job.
19  Q   Where did you work part time as a personal
20  trainer?
21  A   I was self-employed.
22  Q   Did you work out of, like, a specific gym?
23  A   No.
24  Q   After your grandmother passed away in 2009 --
25  my condolences.

4 (Pages 10 - 13)

Page 14

1   A   Thank you.
2   Q   -- what did you do next?
3   A   I took a year off, tried to discover myself,
4   considering -- considered whether I would continue
5   my degree in psychology.
6       Ultimately, after that year, I wanted to get
7   into physical therapy.  And I did -- I started --
8   and I apologize for the ums.  I was enrolled in the
9   University of South Florida to do my prerequisites
10  for physical therapy schools.
11  Q   And how long were you enrolled at the
12  University of South Florida?
13  A   I believe two years.
14  Q   So was that approximately until 2012?
15  A   Yes.
16  Q   After you finished at the University of South
17  Florida in 2012, what did you do next?
18  A   I applied for physical therapy schools.
19  Q   Where did you apply for physical therapy
20  school?
21  A   I'll be honest, I do not recall each and
22  every school that I applied to.  In order to apply
23  for physical therapy schools, you apply to a
24  website.  It was sort of a referral service, to
25  where you apply to them and then you check boxes as

Page 15

1   to schools that you were interested in.
2   Q   Do you recall -- besides the University of
3   St. Augustine, do you recall any other schools that
4   you applied to?
5   A   I have applied -- the ones I remember are
6   Duke University, Georgetown University, University
7   of North Dakota.  And there were a few more that I
8   cannot recall at this time.
9   Q   Do you recall what programs you got accepted
10  to?
11  A   So for my first -- for my first year that I
12  applied, I did not get accepted into any school.
13  Q   So you -- when did you apply for the second
14  time?
15  A   The following year.
16  Q   So would that have been 2013?
17  A   I believe so.
18  Q   And do you recall what schools you applied to
19  the second time around in 2013?
20  A   I believe it was the same universities.  But
21  I was also recommended to make an application
22  towards University of St. Augustine, which I believe
23  was not in that referral service.
24  Q   While you were applying for physical therapy
25  school in 2012 and 2013, were you employed at that

Page 16

1   time?
2   A   I was self-employed as a personal trainer.
3   Q   Was that full time at that point?
4   A   Yes.
5   Q   When did you enroll in the University of
6   St. Augustine?
7   A   I believe it was the summer semester of 2016.
8   Q   So from 2013 until you enrolled in the
9   University of St. Augustine in 2000 -- the summer of
10  2016, what did you do during that time period?
11  A   I was a personal trainer.  And I had taken
12  time to try to strengthen my application, as in
13  doing more than the minimum of shadowing hours,
14  tried to expand my network of people who were in the
15  field.  And that's it.
16  Q   What program -- when you enrolled in the
17  summer of 2016 in the University of St. Augustine,
18  what program did you enroll in?
19  A   I was enrolled in their on-campus accelerated
20  program, accelerated DPT program.
21  Q   And when you say "DPT," is that Doctor of
22  Physical Therapy?
23  A   Yes.
24  Q   And if I say "USA," you know I'm referring to
25  the University of St. Augustine; is that correct?

Page 17

1   A   I understand, and yes.
2   Q   The on-campus DPT program that you were
3   enrolled in in summer of 2016, what degree do you
4   earn at the completion of that program?
5   A   A Doctorate of Physical Therapy.
6   Q   And when were you expected to complete the
7   program?
8   A   Expected completion was summer of 2020, I
9   believe.
10  Q   So it was a four-year program?
11  A   I'm sorry.  It was a -- excuse me.  2020
12  was -- I believe that was my expected graduation for
13  the flex DPT, which I would transition to later.  It
14  was a seven -- it was a seven-semester program for
15  the accelerated.  So it would be summer -- at the
16  end of summer 2018 for the accelerated program.
17  Q   When you enrolled in and began attending USA,
18  did you receive access to the university's policies
19  that applied to students?
20  A   I received a student handbook.
21      MS. BERDECIA:  And, Kimberly, my paralegal
22  should have sent you -- emailed you, via Dropbox,
23  the exhibits for the deposition.  I don't know if
24  you've received them or not.
25      MS. DODSON:  No, ma'am, I didn't get them.

5 (Pages 14 - 17)

Page 18

1    MS. BERDECIA:  Let's go off the record real
2  fast.
3    THE VIDEOGRAPHER:  Off the record, 9:46.
4  (Discussion held off the record.)
5    THE VIDEOGRAPHER:  On the record, 9:48.
6  (Defendant's Exhibit No. 1 was marked for
7  identification.)
8  BY MS. BERDECIA:
9    Q  Mr. Nguyen, my -- the court reporter -- we
10  were just talking about my paralegal.
11    The court reporter just handed you what we've
12  marked as Defendant's Exhibit 1.  Take a look at
13  that document and let me know if you recognize it.
14    A  I'm sorry.  What was your question again?
15    Q  Do you recall receiving that document?
16    A  Yes, I do.
17    Q  And the bottom right-hand corner of the page
18  have the initials LN and the date 1/2/16.  Do you
19  recall initialing that on January 2nd, 2016?
20    A  Yes, I do.
21    Q  If you will turn to page 9, which is
22  Bates-marked USA/Nguyen 13.
23    A  Page 9...
24    Q  Do you recall reviewing this page and
25  checking these boxes on page 9 of Exhibit 1?

Page 19

1    A  Yes, I do.
2    Q  And the second full paragraph says, "If you
3  know of any reason that you cannot now or after
4  regular instruction meet all of the functions set
5  forth below, you are to inform the student services
6  office so you can be counseled regarding the process
7  for requesting reasonable accommodations.  The
8  University of St. Augustine for Health Sciences
9  wishes to make reasonable accommodations in areas in
10  which it's able to do so."
11    Do you recall reviewing that paragraph?
12    A  At that time, yes.
13    Q  And you checked the box on the next page,
14  page 10, under "Coping Skills" that says "Ability to
15  perform in stressful environments or during
16  impending deadlines."
17    Did you check that box?
18    A  Yes.
19    Q  And in January of 2016, did you check the box
20  that says that you are able to "complete timed
21  written, oral, and laboratory practical
22  examinations"?
23    A  Yes.
24    Q  If you turn to page 11, the last sentence of
25  that first paragraph says, "In addition, I

Page 20

1  understand that if I know of any reason why I would
2  need reasonable accommodations to meet the essential
3  functions, I should request these accommodations
4  from the disability awareness committee immediately
5  after acceptance to the university.  Failure to meet
6  the essential functions will lead to termination of
7  my enrollment at the University of St. Augustine for
8  Health Sciences."
9    Do you recall reviewing that paragraph?
10    A  At the time, yes.
11    Q  Did you check the box that says that you can
12  meet all of the essential functions?
13    A  Yes, I did.
14    Q  And an example of potentially needing
15  accommodations says "Complete timed written, oral,
16  and laboratory practical examinations - need
17  extended time on written exams."
18    Did you review that example when you reviewed
19  this page of the documents?
20    A  At the time, yes.
21    Q  And is that your signature at the bottom of
22  the page?
23    A  That is my signature at the bottom of the
24  page.
25    Q  You testified that you enrolled in USA in the

Page 21

1  summer of 2016.  Do you recall what courses you took
2  in the summer of 2016?
3    A  I believe I can recall them.
4    Q  And what were they?
5    A  Anatomy and physiology -- I'm sorry.  Those
6  are two separate courses.  There is anatomy.  There
7  is physiology.  There is -- I forgot the title of
8  the class, but it pertained to clinical skills.
9  There was a class called physical therapy practice.
10  And there was another class.  I do not recall the
11  exact title, but it pertained to scientific study
12  and research.  And critical thinking.
13    How many classes did I state?  Because there
14  were seven that semester.  I remember that clearly.
15    Q  Did you pass all of those courses?
16    A  Yes, I did.
17  (Defendant's Exhibit No. 2 was marked for
18  identification.)
19  BY MS. BERDECIA:
20    Q  The court reporter has handed you what we'll
21  mark as Defendant's Exhibit 2.
22    Take a look at that and tell me if you
23  recognize it.
24    MS. DODSON:  And, Samantha, since these
25  aren't marked on my end, can you just identify

Page 22

1  it?  Are you going in order?
2      MS. BERDECIA:  I am.  And they should be
3  marked via bookmarks.  So if you pull up
4  bookmarks in the PDF viewer --
5      MS. DODSON:  Okay.
6      MS. BERDECIA:  -- it should be marked.
7      But this is -- for your purposes, this is the
8  transcript, and it's USA/Nguyen 34 through 35.
9      MS. DODSON:  Okay.  Just, I think, for the
10  deposition purposes, if we put the Bates numbers
11  on there, it will be helpful.
12  BY MS. BERDECIA:
13  Q  So do you recognize this document?
14  A  I recognize that it is a document that has my
15  transcript on it.
16  Q  To the best of your knowledge, is this
17  accurate?
18  A  Yes, I believe this is accurate.
19  Q  If you look in the bottom left-hand corner of
20  the first page, under fall of -- I believe that's
21  2016-2017 academic year, it shows Ws in the area for
22  grades.
23      Did you withdraw from your courses in the
24  fall of 2016?
25  A  Yes, I did.

Page 23

1  Q  Why?
2  A  I apologize.  This will be a long answer.
3      Near the beginning of the term, I believe it
4  was September 11th, I had -- I had a panic attack.
5  I have never had one before.  I did not know what to
6  expect.  I was hyperventilating.  My mind was blank.
7  I felt disoriented.  And on top of that, there was
8  an overwhelming sense of dread.  And this was in the
9  very beginning of the term before any exams, before
10  anything.  I did not know what was happening, did
11  not understand the episode I was having.
12      I immediately reached out to my wife, who was
13  living in Tampa, Florida, at the time.  I was
14  renting a condo in St. Augustine to attend these --
15  to attend these classes.
16      I reached out to her.  She recommended that I
17  reach out to my professors and tell them what was
18  happening.  And she would drive up immediately to
19  St. Augustine to pick me up and to be there, to be
20  emotional support for me.
21      I looked at the student handbook.  I followed
22  it to the best of my ability.  And I asked for a --
23  I asked for a leave of absence.  I did not -- I
24  didn't think it would take me that long to
25  recuperate from this.  I thought it was temporary.

Page 24

1  But all I knew I could not continue.  Or that's what
2  I felt at the time.
3      I reached out to each and every one -- I
4  reached out to my advisor, and I reached out to my
5  professors.  They advised me to file for a leave of
6  absence, which would require me to also reach out to
7  the program director.
8      So my professors -- my advisor was Dr. Lisa
9  Chase and the program director was Dr. Jeff Rot.
10  They approved.  And it was under the assumption that
11  it would be short-term.
12      I let them know of what my problems were, to
13  where I was recommended their mental health
14  services.  According to the student handbook, the
15  university does provide up to three sessions of
16  mental health.  I was referred to their outsourced
17  counselor, Melissa Muller.
18      And when my wife arrived that night on the
19  11th, she started looking around for a psychiatrist
20  to evaluate my mental health.  The soonest
21  appointment she was able to get was on the 19th of
22  September.
23      In between that time on the 11th and the
24  19th, I was still in a lot of shock.  I still did
25  not truly understand what was happening.  My wife

Page 25

1  took me home to Tampa, Florida, where she had made
2  the appointment with Dr. Stacie Lauro on
3  September 19th.
4      And, again, in between that time, I was in
5  communication with my advisor, Lisa Chase, and the
6  program director, Jeff Rot.  And one of my
7  professors took it upon himself to also be involved.
8  I believe the program director, Jeff Rot, stated
9  that one of my professors, Matthew Daugherty, would
10  serve as an assistant program director at this time.
11  And that is why he was involved with several emails
12  at that time.
13      I informed them of my therapy appointment --
14  of my consultation on the 19th.  On the 19th, I
15  would see Dr. Stacie Lauro.  She would do a
16  screening, and she would -- my wife was there
17  because I was emotionally fragile.  My wife was
18  there in the consultation.  And the therapist
19  diagnosed me with generalized anxiety disorder.
20      When the therapist asked if I had any other
21  questions or concerns, my wife asked that I should
22  be screened for ADHD.  I did not object.  We were at
23  a therapist.
24      So she performed that screen, and I was also
25  diagnosed with attention deficit hyperactivity

Page 26

1  disorder, ADHD, on September 19th, 2016.
2       Since then, I have been in communication with
3  Dr. Lisa Chase and program director Jeff Rot,
4  discussing with them what the therapist has found
5  and what the course of action would be for my future
6  with the University of St. Augustine.
7       After several meetings, again, I made them
8  aware of my condition, of my diagnoses.  They
9  recommended that I perhaps transition into the flex
10  DPT program.  And the program director for that was
11  Debra Gray.
12       Since it was already a few weeks into the
13  semester, it was recommended to me that I enter the
14  program in the spring the following year, or the
15  next semester.  They -- I had meetings with
16  Dr. Debra Gray in and around that time,
17  September/October, as to why I would be
18  transitioning into the flex program, including my
19  diagnoses.
20       And due to this transition, Dr. Lisa Chase
21  would no longer be my advisor.  My new advisor
22  transitioning into the program, into the flex DPT
23  program, would be Dr. Debra Gray, who was also the
24  program director for the flex DPT program.
25    Q   Let me interrupt you real fast.

Page 27

1       So you took a leave of absence because you
2  suffered a panic attack and made the decision to
3  transfer into the flex program.  Is that accurate?
4    A   After being advised and speaking with
5  Dr. Lisa Chase and the program director Jeff Rot,
6  yes.
7    Q   You said "they" recommended that you
8  transition to the flex program.  Who is "they"?
9    A   Dr. Lisa Chase, my advisor for the
10  accelerated DPT program, and Dr. Jeff Rot, the
11  program director of the accelerated Doctorate of
12  Physical Therapy program.
13    Q   Did they say why they made the recommendation
14  that you transition into the flex program?
15    A   To reduce course load, given my diagnoses.
16    Q   And you said "they" recommended that you
17  enter the program in the spring the next semester.
18  Who is "they"?
19    A   They, again, refers to Dr. Lisa Chase, my
20  advisor, and the program director of the accelerated
21  program, Dr. Jeffrey -- Dr. Jeff Rot.
22    Q   And you said you were diagnosed with the
23  general anxiety disorder.  Had you previously been
24  treated for anxiety prior to September 2016?
25    A   No.

Page 28

1    Q   Had you previously been treated for ADHD
2  prior to September of 2016?
3    A   No.
4    Q   The court reporter is going to hand you what
5  we'll mark as Defendant's Exhibit 3.
6       (Defendant's Exhibit No. 3 was marked for
7  identification.)
8  BY MS. BERDECIA:
9    Q   Do you recognize this document?
10    A   Yes, I do.
11    Q   That's the leave of absence request form.
12       Is that your handwriting?  Are you the person
13  that filled it out?
14    A   Yes, it is.
15    Q   And is that your signature -- the first
16  signature on the page, is that your signature?
17    A   Yes, it is.
18    Q   Under reason for leave of absence, you state
19  "anxiety and scheduling issues."
20       What were the scheduling issues?
21    A   The scheduling issues pertains to the reduced
22  course load.  That's what it was referring to.
23    Q   And you mentioned two doctors who you
24  received treatment from.  One of them was Dr. Stacie
25  Lauro?

Page 29

1    A   Yes.
2    Q   And who was the other one?
3    A   That would be the university-provided
4  counselor, Melissa Muller.
5    Q   How many times did you see Melissa Muller?
6    A   Three times.
7    Q   Was she in St. Augustine?
8    A   Yes.
9    Q   And then Dr. Stacie Lauro, how often did you
10  see Dr. Lauro?
11    A   I have seen her, I believe, twice.
12    Q   Was the leave of absence approved by the
13  university?
14    A   For the reasons that I gave, that -- they
15  understood my anxiety and scheduling issues was -- I
16  needed a reduced course load for my diagnoses.  Yes,
17  my -- my leave of absence was approved.
18    Q   So the university did approve your leave of
19  absence for the fall 2016 semester?
20    A   Yes.
21    Q   Besides asking for a reduced course load, did
22  you ask for any other accommodations at that time?
23    A   At the time I did not fully understand my
24  conditions.  I was hoping that by making clear what
25  my conditions were -- I had deferred to my advisor

8 (Pages 26 - 29)

Page 30

1 and the program director to see what the best course
2 of action would be.
3      So in my knowledge, the best that the
4 university was able to provide was to transition
5 into a reduced course -- reduced course load
6 program.
7      Q   My question was:  Did you ask for any other
8 accommodations besides a reduced course load at that
9 time in September -- or in the fall of 2016?
10     A   No.
11     (Defendant's Exhibit No. 4 was marked for
12 identification.)
13 BY MS. BERDECIA:
14     Q   The court reporter is going to hand you what
15 we've marked as Defendant's Exhibit 4.  This is a
16 September 13th, 2016, email string Bates-labeled
17 KAL 1 through 3.
18     Take a minute to look at it and let me know
19 if you recognize it.
20     A   (Reviewing document.)
21     Could you repeat the question again, please.
22     Q   Do you recognize this email string?  Do you
23 recall this email string?
24     A   Yes, I do.
25     Q   So it appears that you initially asked for a

Page 31

1 two-week leave of absence; is that correct?
2      A   Yes.
3      Q   And that was immediately approved by Dr. Jeff
4 Rot; is that correct?
5      A   Yes.
6      Q   And he offered to have Matt Daugherty assist
7 you in setting up counseling services; is that
8 correct?
9      A   Repeat the question, please.
10     Q   Dr. Rot offered to have Dr. Daugherty -- or
11 Dr. Daugherty assist you in setting up counseling
12 services if you -- if you requested that; is that
13 correct?
14     A   Yes.
15     Q   And you requested the counseling services be
16 set up?
17     A   Yes.
18     Q   And you took advantage of those; correct?
19     A   Yes.
20     (Defendant's Exhibit No. 5 was marked for
21 identification.)
22 BY MS. BERDECIA:
23     Q   The court reporter has handed you what we'll
24 mark as Defendant's Exhibit 5.  This is a
25 September 15th email string Bates-labeled

Page 32

1 USA/Nguyen 122 to 123.
2      Take a look and let me know when you're ready
3 to answer questions.
4      A   (Reviewing document.)
5      I am ready to answer questions.
6      Q   This was apparently a follow-up to a meeting
7 that you had with Lisa Chase; is that correct?
8      A   That is correct.
9      Q   And her recollection of that meeting
10 indicates that, in her perception, you were leaning
11 towards taking a leave of absence; is that correct?
12     A   Yes.
13     Q   And she provided you the information on how
14 to request that in this email?
15     A   Yes.
16     Q   And you did request it and it was approved?
17     A   Yes.
18     Q   So based on your testimony, when you returned
19 from your leave of absence -- well, let's back up.
20     When did you return from your leave of
21 absence?
22     A   So there was the first leave of absence that
23 was initially filed for two weeks.  In that time, I
24 have made -- I have spoken to the relevant parties,
25 Jeff Rot, program director; Lisa Chase, my advisor,

Page 33

1 about -- as stated in this email that you have
2 provided to me, Exhibit No. 5, that I would be
3 returning on January of 2017, which I did.
4      Q   When you returned in January of 2017 to the
5 University of St. Augustine, were you enrolled in
6 the flex Doctor of Physical Therapy program?
7      A   Yes.
8      (Defendant's Exhibit No. 6 was marked for
9 identification.)
10 BY MS. BERDECIA:
11     Q   The court reporter is going to mark you -- or
12 hand you what we've marked as Defendant's Exhibit 6.
13 This is the program change request form
14 Bates-labeled USA/Nguyen 21.
15     Do you recognize this?
16     A   Yes, I do.
17     Q   And is this the form that you filled out in
18 order to change from the accelerated DPT program to
19 the flex DPT program?
20     A   I believe that it is.
21     Q   And you reference -- in "Reasons For
22 Requesting Transfer," you state "Change of personal
23 schedule."
24     What did you mean by that?
25     A   I was referring to the reduced course load

9 (Pages 30 - 33)

Page 34

1 that I was anticipating with the flex DPT program.
2   Q   What is the flex DPT program?
3   A   It is a distance-learning program.  It is a
4 longer program.  So instead of the accelerated
5 program, which has -- which is expected to complete
6 in seven semesters with semester course loads of
7 approximately seven to eight classes per semester,
8 the flex program was approximately half of that load
9 to where completion of the flex DPT program is
10 approximately four years or more.
11   Q   And flex DPT, is that the flex Doctor of
12 Physical Therapy program?
13   A   Yes, it is.
14   Q   And what degree would you have received had
15 you completed that program?
16   A   The same degree, a doctorate in physical
17 therapy.
18   Q   So is the primary difference between the two
19 programs you are in the course load?
20   A   Course load, time of degree completion.  To
21 my knowledge, those are the differences.
22   Q   And you -- I think you testified that it was
23 an online program.  So you didn't have to attend
24 class every day?
25   A   It was a distanced-hybrid program to where I

Page 35

1 was still required for several classes to come in on
2 weekends for extended periods of time, for in-class
3 skills, for relevant practical skills, and
4 examinations.
5   Q   So was the majority of the coursework online
6 and the lab in person?  Is that how the program
7 worked?
8   A   Not necessarily.  There were times where
9 there was no laboratory component to a class, but,
10 yet, we still had to come on campus a certain amount
11 of times during -- for that course.
12   Q   When you were attending the flex DPT program
13 starting in January of 2017, where were you living
14 at that time?
15   A   I was living in Jacksonville, Florida.
16   Q   So you weren't staying in a hotel or anything
17 when you had to go to class on campus?
18   A   No.
19   Q   When you returned from your leave of absence
20 in January of 2017, what courses did you take?
21      You can reference the transcript if that
22 helps refresh your memory.
23   A   Thank you.  It does.
24      Wellness and prevention and gerontology.
25   Q   For the reference, he's referencing his

Page 36

1 transcript, which I believe is Exhibit 2, to refresh
2 his memory.
3      Mr. Nguyen, what grades did you earn in those
4 two courses?
5   A   For wellness and prevention, I have a B-plus.
6 And gerontology, A.
7   Q   So you did well in those courses; correct?
8   A   I could say so.
9   Q   Did you request any accommodations from the
10 University of St. Augustine for the spring 2017
11 semester?
12   A   Those classes did not have a laboratory
13 component.  I did not have to go on campus.  It was
14 a very reduced course load, only two courses.  So I
15 did not feel that I needed accommodations at that
16 time.
17   Q   So you did not request any accommodations for
18 the spring 2017 semester; correct?
19   A   That is correct.
20   Q   And the flex DPT program requires you to take
21 courses every semester; is that correct?
22   A   I believe so.
23   Q   So did you take courses in the summer of
24 2017?
25   A   Yes, I did.

Page 37

1   Q   And what courses did you take in the summer
2 of 2017?
3   A   Biomechanics, general pathology, and
4 psychosocial and ethical -- I cannot read the rest
5 of that.
6   Q   Was that psychosocial and ethical aspects of
7 physical therapy?  Does that ring a bell?
8   A   Yes, it does.
9   Q   And was that the course?
10   A   Yes.
11   Q   What grades did you earn in the summer of
12 2017?
13   A   A B-plus in biomechanics, an A in general
14 pathology, and an A in psychosocial and ethical --
15 that course.
16   Q   Did you request any accommodations in the
17 summer of 2017?
18   A   I had spoken to my professor at that time for
19 biomechanics, since it did have a laboratory
20 component and a practical component, that I had
21 concerns about the amount of time that was given for
22 the examination.
23      And he -- he asked me why, and I referred to
24 him with -- I explained to him my generalized
25 anxiety, how it was applicable to where, for

Page 38

1  example, if I was asked to identify a certain part
2  of anatomy that was in the practical exam, it would
3  take me significantly more time because I was --
4  because of my anxiety, I would think of everything
5  multiple times before answering what it was, and the
6  fact that the examination is -- you have 30 seconds
7  to look at a part and identify.
8      He dismissed it and he recommended that I --
9  that I practice.  He made it known that as a
10  student, that I live also close by, I have the
11  opportunity to still come on campus at night, and
12  can prepare for the examination by coming in at
13  night when the university is open, when the cadaver
14  lab is open, and try to be more familiar and be more
15  assertive of my knowledge.
16     Q   And you earned a B-plus in that course;
17  correct?
18     A   That is correct.
19     Q   Who was your professor in biomechanics?
20     A   I cannot recall his name specifically at this
21  time.
22     Q   It was a male?
23     A   Yes.
24     Q   Do you recall what he looked like?
25     A   All I can recall is he was one of the younger

Page 39

1  professors that I've had.
2      Q   Did you at any time in the summer of 2017
3  reach out to USA's disability office for
4  accommodations?
5      A   No.
6      Q   Did you take courses in the fall of 2017
7  semester?
8      A   Yes, I did.
9      Q   What courses did you take in the fall of
10  2017?
11     A   Clinical neuroscience or neurourology, as I
12  know it, and physical modalities.
13     Q   What grades did you earn in those courses?
14     A   I received a C in neurosciences and a B in
15  modalities.
16     Q   You passed those courses?
17     A   Yes.
18     Q   Did you request any accommodations for your
19  courses in the fall of 2017 semester?
20     A   I, again, made my professor know of my
21  concerns of the practical examinations that was in
22  neurosciences, to where I was advised I need to be
23  more confident in my knowledge, which can only come
24  from repetition and study.
25     Same for physical modalities.  I -- one of

Page 40

1  the marks that were against me in modalities was how
2  long it was -- it took me to perform my -- the
3  skills that they asked for me on the examination.
4      Q   Who was your professor in clinical
5  neurosciences?
6      A   I cannot recall the names of my professors of
7  that semester at the time.
8      Q   So you don't recall the name of your
9  professor in physical modalities either?
10     A   Correct.
11     Q   Was your clinical neurosciences professor
12  male or female?
13     A   Female.
14     Q   Do you recall what she looked like?
15     A   Vaguely.  I remember non-white.
16     Q   And was your professor in physical modalities
17  male or female?
18     A   I thought you -- I thought that question
19  prior was for modalities.
20     Q   So your professor in physical modalities was
21  female and non-white; is that correct?
22     A   That is what I recall.
23     Q   Do you recall what your professor in clinical
24  neurosciences looked like?
25     A   There were several professors that were

Page 41

1  teaching that course.  I cannot recall them well.
2      Q   Which of the several professors that taught
3  clinical neurosciences did you speak to about your
4  concerns of the timed examinations?
5      A   I do not recall her name, but she was a white
6  woman professor who was instructing for -- who was
7  the instructor for the first practical examination.
8      Q   Did you ever speak to USA's disability
9  services and request any accommodation for the fall
10  2017 semester?
11     A   I have spoken to several professors and made
12  them aware of my condition, and they have never
13  referred me to student disability.  And I did not
14  know that was an option.  No.
15     Q   So you did not request any accommodation from
16  the disability services in the fall of 2017?
17     A   No.
18     Q   The enrollment agreement that you filled out
19  when you enrolled in the University of St. Augustine
20  provided you information regarding how to request
21  accommodations; is that correct?
22     MS. DODSON:  Objection, asked and answered.
23  BY MS. BERDECIA:
24     Q   You can answer.
25     A   I'm sorry.  I didn't hear her.

11 (Pages 38 - 41)

Page 42

1   Q   My question --
2       MS. DODSON:  I'm just stating an objection.
3   BY MS. BERDECIA:
4   Q   So my question was:  The enrollment agreement
5   that you filled out when you enrolled in the
6   University of St. Augustine provided you
7   instructions with how to request accommodations; is
8   that correct?
9   A   Repeat the question.
10  Q   The enrollment agreement that you filled out
11  when you enrolled in the University of St. Augustine
12  provided you with instructions with regard to how to
13  request accommodations; is that correct?
14      MS. DODSON:  Objection.
15  BY MS. BERDECIA:
16  Q   You can still answer.
17  A   Even if my lawyer objects?
18  Q   Yes, unless she --
19      MS. DODSON:  Yeah.  I mean, you just need to
20  answer.  I'm just -- I'm putting an objection on
21  the record, but you can go ahead and answer.
22  BY MS. BERDECIA:
23  Q   Unless she specifically instructs you not to
24  answer, you still answer the question.
25  A   Sorry.  I am unfamiliar.

Page 43

1       Repeat the question one more time.
2   Q   The enrollment agreement that you filled out
3   when you enrolled in the University of
4   St. Augustine, which we marked as Defendant's
5   Exhibit 1, instructed you with regard to how to
6   request accommodations; is that correct?
7   A   Yes.
8   Q   Did you take courses during the spring 2018
9   semester?
10  A   Yes.
11  Q   And what courses did you take?
12  A   I took orthopedics, or a musculoskeletal I,
13  and general therapeutic exercise.
14  Q   What grades did you earn in those courses?
15  A   I earned a C-plus and C, respectively.
16  Q   Do you recall who taught musculoskeletal I?
17  A   Dr. Kempfert.
18  Q   And who taught general therapeutic exercise?
19  A   Dr. Wicinski.
20  Q   Did you have, for lack of a better way of
21  putting it, issues with Dr. Kempfert during the
22  spring 2018 semester?
23  A   After this question, I would like to request
24  a break.
25  Q   That's fine.

Page 44

1   A   Repeat the question, please.
2   Q   Did you have some issues with Dr. Kempfert
3   in -- during the spring 2018 semester?
4   A   I would say we had misunderstandings.
5   Q   And what were those misunderstandings?
6   A   There was a particular incident where I had a
7   practical examination and I was being tested
8   alongside at the same time as a partner.  I did not
9   pass that examination.
10      After the examination -- after that practical
11  examination concluded, he provided me the practical
12  retake form.  It was a request form.  He said,
13  "Please be detailed and thorough.
14      I filled out that form, and I followed his
15  instructions.  And he was surprised that my request
16  form was five pages.  I discussed where I went
17  wrong, what I could have done better.  But I also
18  felt that -- I made it known to the university I
19  felt that the testing conditions were not -- they
20  were not fair.
21      I indicated several issues I found with
22  that -- with how that test was particularly taken --
23  particularly executed in regard to me, as in I felt
24  that the professor was leading answers to the
25  partner -- to the partner during examination.  I

Page 45

1   felt that the testing conditions were not sterile
2   for noise.
3       And he -- he initially did not approve of my
4   retake -- of my retake with that form.  In fact, he
5   called it -- I believe the words -- unprofessional,
6   I believe.  He believed that it was unprofessional,
7   to which after several meetings with him and my
8   advise- -- with him and my program director and
9   advisor, Dr. Debra Gray, that we -- I basically had
10  to lay out to him that it wasn't a personal attack.
11  I felt that this was a place of learning.
12      And I had to explain that, because of my
13  culture, we deeply respect educators and the
14  education institution.  I thought I was giving
15  constructive criticism.  And I wasn't trying to
16  excuse and say I should have passed this exam.  I
17  detailed what I thought was a problem.
18      And after a few meetings, we did come to the
19  understanding.  And I remember, after several
20  meetings, Dr. Kempfert -- I -- I made a silly joke
21  with him at the end -- at the end of the term.  And
22  I said, "I really hope" -- well, it was kind of
23  unprofessional.  But I said, "I hope that you hold
24  me accountable, and I do respect you."
25      And he smiled back and he agreed.  And I

Page 46

1 would -- so at the end of the term, all things
2 considered, I harbor no ill will to him. There was
3 a misunderstanding, and I'm glad that we were able
4 to communicate through that.
5     MS. BERDECIA: Let's go off the record.
6     THE VIDEOGRAPHER: Off the record, 10:39.
7     (Brief break.)
8     THE VIDEOGRAPHER: On the record, 10:51.
9 BY MS. BERDECIA:
10   Q   Before we took a break, Mr. Nguyen, we were
11 discussing Dr. Kempfert and the retake that you took
12 in his class.
13     And so I believe you testified that you
14 failed an exam in musculoskeletal; is that correct?
15   A   That is correct.
16   Q   Is it musculoskeletal?
17   A   Musculoskeletal/orthopedics.
18     (Defendant's Exhibit No. 7 was marked for
19 identification.)
20 BY MS. BERDECIA:
21   Q   The court reporter has handed you what we've
22 marked as Defendant's Exhibit 7.
23     Will you take a look at that email and let me
24 know if you recognize it.
25     MS. BERDECIA: And this is -- Kimberly, for

Page 47

1 your purposes, this is Bates USA/Nguyen 991.
2     MS. DODSON: Thank you.
3     THE WITNESS: Yes, I recognize this email.
4 BY MS. BERDECIA:
5   Q   And this is an email that you sent to
6 Margaret Wicinski. Who is Dr. Wicinski?
7   A   So Dr. Wicinski is my instructor for general
8 therapeutic exercise.
9   Q   And in this email you thank her for meeting
10 with you. And then you state, "I am absolutely
11 mortified that you were involved in this private
12 matter between Mr. Kempfert and myself."
13     What private matter are you referring to?
14   A   So in the beginning, after I failed that
15 examination, I did the retake form that was provided
16 to me by Dr. Kempfert. And after he did not approve
17 of my retake, I scheduled a meeting with him and,
18 unexpectedly, she was present in that meeting. I
19 did not know that she would be there. So that is
20 what I am referring to.
21   Q   So based on your email and your testimony, on
22 April 11th, 2018, you met with Dr. Kempfert and
23 Dr. Wicinski to discuss your retake of your
24 musculoskeletal exam; is that correct?
25   A   That is correct.

Page 48

1   Q   What occurred in that meeting?
2   A   It was -- it was mostly a discussion of what
3 happened during the retake. Dr. Kempfert made it
4 clear as to why he felt my retake form -- what I
5 submitted in that form was inappropriate.
6     For most of that meeting, if I recall
7 correctly, I did not say very much. I was still in
8 shock that there was another party present. I did
9 not know that she would be there. I was hoping to
10 keep the communication professional and only involve
11 those that are relevant to that situation, namely
12 myself and Dr. Kempfert.
13   Q   What did Dr. Kempfert say in that meeting?
14   A   He believed that I was not holding myself
15 accountable, and he felt that the letter was a
16 personal attack against him.
17   Q   What exam were you having to retake?
18   A   It was a practical examination for several
19 skills. One of them was -- one portion of it was
20 assessing musculoskeletal deficiencies. Another
21 part of it was a question of special skills or --
22 when I say "special skills," it is the treatment
23 procedures we would do for any randomly assigned
24 condition that the professor would ask. And the
25 third was a labeling component of anatomical

Page 49

1 structure chosen by the professor. So the professor
2 would ask, Okay, I am asking for this artery. Could
3 you palpate where this item would be.
4   Q   Was this the final exam?
5   A   No. It was a midterm.
6   Q   Did you pass the retake?
7   A   I failed the first retake because of time.
8 Dr. Wicinski was the examiner, and she marked I did
9 everything well, but I ran out of time to fully
10 complete the third part of my examination to where
11 it was considered a fail.
12     I met with her afterwards and I asked for
13 advice. I mentioned my generalized anxiety and my
14 ADHD. And she gave me the same advice that many
15 professors have given me throughout my tenure, as
16 in, "You need to -- you need to practice more. By
17 practicing more, you will be more assertive with the
18 material."
19     And I made it known with her that I lived
20 very close to campus, approximately 45 minutes away.
21 I was on campus consistently outside of class to
22 meet with classmates. I followed her -- I followed
23 her advice, even before that test, what was commonly
24 given to students, as in have a third person grader,
25 practice with a partner, practice while being

13 (Pages 46 - 49)

Page 50

1 recorded, practice under a time restraint. I
2 have -- and I made it known to her that -- as she
3 was explaining these practice skills, I told her, "I
4 have." And I even offered to give proof.
5      And she said, "Well, okay."
6      And there was a third exam- -- there was a
7 second retake that was scheduled shortly later. I
8 didn't reach out to them. They -- usually the
9 university reaches out to me. And I took that
10 second retake. I passed it and ended up passing
11 that course.
12   Q  So you failed the first retake of the exam?
13   A  Correct.
14   Q  I'll hand you what we'll mark as Defendant's
15 Exhibit 8.
16      (Defendant's Exhibit No. 8 was marked for
17   identification.)
18 BY MS. BERDECIA:
19   Q  This is an April 14th email with an
20 attachment that's USA/Nguyen 994 through 995.
21      Do you recognize this?
22   A  Yes, I do.
23   Q  And what is it?
24   A  So the initial email for the first page of
25 this document I was informing both Dr. Kempfert and

Page 51

1 Dr. Wicinski that I am submitting a remediation plan
2 for my -- for my second retake. I was not provided
3 a form. Usually they provide it to me.
4      So I said, "If you don't mind, I would like
5 to include -- I would like to use the form for the
6 first time as a template, but with revised
7 information as it pertains to the second retake."
8   Q  And this email and then the retake form
9 mentioned ortho. Are you referring to the
10 musculoskeletal I/orthopedics course?
11   A  Yes.
12   Q  And on this remediation plan, you identify
13 your areas of weakness and challenge to be time
14 management; is that correct?
15   A  Yes.
16   Q  And you were approved to retake the exam in
17 musculoskeletal/orthopedics a second time; is that
18 correct?
19   A  After submitting this form with the approval
20 of Dr. Debra Gray, Dr. David Kempfert, yes.
21   Q  What is the process for retaking an exam the
22 first time?
23   A  Immediately after failing an examination,
24 before you even leave class, the professors would
25 provide a form for a -- for a retake. And after it

Page 52

1 is submitted, it is usually approved at the end of
2 that day. Afterwards the professor would email you
3 back and they will tell you of when the next retake
4 will take place. They do the scheduling.
5   Q  And the first retake, is that -- approval for
6 that retaking of the exam the initial time, is that
7 approved by the professor?
8   A  Yes.
9   Q  What is the process for receiving approval
10 for a second retake?
11   A  The procedure is the same, as in after
12 failing the first -- after failing a retake
13 practical examination, they would again provide you
14 a form to fill out, remediation plan. They would
15 approve typically within one or two days. And they
16 would reach back with a schedule for when the next
17 retake would take place.
18   Q  And approval of the second retake, is that
19 done by the professor or someone else?
20   A  It is done by the professor.
21      (Defendant's Exhibit No. 9 was marked for
22   identification.)
23 BY MS. BERDECIA:
24   Q  The court reporter is handing you what we'll
25 mark as Defendant's Exhibit 9, which is an

Page 53

1 April 18th, 2018, email, USA/Nguyen 990.
2      Do you recognize this email?
3   A  Yes, I do.
4   Q  In this email you represent -- you reference
5 ortho LE. Is that musculoskeletal/orthopedics?
6   A  Yes, it is. Lower extremity practical exam,
7 yes.
8   Q  And that's the exam that you were retaking
9 the second time; is that correct?
10   A  Correct.
11   Q  You state in here that you submitted the
12 information to Sue Nordland. Who is Sue Nordland?
13   A  I do not recall.
14   Q  And in response, Dr. Kempfert states, "We
15 will now wait for the ARPC process to unfold."
16      What is the ARPC?
17   A  I do not know.
18   Q  Do you recall whether a second retake has to
19 be approved by the academic review committee?
20   A  I was unaware of it.
21   Q  You were unaware that the approval was done
22 by someone other than Margaret Wicinski and Dave
23 Kempfert, or you just don't recall today?
24   A  I don't recall today.
25   Q  Regardless, did you take this exam -- retake

14 (Pages 50 - 53)

Page 54

1 this exam a second time?
2   A  Yes.
3   Q  And by that, I mean, did you have three
4 attempts to pass this exam?
5   A  Yes.
6   Q  And did you pass the exam on the third
7 attempt?
8   A  Yes, I did.
9   Q  So the retake that you were requesting in
10 Defendant's Exhibit 9 was approved; is that correct?
11   A  Yes.
12   Q  Did you have to retake any other exams during
13 the spring 2018 semester?
14   A  I think I had to retake one in therapeutic
15 exercise, but I cannot recall exactly.
16   Q  And that was taught by Margaret Wicinski?
17   A  Correct.
18   Q  I'm going to hand you what we'll mark as
19 Defendant's Exhibit 10.
20      (Defendant's Exhibit No. 10 was marked for
21   identification.)
22 BY MS. BERDECIA:
23   Q  This is an April 16th, 2018, email string
24 that's USA/Nguyen 1061 through 1064.
25      Take a minute and let me know when you're

Page 55

1 ready to answer questions.
2   A  (Reviewing document.)
3      Can you repeat the question?
4   Q  Just let me know when you're ready to answer
5 questions about the email exchange.
6      Are you ready?
7   A  I'm ready.
8   Q  If you look at page 3, on page 3, the very
9 bottom of the page, Dr. Kempfert references your
10 revised remediation plan and states that he had a
11 question about a statement included in your plan,
12 where you stated, "I also plan to inquire as to the
13 availability of additional test materials from the
14 grader."
15      What did you mean by that statement?
16   A  So given my learning disabilities,
17 generalized anxiety and ADHD, I was going to request
18 that I have the ability to have a sheet of paper,
19 pencil so I can document my process -- my progress
20 as I went through the lower extremity examination.
21 I would bring that up in that meeting, and it was
22 denied.
23   Q  In what meeting did you bring it up?
24   A  The meeting that I would have with my
25 advisor, Dr. Debra Gray, and professor, Dr. David

Page 56

1 Kempfert.
2   Q  Is that the meeting that occurred on
3 April 17th?
4   A  Yes.
5   Q  When, if you recall, did you take your first
6 retake of the musculoskeletal exam?  What was the
7 date?
8   A  I cannot recall at this time.
9   Q  And when you requested the paper and pen,
10 what specifically did you request, and to whom?
11   A  It was a meeting with the three of us, the
12 meeting on April 17th.  I asked the professor -- I
13 asked Dr. Kempfert if that would be available.  But
14 Dr. Gray was in presence of that meeting.
15   Q  Do you recall if the April 17th meeting
16 occurred before or after the first retake of the
17 exam?
18   A  It will be before the second retake.
19   Q  And you passed the second retake; correct?
20   A  Yes.
21   Q  On the first page of the email, Exhibit 10,
22 you say you would like to clear up misconceptions
23 between Dr. Kempfert and yourself.
24      What did you mean by that?
25   A  It was as I stated earlier in this

Page 57

1 deposition.
2   Q  Which was what?
3   A  That my letter -- that my -- what I submitted
4 in that initial retake form, it was not a personal
5 attack.  It was to -- it was not a personal attack
6 against Dr. Kempfert or the university.  It was my
7 concerns for the testing conditions.  I was
8 explaining how I felt that the testing conditions
9 were not consistent between myself and my partner at
10 that time.  I was hoping that this letter with that
11 retake form, that not only would it be approved, but
12 perhaps open a discussion as to them explaining why
13 my assertations were incorrect.
14   Q  You also state in this email that you want to
15 inquire about privacy rights.
16      What is that referencing?
17   A  That is in reference to what I have written
18 in that letter -- in that retake form, to where I
19 felt it was inappropriate for the professor to
20 say -- in front of my classmate, my partner, say
21 within hearing conditions that I have failed the
22 exam -- that I have failed the exam.
23   Q  Was anything else discussed in the meeting
24 with Dr. Gray and Dr. Kempfert on the April 17th?
25   A  That I can recall at this time, I believe

15 (Pages 54 - 57)

Page 58

1 that is it.
2     (Defendant's Exhibit No. 11 was marked for
3  identification.)
4 BY MS. BERDECIA:
5   Q   The court reporter has handed you what we've
6 marked as Defendant's Exhibit 11, which is a April
7 18th, 2018, email exchange, USA/Nguyen 48 through
8 51.
9     Take a look at it and let me know if you
10 recognize it.
11   A   (Reviewing document.)
12     Yes, I do.  I recognize this.
13   Q   And in the email on the first page, you say,
14 "Though the issues throughout this ordeal were
15 resolved yesterday and how I should 'move on,' I
16 hope it is not unprofessional to write a thank you
17 email regarding the time and diligence of everyone
18 regarding the misunderstandings leading up to
19 yesterday and their resolution."
20     The issues you're referencing, is that
21 related to what we've discussed about Dr. Kempfert
22 not understanding the purpose behind your criticisms
23 in the first remediation plan that you submitted?
24   A   Yes, pertaining to the miscommunication
25 between Dr. Kempfert and myself.

Page 59

1   Q   And the reference in the third reference,
2 where you reference "Get off my back, Dr. K," is
3 that what you referred to previously in your
4 testimony about asking Dr. Kempfert to stay on your
5 back?
6   A   So that was -- I didn't remember the exact
7 words at the time earlier.  I said at the end of
8 that final meeting with Dr. Kempfert I had a
9 slight -- I had a light-humored moment with him.
10     In his classes, he would often exclaim some
11 students would have difficulty with how he is
12 unbearing during examinations.  So at the end of
13 the -- so at the end of the meeting, as I explained
14 in this email, as we left the room, I wanted to show
15 no ill will.  And I asked him -- in contrast to that
16 gag to stay off my back, I asked him to stay on my
17 back with the assumption that he continues to hold
18 me accountable.
19   Q   And in that email, are you explaining that to
20 the recipients of the email?
21   A   Yes.
22     (Defendant's Exhibit No. 12 was marked for
23  identification.)
24 BY MS. BERDECIA:
25   Q   The court reporter has handed you what we've

Page 60

1 marked as Defendant's Exhibit 12, which is an
2 April 23rd email exchange Bates-labeled
3 USA/Nguyen 1022 through 1023.
4     Take a look and tell me if you recognize it.
5   A   (Reviewing document.)
6     I recognize these emails, and I'm ready to
7 answer questions.
8   Q   It appears, based on this email exchange,
9 that you did have to retake exams in your -- I think
10 it's -- what course -- your general therapeutic
11 exercise course; is that correct?
12   A   Yes.
13   Q   And on the second page, you tell Dr. Wicinski
14 that you hope to do well tomorrow during the
15 practical, but you're apprehensive about it.  And it
16 looks like you had concerns about time management;
17 is that correct?
18   A   I had spoken to Dr. Wicinski before this
19 email, and time management was an issue as it
20 pertains to my learning disabilities.
21   Q   And --
22   A   And when I spoke about time management, it
23 was under the assumption that it was in context of
24 my learning disabilities that I had spoken to her
25 prior about it.

Page 61

1   Q   In this email exchange, you don't reference
2 either anxiety or your ADHD, do you?
3   A   I do not.
4   Q   And, instead, on the second page, you state
5 that you're apprehensive about being able to work
6 within the time restraints; is that correct?
7   A   That is correct.
8   Q   And in response, Dr. Wicinski gives you some
9 suggestions as to how much time you should spend
10 doing specific manipulations, and suggests that you
11 speak to Dr. Kempfert regarding the order of the
12 techniques; is that correct?
13   A   Yes.
14   Q   You don't ask for additional time on the exam
15 in that email, do you?
16   A   I asked for accommodations in the sense of I
17 knew where my weakness was.  And I asked on the
18 second -- let me see.  Where is this?
19     I asked on the second page if it was possible
20 to have my most time-consuming skill -- have that
21 tested last.
22   Q   And her suggestion to you was to speak to
23 Dr. Kempfert about the order he would go in; is that
24 correct?
25   A   That's correct.

16 (Pages 58 - 61)

Page 62

1   Q   And did you pass this exam?
2   A   Yes.
3       (Defendant's Exhibit No. 13 was marked for
4   identification.)
5   BY MS. BERDECIA:
6   Q   The court reporter has handed you what we've
7   marked as Defendant's Exhibit 13.  And this is a
8   May 8th, 2018, email exchange Bates-labeled
9   USA/Nguyen 1052 through 1053.
10      Do you recognize this?
11  A   I do.
12  Q   And in this email exchange, Dr. Wicinski
13  tells you that she's concerned with your written
14  performance on the exam; correct?
15  A   Yes.
16  Q   And she tells you that she believes some
17  foundational knowledge is lacking?
18  A   I passed a course, and my GPA still, to that
19  time, had not dropped below 3.0.  So I was shocked
20  that she would send this email to me.
21      But, yes, she did send an email expressing
22  her concern of, as she quotes, foundational
23  knowledge may be lacking, end quote.
24  Q   And you, in fact, actually tell her that you
25  agree with her assessment; is that correct?

Page 63

1   A   I have always believed that there was always
2   room for improvement.  And, yes, I agreed with her
3   assessment at that time.
4   Q   Did you request any accommodations from USA's
5   disability services for the spring 2018 semester?
6   A   Other than reminding my professors and my
7   program director of my learning disabilities, no.
8   Q   So did you request any accommodations from
9   USA's disability services in the spring 2018
10  semester?
11  A   No.
12  Q   Did you take courses in the summer of 2018?
13  A   Summer 2018?
14      Yes.
15  Q   What courses did you take?
16  A   Child development, neuromuscular I,
17  therapeutic exercise II, and physical therapy
18  practice II.
19  Q   And what grades did you earn in those
20  courses?
21  A   I received an A, a B, a C-plus, and a B-plus,
22  respectively.
23  Q   Did you have to take -- retake any exams in
24  the summer of 2018?
25  A   Not that I can recall.

Page 64

1   Q   And did you make any accommodation requests
2   in the summer of 2018?
3   A   There were no practical examinations at that
4   time.  And no.
5   Q   Therapeutic exercise II didn't have practical
6   examinations?
7   A   We had a project which we had to complete,
8   but there was no skills demonstration practical
9   exams.
10      MS. BERDECIA:  It's 11:30.  This is a good
11  stopping point, I think, for lunch.
12      Let's go off the record.
13      THE VIDEOGRAPHER:  Off the record, 11:28.
14      (Lunch break.)
15      THE VIDEOGRAPHER:  On the record, 12:04.
16  BY MS. BERDECIA:
17  Q   Mr. Nguyen, did we -- we just talked about
18  your courses in summer of 2018.  Did you take
19  courses in the fall of 2018?
20  A   Yes, I did.
21  Q   What courses did you take in the fall?
22  A   I took pharmacology, musculoskeletal II mock
23  clinic, prosthetics, and cardiovascular/pulmonary.
24  Q   And what grades did you receive in those
25  courses?

Page 65

1   A   Respectively in order that I priorly stated,
2   A, F, A, B.
3   Q   So you received an A in pharmacology?
4   A   Correct.
5   Q   An A in prosthetics?
6   A   Correct.
7   Q   A B in cardiovascular and pulmonary?
8   A   Correct.
9   Q   And an F in musculoskeletal mock clinic?
10  A   Correct.
11  Q   If I call the musculoskeletal II mock clinic,
12  will you know what class I'm referring to?
13  A   Repeat the question.
14  Q   If I call musculoskeletal II mock clinic --
15  if I just refer to that course as mock clinic, will
16  you know what course I'm referring to?
17  A   Yes.
18  Q   It's just a mouthful.
19      You mentioned a couple of times Dr. Debra
20  Gray was your advisor.  Is that accurate?
21  A   That is accurate.
22  Q   And was she also the professor in your
23  cardiovascular and pulmonary physical therapy course
24  as well?
25  A   That is correct.

17 (Pages 62 - 65)

Page 66

1   Q   Do you recall missing an exam in
2   cardiovascular/pulmonary because you had the flu?
3   A   Yes, I do.
4   Q   And you were permitted to make up that exam
5   without penalty; correct?
6   A   That is correct.
7       (Defendant's Exhibit No. 14 was marked for
8   identification.)
9   BY MS. BERDECIA:
10  Q   The court reporter has handed you what we've
11  marked as Defendant's Exhibit 14.  This is the fall
12  2018 mock clinic syllabus, Bates No. USA/Nguyen 953
13  to 969.
14      Do you recognize this document as being the
15  musculoskeletal mock clinic syllabus?
16  A   (Reviewing document.)
17      Repeat the question, please.
18  Q   Do you recognize this document as being the
19  syllabus for the mock clinic fall 2018 course that
20  you took?
21  A   Yes, I do.  That is correct.
22  Q   And did you receive a copy of this either at
23  the point the course started or prior to the course
24  starting?
25  A   Yes.

Page 67

1   Q   And mock clinic was taught online by
2   Dr. Wicinski; is that correct?
3   A   As stated in the syllabus, page 1, it was
4   blended.  So there was an online lecture component,
5   and there was also in-class practical examinations.
6   Q   And who was your professor for mock clinic?
7   A   That would be Dr. Wicinski.
8   Q   And did you have a different lab instructor
9   for that course?
10  A   We had several instructors who acted as
11  assistants, and they are detailed on page 1:  Paige
12  Schreiner, Bryan Olson, and Jennifer Baringer.
13  Q   Wasn't Paige Schreiner the lead lab faculty?
14  A   I believe so.  I believe so, yes.
15  Q   You had previously taken a course taught by
16  Dr. Wicinski; correct?
17  A   Yes.
18  Q   And that was therapeutic -- was that
19  therapeutic exercise?
20  A   Therapeutic exercise I and therapeutic
21  exercise II.
22  Q   Both of those were taught by Dr. Wicinski?
23  A   Yes.
24  Q   And you passed both of those courses;
25  correct?

Page 68

1   A   Yes.
2   Q   If you'll turn to page 2 of the syllabus, the
3   first paragraph of that page says that the "course
4   will build upon examination techniques learned in
5   physical therapy skills and practice, therapeutic
6   exercise I, and musculoskeletal I."
7       Is that correct?
8   A   That is correct.
9   Q   So this was a course that required you to use
10  your knowledge from other courses; is that correct?
11  A   It was, to my understanding, all classes do
12  this.  But as stated here in this document, yes.
13  Q   And did this course have a midterm exam?
14  A   Yes, it did.
15  Q   And did you take the midterm?
16  A   Yes, I did.
17  Q   Do you recall if the midterm exam was a
18  practical exam, or was it a written exam?
19  A   It was a blend.  So typical- -- I will stay
20  relevant to the question.  Typically, in every class
21  we would interview a patient.  We would -- we would
22  diagnose, propose a treatment plan, and at the end
23  of each class session before, we would be able to
24  speak with our partner as to what we have missed.
25      The midterm was similar in nature, as in we

Page 69

1   came in to class.  We did a practical -- we did a
2   practical where we would interview a patient,
3   propose a treatment plan, diagnose, but the graded
4   portion was a written exam.
5       So on the day of the midterm, we would do our
6   examination, take those findings, and have a written
7   examination -- do written documentation that is
8   relevant to that examination, and only the
9   documented part is graded.
10      And, unfortunately, before we took the exam,
11  several days before, it was made very clear to us
12  that we were not allowed to receive additional help
13  from anybody else.  Whether it be an old clinical
14  instructor or classmates, we could not receive
15  additional help.
16      It was with that assumption that, after I --
17  on the day of the midterm, I had completed my
18  interview, but I did not inquire with my partner,
19  nor did my partner give me the information that I
20  would need in order to adequately perform a midterm,
21  because I was still under the assumption that I
22  could not receive additional help.  And that help --
23  or the student giving me the information I would
24  have missed, which every other student did, I did
25  not receive that information.

18 (Pages 66 - 69)

Page 70

1   Q   So you were the only student who didn't know
2   that you could receive additional information then?
3   A   Yes.
4   Q   So the midterm was only graded on the written
5   portion?
6   A   Yes.
7   Q   So, therefore, it wouldn't be considered a
8   practical exam; is that correct?
9   A   I believe it is because -- especially in my
10  case.  Since I did not get information from my
11  partner, all the information I could have done in
12  that documentation had to come from practical skill
13  demonstration.
14  Q   But you weren't graded on your performance of
15  the practical demonstration?
16  A   In this case I was, because the only
17  information I was able to provide for that midterm
18  was what I had received -- was the information I
19  received while I was doing the practical skills.
20  Q   There was not a professor standing with you
21  while you were doing the interview, grading you on
22  how well you did the interview; is that correct?
23  A   Though there was no professor looking over me
24  for that, I still believed in following what I
25  believed were the instructions of no additional

Page 71

1   help, which included receiving help -- which
2   included receiving information from my patient or
3   partner from that time.
4   Q   My question was:  You were not graded on that
5   interview while it was occurring; correct?
6   A   I was not graded, no.
7   Q   You were only graded on the written
8   deliverable that you turned in; is that correct?
9   A   Yes.
10  Q   Do you recall what grade you received on the
11  midterm?
12  A   Below 30 percent.
13  Q   And a midterm in this case was worth
14  25 percent of your final grade; correct?
15  A   That is correct.
16  Q   So you failed the midterm?
17  A   Yes.
18  Q   Do you recall when you took your midterm
19  exam?
20  A   I cannot recall an exact date, but it was in
21  the middle of the semester.
22  Q   Would that have been around October?
23  A   I believe so.
24  Q   Did you have discussions with anyone after
25  you failed the midterm about withdrawing from mock

Page 72

1   clinic?
2   A   Repeat the question.
3   Q   Did you have discussions with anyone after
4   failing the midterm of withdrawing from your mock
5   clinic course?
6   A   There were no discussions of withdrawing from
7   the course.
8   Q   It was never suggested to you that it might
9   make sense to withdraw from the course?
10  A   No.
11  Q   If you look at page 6 of Defendant's 14,
12  which is the mock clinic fall 2018 syllabus, the
13  bottom of that page says "Final Assessment Criteria
14  Form" and outlines exactly how your final exam would
15  be graded; is that correct?
16  A   Yes.
17  Q   If you turn to page 7, the first paragraph at
18  the top of the page informs you that if you have to
19  retake the practical examination, the highest grade
20  that you can be awarded is a 75; is that correct?
21  A   That is correct.
22  Q   If you turn to page 8, towards the bottom of
23  that page in the syllabus of the mock clinic fall
24  2018 course, there is a paragraph that says "Special
25  Needs and Consideration."  Do you see that

Page 73

1   paragraph?
2   A   Yes.
3   Q   And that paragraph states, "The University of
4   St. Augustine for Health Sciences is committed to
5   providing students with disabilities equal access to
6   all its programs and services.  To register with
7   disability services and request accommodations for a
8   disability, contact staff at disability@usa.edu.
9   Accommodations are determined on a case-by-case
10  basis by the director of disability services after
11  review of medical documentation."
12      Do you see that?
13  A   I do.
14  Q   So the syllabus provides you with
15  instructions on how to request accommodations;
16  correct?
17  A   With that paragraph on page 8, yes.
18  Q   And did you review the syllabus when you
19  received it?
20  A   Yes, I did.
21  Q   And if you turn to page 15 of the syllabus,
22  it looks like the mock clinic midterm was scheduled
23  for October 27th.  Does that refresh your memory as
24  to when you took your midterm?
25  A   Repeat the question, please.

19 (Pages 70 - 73)

Page 74

1 Q This calendar indicates that the mock clinic
2 midterm was scheduled for October 27th, 2018. Does
3 that refresh your memory as to when you took the
4 midterm?
5 A The 27th of October, 2018, yes.
6 Q Do you recall whether you turned in all of
7 your mock clinic assignments?
8 A Yes.
9 Q And did you turn in all of your mock clinic
10 assignments?
11 A I believe there was one time that I did not
12 submit it in time, but I may be confused on another
13 class.
14 Q Do you recall which assignment that might
15 have been?
16 A Not at this time.
17 Q And the mock clinic course had a final exam;
18 correct?
19 A That is correct.
20 Q Did you suffer from a -- mental health issues
21 towards the end of the fall 2018 semester?
22 A Yes.
23 Q And what mental health issues did you suffer
24 from?
25 A I had another panic attack similar to the one

Page 75

1 I had on September 11th of 2016.
2 Q And when did that panic attack occur?
3 A The best I can recall was that it was early
4 December of 2018.
5 Q At the time that you suffered from the panic
6 attack in the fall of 2018, were you already on
7 medication for your anxiety?
8 A Yes.
9 Q And what medication were you taking prior to
10 the mental health issues -- or concerns in
11 December 2018?
12 A At the beginning of the term, I was taking --
13 I was taking a -- I forget which medication it was
14 for my generalized anxiety. I was taking medication
15 for my ADHD.
16 And as the term progressed, I was working
17 with my health care provider, Dr. Jennifer Davis,
18 that -- and by the time early December -- my initial
19 dose of my antianxiety medication was around 20
20 milligrams. And as the course -- as the term
21 progressed, my psychiatrist had increased my
22 medication to 60 milligrams, triple what I initially
23 started with. So before that mental health crises,
24 I was taking 60 milligrams of my antianxiety
25 medication at the time.

Page 76

1 Q Do you recall if that medication was Prozac?
2 A I believe it is.
3 Q And were you also taking Adderall prior to
4 December 2018?
5 A Yes.
6 Q And those were prescribed for you back in the
7 fall of 2016; is that correct?
8 A I believe so.
9 Q Did you contact Dr. Wicinski regarding your
10 mental health issues that you were having in the
11 fall of 2018?
12 A Yes, I did.
13 Q And when did you contact her?
14 A I contacted her immediately after I was able
15 to get to grips with -- after I suffered from those
16 symptoms and I finally had time to finally recollect
17 myself, I notified her immediately.
18 (Defendant's Exhibit No. 15 was marked for
19 identification.)
20 BY MS. BERDECIA:
21 Q Take a look at what we've marked as
22 Defendant's Exhibit 15. It's a November 30th, 2018,
23 email exchange between you and Dr. Wicinski,
24 Bates-numbered USA/Nguyen 987 to -- I believe it's
25 989.

Page 77

1 A What was your question?
2 Q Are you ready to answer questions?
3 A Yes.
4 Q It appears that you were following up with a
5 conversation that you had already had with
6 Dr. Wicinski earlier that day. Do you recall what
7 that conversation was?
8 A So I called her on the phone. That was my
9 first reaction. I was -- I was still coming to
10 grips with the panic attack. Ideally,
11 professionalism, email. But I wanted her to be
12 aware of what was happening as soon as possible. So
13 I called her, and then I did a follow-up email,
14 because it seemed like she was doing something else
15 at the time when I did the phone call.
16 Q And you thank her for her understanding and
17 follow-up; is that correct?
18 A Yes.
19 Q Do you recall what she said when you spoke to
20 her earlier that day on the phone?
21 A She asked for -- she asked about my safety,
22 and she asked that not only do I reach out --
23 because I told her I reached out to my psychiatrist.
24 She recommended that I see my primary care
25 physician, Dr. Sastre.

20 (Pages 74 - 77)

Page 78

1   Q   And in this email on November 30th, 2018, you
2   are requesting to postpone your exam until after
3   your follow-up appointment with your primary care
4   physician; is that correct?
5   A   That is correct.
6   Q   And your exam was originally scheduled for
7   December 6th at 10:00 a.m.; is that correct?
8   A   I believe so.
9   Q   And this email references a call that was
10  scheduled for the next morning.  Did that call
11  occur?
12  A   I do not recall.
13  Q   Was your exam rescheduled?
14  A   Yes.
15  Q   When was it rescheduled for?
16  A   To the best of my recollection, it was on a
17  Saturday.
18      (Defendant's Exhibit No. 16 was marked for
19  identification.)
20  BY MS. BERDECIA:
21  Q   The court reporter has handed you what we've
22  marked as Defendant's Exhibit 16, which is a
23  December 2nd email exchange Bates-labeled
24  USA/Nguyen 1014 through 1015.
25      Do you recognize this email?

Page 79

1   A   I do.
2   Q   And is this an email exchange you had with
3   Dr. Wicinski regarding your return to class?
4   A   Yes.
5   Q   In the email on the second page, which was a
6   December 1st email from you to Dr. Wicinski, you
7   state that you had similar enthusiasm with regard to
8   returning for tomorrow's class, but "my wife feels
9   that I am not fully recovered."
10      Did your wife tell you why she felt you were
11  not fully recovered?
12  A   If I recall correctly, she felt that it was
13  too soon after my mental health crisis.
14  Q   And on the first page of the email,
15  Dr. Wicinski tells you to be sure to submit an
16  excused absence form and suggests that you meet
17  Monday at 11:00 a.m.
18      Do you see that?
19  A   Yes.
20  Q   And based on the dates of this email, Monday
21  would have been December 3rd, 2018; is that correct?
22  A   There was a calendar on the syllabus.
23      That is correct.
24  Q   Did you meet with Dr. Wicinski on
25  December 3rd?

Page 80

1   A   Yes.
2   Q   And what -- where did you meet with her?
3   A   If I recall correctly, it was her office.
4   Q   What was discussed at that meeting?
5   A   If I recall correctly, she was asking how I
6   was feeling.
7   Q   And what did you say?
8   A   I believe that I said that I was feeling
9   better.
10  Q   Was anything else discussed in that
11  December 3rd meeting?
12  A   I do not recall.
13      (Defendant's Exhibit No. 17 was marked for
14  identification.)
15  BY MS. BERDECIA:
16  Q   You've been handed what we marked as
17  Defendant's Exhibit 17, which is a December 2018
18  email exchange Bates-numbered USA/Nguyen 88 through
19  90.
20      Let me know if you recognize this email
21  exchange.
22  A   I do recognize it.
23  Q   This is an email exchange between you and
24  Dr. Gray; correct?
25  A   That is correct.

Page 81

1   Q   On the second page of the email, you tell
2   Dr. Gray that it was recommended by your health care
3   providers to reschedule your mock practical
4   examination that was originally set for 12/1/2018.
5   A   In this email, I specified that I had
6   psychiatric medication relevant to my learning
7   disabilities and that I was recommended by my health
8   care providers to request a reschedule of the mock
9   practical examination.
10  Q   You don't mention asking for additional time
11  on the examination in this email, do you?
12  A   No, I have not.
13  Q   And you state that you have a follow-up
14  appointment with your psychiatrist and your -- I
15  believe PCP would be primary care physician, on
16  December 6th, 2018; correct?
17  A   That is correct.
18  Q   And did you attend those follow-up
19  appointments?
20  A   Yes.
21  Q   And your absences that you were submitting
22  the request for absence form on the third page of
23  this email, those were approved; correct?
24  A   Yes.
25  Q   And your exam that was scheduled on

21 (Pages 78 - 81)

1 December 6th was moved; is that correct?
2    A   That's correct.
3    Q   If you look at the third page of this email,
4 this attachment, is that your handwriting?
5    A   Yes, it is.
6    Q   And is that your signature?
7    A   Yes, it is.
8    Q   And you made up that missed time; is that
9 correct?
10    A   Yes, I did.
11       (Defendant's Exhibit No. 18 was marked for
12 identification.)
13 BY MS. BERDECIA:
14    Q   The court reporter has handed you what we've
15 marked as Defendant's Exhibit 18, which is a
16 December 6th, 2018, email Bates-labeled
17 USA/Nguyen 1037.
18       Do you recognize this email?
19    A   I recognize this email.
20    Q   And it's an email that you sent to
21 Dr. Wicinski; correct?
22    A   Yes, it is.
23    Q   And you were informing her that on
24 December 6th you had a follow-up with your primary
25 care physician and your psychiatrist; is that

1 correct?
2    A   Yes, it is.
3    Q   You're telling her that your medical health
4 care professionals believed that you were okay to
5 continue with school?
6    A   According to this email, both professionals
7 are stating that I am okay to continue with school,
8 and that my psychiatrist also recommends that I
9 explore the option of time and a half for
10 examination in the future.
11    Q   And you tell Dr. Wicinski that you're going
12 to research USA's requirements and get back to her
13 with a scheduled appointment on 12/10/2018, which
14 would be December 10th, 2018; correct?
15    A   Yes.
16    Q   Who is "her"?
17    A   If I recall correctly, the context of "her"
18 is my psychiatrist, Dr. Jennifer Davis.
19    Q   So you were going to research USA's
20 requirements and get back to your psychiatrist with
21 a scheduled appointment on December 10th; is that
22 correct?
23    A   Yes.
24    Q   Prior to this email on December 6th, 2018,
25 had you spoken to anyone at the University of

1 St. Augustine about time and a half on your exams?
2    A   Not yet.
3    Q   And this is, I believe, asked and answered,
4 but it's on my outline, so I'm going to ask again.
5       Were you given an extension with regard to
6 the date of your final exam in mock clinic?
7    A   No.
8    Q   Your final exam in mock clinic was not
9 extended?
10    A   The amount of -- I believe your question was
11 if I was given additional time to complete the exam.
12    Q   Let me clarify my question.
13    A   Okay.
14    Q   Was your exam date moved?
15    A   My exam date was moved.
16    Q   So you were given a new date to take the exam
17 because of your mental health issues; is that
18 correct?
19    A   Yes.
20       (Defendant's Exhibit No. 19 was marked for
21 identification.)
22 BY MS. BERDECIA:
23    Q   The court reporter has handed you what we've
24 marked as Defendant's Exhibit 19.  And this is a
25 December 7th email string with you and Dr. Wicinski

1 Bates-labeled USA/Nguyen 1047.
2       Do you recall this email exchange?
3    A   I do.
4    Q   And in this email, you were confirming the
5 date, I believe, of your examination in mock clinic
6 II; is that correct?
7    A   Yes.
8    Q   And based on the dates of these emails, since
9 Friday was December 7th and you were confirming
10 Saturday at 12:45 for your mock clinic final, it
11 appears that you took your mock clinic final on
12 December 8th, 2018; is that correct?
13    A   That is correct.
14    Q   What was the structure of the mock clinic
15 final?
16    A   So unlike the midterm, you were graded on --
17 you were graded on two parts.  There was a
18 practical, where you would -- you would examine a
19 patient who would mimic symptoms.  You would -- you
20 would assess, diagnose, and create a plan of
21 treatment.
22       Following that exam, there -- immediately
23 after taking -- well, after taking that practical
24 examination, you are then taken to another room
25 where you would take your findings and do a written

1 plan of care, which was separately graded. But
2 there were two parts that were graded for this
3 examination.
4   Q   What was your score on the physical
5 examination question part of the practical --
6 physical examination practical section of the final
7 exam?
8   A   I do not recall exactly, but I believe I was
9 a few points short. I believe I was -- I scored a
10 76 -- 76 out of the 80 that is required to pass.
11 And so that was the first part.
12       After I took that first part, I had an
13 anxiety attack right there, after I received my
14 grade. While I was suffering through the symptoms
15 of that panic attack, where I had elevated
16 heartbeat, my mind went blank, sense of dread, it
17 felt like September 11th of 2016 all over again, I
18 wanted to speak to my advisor.
19       And after speaking to my advisor, she -- she
20 calmed me down. She was like, "Okay. Well, that
21 was just the first part. You still have the second
22 part of your exam," which I was never scheduled for
23 and I was never approached to finish my exam.
24   Q   When you say you spoke to your advisor, are
25 you referring to Dr. Gray?

1   A   Dr. Debra Gray.
2   Q   Did you tell your instructor after you
3 finished the practical part that you believed you
4 were having a panic attack?
5   A   Yes, I did.
6   Q   And what was your instructor's response?
7   A   She agreed, and I immediately saw Dr. Debra
8 Gray.
9   Q   And who was your instructor during that time
10 that was -- you were speaking to?
11   A   Dr. Margaret Wicinski.
12   Q   Dr. Margaret Wicinski was the one who
13 administered the practical?
14   A   I do not recall if she was actually the one
15 who gave the practical. I know that she was in the
16 room. She was pos- -- I knew she was the grader.
17 Yes, I believe she was the one who gave me the --
18 she was the one who did my examination.
19   Q   And you told Dr. Wicinski at the time that
20 you had a panic attack?
21   A   Yes.
22   Q   And what did you say when you spoke to
23 Dr. Gray?
24   A   If I recall correctly, I was explaining to
25 her my physiological symptoms, and I was explaining

1 to her why I felt -- how -- what I thought was the
2 source of my sense of dread, that I -- that I would
3 fail the second part of the exam.
4   Q   Didn't you specifically tell them that you --
5 tell your instructors that you were not going to
6 write the plan of care?
7   A   I do not recall that.
8   Q   Didn't you specifically state that you were
9 choosing not to write the plan of care?
10   A   No, I did not.
11   Q   So if your instructor recalls you stating
12 that you were choosing not to write the plan of
13 care, you don't recall that conversation occurring
14 at all?
15   A   I was having a panic attack at the time, so I
16 don't think I would be able to recall it even if I
17 wanted to.
18   Q   So it's possible that you did tell your
19 instructors that you were choosing not to write the
20 plan of care, then?
21       MS. DODSON:  Objection.
22       THE WITNESS:  Repeat the question.
23 BY MS. BERDECIA:
24   Q   It's possible that you did tell your
25 instructors that you were choosing not to write the

1 plan of care?
2       MS. DODSON:  Objection. He said he was
3   having a panic attack and he can't recall.
4 BY MS. BERDECIA:
5   Q   Right. So it's possible that that did occur;
6 correct?
7       MS. DODSON:  Objection.
8       THE WITNESS:  I still answer; correct?
9 BY MS. BERDECIA:
10   Q   Yes, you still answer.
11       MS. DODSON:  I mean, sitting here today, what
12   information and knowledge do you know?
13       THE WITNESS:  I strongly believe that I did
14   not tell them I would not complete the -- I would
15   not do that --
16 BY MS. BERDECIA:
17   Q   But if you --
18   A   -- because I wanted to pass the exam.
19   Q   But if you were having a panic attack and
20 can't necessarily recall, then it's possible that
21 you stated that you would not write the plan of
22 care; correct?
23       MS. DODSON:  Objection, calls for
24   hypothetical.
25       Objection, he's already asked and answered.

23 (Pages 86 - 89)

Page 90

1  Objection --
2  MS. BERDECIA:  And speak- --
3  MS. DODSON:  -- he says that he does not
4  recall.  He was having a panic attack and was not
5  capable of --
6  MS. BERDECIA:  Kimberly, in Florida speaking
7  objections are improper.  You can object to the
8  form, but speaking objections are improper.
9  MS. DODSON:  Okay.  Three objections.
10  THE WITNESS:  Repeat the question, please.
11  BY MS. BERDECIA:
12  Q  If you were having a panic attack and
13  wouldn't necessarily recall everything because of
14  that, isn't it possible that you told your
15  instructors that you were not going to write the
16  plan of care?
17  MS. DODSON:  Objection.
18  THE WITNESS:  I find it very unlikely, given
19  that I wanted to pass the exam.  But likely.
20  BY MS. BERDECIA:
21  Q  You failed the final in mock clinic; correct?
22  A  Since I was unable to complete my final
23  examination, the plan of care portion of the exam,
24  yes.
25  Q  Because you scored under 30 percent on your

Page 91

1  midterm, do you recall what numeric grade you needed
2  to get to pass mock clinic?
3  A  For the final examination, I believe I needed
4  to at least get an 80 percent.
5  Q  So you had to get a numeric grade of
6  80 percent to pass the course; correct?
7  A  To my knowledge, yes.
8  Q  You had a follow-up appointment with your
9  psychiatrist on December 10th, 2018?
10  A  I do not recall.
11  Q  Do you recall telling your doctor in that
12  appointment, your psychiatrist in that appointment,
13  that you planned to talk to the disability office to
14  see what accommodations could be made?
15  A  I believe if I did have an appointment on the
16  10th, as you have stated, I would have mentioned
17  that to my psychiatrist.
18  Q  And at some point, did you reach out to USA's
19  disability service?
20  A  Yes.
21  Q  And when was the first time you contacted
22  them?
23  A  I believe the first time I was in contact
24  with them was sometime in the week of December 9th
25  and the 12th.  As in, at that time I was looking for

Page 92

1  student disability, I went to the administration
2  building.  There were two buildings for the
3  university.  There was an administration building,
4  where most non -- actually, faculty is there, but
5  they also have office administration.  I figured
6  they would know where it would be.  They did not
7  know where student disability was.  So they
8  recommended that I check the main campus, top floor,
9  where financial services and other miscellaneous
10  services would be.
11  I went up there.  I asked someone who was
12  working up there about student disability.  They
13  went back to their desk to check.  They came back to
14  me and they gave me a card for Ryan Davis, who is
15  the disability officer.
16  And I found it peculiar that he was -- this
17  was the main campus of University of St. Augustine
18  and he wasn't on campus.  I had to reach out and
19  call him.  And he would get back to me the next --
20  the next day or two.  And he would state, "Hey, I do
21  it for all three campuses."
22  And he seemed unfamiliar -- what surprised me
23  is he seemed very unfamiliar not only about who I
24  was, but, when he pulled up my file, he was -- he
25  did not -- he did not seem to indicate that he knew

Page 93

1  of my diagnoses, which I had made clear throughout
2  my tenure in USA, which is my ADHD and my GAD.
3  Q  So the first time that you contacted USA's
4  disability services was the week of December 9th?
5  A  Yes.
6  Q  And that was after you failed your mock
7  clinic final exam; correct?
8  A  After I failed that examination, I had
9  reached out to Debra Gray asking how I could appeal
10  my midterm.  And all the while I was waiting for
11  confirmation as to when I would be given a retake
12  opportunity for my mock clinic, and let alone even
13  just finishing the documentation part of my first
14  examination.  So there were several things in motion
15  at that time.
16  Q  So my question was:  When you contacted USA's
17  disability services the week of December 9th, that
18  was after you had failed the mock clinic II exam?
19  A  In conjunction with other preventative
20  measures that I felt was appropriate, yes.
21  Q  Right.  But my question is:  The first time
22  you contacted USA's disability services the week of
23  December 9th was after you failed your final exam in
24  mock clinic?
25  A  My answer was yes.

24 (Pages 90 - 93)

Page 94

1   Q   I'm going to play for you a voicemail that
2   was left for Mr. Davis on December 10th, 2018.
3       Everybody bear with me.
4       (Audio play:)
5       "Hello, Mr. Davis.  My name is Luke Nguyen.
6   I am a student of University of St. Augustine's flex
7   program at the St. Augustine campus.  I need to talk
8   to talk to you about student disability, stuff like
9   that, as it pertains to recently.  So if you can
10  call me back at area code (813) 369-3953.  And if
11  you can help me, great, or point me in the right
12  direction, I would appreciate it.  Thank you very
13  much.  Bye-bye."
14      (Audio stopped.)
15      Could you hear that okay?
16  A   Yes.
17  Q   Was that a voicemail left by you?
18  A   Yes.
19  Q   And is that the first time that you contacted
20  Ryan Davis?
21  A   I do not recall if I called him first or I
22  emailed him first.  But I did both.
23  Q   And did Mr. Davis return your call?
24  A   I believe he did.
25  Q   And did you speak to him on December 10th,

Page 95

1   2018?
2   A   Around the time frame of September {sic} 9th
3   through the 14th, I spoke with him.
4   Q   And when you spoke to him, what was that
5   conversation?
6   A   I spoke to him about reaching out for
7   student -- reaching out for accommodations for
8   student disability.  I explained to him that I told
9   my professors throughout my tenure that I had these
10  learning disabilities and have asked for -- I've
11  asked for help, and it always came down to they felt
12  that I was unprepared, even though I was following
13  their advice, and even offered to give proof that I
14  was following their advice.
15      Excuse me.
16      I was telling him -- I recall telling him the
17  struggles I've had in previous classes and how I am
18  likely going to be taking my retake.  And if I work
19  with him now, would I be able to get accommodations
20  for that practical examination?
21      And he did not give me a definitive answer.
22  Q   What was his response?
23  A   If I recall correctly, it was something along
24  the lines of, I will work on it.  That's the best I
25  can recall.

Page 96

1   Q   Did you have any -- was anything else said or
2   have any other discussions with Mr. Davis -- was
3   anything else said in that conversation that we're
4   talking about -- let's strike that and try that
5   again.
6       Was anything else discussed in the
7   conversation with Mr. Davis that you are referencing
8   right now?
9   A   Repeat the question.
10  Q   The conversation with Mr. Davis that you were
11  just testifying to, was anything else said by either
12  you or him during that conversation?
13  A   I may have mentioned that I had a meeting
14  with the program director, my advisor, Debra Gray,
15  later that week.
16  Q   And what was his response to that?
17  A   I believe his answer was, "Okay."
18  Q   And was there anything else discussed?
19  A   Other than telling him my history and
20  struggle of trying to tell my professors throughout
21  every semester that I have learning disabilities and
22  I've struggled, no.
23  Q   Do you recall leaving a second voicemail with
24  Mr. Davis on December 10th?
25  A   Probably.  I think when I called him I wasn't

Page 97

1   sure if I -- if I contacted the right party.
2       MS. BERDECIA:  I'm going to mark this second
3   voicemail as Defendant's Exhibit 22.
4       Did we mark the first one as 21?
5       THE COURT REPORTER:  No.  And I think we're
6   on 20.
7       MS. BERDECIA:  If we can mark the voicemail
8   that was just played as 21, which is the --
9       THE COURT REPORTER:  I think 20.
10      MS. BERDECIA:  20?
11      THE COURT REPORTER:  I think so.
12      MS. DODSON:  It was 20.
13      MS. BERDECIA:  Okay.  As 20.  Yes, you're
14  right, it's 20.
15      Can we mark the voicemail that was just
16  played as 20.
17      And this voicemail I'm about to play let's
18  mark as Defendant's 21.
19      (Defendant's Exhibit Nos. 20 and 21 were
20  marked for identification.)
21  BY MS. BERDECIA:
22  Q   (Audio played:)
23      "Hello, Mr. Davis.  This is Luke Nguyen.  I
24  talked to you earlier about setting up student
25  disability services.  I have a letter from my

25 (Pages 94 - 97)

Page 98

1 psychiatrist, but, unfortunately, they charge a lot
2 per page for any kind of medical records. The
3 letter states what my diagnoses are. But according
4 to the form, they also ask for supporting
5 documentation. So if you can call me back at
6 ██████████ and let me know specifically what
7 kind of documentation you're looking for other than
8 that letter, I would really appreciate it. Thank
9 you."
10    (Audio stopped.)
11    Is that your voice on that voicemail?
12 A  I believe it is.
13 Q  And do you recall leaving that message for
14 Mr. Davis?
15 A  I do not personally recall, but that does
16 sound like me and what I would try to convey at the
17 time.
18 Q  Do you recall if Mr. Davis ever called you
19 back after -- to give you guidance on what
20 documentation to provide?
21 A  Not until after dismissal, I believe.
22    (Defendant's Exhibit No. 22 was marked for
23    identification.)
24 BY MS. BERDECIA:
25 Q  We'll mark this as Defendant's 22. This is

Page 99

1 an email exchange between you and Mr. Davis dated
2 December 11th, 2018, Bates Nos. USA/Nguyen 1145 to
3 1150.
4    Do you recognize this exchange?
5 A  I do.
6 Q  Does the email that starts on page 2 and
7 moves on to page 3, dated December 11th, 2018, at
8 2:28 p.m. -- is that a summary of the conversation
9 that you had with Mr. Davis?
10 A  (Reviewing documentation.)
11    Repeat the question, please.
12 Q  Does the email that's at the bottom of page 2
13 and moves on to page 3 discuss the information that
14 you talked about with Mr. Davis?
15 A  I believe so.
16 Q  And in response, you also asked Mr. Davis for
17 some disability documentation; is that correct?
18 A  Yes.
19 Q  And in response, Mr. Davis sent you two
20 documents, the first one being the professional
21 documentation information, which is guidance
22 regarding the documentation that you would provide
23 for your disability; is that correct?
24 A  Repeat the question.
25 Q  Mr. Davis provided you with two documents.

Page 100

1 One is a document entitled "Professional
2 Documentation Information"; is that correct?
3 A  I do not recall that, but according to this
4 packet, yes.
5 Q  Do you recall receiving this email?
6 A  I recall receiving what he has personally
7 described to me, but I do not recall the
8 attachments.
9 Q  Is the email address on page 1,
10 l.██████████ -- is that your email address?
11 A  That is my email address.
12 Q  Any reason to believe that you did not
13 receive this email?
14 A  As I have stated, I believe that I have
15 received the email discussing what he has personally
16 said. I do not recall him emailing me attachments
17 of these forms.
18 Q  And his email says, "The two documents are
19 attached for your review"; correct?
20 A  Yes.
21 Q  And the form entitled "Professional
22 Documentation Information" asks for recommendations
23 for accommodations in the educational environment;
24 correct?
25 A  Repeat the question, please.

Page 101

1 Q  The "Professional Documentation Information"
2 form requests that as part of the documentation you
3 include recommendations for accommodations in the
4 educational environment; correct?
5 A  You're referring to the final page of this?
6 Q  The document entitled "Professional
7 Documentation Information," which is Bates No. 1148,
8 the documentation that it's requesting you provide
9 included recommendations for accommodations in the
10 educational requirement -- or environment; correct?
11 A  Yes.
12 Q  And the second document that was attached is
13 the "Reasonable Accommodation Request Form";
14 correct?
15 A  Correct.
16 Q  And the final page of that document asks that
17 you list the accommodations you're requesting for
18 the clinical portion of your program; correct?
19 A  That is correct.
20    (Defendant's Exhibit No. 23 was marked for
21    identification.)
22 BY MS. BERDECIA:
23 Q  The court reporter has handed you what we've
24 marked as Defendant's Exhibit 23. And that is an
25 email exchange between you and Mr. Davis --

26 (Pages 98 - 101)

Page 102

1  A  Yes.
2  Q  -- Bates-labeled KAL 52 through 53.
3     Do you recognize this?
4  A  I do.
5  Q  And this appears to be a follow-up from the
6  voicemail that you left in which you are asking
7  again for the disability documentation.
8     And you state that you could not pass the
9  course -- the mock clinic course without passing the
10 final exam on the first attempt; correct?
11 A  I have incorrectly stated that at the time.
12 Q  What was incorrect about that statement?
13 A  To where, if I did the math correctly, that I
14 would have actually been able to pass even if --
15 with the maximum score that is allotted for the
16 retake, that I still would have possibly been able
17 to pass the course at that time.
18 Q  Didn't you just testify that in order to pass
19 the course you had to receive an 80 percent on the
20 exam?
21 A  It was under my assumption when I made that
22 statement that that was my belief at the time.
23 Q  Is that not currently your belief?
24 A  That is currently not my belief.
25 Q  And what is that not your belief currently?

Page 103

1  A  Because if I remember correctly, as this was
2  going on, I did the calculations and I would have
3  been able -- I would have been able to pass with the
4  penalties for the first retake.
5  Q  So what is the score that, as you sit here
6  today, you believe you needed to receive in order to
7  pass the exam -- or in order to pass -- strike that.
8     As you sit here today, what score do you
9  believe you needed to get on the mock clinic final
10 exam in order to pass the course?
11 A  If I recall correctly, it was a 75.
12 Q  So as you sit here today, you believe that if
13 you received a 75, you could have passed the mock
14 clinic course?
15 A  Yes.  And, also, I would like to state that
16 during the month of December of 2018, that week of
17 the 9th through the 15th, that I had an appointment
18 with Dr. Debra Gray at that time expressing my
19 concerns about the calculation.  I had a meeting
20 with her later that week, and I said, "Okay.  Well,
21 before we cross that bridge, I would like to appeal
22 my midterm because of that incomplete information.
23 It was not -- I did not have all the tools available
24 as afforded by other students."
25     So I wanted to get that appeal processed

Page 104

1  first.  And I knew it wouldn't be an issue if
2  they -- if they accepted and if there was going to
3  be retakes, because I knew there were students who
4  were doing second retakes almost at Christmas week.
5     So I was waiting for that to be done, and
6  then I was also waiting to -- and I was still
7  waiting at the time to -- typically the university
8  or my professor would reach out and say, "This is
9  your retake opportunity."
10    Regardless of if you can pass or not, they
11 always schedule you for this.  And I was waiting
12 even for -- just being able to complete my first
13 practical exam.  I was still waiting on that.  But I
14 was going in order.  And at that time, they still
15 have not processed an appeal for -- they still --
16 no.  They did process the midterm, which they said
17 no.  But they still have not scheduled me to finish
18 my first examination, let alone schedule me for the
19 second.
20 Q  You believe that you should have been allowed
21 to write your plan of care weeks after you took the
22 practical?
23 A  I still had all of my findings from that
24 examination.  And, yes.
25 Q  Did you request from anybody at USA to write

Page 105

1  your plan of care after the fact?
2  A  Yes.
3  Q  Who did you make that request to?
4  A  I made that request to Dr. Margaret Wicinski.
5  And I was still pending any kind of -- again, the
6  university typically --
7  Q  My question was:  Who did you make the
8  request to to write the plan of care to finish your
9  final exam?
10 A  Margaret Wicinski.
11 Q  Anyone else?
12 A  Dr. Debra Gray.
13 Q  When did you ask Dr. Wicinski to write your
14 plan of care after the exam was over?
15 A  I believe I asked for it during -- when I
16 made my appeal for the midterm grade.
17 Q  Did you ask for it in writing, or did you ask
18 for it verbally?
19 A  I believe verbally, after I turned in my
20 official appeal for the midterm, because it -- my
21 request for the plan of care does not immediately
22 relate to the midterm.
23 Q  When you made that verbal request, where were
24 you?
25 A  On campus.

27 (Pages 102 - 105)

Page 106

1   Q   Where on campus?
2   A   I believe in front of the administration
3   building.
4   Q   And where was she?
5   A   Also in front of the administration building.
6   Q   And what was the date that you made that
7   request?
8   A   I do not recall. I do know that I had a
9   meeting with Dr. Debra Gray at that time. And after
10  that meeting, I met upon her in chance in front of
11  the administration building. "Her," as in
12  Dr. Margaret Wicinski.
13  Q   When did you ask Dr. Debra Gray to finish
14  your final exam and write the plan of care after the
15  final exam was done?
16  A   So I had a meeting with her that week, in the
17  9th -- between the 9th and the 15th. I asked her
18  when would I be able to complete my examination.
19  Also, I asked her specifically about -- because at
20  that time, I have already reached out to Ryan Davis.
21  And I said if -- if I worked with him, would I be
22  able to get accommodations for my -- for my exam.
23      And she told me distinctly that even if I was
24  to get accommodations with Ryan Davis, that no
25  accommodations would be made for mock clinic because

Page 107

1   it is inconducive to physical therapy practice. She
2   stated erroneously at the time that later on in my
3   career, should I continue the career, that -- that
4   when I take my licensing boards for physical therapy
5   practice, that no accommodations would be made
6   there. No accommodations would be made in a
7   workplace afterwards when I would be a physical
8   therapist. And she made it very clear at that
9   time -- she kept trying to -- it was odd to me in
10  that meeting. She kept downplaying -- because I
11  talked about my enthusiasm for physical therapy.
12  And she kept talking about how not having a
13  doctorate in physical therapy, it doesn't mean I
14  cannot contribute to physical therapy. And this was
15  in -- it was even before dismissal was really part
16  of the conversation.
17  Q   I'm going to bring you back to my question.
18  My question is: When did you ask Dr. Gray about
19  completing the final exam and writing your plan of
20  care?
21  A   As I priorly stated, it was between -- in
22  that week of December 9th and December 14th.
23  Q   And what did she say in response to that
24  question?
25  A   She said, "Wait until after the" -- she said,

Page 108

1   "Wait until after the midterm appeal has been
2   processed."
3   Q   Did you request -- make a request to anyone
4   at USA to retake the mock II final -- or the mock
5   clinic final?
6   A   That is not --
7       MS. DODSON: Objection.
8       THE WITNESS: That is not standard procedure,
9   for me to reach out to USA for retake
10  opportunities. USA, with my several failures in
11  practical examinations, they have always reached
12  out first.
13  BY MS. BERDECIA:
14  Q   Did you ask anybody to retake the mock clinic
15  final?
16      MS. DODSON: Objection.
17      THE WITNESS: I assumed it was pending. And
18  no.
19  BY MS. BERDECIA:
20  Q   So you did not ask anybody if you could
21  retake the mock clinic final?
22      MS. DODSON: Objection.
23      THE WITNESS: No.
24  BY MS. BERDECIA:
25  Q   Did you ever return the accommodation form to

Page 109

1   the University of St. Augustine?
2   A   I had it filled out ready to go. But
3   after -- even despite Dr. Gray's objection that
4   there would be no accommodations made in the future,
5   I did have it filled out, and I was ready to submit
6   it, should I be admitted back to the university.
7   Q   Did you ever submit the form to the
8   university?
9       MS. DODSON: Objection.
10      THE WITNESS: I was dismissed as a student at
11  the time; did not -- I did not think that I would
12  be able to submit it.
13  BY MS. BERDECIA:
14  Q   So you did not submit the accommodation form
15  to the University of St. Augustine; correct?
16      MS. DODSON: Objection.
17      THE WITNESS: No.
18  (Defendant's Exhibit No. 24 was marked for
19  identification.)
20  BY MS. BERDECIA:
21  Q   The court reporter has handed you what we'll
22  mark as Defendant's Exhibit 24, which is a December
23  11, 2018, email exchange between you and Dr. Debra
24  Gray, Bates-labeled USA/Nguyen 95 through 96.
25      Do you recognize this document?

28 (Pages 106 - 109)

Page 110

1   A   Yes.
2   Q   On December 11th, at the bottom of the page,
3   you tell Dr. Gray that you want to discuss with her
4   your tentative plans after reaching out to USA's
5   disability student services; is that correct?
6   A   That is correct.
7   Q   What were those tentative plans that you
8   wanted to discuss?
9   A   What I wanted to discuss was -- repeat the
10  question.
11  Q   You say in an email to Dr. Gray on
12  December 11th that you want to discuss your
13  tentative plans after reaching out to USA's
14  disability student services.
15      What were those tentative plans that you
16  wanted to discuss?
17  A   My discussions were I wanted to complete
18  my -- my first attempt at the examination.  I wanted
19  to discuss my other recourses of action, such as
20  appealing the midterm so that I would have a greater
21  threshold, if you will, for my grade on the -- with
22  the mock clinic retake examination grade, I would
23  have more threshold to be able to pass the class if
24  I'm able to appeal the midterm grade.  I wanted to
25  discuss that.  I wanted to discuss also speaking

Page 111

1   with Ryan Davis earlier.
2   Q   Anything else?
3   A   I believe that's it.
4   Q   In this email exchange, Dr. Gray states that
5   she's available on December 18th.  And you respond
6   that you look forward to meeting with her.
7       Did you meet with Debra Gray on
8   December 18th?
9   A   Yes.
10  Q   Is this the meeting where you claim to have
11  asked about completing your plan of care?
12  A   Yes.  I was earlier mistaken.  I thought it
13  was in that week between the 9th and the 14th.  This
14  would be that meeting where I have stated prior how
15  no accommodations would be made.
16  Q   So where did the December 18th meeting occur?
17  A   On campus, in her office.
18  Q   Is this the day that you also ran into
19  Dr. Wicinski outside the administrative building?
20  A   Yes.
21  Q   What did you discuss in that December 18th
22  meeting with Dr. Gray?
23  A   I believe I already disclosed that.  I
24  believe I already answered that.
25  Q   You stated that you requested to write the

Page 112

1   plan of care.
2   A   Complete my plan of care.
3   Q   You asked to retake the exam?
4       MS. DODSON:  Objection.
5       THE WITNESS:  I believe I was asking for --
6   to complete my first examination.  I believe also
7   the discussion was pertaining to my conversations
8   of student disability with Ryan Davis, and also
9   discussions of appealing the midterm.
10  BY MS. BERDECIA:
11  Q   And this was the conversation where you
12  alleged that Dr. Gray told you that USA does not
13  provide additional time on practical exams; correct?
14      MS. DODSON:  Objection.
15      THE WITNESS:  Repeat the question.
16  BY MS. BERDECIA:
17  Q   Is this the conversation where you allege
18  Dr. Gray stated that USA does not provide additional
19  time on practical exams?
20      MS. DODSON:  Objection.
21      THE WITNESS:  Yes.
22  BY MS. BERDECIA:
23  Q   Was anything else discussed in that
24  December 18th, 2018, meeting?
25  A   As I have stated earlier, she -- I spoke

Page 113

1   about my enthusiasm for physical therapy as a side
2   conversation.  And she kept downplaying the need of
3   having a doctorate to contribute to physical
4   therapy.  It seemed odd to me that was her choice of
5   subject or how to approach that.
6   Q   And was there anything else that was
7   discussed in this December 18th meeting?
8   A   I believe if -- there may have been
9   discussion of what would happen if I failed -- if I
10  failed this course, because the University of
11  St. Augustine was transitioning into a new
12  curriculum.  I was a member of the cohort that was
13  doing -- we were the last cohort that was under the
14  old curriculum.
15      What was -- what was made aware to me several
16  times during my tenure is that if I was to be held
17  back in any -- in any courses, that I would have to
18  be transitioned into this new curriculum, which
19  probably would require that I retake some classes,
20  since the curriculum has kind of changed.  So I
21  believe I asked the details as to what that kind of
22  transition would be.
23  Q   And was there anything else discussed in this
24  December 18th meeting?
25  A   I do not recall.

29 (Pages 110 - 113)

Page 114

1    (Defendant's Exhibit No. 25 was marked for
2    identification.)
3  BY MS. BERDECIA:
4    Q  The court reporter has handed you what we'll
5  mark as Defendant's Exhibit 25.  It's a
6  December 18th, 2018, email exchange between you and
7  Dr. Wicinski, Bates-labeled USA/Nguyen 1054 to 1055.
8    Do you recognize this email exchange?
9    A  (Reviewing document.)
10   Repeat the question, please.
11   Q  Do you recognize this email exchange?
12   A  Yes, I do.
13   Q  And was this your formal appeal of your
14  midterm grade?
15   A  Yes, it is.
16   Q  On the second page, the last paragraph, you
17  say, "While I do thank Dr. Wicinski for her
18  understanding and diligence in helping me resolve my
19  issues this term I've had regarding my mental health
20  with this term, I feel that this miscommunication of
21  expectations and procedure show that my current
22  midterm grade is not reflective of both my
23  comprehension and execution of the course
24  requirements."
25   Do you see that?

Page 115

1    A  I do.
2    Q  In the first paragraph, you reference an
3  email sent on December 13th, 2018.
4    (Defendant's Exhibit No. 26 was marked for
5    identification.)
6  BY MS. BERDECIA:
7    Q  The court reporter is handing you what we'll
8  mark as Defendant's Exhibit 26, which is an email
9  exchange; the first email being December 15th, 2018,
10  Bates-labeled USA/Nguyen 1011 through 1012.
11   Is the second email on Exhibit 26, which is
12  dated December 13th, 2018, to Dr. Wicinski and
13  Dr. Schreiner, where you say "I'm reaching out to
14  you both today" -- is this the December 13th email
15  that you're referencing in Defendant's Exhibit 25?
16   A  I believe it is.
17   Q  In both of these, Exhibit 25 and Exhibit 26,
18  you discuss that the reason that you did poorly on
19  the midterm was your misunderstanding of the
20  instructions; is that correct?
21   A  Repeat the question, please.
22   Q  In both Defendant's Exhibit 25 and 26, when
23  discussing your appeal, you reference the fact that
24  you didn't understand the instructions as being the
25  reason that you did poorly on the exam; is that

Page 116

1  correct?
2    A  That is not -- that is not correct.  I
3  misinterpreted the -- I misinterpreted the testing
4  procedures, as stated in here where I -- let's see.
5    "However, prior instruction of our class that
6  we are prohibited to receive aid in the completion
7  of our plan of care (further supplemented with
8  signed waivers of acknowledgement" --
9    THE COURT REPORTER:  I'm sorry.
10   MS. DODSON:  Slow down.  Slow down, Luke.
11  The court reporter can't take it down.
12   THE WITNESS:  "However, prior instruction of
13  our class that we are prohibited to receive aid
14  in the completion of our plan of care (further
15  supplemented with signed waivers of
16  acknowledgement upon assignment submission), I
17  did not inquire my student patient during the
18  midterm for their relevant information not
19  assessed during testing for fear of violating
20  such terms."
21  BY MS. BERDECIA:
22   Q  And you're the only student in your class
23  that made that mistake; is that correct?
24   A  That I know of.
25   Q  You appealed your midterm grade to

Page 117

1  Dr. Wicinski and Dr. Schreiner; correct?
2    A  That is correct.
3    Q  What was the outcome of that appeal?
4    A  If I remember correctly, they felt that I had
5  all of the information required to pass the -- to
6  pass the documentation, and it was denied.
7    (Defendant's Exhibit No. 27 was marked for
8    identification.)
9  BY MS. BERDECIA:
10   Q  The court reporter has handed you what we've
11  marked as Defendant's Exhibit 27.  It's a
12  December 21st, 2018, email Bates-labeled KAL 43.
13   Is this the denial of your grade appeal from
14  Dr. Schreiner and Dr. Wicinski?
15   A  Yes, it is.
16   Q  What is the next step in the grade appeal
17  process after it's denied by the professor?
18   Let me ask you this question:  Did you
19  appeal, then, your midterm grade to the flex DPT
20  program director, Dr. Gray?
21   A  Despite how I feel that I have adequately
22  identified that I could not have had the information
23  to pass this -- to pass that midterm similarly to
24  my -- compared to my colleagues, I then followed the
25  next step of appealing to the program director and

Page 118

1 my advisor, Dr. Debra Gray.
2      (Defendant's Exhibit No. 28 was marked for
3   identification.)
4 BY MS. BERDECIA:
5   Q   The court reporter has handed you what we've
6 marked as Defendant's Exhibit 28, which is a
7 December 26th email exchange Bates-labeled
8 USA/Nguyen 1084 to 1085.
9      Do you recognize this email exchange?
10      MS. DODSON:  Hey, Samantha.
11      MS. BERDECIA:  I just got a text.  I've got a
12 friend that's on the heart transplant waiting
13 list.  He just sent me a 911 message.  Can we
14 just take a quick break?
15      MS. BERDECIA:  Sure.
16      Go ahead and review Defendant's Exhibit 28.
17      We'll go off the record.
18      THE VIDEOGRAPHER:  Off the record, 1:30.
19      (Brief break.)
20      (Videographer Gavin Boyd-Goodrich not
21   present.)
22      THE VIDEOGRAPHER:  Back on the record, 1:44.
23 BY MS. BERDECIA:
24   Q   Mr. Nguyen, before we took a break, we were
25 looking at what's been marked as Defendant's

Page 119

1 Exhibit 28.
2      Do you recognize this email exchange?
3   A   I do.
4   Q   In the first sentence, you say, "On Friday my
5 instructor sent an email response to me, which you
6 received a forwarded copy, to reject my appeal."
7      Do you recall if the email you're referencing
8 is Defendant's Exhibit 27 that we just looked at,
9 which was the denial of your midterm appeal from
10 Dr. Wicinski and Dr. Schreiner?
11   A   So No. 27?  Let's see.  That's 28.  This is
12 25.
13   Q   This one.
14   A   Repeat the question, please.
15   Q   So on the first sentence of your email to
16 Dr. Gray, you say, "On Friday, my instructor sent an
17 email response to me, which you received a forwarded
18 copy, to reject my appeal."
19      Is the email response you're referencing
20 Defendant's Exhibit 27?
21   A   Yes.
22   Q   And then in your appeal to Dr. Gray, you
23 said, "Within the proposal, I took responsibility
24 for my error in clinical judgment, but I feel that
25 there may have been a miscommunication of

Page 120

1 instruction and scope of testing environment.  I
2 feel that because of this miscommunication about the
3 scope of testing environment I would not be able to
4 complete a reasonable plan of care."
5      Was that the basis for your midterm appeal to
6 Dr. Wicinski and Dr. Schreiner?
7   A   Repeat the question, please.
8   Q   The third paragraph of your email to
9 Dr. Gray, you say, "Briefly, within the proposal, I
10 took responsibility for my error in clinical
11 judgment, but I feel that there may have been a
12 miscommunication of instruction and scope of testing
13 environment.  I feel that because of this
14 miscommunication about the scope of testing
15 environment I would not be able to complete a
16 reasonable plan of care."
17      Is that the basis of your midterm appeal that
18 you sent to Dr. Wicinski and Dr. Schreiner?
19   A   Yes.  This pertains to my midterm.
20   Q   Let me show you what we'll mark as
21 Defendant's Exhibit 29.
22      (Defendant's Exhibit No. 29 was marked for
23   identification.)
24 BY MS. BERDECIA:
25   Q   This is a January 11th, 2019, email exchange

Page 121

1 from Dr. Gray to you that's Bates-labeled KAL 56
2 through 58.
3      Let me know if you recognize this email.
4   A   Yes, I do.
5   Q   Is this the denial of your midterm grade
6 appeal from the program director -- flex DPT program
7 director, Dr. Gray?
8   A   Yes.
9   Q   It appears that Dr. Gray believed that you
10 were appealing your final grade for mock clinic.
11 Was that what you were appealing?
12   A   As stated at the bottom of this first page of
13 Exhibit No. 29, which is also stated in the second
14 paragraph of Exhibit No. 28, that "I have enclosed a
15 copy of the initial email sent to the instructors of
16 musculoskeletal II mock clinic sent Tuesday,
17 December 18th, with my proposal of appeal for the
18 midterm. I also requested to be allowed to complete
19 the mock clinic curriculum," which was my -- which
20 was how I stated I wanted to -- not only appeal
21 their appeal, but, again, reiterate that I wanted to
22 complete the mock -- the mock clinic class, which
23 includes the plan of care from my first attempt of
24 the final.
25   Q   So in your December 24th email, where you

31 (Pages 118 - 121)

Page 122

1  were asking to complete the mock clinic curriculum
2  on KAL 57 at the top of the page, first paragraph,
3  that was your way of requesting to write the plan of
4  care for your mock clinic final that had not yet
5  been written; is that correct?
6      A   Repeat the question, please.
7      Q   On the -- on Exhibit 29, the page that is
8  marked KAL 57, which is the second page, bottom of
9  the first paragraph, you say, "I also requested to
10  be allowed to complete the mock clinic curriculum."
11      Do you see that?  Top of the page, last
12  sentence, first paragraph.
13      "I also requested to be allowed to complete
14  the mock clinic curriculum."
15      A   Yes.
16      Q   You are requesting to draft the plan of care
17  for your mock clinic final that you did not do on
18  December 8th, 2018; is that what your request is
19  for?
20      A   With the assumption that after that, should I
21  fail that portion, that I also would get retake
22  opportunities.
23      Q   So on January 11th, 2019, Dr. Gray was
24  denying your request to appeal your midterm?
25      A   Yes.

Page 123

1      Q   And your request to complete the plan of care
2  for your December 8th exam?
3      A   According to this first paragraph, to my
4  understanding, she -- she stood with Wicinski and
5  Scheiner in not overturning my midterm, but did not
6  directly address whether I would be able to complete
7  mock clinic.  She did not completely answer my
8  concern.
9      Q   Dr. Gray tells you that your grade for mock
10  clinic for the final 2018 term will stand, does she
11  not?
12      A   I assumed that it was as is pending taking
13  retakes, which I was still waiting for.
14      Q   On January 11th, 2019, Dr. Gray says, "Your
15  grade for MSK II mock clinic for the fall 2018 term
16  will stand"; correct?
17      A   She states that in this email, yes.
18      Q   And your grade as of January 11th, 2019, for
19  mock clinic was an F?
20      A   Yes.
21      Q   In your grade appeal to Dr. Wicinski and
22  Dr. Schreiner, you never mention your ADHD or
23  anxiety, do you?
24      A   Repeat the question.
25      Q   In your midterm grade appeal to Dr. Wicinski

Page 124

1  and Dr. Schreiner, you never mention your ADHD or
2  anxiety, do you?
3      A   In the same document, I also did -- I also
4  did highlight the fact that Dr. Wicinski
5  noted noticeably improve- -- improvement in my
6  writing immediately after the midterm.
7      Q   My question was:  Did you reference your
8  anxiety or ADHD in your appeal to Dr. Wicinski or
9  Dr. Schreiner?
10      A   I have made it known with Wicinski in the
11  classes I've had before of my disabilities.  And in
12  this email, I did not explicitly state it again --
13      Q   So --
14      A   -- of my disabilities.
15      Q   -- in the email, you did not reference your
16  anxiety or your ADHD; correct?
17      A   That is correct.
18      Q   And that email, which is Defendant's
19  Exhibit 25, that was your appeal; correct?
20      A   Yes.
21      Or the first appeal with Dr. Wicinski and
22  Dr. Schreiner.  And as indicated on -- my appeal to
23  the program director, Debra Gray, was Exhibit 29.
24      Q   And in Exhibit 29, you never reference your
25  anxiety or your ADHD; correct?

Page 125

1      MS. DODSON:  Objection.
2      THE WITNESS:  Repeat the question.
3  BY MS. BERDECIA:
4      Q   In Exhibit 29, which was your appeal to
5  Dr. Gray, you never mention anxiety or ADHD;
6  correct?
7      MS. DODSON:  Objection.
8      THE WITNESS:  No.
9      (Defendant's Exhibit No. 30 was marked for
10  identification.)
11  BY MS. BERDECIA:
12      Q   The court reporter has handed you what we've
13  marked as Defendant's Exhibit 30, which is a
14  December 21st, 2018, letter to you.
15      Do you recognize this?
16      A   I do.
17      Q   And did you receive it?
18      A   Yes, I did.
19      Q   This letter is informing you that you were
20  dismissed from -- I believe the letter says PA --
21  strike that.
22      The document we've marked as Defendant's
23  Exhibit 30 is the letter informing you that you were
24  being dismissed from the flex DPT program; correct?
25      A   Yes.

32 (Pages 122 - 125)

Page 126

1   Q   And the dismissal letter says, "Based on your
2   final grade(s) for the following courses, you have
3   been dismissed:  PHT 5 133 C 001."
4       And that is referring to mock clinic; is that
5   correct?
6   A   Repeat the question.
7   Q   The December 21st, 2018, letter we've marked
8   as Defendant's Exhibit 30 states "Based on your
9   final grade(s) for the following courses, you have
10  been dismissed:  PHT 5 133 C 001."
11      That is referring to mock clinic; correct?
12  A   Yes.
13  Q   And you appealed your dismissal from the flex
14  DPT program; is that correct?
15      MS. DODSON:  Objection.
16      THE WITNESS:  Repeat the question, please.
17  BY MS. BERDECIA:
18  Q   You appealed your dismissal from the flex DPT
19  program, didn't you?
20  A   I was instructed by Dr. Debra Gray, according
21  to Exhibit 28, that I should proceed with the
22  dismissal appeals process to avoid delays.
23  Q   So the answer is, yes, you appealed your
24  dismissal?
25  A   The answer is yes.

Page 127

1       (Defendant's Exhibit No. 31 was marked for
2   identification.)
3   BY MS. BERDECIA:
4   Q   The court reporter has handed you what we've
5   marked as Defendant's Exhibit 31.  It's an email
6   from you to the registrar dated December 31st, 2018,
7   USA/Nguyen 1072.
8       Was this your initial appeal of your
9   dismissal?
10  A   This was my appeal email as specified, that
11  USA asked for me in Exhibit 30.
12  Q   So this was you appealing the dismissal from
13  the flex DPT program; correct?
14  A   Yes.
15      (Defendant's Exhibit No. 32 was marked for
16  identification.)
17  BY MS. BERDECIA:
18  Q   The court reporter has handed you what we've
19  marked as Defendant's Exhibit 32, which is an email
20  dated January 2nd, 2019, Bates-labeled KAL 47
21  through 48.
22      Do you recognize this email?
23  A   Yes, I recognize this email.
24  Q   And what is it?
25  A   So this was -- so this was another email

Page 128

1   follow-up to Exhibit 31, where they asked me to
2   be more specific for my appeal request so I could have
3   an appointment with the academic review committee.
4       And this was the revision where I added
5   additional details, such as being able to --
6   according to paragraph 3, "I could have passed the
7   final practical on the first try..."
8       And at the end of paragraph 1, 2, 3, 4, that
9   "I have been in communication with the student
10  disability services manager, Ryan Davis, to
11  coordinate" -- "to coordinate with my psychiatrist
12  for appropriate testing accommodations while still
13  being" -- "while still being accountable to the
14  university's highest standard."
15  Q   So as of the date of this January 2nd email,
16  you were still having discussions with Mr. Davis
17  about appropriate testing accommodations; correct?
18  A   At the same time, I was still -- I was still
19  drafting my consider -- my appeal -- well, I'm
20  sorry.  Excuse me.
21      I was considering drafting a letter to
22  Dr. Debra Gray asking if I could finish mock clinic,
23  including my original mock clinic -- mock clinic
24  final attempt at the -- at the plan of care.
25  Q   So my question is -- you state in this

Page 129

1   January 2nd email that you have been in
2   communication with Ryan Davis to coordinate with
3   your psychiatrist for appropriate testing
4   accommodations; correct?
5   A   Yes.
6   Q   So as of January 2nd, you were still in the
7   process of coordinating appropriate testing
8   accommodations; correct?
9   A   At that time, everyone was on break,
10  including Dr. Debra Gray, and trying to give the
11  appeal for the midterms.  So, yes, at that time, I
12  was still working on getting the appropriate testing
13  accommodations.
14  Q   We've had -- we've already discussed the
15  conversations you had with Ryan Davis.  Besides the
16  conversations that you've already testified to, did
17  you have any other conversations with Ryan Davis
18  regarding accommodations?
19  A   I believe he reached back -- he attempted to
20  reach back with me after I was formally dismissed by
21  the university some- -- sometime late January, after
22  my dismissal on January 13th, I believe.
23  Q   And did -- when he reached back out to you,
24  was that in writing or verbally by telephone?
25  A   He claims to have reached -- to try to

33 (Pages 126 - 129)

Page 130

1 attempt to reach me through telephone, which I do
2 not recall. But he did reach out with an email,
3 stating that he did try to reach me through
4 voicemail.
5    Q   Your appeal of your dismissal was heard by
6 the academic appeals committee; correct?
7    A   That is correct.
8    Q   Besides this January 2nd email that outlined
9 in more detail your reasons for the appeal, did you
10 submit any additional information for the academic
11 appeals committee to consider?
12   A   I did not know that was an option. So, no.
13   Q   I don't know if it's an option either. I'm
14 just asking if you did. Did you provide any
15 additional information in writing to the academic
16 appeals committee?
17   A   No.
18   Q   The academic appeals committee met regarding
19 your appeal of your dismissal from the flex DPT
20 program on January 10th, 2019; is that correct?
21   A   I believe it was that date.
22   Q   Did you attend that meeting?
23   A   It was a -- even though I live in
24 Jacksonville, the meeting was done over the phone.
25   Q   Do you recall who else was on the phone line?

Page 131

1    A   I recall -- the only professor I recall was
2 Dr. Matthew Daugherty, who -- I recognized him
3 because he was my professor when I had my first
4 mental health crisis in September of 2016.
5    Q   Do you recall anybody else who was attending
6 that telephone conference on January 10th as part of
7 the academic appeals committee?
8    A   I recognized that they were all staff. They
9 introduced themselves as such. But, no.
10   Q   What occurred on that January 10th, 2019,
11 telephone call that was the academic appeals
12 committee meeting?
13   A   So it was made clear to me that they were
14 reviewing my case as it pertains to my failure in
15 musculoskeletal II mock clinic. They asked me
16 several questions as to my living situation. They
17 asked about my study habits. They asked about what
18 I was doing in order to be a more successful
19 student.
20       Most notably, I did tell them that I had been
21 working with mental health, that I feel that I am
22 much more stabilized now. I mentioned to them the
23 fact that my antianxiety medication, I have -- I
24 have told them that since the beginning of the term
25 of fall 2018 until the end, which was December 2018,

Page 132

1 that I have been under the supervision of a
2 psychiatrist and my medication has tripled in that
3 time, and has steadied since then. There was no
4 further adjustments. So I feel that my generalized
5 anxiety was under better care and better management.
6       I mentioned to them that I have previously
7 filed for -- I previously filed for an appeal on the
8 midterm, which was denied. And I was going to
9 appeal for my final, but I was instructed by Debra
10 Gray to -- and I believe -- again, referencing an
11 email on Exhibit 28, I followed her instruction that
12 I should proceed with the dismissal appeals process,
13 which includes this hearing.
14   Q   Do you recall anything else that you said in
15 that hearing?
16   A   So what I told them -- they asked me about
17 the midterm. They asked, "Well, how did you know
18 about" -- "How did you know that you were supposed
19 to get information from your teammates regarding the
20 final" -- "well, regarding the midterm to where you
21 can do full documentation, do adequate
22 documentation?"
23       They asked me, "Well, how did you find out
24 about this after the fact?"
25       And I told them, candidly, that at the end of

Page 133

1 December, us cohorts -- a fellow classmate, good
2 friend of mine at the time, he -- he approached me.
3 He saw me on campus. And he asked me why I was
4 visibly upset.
5       And I told him that I was not doing well in
6 the course, I failed my midterm, and I -- and I was
7 anxious about the final.
8       And he explained to me, he's like, "How" --
9 he was confused. He said, "How did you fail that?
10 It's just documentation. Did you not get your
11 information from your partner?"
12      And I let them know this. I said it was --
13 "I did not approach anyone. I understand -- I
14 understand testing security. But, again, he -- the
15 classmate was approached to me at the end of the
16 term after everyone is taking the midterm. There is
17 no question about testing security. He approached
18 me and he told me about this. So I -- that is why I
19 filed my appeal for the midterm."
20      And I expressly told them that.
21   Q   Who was the good friend you were referring
22 to?
23   A   He was a classmate who was also taking -- who
24 was also taking the course. He was in my cohort.
25   Q   What is his name?

34 (Pages 130 - 133)

Page 134

1   A   ███████████.
2   Q   How do you spell ████████?
3   A   To the best of my ability, I believe it's
4   ████████.
5   Q   Is there anything else that you said to the
6   academic appeals committee?
7   A   They asked me -- at the end, they asked me if
8   I had any questions, and I asked for constructive
9   criticism as to how I could improve my chances of
10  success with the program, to which they gave me
11  generalized answers.  They were like, "Well, keep
12  working hard.  Work with your cohort.  Communicate
13  with your professors," nothing I haven't heard
14  before.
15  Q   Did anybody on the academic appeals committee
16  make any other statements during that meeting?
17  A   Not that I recall.
18  Q   Did Dr. Daugherty make any statements during
19  that meeting?
20  A   He was the one who specifically asked why I
21  knew about the testing procedure for the midterm.
22  Q   Do you -- were you aware when you were
23  speaking to the academic appeals committee that
24  discussing a practical exam was a violation of USA's
25  academic integrity policy?

Page 135

1   A   I was aware of the academic policy.  However,
2   I made it very clear that it was unprompted.  I did
3   not ask for it.  I did not seek for it.  We did not
4   talk about specific answers or questions or how
5   to -- how to unfairly pass the exam, other than what
6   was considered general knowledge.
7   Q   Do you recall admitting to the committee that
8   you were aware that discussing the practical
9   examination was a violation of USA's academic
10  integrity policy?
11  A   I believe Dr. Daugherty mentioned it during
12  that interview.
13  Q   Do you remember admitting that you knew that
14  this was a violation of USA's academic integrity
15  policy?
16      MS. DODSON:  Objection.
17      THE WITNESS:  I honestly do not recall.
18  BY MS. BERDECIA:
19  Q   Did the committee ask any other questions or
20  make any other statements during that meeting?
21  A   I believe the committee was on point of
22  asking everything that was pertaining to why I was
23  there, and that was failing musculoskeletal II mock
24  clinic.
25  Q   Did they ask any other questions?

Page 136

1   A   No.
2   Q   Did they make any other statements?
3   A   Not that I can recall.
4   Q   Did you make any statements regarding
5   accommodations that you had requested?
6   A   I believe during that meeting I told them
7   about my ongoing communication with Ryan Davis.
8   Q   And what did you say about your ongoing
9   communications with Ryan Davis?
10  A   That it is pending and that I am, as I've
11  stated prior -- I said the same thing to them --
12  that I was working in coordinating those two
13  parties, my psychiatrist and Ryan Davis, in order to
14  do -- in order to get the ball rolling on
15  accommodations.
16  Q   Is there anything else that was said or
17  occurred at the January 10th academic appeals
18  committee meeting that was -- happened via telephone
19  that we haven't discussed?
20  A   Not that I can recall.
21      (Defendant's Exhibit No. 33 was marked for
22      identification.)
23  BY MS. BERDECIA:
24  Q   The court reporter handed you what we've
25  marked as Defendant's Exhibit 33.

Page 137

1       Do you recognize this email?
2   A   Yes.
3   Q   The letter on the second page, did you
4   receive a copy of this letter?
5   A   Yes, I did.
6   Q   And this letter is informing you that the
7   academic appeals committee denied your appeal;
8   correct?
9   A   For unclear reasons, I was -- I was denied,
10  yes, by the academic -- academic appeals committee,
11  for vague reasons.
12  Q   The academic appeals committee "denied your
13  appeal based on concerns regarding your academic
14  performance, professional behaviors, and academic
15  integrity"; correct?
16  A   According to them, yes.
17      (Defendant's Exhibit No. 34 was marked for
18      identification.)
19  BY MS. BERDECIA:
20  Q   The court reporter has handed you what we've
21  marked as Defendant's Exhibit 34.
22      The bottom email that's dated January 17th,
23  2019, from Ryan Davis to you, do you recognize this
24  email?
25  A   I do.

35 (Pages 134 - 137)

Page 138

1   Q   Do you recall receiving it?
2   A   I do.
3   Q   And Mr. Davis was telling you how to appeal
4   to the president; correct?
5   A   Yes.
6   Q   Was he -- was this in reference to appealing
7   your dismissal, this email?
8   A   Yes.
9       (Defendant's Exhibit No. 35 was marked for
10      identification.)
11  BY MS. BERDECIA:
12  Q   You've been handed what's been marked as
13  Defendant's Exhibit 35, which is an email exchange
14  dated February 11th, 2019, Bates-labeled
15  USA/Nguyen 1073 to 1074.
16      Do you recognize this?
17  A   I do.
18  Q   On January 25th, the registrar sent you an
19  email on the second page reaching out to you a
20  second time letting you know that USA had not
21  received an appeal letter to the president; is that
22  correct?
23  A   That's correct.
24  Q   And you responded that -- on February 11th;
25  is that correct?

Page 139

1   A   So I need to further clarify.  So after I
2   received the letter of -- the letter of dismissal
3   from the academic appeals committee on January 14th,
4   I reached out to the president's office through
5   phone, where I was in contact with the assistant of
6   the then president, to where she advised to me that
7   I should do it in writing.  And I believe that is --
8   I don't think it was Brooke.  I believe they sent
9   out an email to me to where they did not give me a
10  time frame as to when I needed to write -- when I
11  needed to write and submit my appeal to the
12  president.
13  Q   On January 23rd, if you look at the second
14  page, the assistant registrar, Brooke Nelson, says,
15  "Please provide your appeals letter to the
16  registrar's office as soon as possible"; correct?
17  A   There was no specific date and said "as soon
18  as possible," yes.
19  Q   And then on the 25th, the registrar reaches
20  out to you again and says that they've not received
21  your appeal letter; correct?
22  A   I was still trying to make sense of the
23  charges that the academic appeals committee has made
24  regarding my dismissal.  They did not clearly define
25  why my academic performance was not adequate,

Page 140

1   because my GPA has never dropped below a 3.0.  They
2   did not specify what professional behaviors are or
3   how I infringed upon that, nor is it stated in the
4   student handbook.
5       And academic integrity, I did not believe
6   that was their purview.  I was not given evidence
7   to -- to kind of defend myself against these.  And
8   because of the nature of how this was happening, I
9   did not -- I assumed that they were speaking about
10  perhaps legal terms.
11      So at this time I was reaching out to legal
12  counsel, and I did not know how to respond at that
13  time.  And I did not email them back because of
14  that.
15  Q   So my question was that on the 25th, the
16  registrar reached out to you a second time letting
17  you know that they had not received your appeal
18  letter; correct?
19  A   According to this email, they claim that the
20  appeal must be submitted in writing within five days
21  to the president following the dismissal from --
22  well, following the decision of the academic appeals
23  committee.
24      However, December 23rd and even 25th, I
25  believe neither one of those is within five business

Page 141

1   days.
2   Q   Right.  So they did reach out to you on
3   January 25th; correct?
4       MS. DODSON:  The January 25th and
5       January 23rd, are you looking at 1074?
6       MS. BERDECIA:  Both of them.
7   BY MS. BERDECIA:
8   Q   1073, they reached out on January 25th.  And
9   1074, they reached out on January 23rd.  Correct?
10  A   I did not respond to them because I did not
11  know how to respond.
12  Q   My question is:  Did they reach to you?
13  A   They did reach out to me.
14  Q   You responded on February 11th; correct?
15  A   That was after I received -- I had legal
16  counsel.
17  Q   You responded on February 11th; correct?
18  A   That is correct.
19  Q   And that's 17 days later; is that correct?
20  A   I believe it is.
21  Q   And since you referenced the five business
22  days, the second part of the email on 1073 says, You
23  were given an opportunity to work past that deadline
24  when I reached out to you on the 23rd and 25th;
25  correct?

36 (Pages 138 - 141)

Page 142

1    A   They did not specify a hard deadline.
2    Q   The email response to your February 11th
3    email --
4    A   Yes.
5    Q   -- indicated that you were given the
6    opportunity to work past the five-day deadline when
7    the registrar reached out on the 23rd and 25th; is
8    that correct?
9    A   That is what's stated on the email.
10   Q   And you were informed in that email that your
11   opportunity to appeal the dismissal to Dr. Grossman,
12   who was the president, had passed; correct?
13   A   Yes.
14       (Defendant's Exhibit No. 36 was marked for
15   identification.)
16   BY MS. BERDECIA:
17   Q   The court reporter has handed you what we've
18   marked as Defendant's Exhibit 36, which is the
19   student's handbook that is Bates-labeled KAL 98 to
20   KAL 215.
21       And I'll represent to you that this is the
22   handbook that you -- your counsel produced to my
23   office; okay?
24   A   Okay.
25   Q   Is this the handbook that you believe applied

Page 143

1    to your dismissal?
2    A   Yes.
3    Q   And this is the handbook that, according to
4    the title page, was current as of August 9th, 2018;
5    correct?
6    A   It says August 14th, 2018.
7    Q   Correct.
8    A   Well, the PDF, August 14th.  But down here it
9    says the 9th.  So...
10   Q   So based on the information on the title
11   page, it's your understanding that this was the
12   handbook that was applicable to events that occurred
13   after August of 2018; is that -- would that be
14   accurate?
15   A   Yes.
16   Q   If you will turn to page 20 of the handbook.
17   And that's Bates KAL 118, for your purposes.
18       This is the academic integrity policy; is
19   that correct?
20   A   That's correct.
21   Q   And it defines cheating as "sharing case
22   scenarios from a practical with other students"; is
23   that correct?
24   A   It says it on the page, yes.
25   Q   And on page 21, "Level Three Academic

Page 144

1    Honesty" {sic} includes "giving or receiving
2    information about the content of an exam"; is that
3    correct?
4    A   Repeat the question.
5    Q   Page 21 of the student handbook, under "Level
6    Three Academic Honesty" {sic}, one of the violations
7    is "giving or receiving information about the
8    content of an exam"; is that correct?
9    A   According to this page, yes.
10   Q   If you turn to page 22 -- if you turn to
11   page 22, this outlines USA's ADA policy; correct?
12   A   Yes.
13   Q   And it states that "To request a reasonable
14   accommodation, a student must complete the
15   reasonable accommodation request form available
16   through MyUSA."
17       Do you see that?
18   A   Yes.
19   Q   What is MyUSA?
20   A   MyUSA is an online portal where every student
21   logs in or they have access to student documents,
22   such as this handbook.  It is also the portal that
23   links us to our blackboard, our learning pages.
24   Q   This policy in the -- one, two, three --
25   fourth paragraph also states that "only the approved

Page 145

1    accommodations will be provided"; is that correct?
2    A   It reads, "Faculty are to adhere to the
3    approved accommodations as provided by the student
4    and are encouraged to seek clarification from
5    disability student -- disability services should
6    there be a question about the provision of an
7    accommodation."
8    Q   And this policy provides that accommodations
9    have to be approved through the disability services;
10   correct?
11   A   I believe this document also says that any
12   questions, regardless of student or faculty, should
13   be asked or clarified by disability services.
14   Q   Doesn't this policy also say that
15   accommodations must be approved by disability
16   services?
17   A   Yes.
18   Q   And this policy also says that "Students
19   should submit the completed reasonable accommodation
20   request form and appropriate documentation to
21   disability@usa.edu"; correct?
22   A   It does say that, in addition to saying that
23   "Being penalized for having a disability is
24   unacceptable, as is expecting more than reasonable
25   accommodations."

37 (Pages 142 - 145)

Page 146

1   Q   Right.  So it's saying expecting more than
2  reasonable accommodations is also not acceptable;
3  correct?
4   A   Repeat that question.
5   Q   So that sentence states, "Being penalized for
6  having a disability is unacceptable, as is expecting
7  more than reasonable accommodations."
8   A   That is correct.
9   Q   Turn to page 38 of the student handbook.
10  This is the -- at the bottom of the page, the "Leave
11  of Absence (Including Emergency Leave)" policy, do
12  you see that?
13   A   I do.
14   Q   And you utilized this process in 2016;
15  correct?
16   A   Yes.
17   Q   If you turn to page 73 of the handbook, at
18  the very bottom of the page, it discusses grade
19  changes.  And this policy outlines the grade appeal
20  process; is that correct?
21   A   Yes.
22   Q   And you utilized this process to appeal your
23  midterm grade; correct?
24   A   Yes.
25   Q   If you turn to page 91 of the handbook, the

Page 147

1  third paragraph of this "Academic Evaluation and
2  Right of Appeal," this outlines the appeals process
3  for dismissal; is that correct?
4   A   That is correct.
5   Q   And you utilized this policy in appealing
6  your dismissal?
7   A   To the best of my ability, yes.
8   Q   Under "Midterm Meetings" on page 92, the
9  fourth paragraph, it states that if the student
10  doesn't agree with the program director, the student
11  has the right to appeal to the president, and the
12  appeal must be submitted within five business days;
13  correct?
14   A   That is correct.
15   Q   And if you turn to page 98, as part of the
16  "Examination and Proctoring" policy, this bullet
17  point deals with practical examination for the
18  university; is that correct?
19   A   Which one are you referring to?
20   Q   The very bottom of the page 98.
21   A   Okay.  It's not highlighted on mine.
22   Q   So you see that?
23   A   Yes.
24   Q   If you flip to the next page on 99, this page
25  outlines the retake policy for practical

Page 148

1  examinations; correct?
2   A   Yes.
3   Q   No. 1 on page 99, under "First Retake
4  Practical Examination Process," says, "It is the
5  student's responsibility to contact the faculty
6  instructor within one to two business days of
7  failing the exam to receive instructions on how to
8  write a plan of remediation"; correct?
9   A   That is correct.
10   Q   It also states on No. 4 that "The highest
11  grade awarded for passing the first practical
12  examination -- first retake practical examination
13  will be a 75 percent"; is that correct?
14   A   That is correct.
15   Q   At the time of your dismissal, you believed
16  that you needed to score an 80 percent to pass the
17  final -- to pass the mock clinic course; is that
18  correct?
19   A   Not at that time.  So as I've stated, in
20  December of 2000 -- in 2018, after recalculation, I
21  found that I was allotted a 75 percent in order to
22  pass the course.
23      So as pertaining to your question in January,
24  after my dismissal, did I believe I needed an
25  80 percent in order to pass the course, the answer

Page 149

1  was no.
2   Q   If I represented to you that you received a
3  29 on your midterm, does that sound accurate?
4   A   That sounds accurate.
5   Q   And if you turn to page 102, under
6  "Dismissal" at the very bottom of the page, the
7  dismissal policy states that "A student will be
8  dismissed from the program if an F is received in
9  any course"; correct?
10   A   Yes.
11   Q   And you received an F in mock clinic;
12  correct?
13   A   At the time, I did not know that I had
14  received an F for sure, as in I've already stated
15  before, in a prior email with Debra Gray, that I was
16  just going along with the appeals process.  I did
17  not know that I was already declared failing the
18  class.
19      She said just do the procedure, go on -- just
20  go with it to expedite {verbatim} the process.  As
21  I stated prior, I wanted to exhaust my options for
22  the final, as in I did not even get to complete my
23  first exam, let alone have a retake opportunity,
24  which is given to every student of the University of
25  St. Augustine.

38 (Pages 146 - 149)

Page 150

1   Q   You never requested the retake opportunity;
2   correct?
3   A   That is not --
4       MS. DODSON:  Objection.
5       THE WITNESS:  -- typical procedure.
6   BY MS. BERDECIA:
7   Q   My question is:  You didn't request the
8   retake opportunity; correct?
9   A   I have.  There was -- if you refer back to --
10  I requested it to my professor Margaret Wicinski
11  following that exam, but also even documented here
12  on Exhibit No. 28.  I have asked on the second
13  paragraph for the email with Dr. Gray, "I also
14  requested to be allowed to complete the mock clinic
15  curriculum," which would include a retake.
16  Q   So your testimony is that -- previously was
17  that the request to complete the mock clinic
18  curriculum was related to writing the plan of care.
19  So now your testimony is that that also included a
20  retake?
21      MS. DODSON:  Objection.
22      THE WITNESS:  My testimony is that I want --
23      that I should have been given the opportunity to
24      complete musculo- --- musculoskeletal II mock
25      clinic, which would include being able to

Page 151

1       complete the exam and everything that follows
2       afterwards, including a retake.
3   BY MS. BERDECIA:
4   Q   Did you ever specifically state to anyone at
5   USA, "I would like to retake the mock clinic final"?
6       MS. DODSON:  Objection.
7       THE WITNESS:  I have stated and requested
8       that I be able to complete my first exam;
9       therefore, I did not ask for a retake, because
10      the first exam was not completed.
11  BY MS. BERDECIA:
12  Q   Since January of 2019, have you applied to
13  any other physical therapy programs?
14  A   Given the difficulty it was for me to get
15  into physical therapy to begin with, with a clean
16  record, I did not apply for physical therapy
17  schools, and resolved to do so once I resolved this
18  letter of dismissal.
19  Q   So you have not applied to any other physical
20  therapy programs since January of 2019 until today?
21  A   I have applied to -- I have applied to
22  Harvard to do an unrelated program in finance.
23  Q   Have you applied to any other physical
24  therapy programs since January of 2019?
25  A   No.

Page 152

1   Q   Did you apply to any medical-related programs
2   of higher education since January of 2019?
3   A   Not medical, no.
4   Q   Have you submitted, since January of 2019,
5   any applications for any programs that are
6   comparable to physical therapy?
7   A   No.
8   Q   You testified about applying to a program at
9   Harvard.  What was the program?
10  A   It was a master's in economics and finance.
11  Q   When did you apply for that program?
12  A   Early 2019.
13  Q   Is that an online program?
14  A   It was a hybrid program, as in they did
15  require -- upon acceptance, it would require me
16  going on campus several times during the semester.
17  Q   Did you submit an application online?
18  A   Yes, I did.
19  Q   Why did you choose the master's in economics
20  and finance in Harvard?
21  A   As I have stated prior, I felt with the
22  university's actions to appeal -- to dismiss me from
23  the university, which is on record, that I would not
24  be able to be fairly -- to be fairly judged when
25  applying to any kind of medical program.

Page 153

1   Q   Did your wife suggest that you attend the
2   master's in economic -- economics and finance
3   program at Harvard?
4   A   My wife suggested it because we were hoping
5   that there would be enough disconnect to where any
6   kind of complications -- because every university,
7   they stress the importance of academic integrity,
8   that there would be enough removal to where it would
9   not be an issue.
10  Q   Was your wife also enrolled in that program?
11  A   She is.
12  Q   She's currently enrolled in it?
13  A   Yes.
14  Q   When's her expected graduation?
15  A   Spring of 2023.
16  Q   How long is the program?
17  A   Typically, I believe, three years.
18  Q   Did she take a break from it?
19  A   Yes.
20  Q   Why'd she take a break?
21      MS. DODSON:  Objection.
22      THE WITNESS:  For health reasons.
23  BY MS. BERDECIA:
24  Q   And at the end of that program, had you
25  completed it, would you have a master's degree?

39 (Pages 150 - 153)

Page 154

1   A   If I was truly accepted into the program and
2   completed the program, yes, it would have been a
3   master's degree.
4   Q   Were you accepted into the program?
5   A   It was provisional, as in, in order for -- so
6   this was part of Harvard's -- what's the name of
7   that program?  It was for their -- what's the term?
8   It was for their satellite school.  It was still
9   Harvard.  If I completed that program, it would have
10  been a -- it would have been a master's degree in
11  economics and finance from Harvard.  But it is with
12  their satellite school, to where you submit an
13  application with a general competency test, an
14  essay, provide some history -- provide academic
15  history, and completion of three courses.
16      I completed two of the courses.  And I made
17  it very clear up front when I was applying and I
18  spoke to my advisor -- I said, "I am currently -- I
19  am currently working to absolve -- to get rid of
20  that letter that is on my record for physical
21  therapy that pertains to questionable academic
22  performance, professional behaviors, and academic
23  integrity."
24      She asked me when I was expected to resolve
25  this.

Page 155

1       I said, "I do not know."
2       And that was when -- before I took all the
3   classes -- I started any class.  I took two classes.
4   I received an A and a B.  And I was -- reached out
5   to my advisor at Harvard, where she asked if I had
6   resolved the issue yet with my previous university.
7   And my answer was no.  She would then state that,
8   until that is resolved, I cannot -- I cannot be
9   accepted into their program.  And I stopped with the
10  classes with that knowledge.
11  Q   So what was the provisional -- what were the
12  provisional conditions of your acceptance to that
13  Harvard program?
14  A   So the provisional conditions -- normally is
15  completing three classes with a grade of B or
16  better.  And what was made sensitive to my case was
17  that I have that letter of dismissal, that record,
18  be removed or stricken.
19  Q   Was it put in writing that you had to have
20  what you've been calling "that letter" removed or
21  stricken in order to be accepted into the program?
22  A   It was over the phone.  But written, no.
23  Q   And you had to complete three courses;
24  correct?
25  A   Correct.

Page 156

1   Q   And you only completed two?
2   A   Two was already considered full time for that
3   program.  I did not take the third.
4   Q   So you didn't complete the provisional
5   requirements to get accepted in the program;
6   correct?
7   A   Correct.
8   Q   And when you say "that letter," are you
9   referring to the January 14th, 2019, letter relating
10  to the academic appeals committee?
11  A   Yes, the second page of Exhibit No. 33.
12  Q   And that's Bates No. USA/Nguyen 1112;
13  correct?
14  A   Yes.
15  Q   Did you choose not to complete the third
16  required course?
17  A   That was recommended by the advisor, that I
18  not waste additional money, until I get that
19  resolved, because I had unclear -- I was not able to
20  provide a clear date as to when it would be
21  resolved.
22  Q   What's your adviser's name?
23  A   I do not recall.
24  Q   Do you have any documents indicating what
25  your adviser's name is?

Page 157

1   A   As I was not an official student with
2   Harvard, it was provisional, I did not have a formal
3   Harvard email address -- no.  Actually, I did.
4   However, when I tried to get documentation later, as
5   in last year, with the request for -- the request
6   for discovery, I reached back to Harvard.  And they
7   said because I was not admitted as a full student
8   and I was only provisional, my email was considered
9   temporary.  And I was unable to retrieve my old
10  emails from Harvard.
11  Q   What -- did your advisor explain to you what
12  the problem was with the academic appeals committee
13  January 14th letter?
14  A   They explained the integrity of the
15  institution of Harvard and how they uphold -- how
16  they strongly emphasize and uphold the idea of
17  academic integrity and how my record is not
18  consistent with that.
19  Q   But you were provisionally accepted and they
20  already were aware of that letter; is that correct?
21  A   When I first applied, I told them.  And they
22  asked me, "Will this be" -- they asked me when would
23  this be resolved.  And when I first applied, I
24  believed that it would be soon.
25      Unfortunately, when they reached back out to

40 (Pages 154 - 157)

Page 158

1 me after completion of the first semester, they
2 asked me again.  And I said the date of -- date
3 of resolving this issue with USA, University of
4 St. Augustine, was unclear.
5    Q   Did your advisor tell you that it was the
6 academic integrity language in the January 14th
7 letter or your dismissal from USA that was the
8 problem?
9    A   She did not say academic integrity.  She did
10 say the reasons for my dismissal.
11   Q   But you were never formally rejected by
12 Harvard; is that correct?
13   A   I was highly encouraged not to continue until
14 it was resolved.
15   Q   You were never formally rejected by Harvard;
16 correct?
17   A   No.
18   Q   And you didn't complete the provisional
19 requirements; correct?
20       MS. DODSON:  Objection.
21       THE WITNESS:  No.
22 BY MS. BERDECIA:
23   Q   Did you maintain any documents related to
24 your application, enrollment, work, coursework,
25 anything related to this Harvard economics program?

Page 159

1    A   I believe I have some assignments somewhere,
2 like a written hard copy somewhere.
3    Q   Did you maintain any communications regarding
4 your acceptance to the program?
5    A   Repeat the question.
6    Q   Did you maintain any communications related
7 to your acceptance to the program?
8    A   In what time frame are you asking?
9    Q   Any communications with regard to acceptance
10 into the Harvard program.  Did you maintain any
11 communications related to your acceptance into the
12 Harvard program?
13   A   Not until after I was encouraged not to
14 continue.  After that, there was no further
15 communication.
16   Q   But do you have copies of those
17 communications?
18   A   As I have stated prior, before, I do not have
19 access because I was not formally registered as a
20 student.  I was considered temporary.  I have tried
21 to provide those documents during discovery.
22 However, as I have reached out to Harvard, the IT
23 department told me that they did not keep records --
24 they do not keep emails for students --
25   Q   I understand you don't have --

Page 160

1    A   -- for people that are --
2    Q   -- your Harvard email account.  But my
3 question is -- when you were accepted, you wouldn't
4 have had an email account.  So what did you use to
5 communicate with Harvard --
6    A   Oh.
7    Q   -- in applying and being accepted?
8    A   I have the email for that acceptance, yes.
9    Q   Do you have any written communication
10 regarding what the provisions -- the requirements of
11 your provisional acceptance are?
12   A   No.  That was over the phone.
13   Q   So your documents indicating that you were
14 accepted into the program don't lay out what the
15 provisional requirements are?
16   A   I wasn't formally accepted into the program.
17 As I have stated before, is that it -- the classes
18 were part of the application process for that
19 program.  So I was never formally registered as a
20 student.
21   Q   Did you maintain your application to the
22 program?  Do you still have access to your
23 application to the program?
24   A   I think so.
25       MS. BERDECIA:  Kimberly, to the extent that

Page 161

1 he has any of these documents, those were
2 requested.  So I know that you're new to the
3 case, so just for purposes of follow-up.
4       MS. DODSON:  If he's got them, I'll ask him
5 to give them, and we'll give them to you.
6       MS. BERDECIA:  Thank you.
7       MS. DODSON:  Yeah.  I'm very straightforward.
8 I don't --
9       MS. BERDECIA:  No.  I --
10      MS. DODSON:  If you ask for it, I give it, if
11 I've got it.
12      MS. BERDECIA:  Like I said, I know you're new
13 to the case, so I just kind of wanted to fill you
14 in on where we were.
15      MS. DODSON:  As of yesterday, for the record.
16 BY MS. BERDECIA:
17   Q   Mr. Nguyen, are you currently employed?
18   A   I do part-time online sales.
19   Q   Part-time online sales for what?
20   A   For video game items.  I'm considered an
21 independent seller for a website called G2G.com.
22      MS. DODSON:  Before you ask the next
23 question, does anybody want to take just a
24 five-minute break or a couple-minute break?
25      MS. BERDECIA:  I'm good with that.

41 (Pages 158 - 161)

Page 162

1     THE WITNESS: Okay.
2     THE VIDEOGRAPHER: We'll go off the record,
3  2:56.
4     (Brief break.)
5     THE VIDEOGRAPHER: We're back on the record,
6  3:06.
7  BY MS. BERDECIA:
8     Q  You referenced that you are an independent
9  seller for a website GZG.com; is that correct?
10    A  G2G.
11    Q  G2G. I can't read my own writing.
12       And that -- explain to me what you do
13  specifically for that website.
14    A  So for certain games where you can trade
15  items with other people, G2G is a website that
16  basically takes people who want certain items with
17  people who have items, puts them together to where
18  those two people can discuss how the items -- how to
19  transfer the items for however much money.
20    Q  How much income have you -- would you say you
21  earn a year doing this part-time sales work?
22    A  Approximately 8- or 9,000 a year.
23    Q  And is that reported on your taxes?
24    A  I started with G2G last year, I believe in
25  July. And it has not currently -- it has not been

Page 163

1  on my current tax report yet.
2     Q  So from July of 2021 until today, which is
3  May 19th of 2022, approximately how much income have
4  you earned on the G2G website?
5     A  Approximately the 8- to 9,000. And I would
6  say about approximately 4- or 5,000 was from last
7  year.
8     Q  What did you do for employment from January
9  of 2019 until July of 2021?
10    A  Repeat the time frame, please.
11    Q  What did you do for employment from January
12  of 2019 until July of 2021?
13    A  It was at the time when I was consulting my
14  psychiatrist. My symptoms had worsened to where I
15  was unable to get out of bed many times, and I felt
16  that I was unable to hold steady employment. So
17  other than the G2G, which happened recently -- and
18  it was slow steps since that -- I have not had
19  employment since then.
20    Q  What efforts have you made to find employment
21  since January of 2019?
22    A  I have tried to resume my previous work. I
23  was a personal trainer before I got into physical
24  therapy school. I tried to resume that, but I found
25  myself very traumatized to resume that line of work,

Page 164

1  because of all the connective tissue that I've had
2  with University of St. Augustine, how I would try to
3  tell someone to do a certain exercise, but then be a
4  roller coaster of emotions going over that because
5  of all the enhanced knowledge I have gotten from the
6  University of St. Augustine and how they have done
7  me wrong and prevented me from furthering my
8  education, doing more than my current education
9  level and stifling my overall lifetime income to
10 where I cannot adequately provide for my family as I
11 should be able to.
12    Q  Did you submit any applications for any jobs
13 since January of 2019?
14    A  After my attempt of physical -- after my
15 attempt of being a personal trainer and still to
16 this day working through a lot of my issues with
17 a -- with Dr. Jennifer Davis, but also now another
18 therapist in conjunction, Dr. Harry Williams, I have
19 not sought out additional employment after that.
20    Q  So you've not submitted any applications for
21 any jobs since January of 2019?
22    A  Due to the pandemic and -- due to the
23 pandemic and my wife's fear of my safety, I did not
24 apply for employment in that time frame.
25    Q  And I'm assuming, since you didn't apply for

Page 165

1  any jobs since January of 2019, you haven't had any
2  interviews or job offers either; is that correct?
3     A  No.
4     Q  You said you attempted to resume your
5  personal training. What did you do in making the
6  attempts to resume the personal training? Like,
7  what actions did you take?
8     A  I tried starting small again, as is when I
9  first did personal training, I studied it. And I
10 was very overweight at the time. So I implemented
11 it with myself as a program, and with several close
12 family and friends. I figured I'd start again with
13 that process. I've -- because of my declining
14 mental health, because of my state, I gained a
15 significant amount of weight. I figured I'd try to
16 start again with myself.
17       My wife at this time, she was also concerned
18 about her weight. And I tried working with her, and
19 I shuttered at not even just trying to implement and
20 even just describe the techniques to be done, but
21 also to create workout plans, because, again, with
22 so much overlap of personal training, anatomy and
23 physiology with USA.
24    Q  So besides yourself and your wife, did you
25 have any other personal training clients since

42 (Pages 162 - 165)

1  January of 2018?

2    A  I couldn't hold it together to just deal with

3  myself and my wife, so I did not pursue further with

4  other clients.

5    Q  You have made a claim for disability

6  discrimination in this case.  How were you

7  discriminated on based on your disability?

8    MS. DODSON:  Objection.

9    THE WITNESS:  I feel that ever since my

10  diagnosis in 2016, I made it clear time and time

11  again that I -- that I had these disabilities.

12  And at that time, they were fresh to me.  I

13  didn't even truly understand the diagnosis

14  myself.  But as time went on, telling my

15  professors how hard I was trying.  I was

16  following their advice, but, yet, I continued to

17  struggle.  And no matter how much I told them

18  about my disabilities, they never acknowledged

19  it.

20    I feel that -- I mentioned in the academic

21  review committee meeting, when I was appealing

22  for my final term -- even before that, like I

23  said, I reached out to every professor I had

24  practical exams.  It was -- but I told the

25  academic committee about my conditions, about how

1  I was working with a mental health counselor.

2    And for them to -- for their reason of

3  dismissal, according to Exhibit 33, for them to

4  tell me that, Oh, it's not a disability.  It's --

5  you're a terrible person, that academic

6  performance -- I failed one course, a course

7  that -- at that time there were people retaking

8  that course.  For professional behaviors, was

9  that because of my disability?  I don't know.

10  Because it's not in the student handbook.  What

11  is professional behaviors that is enough for me

12  to be dismissed?  What is -- and then for

13  academic integrity, to be called -- to be told

14  that.

15    And I remember all the panic of where did

16  that come from.  I didn't understand.  And I

17  remember going through the student handbook.

18  I've read everything that you've pointed out.

19  I've read the same things.  And I also saw I have

20  rights that I didn't have.  They didn't tell me

21  what degree of academic integrity.  They didn't

22  give me a professional misconduct hearing that's

23  guaranteed here.  They didn't let me even finish

24  my first exam.  All this time I told them about

25  my disabilities time and time again.

1    MS. BERDECIA:  Why don't we take a break.

2  Let's go off the record.

3    THE VIDEOGRAPHER:  We'll go off the record,

4  3:19.

5    (Brief break.)

6    THE VIDEOGRAPHER:  We're back on the record,

7  3:35.

8  BY MS. BERDECIA:

9    Q  Mr. Nguyen, are you -- you're okay now?

10    A  I am.

11    Q  Ready to move forward?

12    A  Yes.

13    Q  Another claim that you make in this case is

14  that you didn't receive accommodations that you

15  should have received.

16    What accommodations do you believe you should

17  have been given?

18    A  I believe I should have received -- since I

19  have made my learning disabilities known throughout

20  my entire tenure, I feel that a lot of the problems

21  I've had, why I struggled -- and even while I

22  struggled, I was able to maintain my GPA above a 3.

23  But I feel that it was well-known throughout my

24  entire tenure of my learning disabilities, that

25  accommodations could have been made.

1    And when I was -- and I believe that if I was

2  given at least what is normally expected for people

3  with my conditions, additional time, not even the

4  full time and a half, but additional time -- just

5  some consideration, rather than being told that it

6  is inconducive to physical therapy practice, like

7  Debra Gray has said, I feel that I could have been a

8  lot more successful.  And I feel that no matter how

9  many times I have brought up my conditions, they

10  were ignored.

11    And, in fact, relating to the previous

12  question, not only were they ignored, but I was less

13  of a student -- not afforded the same rights as any

14  other student, to where I would have proper due

15  process with the professional misconduct committee.

16  I would be able to complete my first attempt at an

17  exam and follow-up examination.

18    I feel that, again, I was both, one,

19  discriminated against and, two, because of --

20  discriminated against because of my disabilities.

21  And, two, that because I made it so well-known

22  throughout my entire time, that I was actively

23  ignored in that regard.

24    Q  You just mentioned additional time is an

25  accommodation that you believe you should have

43 (Pages 166 - 169)

Page 170

1 received. Any other accommodations that you believe
2 you should have received?
3    A   I believe I should have received
4 accommodations for -- as I've stated before, in one
5 of my prior emails, I requested writing materials so
6 I can track and progress myself. Because what
7 happens is generalized anxiety and ADHD together --
8 is that I would go to an examination. They'd say,
9 "Okay. We're working lower extremity today. This
10 is the particular part that we would like you to
11 work on."
12       But because of my conditions, my thoughts are
13 still already racing to things that are not
14 immediately relevant. And as I go through the steps
15 that is -- that is required, that -- I would get
16 sidetracked in my mind from my ADHD, to where I
17 start again from the beginning.
18       And I just lose time that way, rather than if
19 I can go along with my testing procedure -- I'm not
20 even asking -- I'm asking for a blank sheet of paper
21 to where, as I'm going, I can write did this, did
22 this, did this.
23    Q   So you testified that you believe you should
24 have received additional time and that you should
25 have received writing materials. Are there any

Page 171

1 other accommodations that you believe you should
2 have received while you were a student at USA?
3    A   I believe that I should have received the
4 full rights of every student, disability or not.
5    Q   My question is related to specifically what
6 accommodations you believe you should have received.
7    A   I believe my accommodations are appropriate
8 for people with my -- for people with similar
9 circumstances, similar conditions.
10    Q   And what accommodations are those that
11 you're -- that you believe you should have received?
12    A   For additional time and for just a way for me
13 to document myself while I'm doing practical
14 examinations.
15    Q   Any other accommodations you believe you
16 should have received?
17    A   As it pertains to disability, I believe
18 that's it.
19    Q   You say "as it pertains to disability." Why
20 did you qualify your answer in that way?
21    A   Because, as I've stated before, I feel that I
22 was not afforded -- I was not afforded equal rights
23 and -- equal rights compared to other students of
24 the university.
25    Q   But with regard to accommodating your

Page 172

1 disability, the only accommodations you believe that
2 you should have received were additional time and
3 those writing materials; is that correct?
4    A   I believe they were a start. And that's as
5 far as we got -- I got into conversations with
6 Dr. Jennifer Davis because then the point was moot.
7    Q   So if they were a start, what other
8 accommodations do you believe you should have
9 received?
10    A   Whatever would have been judged appropriate
11 by my psychiatrist, Dr. Jennifer Davis.
12    Q   So as we sit here today, you can't tell me
13 what additional accommodations you believe you
14 should have received, then?
15    A   I am -- I only have a four-year degree in
16 psychology, and I do not have the expertise to
17 ascertain what better methodology or modalities
18 would help augment my success.
19    Q   You also made a claim in this case for breach
20 of contract. Do you believe that the contract that
21 was breached between you and the University of
22 St. Augustine was written or oral?
23    A   I believe it was both.
24    Q   What documents do you believe make up the
25 written portion of your contract with the University

Page 173

1 of St. Augustine?
2    A   The written portion --
3       MS. DODSON: Objection.
4       THE WITNESS: The written portion would be
5 the student handbook and -- would be the student
6 handbook, especially as it pertains to how they
7 proceeded with their choices in dismissing me.
8       For example, I believe that to say academic
9 performance, despite I have only failed one
10 course -- and I reiterate that the course when I
11 was taking it at the time had students in there
12 who were retaking that same class. It is a known
13 class that has a significantly higher failure
14 rate.
15       So for them to say academic performance
16 overall without further qualifications, to imply
17 that my overall academic performance was suspect,
18 despite the fact that my GPA has never dropped
19 below a 3.0...
20       For them to say professional behaviors, it
21 was superfluous. There is nowhere in this
22 written contract that even states the terms
23 "professional behaviors." They are not -- they
24 do not define it. They do not even mention that
25 it exists. But, yet, it is a dismissible

44 (Pages 170 - 173)

Page 174

1  offense, according to this letter.
2      And for academic integrity, for them to
3  say -- for them to make that assertation without
4  following their own written contract of the
5  student handbook, for them not to do -- for them
6  not to label the degree of academic dishonesty,
7  as indicated by page 20 and page --
8  BY MS. BERDECIA:
9  Q  So my question was only:  What written
10  document do you believe makes up the contract?
11      A  I am explaining that it is the handbook, and
12  also describing -- I am also, relevant to your
13  question, as to why they have breached the contract.
14      Q  I just asked what the document is that is the
15  contract.  We'll get into the breach in a minute,
16  but let me get there.
17      So what document do you believe makes up the
18  written contract between you and the University of
19  St. Augustine?
20      MS. DODSON:  Objection.
21      THE WITNESS:  The handbook and several
22  written correspondences that we have referenced
23  earlier with my professors.
24  BY MS. BERDECIA:
25  Q  Which written correspondence with your

Page 175

1  professors do you believe makes up the contract
2  between you and the university?
3  A  I believe that they have -- they have
4  breached the contract in a few instances.
5  Q  I didn't ask the breach.  I asked which
6  documents make up the contract.
7      MS. DODSON:  Objection.
8      THE WITNESS:  Repeat the question, please.
9  BY MS. BERDECIA:
10  Q  What documents do you believe make up the
11  written contract between you and the University of
12  St. Augustine?
13      You've already testified that Exhibit 36, the
14  student handbook.  Are there any other documents
15  that are part of the contract between you and the
16  University of St. Augustine?
17  A  I believe several emails in there do pertain
18  to it because they do reference the student
19  handbook.
20  Q  You also testified that you believe that part
21  of the contract was verbal.
22  A  Yes.
23  Q  What do you believe is the verbal part of the
24  contract?
25      MS. DODSON:  Objection.

Page 176

1      THE WITNESS:  I believe that verbal, that I
2  was told that I would be -- I was given vague
3  deadlines.  Well, actually, I was not given even
4  a deadline.  I was told as soon as possible.
5      For example, in the letter from -- I guess it
6  would be considered written, as I've stated with
7  emails.  But, also, actually, verbal was when I
8  have talk- -- when I have spoke to Dr. Gray about
9  the appeals process.  We actually spoke about
10  that, and she told me what to expect with the
11  academic review committee, that it would be based
12  on the fact that -- it would be based on that I
13  failed the exam.  But, yet, they decided to
14  include these other criterias that do not apply
15  to failing that class.
16  BY MS. BERDECIA:
17  Q  In what ways did USA breach its contract with
18  you?
19      MS. DODSON:  Objection.
20      THE WITNESS:  I am not a lawyer, and I will
21  try to answer the best I can, given the student
22  handbook, which was the written contract with me
23  and the University of St. Augustine.
24      So they breached the contract when the
25  university declared that I was dismissed based on

Page 177

1  concerns regarding academic performance,
2  professional behaviors, and academic integrity.
3      They have breached the contract because, for
4  academic performance, they did not -- they did
5  not adequately qualify what that is.
6      And professional behaviors, again, in the
7  written contract, the words "professional
8  behaviors" cannot be found together, like that as
9  they have stated in that dismissal letter.
10  Professional behaviors is not in this student
11  handbook, to where they decided, "Okay.  We will
12  use these two words, which we have never
13  mentioned before, and that is a dismissible
14  offense."
15      And then they say academic integrity, to
16  where, as I have tried to state prior, that the
17  academic review -- the academic appeals
18  committee, they made the assertations of academic
19  integrity.  But, yet, they do not specify what
20  was the infringement.  They did not give me the
21  ability to defend myself.  They did not even
22  provide me with the evidence of why they have
23  made that claim.  They did not specify, according
24  to their written contract, level one, two, or
25  three.  And even with -- even if level three

45 (Pages 174 - 177)

Page 178

1 applies, according to them, "Students committing
2 level three academic dishonesty offenses will be
3 referred to the professional misconduct
4 committee. The professional misconduct committee
5 will make appropriate recommendations to the
6 designated program director."
7    That did not occur. And as I have stated
8 before, that they did not even let me complete my
9 first exam. And, additionally --
10    MS. DODSON: (Sneezing.)
11    MS. BERDECIA: Bless you.
12    MS. DODSON: I couldn't hit the mute.
13    THE WITNESS: So repeat the question again.
14 I believe it was written -- about the written
15 contract.
16 BY MS. BERDECIA:
17    Q   Are there any other ways that the University
18 of St. Augustine breached its contract with you?
19    A   Yes. So according to Exhibit 35, they --
20 they broke the contract when they tried to reach out
21 to me on the 23rd. That was beyond the appeal date.
22 And when I reached back to them, then they
23 conveniently say that I have missed my opportunity.
24 So even if I was to reply to them on January 23rd,
25 then that would be beyond it, beyond the time of

Page 179

1 recourse. But, again, at the time, how was I able
2 to defend myself when I was not given my normal
3 rights or the evidence or given the opportunity to
4 face my accusers?
5    Q   You made a claim for defamation in this case,
6 and your complaint references the January 14th
7 letter. Is -- are you referring to Exhibit 33, the
8 January 14th, 2019, letter related to the academic
9 appeals committee decision?
10    A   Yes.
11    Q   What specific statements in this letter do
12 you contend are defamatory?
13    A   I contend that -- I contend that the academic
14 performance, the professional behaviors, and the
15 academic integrity, they are defamatory. Since they
16 do not clarify what they are, any person who would
17 read this letter would assume the worst. They do
18 not understand -- the university gave no room for
19 context. And the reader would not know, "Oh, it's
20 an academic appeals committee. They can't make
21 those assertations. That's a professional
22 misconduct committee ruling."
23    And, again, they do not clarify what these
24 are, so it leaves it to subjectivity.
25    Q   So the defamatory statement in this letter is

Page 180

1 "The AAC has denied your appeal based on concerns
2 regarding your academic performance, professional
3 behaviors, and academic integrity"; is that your
4 contention?
5    A   It is my contention that they have denied
6 my -- they have denied me as being a student because
7 of these perceived and ill-defined qualifiers.
8    Q   But my question is: What in this letter is
9 defamatory? What statement in this letter defames
10 you?
11    MS. DODSON: Objection.
12    THE WITNESS: That very sentence of their
13 reasons for dismissal, because I was -- because
14 there was --
15 BY MS. BERDECIA:
16    Q   Which sentence?
17    A   "The AAC has denied your appeal based on
18 concerns regarding your academic performance,
19 professional behaviors, and academic integrity."
20    Q   Are there any other statements in this letter
21 that you say are defamatory?
22    MS. DODSON: Objection.
23    THE WITNESS: I believe the sentence before
24 that would also be defamatory, as in the sentence
25 reads, "The committee reviewed your academic

Page 181

1 record, information provided by MSK faculty, your
2 appeal letter, and your statements made during
3 the meeting with them."
4    "Academic record" is ambiguous, and it does
5 not reflect how I maintained a 3.0 GPA even with
6 an F with mock clinic.
7    "Information provided by MSK II faculty,"
8 that was not provided to me. That -- this
9 sentence assumes that I was given a due process.
10    "Your appeal letter," that is correct.
11 They -- I wrote that. That's fine.
12    And "statements made during the meeting with
13 them," to my knowledge, there were no
14 transcripts. And, again, I was not able to
15 defend myself of their accusations -- their
16 accusations, which they should not have been able
17 to make. They are the academic appeals
18 committee, not the professional misconduct
19 committee.
20 BY MS. BERDECIA:
21    Q   Are there any other sentences in this letter
22 that you contend are defamatory?
23    A   No.
24    Q   You've made a claim for damages in this case;
25 is that correct?

46 (Pages 178 - 181)

Page 182

1   A  Yes.
2   Q  How have you been harmed?
3   A  I have been harmed to where -- as I have
4  stated prior, it was already difficult for me to get
5  into physical therapy school with a clean record.
6  For me to reapply, I have to disclose I attended the
7  University of St. Augustine.  And the fact that this
8  file, according to -- let's see.
9       According to the CC here on the second page
10  of Exhibit 33, it is in my student file, to where it
11  would be very difficult -- as I stated prior, it was
12  difficult for me to get into a physical therapy
13  school with a clean record.  But to have this and
14  apply again, my chances are understandably much
15  less.
16       I also contend that I would have been better
17  off not even attending this university because of
18  what they have done, to where I could have continued
19  being a personal trainer without constantly being
20  reminded of how an institution discriminated against
21  me, not for -- not for who I am, but for the
22  conditions that I have.
23       I contend that after -- even if this letter
24  comes off, that if I apply to physical -- I will
25  apply to physical therapy schools.  But as part of

Page 183

1  the application process, it requires that I take
2  prerequisite courses within six years.  That is
3  standard for every school.  It has been -- it's been
4  over six years since I've taken those prerequisites.
5  I have to take them again.  I'm not asking for
6  anything exorbitant.  I am asking to do what's
7  right.
8   Q  What are you seeking as damages?
9   A  I am seeking the damages that was outlined
10  by -- I believe you guys have it.  It is -- it is
11  what is written from Dr. Chris Jones of Florida
12  Economic Advisors.
13       MS. DODSON:  I think what he's referring to
14  is the Bates -- KAL Bates 315 to 319.
15       (Defendant's Exhibit No. 37 was marked for
16  identification.)
17  BY MS. BERDECIA:
18   Q  You've been handed what we've marked as
19  Defendant's Exhibit 37.
20       MS. BERDECIA:  And for your reference,
21  Kimberly, it's KAL 319.  That's what we just
22  printed.
23  BY MS. BERDECIA:
24   Q  Mr. Nguyen --
25       MS. DODSON:  Okay.  Thanks.

Page 184

1  BY MS. BERDECIA:
2   Q  -- is the document that you were
3  referencing -- or part of the document, at least,
4  that you were referencing with regard to what you're
5  owed?
6   A  This is part of the document.  The first
7  part, which is not listed here, is a spreadsheet of
8  physical therapy -- of typical starting physical
9  therapy salary, and also compared to my salary when
10  I was a personal trainer.
11   Q  So that spreadsheet that you're referencing
12  is what you believe you should have earned as a
13  physical therapist up until a certain point; is that
14  correct?
15   A  That spreadsheet that I'm referring to that
16  is not printed, that page is only a reference
17  for two of those -- for two of those career paths,
18  and the differences of their salary.
19       This second page here that's presented in
20  front of me, Exhibit No. 37, those are -- that takes
21  the information from that first page in order to
22  make those damages -- to make those damage claims.
23   Q  Right.  So the total here of $167,210.06, is
24  that all of the damages you believe that you're
25  entitled to, or do you believe you're entitled to

Page 185

1  more damages than what's listed here?
2   A  I believe I am entitled --
3       MS. DODSON:  Objection.
4       THE WITNESS:  This document was drafted in
5  mid 2020.  So not all of the information is
6  correct, such as "foregone income" should be
7  increased.  I have also received additional
8  counseling and mental health services from
9  Baptist -- Baptist Behavioral Health.  So this is
10  not entirely accurate up to today.
11  BY MS. BERDECIA:
12   Q  However, the damages on Exhibit 37 that are
13  numbered 1 through 11, are these all of the
14  categories of damages that you believe you are
15  entitled to in this case?
16       MS. DODSON:  Objection.
17  BY MS. BERDECIA:
18   Q  Even if the numbers are not accurate, it
19  would be accurate?
20   A  It would be accurate if it includes -- if
21  this information was updated.  Again, this draft
22  was -- this document was created in mid 2020.
23   Q  Right.  I'm not asking about the numbers.
24  I'm asking category of damages.  The tuition,
25  foregone income, proctoring services, medical

47 (Pages 182 - 185)

Page 186

1  supplies, school supplies, residence in
2  St. Augustine, APTA, legal, ADHD counseling, and
3  your doctor, incidentals, and other, those are all
4  of the category of damages you believe that you're
5  entitled to in this case; is that correct?
6     A  Yes.
7        MS. DODSON:  Objection.
8  BY MS. BERDECIA:
9     Q  Are there any damages not listed on this
10 Exhibit 37, as far as categories go, that you
11 believe that you should be able to recover?
12    A  Unlike the person who has drafted this
13 letter, Dr. Chris Jones of Florida Economic
14 Advisors, I do not have the expertise to evaluate or
15 even predict what may -- what additional costs and
16 damages may occur between now --
17    Q  I'm not asking for your expertise.
18    A  -- and the end.
19    Q  I'm not asking for your expertise.  I'm just
20 asking, based on your personal knowledge, as you sit
21 here today, do you see any category of damages that
22 you believe is missing from the categories outlined
23 by the individual that created this document?
24    A  I do not know.  And I'll have to defer to
25 Dr. Chris Jones.

Page 187

1     Q  Do you see any categories that are missing,
2  based on your knowledge, of types of damages you
3  think you should be able to recover?
4     A  At this present time, with my present
5  understanding, no.
6     Q  You said the individual that filled this out
7  was Chris Jones?
8     A  Yes.  He is referenced in the third page,
9  which is not included with this printout.  But it is
10 part of the same document.
11    Q  Did you meet with Mr. Jones?
12    A  Over the phone.  And I met -- I met him over
13 the phone initially to tell him that I am having
14 some issues with a university.  And then he -- he
15 drove out to St. Augustine to run the spreadsheet
16 with me to see what was applicable.
17    Q  So did you meet with him in person?
18    A  Yes.
19    Q  When?
20    A  I believe mid 2020.
21    Q  And you said you met with him during -- via
22 telephone as well?
23    A  Yes.
24    Q  When did you meet with him via telephone?
25       MS. DODSON:  I'm going to object.  I mean, I

Page 188

1  don't know if this is -- and I apologize because
2  I am new in the case.
3        I don't know if your meeting was predicated
4  on something with an attorney, so I'm just going
5  to have a standing objection with this line of
6  questioning to --
7        MS. BERDECIA:  I just asked when the meeting
8  was.  I didn't ask for the content of the
9  meeting.  So that wouldn't be privileged.
10       MS. DODSON:  But before he answers, though,
11 and opens the door, I'm just putting an objection
12 on there.
13 BY MS. BERDECIA:
14    Q  So when did you meet -- when did the
15 telephone call between you and Mr. Jones occur?
16    A  The best I can recall was in the middle of
17 2020.
18    Q  Was anybody else on the telephone with you?
19    A  No, but my wife was in presence in the room.
20    Q  Were there any lawyers that were in
21 attendance either in your in-person meeting or on
22 the telephone?
23    A  No.
24    Q  Did you provide Mr. Jones with any documents?
25    A  Only receipts, such as my -- the cost for my

Page 189

1  tuition each term, receipts for the school supplies,
2  receipts for them I was living in St. Augustine, my
3  APTA.  He knows receipts.
4     Q  Exhibit 37 says that you're making a claim
5  for tuition reimbursement; correct?
6     A  That is correct.
7     Q  Why do you believe you should be reimbursed
8  for your tuition?
9     A  I believe I should be reimbursed because,
10 again, I feel that I was much better off not
11 attending the university at all.  And now I have --
12 after -- after this is resolved, hopefully, I
13 will -- the letter will be off and I will be able to
14 apply to schools because -- and I will have to take
15 all of my prerequisites all over again.
16       Even if I considered going back and applying
17 to the University of St. Augustine, my courses, they
18 would not transfer because, as I have stated prior,
19 they have changed their curriculum since.
20    Q  Have you been told by any other university or
21 college that your credits would not transfer?
22    A  I was told by the University of St. Augustine
23 themselves that even if I was to stay with the
24 university, not all of my credits would transfer.
25    Q  Have you been told by any other university or

48 (Pages 186 - 189)

Page 190

1  college, besides the University of St. Augustine,
2  that your credits received at USA would not
3  transfer?
4      A   I have reached out to the University of South
5  Florida, and I was ask- -- I was talking to one of
6  their -- I was talking to one of their advisors --
7  I'll have to check.  Actually, I think it was an
8  advisor -- about "I was a student at the University
9  of St. Augustine.  I have completed two and a half
10 years.  Would everything be able to transfer?"
11      And the answer was "Not likely."
12     Q   So all you've been told is it's not likely
13 that they would transfer, but you have not been told
14 which credits would and would not transfer; correct?
15     A   Correct.
16     Q   And you're seeking emotional distress damages
17 in this case?
18     A   Yes.
19     Q   This question is probably going to be
20 difficult and -- but I do have to ask it.  Can you
21 please describe your pain and suffering.
22     A   I am no stranger to failure.  I have done
23 many things in my life.  Many people have commented
24 that I have accomplished a lot:  Eagle Scouts,
25 martial arts, musical arts, school.  I did all of

Page 191

1  them well.
2      My grandmother, as I stated before, I was her
3  caregiver.  But I was always -- I didn't do all of
4  them perfectly.  No, I didn't.  But I tried.  I
5  worked hard.  And net overall, I did -- I did well.
6      And ever since this -- a lot of people have
7  looked up to me.  I was encouraged -- as a personal
8  trainer, just me, I was encouraged by -- I was
9  encouraged by my clients in Tampa, I should be more
10 than that.  I should be a physical therapist.  I
11 should do more.  And I left my home in Tampa for
12 that.  I pursued that dream.
13     It was the first time I really felt like I
14 cared.  I did martial arts, Boy Scouts.  It was
15 because my mom told me to do it.  Physical therapy
16 is what I wanted to do.
17     In all of my endeavors, I've always tried to
18 communicate with people.  I was always kind of
19 different.  Some people said I was too brutally
20 honest.  I didn't realize it was ADHD until much
21 later.  I thought I was in a place of learning.  I
22 thought this was a university.
23     I've always respected education, as I stated
24 with Dr. Kempfert before.  And I have nothing but
25 respect for education.  Education is the pillar of

Page 192

1  the enemy's culture.  And I tried hard.  I
2  communicated.  I was hoping I'd get help.
3      And I can understand a misstep.  I can
4  understand a setback.  But I can't expect -- I
5  didn't expect that I would never -- it was already
6  difficult for me to get into school with a clean
7  record, now having a hand tied behind my back
8  because of this record.
9      I used to maintain social media at the time.
10 I was big into Facebook.  I loved talking to people.
11 I let them know -- even when I was in school, every
12 semester, I made it a point to call them, say, "Hey,
13 I'm still doing okay."
14     And since this dismissal, I can't approach
15 them.  I can't tell them what happened.  I
16 refused -- I didn't state in my Facebook or
17 anyone -- I didn't even tell anyone other than my
18 wife what happened, because the university was not
19 right.
20     I have integrity.  I can be -- I am
21 professional.  And for them to say -- for them, I
22 wasn't even a student -- even before this dismissal,
23 I wasn't even a student, when I told them constantly
24 about my conditions and I asked for help.
25     You stated in your line of questioning that

Page 193

1  they helped me.  They're medical professionals.  I
2  thought they would be able to understand more
3  because this wasn't just a one-time deal with my
4  disabilities.  They were there at the onset, and
5  what bothers me is I opened myself to the
6  university.
7      Mental health is shunned in my culture, but I
8  still opened up to my professors in a plea for help.
9  And I was rewarded with that by not even being
10 afforded the same rights, and even really being
11 considered a student long before this dismissal.
12     Every day I wake up -- and I talked to my
13 therapist Dr. Harry Williams about this many times,
14 and it's what keeps me in bed many days, that --
15 many days, that the university cannot take away my
16 other endeavors.
17     But, yet, every day I see people doing
18 things, people being accused of crimes, people
19 accused of things to where all of their past
20 achievements are suspect.  No, the university cannot
21 take away my hard work.  And every day it's a
22 struggle to remind myself that they don't.
23     But everyone else will when they see
24 things -- when an established university claims that
25 I have done these things that I have not.  Every day

49 (Pages 190 - 193)

Page 194

1 I lose faith, I lose hope that not only will I not
2 be able to do higher education, like my mom always
3 wanted me to do, but because of my limited degree
4 now, I will not be able to provide for my family the
5 best I could have, that I -- worst-case scenario, I
6 could have stayed a personal trainer and still do
7 that. That was a passion of mine. And that was
8 taken away from me.
9      MS. BERDECIA: Let's take a break. Let's go
10 off the record.
11      THE VIDEOGRAPHER: Go off the record, 4:18.
12      (Brief break.)
13      THE VIDEOGRAPHER: Back on the record, 4:25.
14 BY MS. BERDECIA:
15   Q  Prior to 2016 -- let me back up a little bit.
16 You're okay?
17   A  Yes. Thank you.
18   Q  You're okay to continue?
19   A  Yes.
20   Q  Prior to 2016, when you took the leave of
21 absence from the University of St. Augustine, had
22 you seen a therapist or any mental health
23 professionals for any reason prior to 2016?
24   A  Not that I can recall.
25   Q  Were you hospitalized at some point in high

Page 195

1 school as a result of depression?
2   A  I don't recall.
3   Q  Had you been treated for depression at all
4 prior to 2016, that you can recall?
5   A  Not that I can recall.
6   Q  And you were diagnosed with a general anxiety
7 disorder in 2016, is that correct --
8   A  Yes.
9   Q  -- while on the leave of absence from the
10 University of St. Augustine?
11   A  Yes.
12   Q  You were also diagnosed with ADHD at the same
13 time?
14   A  Yes.
15   Q  And you were prescribed Prozac back in 2016;
16 is that accurate?
17   A  I believe so.
18   Q  And you remained on that medication up
19 through your dismissal in 2018?
20   A  I believe I was still on Prozac. Maybe there
21 was a change to a different antidepressant in that
22 time. I do not recall. But I don't make any
23 medication changes without my psychiatrist.
24   Q  And then you were on Adderall with your ADHD
25 while you were enrolled in the University of

Page 196

1 St. Augustine after you were diagnosed?
2   A  Yes.
3   Q  We discussed this, but I think we did it off
4 the record. You have a daughter?
5   A  Yes.
6   Q  And when was she born?
7   A  March 8th, 2021.
8      (Defendant's Exhibit No. 38 was marked for
9 identification.)
10 BY MS. BERDECIA:
11   Q  The court reporter handed you what we've
12 marked as Defendant's Exhibit 38. And these are
13 the -- entitled "Plaintiff's Responses to
14 Defendant's First Set of Interrogatories."
15      Do you recognize this document?
16   A  Yes, I do.
17   Q  And did you review these answers to
18 interrogatories prior to them being sent to my
19 office?
20   A  Not that I can recall.
21   Q  Do you recall reviewing these answers at any
22 point?
23   A  Well, I wrote a lot -- I wrote the answers,
24 and I reviewed it before submission.
25   Q  Let me borrow that real quick. Let me make

Page 197

1 sure that the -- what was included is supposed to
2 be.
3      Okay. Sorry. I have privileged information
4 on my copy, so...
5      So I'm sorry. I missed the answer to the
6 question.
7      My question was: Did you review these
8 answers at any point?
9   A  After I wrote the answers, I remember seeing
10 them again when it had to be notarized, I believe,
11 via DocuSign.
12   Q  On page 4, you -- No. 11, you say defendants
13 and defendant's counsel are individuals who have
14 knowledge about the facts of this case.
15      Who at the University of St. Augustine do you
16 believe has knowledge of the facts of this case?
17   A  I believe, to the best of my knowledge, my
18 professors, relevant members of the administration,
19 people who have written emails to me, who have
20 participated in many events that were described
21 earlier, that is who I believe when I said
22 defendants.
23      And counsel -- I'm not a lawyer, but I assume
24 that the lawyer -- their lawyer or legal
25 representative would know.

50 (Pages 194 - 197)

Page 198

1   Q   Who specifically, though?  What individuals,
2   like the names of individuals, who you believe have
3   knowledge?  I mean, you've named some doctors.
4   You've named your wife.  And then you say
5   defendants.  But the defendant is the University of
6   St. Augustine.  So what specific individuals?
7   A   I believe every single professor that I have
8   spoken -- that I had classes with, everyone who has
9   seen some of these emails.  I cannot say that
10   everyone knows everything, but I know everyone knows
11   a good amount to understand why I feel that I was
12   discriminated against.
13   Q   On page 10 of these responses, Interrogatory
14   No. 4 references -- asks you to identify the
15   individuals who you contend discriminated against
16   you.
17   A   Yes.
18   Q   You say David J. Kempfert.  How did
19   Dr. Kempfert discriminate against you?
20   A   There was discrimination with him to where --
21   we had to resolve that eventually, but there was
22   initially discrimination since he did not understand
23   the cultural relevance of my retaking remediation
24   forms.  And he also -- even with that resolved, he
25   did not address my concerns of my learning

Page 199

1   disabilities and my problems with fulfilling the
2   University of St. Augustine curriculum.
3   Q   How did Margaret Wicinski discriminate
4   against you?
5   A   She discriminated against me because, again,
6   she was familiar with my conditions, with my
7   learning disabilities, for several classes prior to
8   mock clinic.  She would not address all of -- she
9   would not address all of my concerns, especially
10   regarding the midterm and the appeal for that.
11       She has discriminated against me when she did
12   not allow me to take -- to complete my first
13   examination of mock clinic.
14       She discriminated against me when I was not
15   given my retake opportunity.  She discriminated
16   against me when -- to where even when I outlined
17   clearly that I did not have all of the information
18   to successfully complete my midterm during the
19   appeal, she chose to ignore, personally, my
20   concerns, and feel that I had enough information
21   without specifying or clarifying the rationale
22   behind her decision.
23   Q   How -- you say in No. 3 Jessica Scherier.  Is
24   that Jessica Scheiner?
25   A   Yes.

Page 200

1   Q   How did Jessica Scheiner discriminate against
2   you?
3   A   Unfortunately this list, I wish I could have
4   added every professor that I have -- that I have
5   discussed my disabilities with.  I was more focused
6   on the mock clinic.  But she discriminated against
7   me, Jessica Schreiner, because I made it known about
8   my learning disabilities.  And I've had private
9   meetings with her about my -- I have had meetings
10   requesting the additional testing materials, my
11   learning disabilities, to where she chose -- she
12   decided it was not worth pursuing.
13   Q   What do you mean requesting "additional
14   testing materials"?
15   A   So in the case of the final -- of the final
16   practical, there were some -- there was some
17   equipment that I personally did not own.  And I
18   could ask ahead of time from the university if I
19   could get them from the professors.  I approached
20   her first since she was the head lab professor for
21   mock clinic.  And I asked her for specific equipment
22   just to do the exam normally, not even for -- not
23   even for my disability, just to complete the
24   practical exams, to where they were not provided,
25   and I had to ask Margaret Wicinski during the test

Page 201

1   to provide them.
2   Q   And Dr. Wicinski provided the materials;
3   correct?
4   A   Yes.
5   Q   How did Debra Gray discriminate against you?
6   A   As I have stated prior, she was made very
7   aware of my conditions since the onset -- near --
8   near the onset of -- near the onset of my -- the
9   diagnosis of my conditions in 2016.  She was the
10   program director of the flex program.  I was
11   transitioning into her program.  I had to give her
12   reasons.  And I've had private meetings before,
13   explaining why I was transitioning to a lighter
14   course load flex DPT program.
15       She also served as my student advisor.  And
16   it was to my understanding that student advisors,
17   they are to clarify any kind of -- to clarify any
18   needs for students to address them the best that
19   they can.
20       She was made aware of my condition, of my
21   learning disabilities.  And even throughout, as the
22   terms progressed, she did not address them and, in
23   fact, tried to downplay them, as I have described in
24   my meeting with her on December 18th of 2018, where,
25   after I described that I was working with Ryan

51 (Pages 198 - 201)

1  Davis, the disability -- the disability manager for
2  USA, I was coordinating with him and my
3  psychiatrist, Dr. Jennifer Davis, for
4  accommodations.  She immediately retorted
5  erroneously that no accommodations would be made
6  on -- erroneous statements that -- for example, that
7  accommodations would not be made for when I take
8  my -- when I do my licensing boards.
9      Did you need me to do No. 5?
10  Q  No.
11  A  Okay.
12      (Defendant's Exhibit No. 39 was marked for
13  identification.)
14  BY MS. BERDECIA:
15  Q  The court reporter has handed you what we've
16  marked as Defendant's Exhibit 39.  This is
17  "Plaintiff's Objections and Responses to Defendant's
18  First Set of Request for Production of Documents."
19      Have you seen this document before?
20  A  I believe I have seen a similar form to where
21  they were -- the plaintiffs were asking for
22  production of documents.  But this exact document
23  with answers, no.
24      (Defendant's Exhibit No. 40 was marked for
25  identification.)

1  BY MS. BERDECIA:
2  Q  I've handed you what we've marked as
3  Defendant's Exhibit 40.  This is the complaint
4  against the University of St. Augustine that you
5  filed in this case.
6      Have you seen this document before?
7  A  Yes, I recognize this document.
8  Q  Did you review this document before it was
9  filed?
10  A  Repeat the question.
11  Q  Did you review this document before it was
12  filed?
13  A  Yes.
14  Q  And to the best of your recollection, were
15  the allegations contained in this document accurate?
16  A  On page 4, item 10, that statement is not
17  entirely correct.  I began attending the University
18  of St. Augustine in the summer of 2016 as part of
19  their accelerated DPT program.  I would transition
20  into the flex DPT program in spring of 2017.
21      No. 18 is not entirely correct.  For the
22  first sentence, "Mr. Nguyen was not able to pass his
23  mock clinic final exam because of his GA and ADHD
24  disability."
25      There was an additional part that should be

1  added to this to where I was not able to pass the
2  exam since I was not given -- I was not given the
3  opportunity to complete my first attempt at the
4  final examination and was not given my retake
5  opportunity.
6      No. 25 on page 8 is also incorrect.  Where it
7  reads "At all times after November 30th, 2018,
8  Defendant was fully aware of Plaintiff's
9  disability," they were aware since my first meeting
10  after my diagnoses with Dr. Stacie Lauro in
11  September of 2016.
12      No. 46, page 13 here.  No. 46, it reads,
13  "Defendant USA committed a further beach of contract
14  by failing to allow Plaintiff to retake his final
15  exam despite being entitled to a retake."
16      I would like to add that they did not allow
17  me to complete my first examination -- first attempt
18  of examination.
19      On page 16, No. 58, it says, "Plaintiff was
20  dismissed from an online finance program through
21  Harvard University based on the allegations in
22  Plaintiff's -- based on the allegations in
23  Plaintiff's student portfolio."
24      This is not entirely true.  I was still in --
25  I was still applying for Harvard University,

1  attempting to fulfill their admission requirements
2  for their online finance program, to where I was
3  dismissed based on allegations included with that
4  dismissal letter from the University of
5  St. Augustine.
6  Q  You weren't dismissed, though; correct?  You
7  hadn't actually been admitted into the program?
8  A  I was invited to continue the application
9  process and take courses with Harvard with the
10  understanding that this would -- that this issue
11  with St. Augustine would have resolved quickly.  It
12  did not.  And when that did not occur, I was asked
13  not to continue.
14      Okay.  That's it.
15      What was your initial question regarding
16  this, before I started going through all of it?
17  Q  You answered it.
18  A  Okay.
19  Q  Did -- have you spoken to anybody and asked
20  them to be a witness for you in this case?
21  A  No.
22  Q  Have you spoken to any of your former
23  classmates or students from the University of
24  St. Augustine about this lawsuit?
25  A  I was concerned of how the university was

52 (Pages 202 - 205)

Page 206

1 denying me of my rights and dismissing me the way
2 they did. I did not want that to happen to my
3 classmates. And, therefore, I actively chose not to
4 speak with them. And they are unaware of the
5 situation.
6   Q  Did you speak to any USA employees about this
7 lawsuit after it was filed?
8   A  No.
9   Q  Have you obtained any statements from any
10 witnesses with regard to this lawsuit?
11   A  No.
12     MS. BERDECIA: So because of the fact that we
13 sent a discovery deficiency letter on
14 February 11th of this year asking for additional
15 documents and information from the plaintiff,
16 we're going to reserve the right to come back on
17 another day to cover issues or matters related to
18 the supplemental information that we've
19 requested.
20     So I'm done for today. But to the extent we
21 feel like it's necessary to come back, we're
22 going to reserve the right to do so.
23     MS. DODSON: Well, free to ask him about any
24 of those issues that you feel like you are
25 deficient while you've got the opportunity.

Page 207

1     MS. BERDECIA: I don't have the information,
2 so I can't ask those questions.
3     MS. DODSON: I have just a couple. Probably
4 what I'll have to do, for the court reporter, is
5 I'll get this document sent over.
6     So we're going to mark as Plaintiff's
7 Exhibit 1 -- it's going to be the rest of the
8 damages compilation, which is KAL -- Bates
9 No. KAL 315 through 318, so that's a complete
10 document.
11     Do you have any objection to that?
12     MS. BERDECIA: I have no objection to that.
13     (Plaintiff's Exhibit No. 1 was marked for
14 identification.)
15     MS. DODSON: I'm also going to mark as
16 Plaintiff's Exhibit 2 -- it's going to be KAL 381
17 through 385. And those are Baptist Health
18 medical records --
19     MS. BERDECIA: I'm going to object to that.
20 I don't think that one is appropriate.
21     MS. DODSON: Why?
22     MS. BERDECIA: Because --
23     MS. DODSON: You've been -- you received them
24 in discovery. They were in responses. You've
25 gotten them.

Page 208

1     MS. BERDECIA: I don't see the purpose of
2 marking the medical records at all in his
3 deposition.
4     MS. DODSON: Okay. Well, seeing as though
5 this deposition is about an ADA claim and a rehab
6 claim, I want something on record showing that he
7 does have those diagnoses, and, in the close
8 proximity of the time that he was dismissed from
9 USA, he received these diagnoses and that he did
10 have those clinical diagnoses.
11     MS. BERDECIA: He's not --
12     MS. DODSON: Unless you guys -- unless you
13 guys want to stipulate on the record that you
14 don't dispute that he --
15     MS. BERDECIA: I'm not stipulating to that,
16 but he -- there's no indication -- you haven't
17 set any predicate with regard to him having seen
18 these medical records, reviewed these medical
19 records, have any knowledge of these medical
20 records, anything like that.
21     MS. DODSON: Okay. Well, I mean, I'm about
22 to ask him questions about them. I'll ask him
23 questions, but...
24     (Plaintiff's Exhibit No. 2 was marked for
25 identification.)

Page 209

1     CROSS-EXAMINATION
2 BY MS. DODSON:
3   Q  Do you recall going to Baptist Health
4 Center -- Baptist Health systems on March 5th,
5 2019 -- Baptist Behavioral Health on March 5th,
6 2019?
7   A  Yes.
8   Q  And who were you seen -- were you seen by a
9 mental health person at that facility?
10   A  I believe so.
11   Q  And do you recall whether or not you received
12 a diagnosis on that -- with regard to that visit?
13   A  I was not made aware that I had any
14 additional diagnoses other than my ADHD and my
15 generalized anxiety disorder.
16   Q  Well, I just lost it. Hold on.
17     Have you ever been diagnosed with acute
18 adjustment disorder with depressed mood?
19     MS. BERDECIA: Object to the form.
20     THE WITNESS: I do not recall.
21 BY MS. DODSON:
22   Q  Do you have any reason to dispute that if the
23 medical records from Behavioral -- Baptist
24 Behavioral Health, with an encounter visit of March
25 5th, 2019, at 1:30 p.m., Bates No. KAL 381 through

Page 210

1 385, states that you were -- received a diagnosis of
2 acute adjustment disorder with depressed mood.  Do
3 you have any reason to dispute that?
4     MS. BERDECIA:  Object to the form.
5     THE WITNESS:  I don't have the expertise
6  of -- to that degree of psychology.
7 BY MS. DODSON:
8   Q   If the document states that, do you have any
9 reason to dispute that the document is correct?
10     MS. BERDECIA:  Object to the form.
11     THE WITNESS:  I trust the health care
12  provider at that time has made their assertations
13  to the best of their ability.
14 BY MS. DODSON:
15   Q   Did you ever tell anyone at USA that you did
16 not want to receive any accommodations with regard
17 to your GAD or your ADHD?
18   A   Repeat the question.
19   Q   Did you ever advise anyone at USA that you
20 did not want to receive accommodations for your GAD
21 or ADHD?
22   A   No.
23   Q   You testified earlier with regard to
24 Defendant's Exhibit 36 that you had had a
25 conversation with a cohort that -- with regard to an

Page 211

1 examination.
2     My question to you is:  When did that
3 conversation take place?  Was it before or after the
4 examination?
5     I mean, there's not really -- I mean, you can
6 look for the document, but I'm just asking if you
7 had the conversation with your co-student, you're
8 calling cohort, prior to the examination or after.
9   A   The conversation was relevant to the midterm,
10 which was in late October 2018.  And the actual
11 conversation pertaining to that information for that
12 was approximately in the week of December 10th
13 through the 14th.
14   Q   Was that conversation after the final exam in
15 that course?
16   A   The conversation did not pertain to the final
17 exam, but --
18   Q   My question was:  The conversation you had
19 with the individual, was it after the final exam in
20 that course?
21   A   It was after the final examination of that
22 course.
23   Q   Okay.  In your being dismissed from USA, have
24 you received any -- other than what I've just
25 brought to your attention in Plaintiff's Exhibit 2,

Page 212

1 have you received any psychological counseling or
2 treatment?
3   A   I have continued to receive psychological
4 counseling with Jennifer Davis.  She is still my
5 psychiatrist to this day.  I see her once a month.
6 And, also, in that time, I had an acute episode.  I
7 had another panic attack that related to a lot of
8 the feelings I have expressed earlier regarding the
9 university.  And that was with Baptist Health --
10 Behavioral Health Acute Care.
11     And that was a temporary -- those were
12 temporary appointments I had with her.  Her name is
13 Dorie Hanson.  And I had, I believe, six
14 appointments with her, until I was able to
15 transition to another psychiatrist who I am still
16 seeing to this day, in conjunction with Jennifer
17 Davis.  That psychiatrist is Dr. Harry Williams.
18 Also -- what was the time frame that you asked
19 for --
20   Q   Since your dismissal from USA.
21   A   So I also represent -- and I stated it in my
22 complaint -- well, not in my complaint.  My --
23   Q   Responses to interrogatories?
24   A   Yes, that I saw a Lori Vallelunga.  I saw her
25 for approximately three or four sessions, and I

Page 213

1 abruptly stopped seeing her because she gave --
2 because I confided in her my current situation with
3 the letter with grounds of dismissal, how it would
4 be more difficult for me to get accepted into any
5 program, to which she advised me that perhaps I
6 should not --
7   Q   I was just --
8   A   -- bring it up.  I should not mention it.
9   Q   Okay.  Have you been hospitalized since you
10 were let go from USA?
11     MS. BERDECIA:  Object to the form.
12 BY MS. DODSON:
13   Q   Or not let go, but you were dismissed from
14 the program?
15     MS. BERDECIA:  Object to the form.
16     THE WITNESS:  Yes.
17 BY MS. DODSON:
18   Q   When was that?
19   A   I was -- I was hospitalized due to a duodenal
20 ulcer last year.  And last month I was hospitalized
21 in -- I believe it's called River View, or
22 Riverfront.  It was a mental health facility.
23     I was -- I admitted myself voluntarily
24 immediately following my self-admission to an ER
25 where I was having suicidal thoughts relevant to

54 (Pages 210 - 213)

Page 214

1  my -- relevant to the claims I have made and damages
2  for all this.
3      Q   Can you recall the dates that you were --
4  that you went to the ER and then your release from
5  the second facility?
6      A   I cannot recall the dates exactly right now.
7  I do know that it was last month I went to the ER.
8  It was Baptist Health off of Old St. Augustine.  And
9  from there, I was transferred, same day, to
10 Riverfront, where I stayed there overnight while
11 they evaluated me.  And I was released two days
12 later.
13     Q   Did you receive a diagnosis from them?
14     A   Not to my knowledge.
15     Q   Do you have in your custody or control any
16 medical records from those two visits -- or from the
17 Baptist Health and from the second facility?
18     A   I suppose I could reach out to
19 Baptist Health --
20     Q   No, sir.  My question was:  Do you have them
21 within your custody or control?  Do you have those
22 documents or medical records?
23     A   I have discharge documents only.
24     Q   Are you currently under any type of
25 medication?

Page 215

1      A   Yes.
2      Q   What are you currently taking?
3      A   I am currently under Vyvanse for my ADHD and
4  I am under sertraline for my generalized anxiety.
5  And I also have, as-needed, breakthrough
6  medication -- breakthrough anxiety medication
7  lorazepam.
8      Q   Can you recall when you were prescribed those
9  medications?
10     A   I was prescribed Vyvanse, I believe last
11 year, when I reported to Dr. Jennifer Davis that the
12 Adderall seemed to have less efficacy.  And I also
13 reported feeling -- I believe that the breakthrough
14 medication, the lorazepam, was prescribed after the
15 March -- after the March hospitalization, where I
16 met -- my March appointment with Baptist Behavioral
17 Acute Health.
18     Q   When is your next scheduled appointment with
19 a mental health person?
20     A   I believe I have an appointment with
21 Dr. Harry Williams next week.  I've had them every
22 week since I started seeing him.  I cannot recall
23 the exact date when I started seeing him.  And
24 Dr. Jennifer Davis, I have an appointment with her
25 next month, as I've had my regular appointment with

Page 216

1  her this month already.
2      MS. DODSON:  That's all I have.
3          REDIRECT EXAMINATION
4  BY MS. BERDECIA:
5      Q   I just have a couple of follow-ups on that
6  same line.  I wasn't going to ask.  But since the
7  door was opened, have you been recently suffering
8  from some marital problems?
9      MS. DODSON:  Objection.
10     THE WITNESS:  No.
11 BY MS. BERDECIA:
12     Q   Have you recently been dealing with some of
13 your wife's issues with alcohol?
14     MS. DODSON:  Objection.
15     THE WITNESS:  I had concerns of her drinking,
16 yes.
17 BY MS. BERDECIA:
18     Q   And these issues would have affected your
19 mental health in the recent months; is that correct?
20     MS. DODSON:  Objection.
21     THE WITNESS:  Possibly.
22     MS. BERDECIA:  That's all I have for today.
23 We'll reserve the right to come back on the
24 supplemental issues that we discussed.
25     But unless Kimberly has any other questions,

Page 217

1  I think you're done.
2      MS. DODSON:  I have one more question.
3          RECROSS-EXAMINATION
4  BY MS. DODSON:
5      Q   Were you seeing a mental health professional
6  prior to your concerns about your wife's drinking?
7      A   Dr. Harry Williams, I have consulted with him
8  with regards to my wife's drinking over the course
9  of several months.
10     Q   But as -- my question to you was:  Prior to
11 your concerns about your wife's drinking, which
12 you've said, now twice, were within the last several
13 months, were you seeing a mental health counselor
14 prior to that time?
15     A   Yes.
16     MS. DODSON:  Okay.  That's all I have.
17     MS. BERDECIA:  You are done for today.
18     Let's go off the record.
19     MS. DODSON:  Thank you so much.  Thanks,
20 everyone.
21     I'll -- Ms. Court Reporter, I'll get those
22 exhibits to you.
23     THE COURT REPORTER:  Would you like me to
24 give -- I can give you my email address when we
25 go off the record.

55 (Pages 214 - 217)

Page 218

1    MS. DODSON: Sure.
2    THE VIDEOGRAPHER: We'll go off the record,
3    5:10.
4    (Discussion was held off the record, and
5    reading of the transcript was waived.)
6    (Witness excused.)
7    (And at 5:10 p.m., taking of the above
8    deposition was concluded.)
9         - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 220

1         C E R T I F I C A T E
2
3    STATE OF FLORIDA  )
4    COUNTY OF DUVAL   )
5
6        I, Renee B. Farhat, Registered Professional
7    Reporter, certify that I was authorized to and did
8    stenographically report the deposition of LUKE PHUOC
9    NGUYEN; that a review of the transcript was not
10   requested; and that the transcript is a true and
11   complete record of my stenographic notes.
12       I further certify that I am not a relative,
13   employee, attorney or counsel of any of the parties,
14   nor am I a relative or employee of any of the
15   parties' attorneys or counsel connected with the
16   action, nor am I financially interested in the
17   action.
18       Dated this 1st day of June, 2022.
19
20
21
22
23   *Renee B. Farhat*
24       RENEE B. FARHAT, RPR
25

Page 219

1         C E R T I F I C A T E   O F   O A T H
2
3    STATE OF FLORIDA  )
4    COUNTY OF DUVAL   )
5
6        I, Renee B. Farhat, Registered Professional
7    Reporter, Notary Public, State of Florida, certify
8    that LUKE PHUOC NGUYEN personally appeared before me
9    on the 19th of May, 2022, and was duly sworn.
10       WITNESS my hand and official seal this 1st
11   day of June, 2022.
12
13
14
15   *Renee B. Farhat*
     RENEE B. FARHAT
16   Notary Public State of Florida
     My Commission No. GG 314860
17   Expires:  MAY 26, 2023
18
19
20
21
22
          Personally Known_____
23   OR Produced Identification____xx_____
     Type of Identification Produced____DL____
24
25

Veritext Legal Solutions
800-726-7007                                              305-376-8800



the deposition wholly or partly, on motion under

rule 1.330(d)(4).

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES

ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.

THE ABOVE RULES ARE CURRENT AS OF APRIL 1,

2019.  PLEASE REFER TO THE APPLICABLE STATE RULES

OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

```
                VERITEXT LEGAL SOLUTIONS
       COMPANY CERTIFICATE AND DISCLOSURE STATEMENT
```

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.



# UNIVERSITY OF ST. AUGUSTINE
## FOR HEALTH SCIENCES

## Steps to Secure Acceptance

### Congratulations on your acceptance to the University of St. Augustine!

- **Submit your $500 tuition deposit (see your attached enrollment agreement for tuition deposit refund details)**. Make checks payable to University of St. Augustine. To pay by credit card, complete the following steps:

    o **Step 1** – Log on to the myusa portal at http://my.usa.edu/ics using your User Name and Password.

    o **Step 2** – At the top of the page, you will see a tab labeled "Student **Accounting**". Click this tab.

    o **Step 3** – Go to **"My Account Balances"**. Although the balance will most likely be shown as "$0.00 due" – **you must make a $500 payment to secure your seat.**

    o **Step 4** – Click **"Make a Payment"** and indicate $500.00 in the **"Amount to Pay"** box next to your campus.

    o **Step 5** – Continue on to fill out your credit card information and click continue. Once you verify your information is correct, click **Make Payment.** Once your payment is successful, you will receive an **email confirmation**.

- **Review and complete the attached forms:**
    o **Enrollment Agreement (initial each page where indicated)**
    o **New Student Information Form**
    o **Essential Functions** acknowledging your ability to meet the essential functions necessary to complete the OT and PT degree programs at the University.
    o **Admissions Policies**

- **Please return completed forms in one .pdf file by scan to Advising @usa.edu or fax to 904.810.3819.**

### Financial Assistance Information

Although our financial counselors are campus based, they are available to assist you at any point in the process. For information on **financial assistance**, please contact:

- Eloisa Augustus, Miami &Texas Campus: eaugustus@usa.edu or 512-394-9766, ext. 3106
- Erica Kelly, Florida Campus: ekelly@usa.edu or 904-826-0084, ext. 1241
- Angela Valentin, Florida Campus: avalentin@usa.edu or 904-826-0084, ext. 1208
- Jazmin Garcia, California Campus: jgarcia@usa.edu or 760-591-3012, ext. 2442
- Mary Grawl, California Campus: mgrawl@usa.edu or 760-591-3012, ext. 2441

Page 1 of 13



DEFENDANT'S
EXHIBIT NO. 1
FOR IDENTIFICATION
5/19/22
DATE:        RPTR: RF
PENGAD 800-631-6989

LN          1/2/16
**Student Initials    Date**
USA/Nguyen 000006

| Clinical Education Costs** | Non-refundable – includes background check, fingerprinting, CPR training, travel and lodging*** – costs vary by clinic location | | $8,145.00 |
|---|---|---|---|
| Graduation fee | Non-refundable | | $150.00 |
| Transfer Credit Process Fee*** | Non-refundable | | $75.00 |
| **Estimated living expenses*** | | Single | Married |
| Health insurance: | Health insurance*** | $2,860.00 | $3,811.00 |
| Living expenses: | Room and board*** | $32,973.00 | $38,707.00 |
| | Transportation*** | $6,363.00 | $6,363.00 |
| | Personal*** | $10,593.00 | $10,593.00 |
| **Total Program Estimated Expenses** | | $145,376.00 | $152,061.00 |

*Based on 2015-2016 tuition
**Subject to change
***These expenses may or may not be incurred by a student.

5. Methods of payment: A tuition deposit of $500 is due at the time the signed enrollment agreement is submitted. Tuition and fees for the first trimester, less the $500 tuition deposit, is due on the established registration date per the academic calendar for the applicable trimester. Thereafter, tuition and fees are paid on a trimester basis on the established registration dates per the academic calendar. Tuition and fees are payable by cash, check or credit card.
6. Credit from the University of St. Augustine for Health Sciences may or may not be transferable to other institutions. The option to accept credit by a graduate institution lies with that institution. The University actively pursues a policy of requesting other graduate occupational and physical therapy schools to accept USA credit transfer.
7. The University of St. Augustine does not guarantee employment. Completion of the degree program is not a guarantee of employment. The University provides students with job postings located on the MyUSA portal, students are required to participate resume writing and interviewing skills as part of their coursework. The University holds on-campus job fairs twice a year, supplies a career guide to students before each job fair, and provides students with information on recruiting services.
8. Clinical education placement is based on availability of sites under contract. There is no mileage limitation for any one-day or full-time placements.

**Please complete, sign, date and return this to the Admissions office by the date listed in your acceptance letter to secure your admission to the Doctor of Physical Therapy degree program.**

**I acknowledge that I have read and understand the Academic Policies, Refund Policy, Code of Conduct, and my financial responsibilities to the University.**

**Notice: Do not sign this contract before you read it or if it contains any blank spaces. You should keep a copy of the contract to protect your legal rights. This agreement, along with the catalog, constitutes a binding contract between you and the University of St. Augustine, upon acceptance by the school. All signers have read and received the binding document and catalog.**

_____
Student Signature

Luke Nguyen
Print name

1/2/2016
Date

_____
Signature of School Official

December 21, 2015      1.8.16

**Enrollment Agreement Cancellation policy:**

Page 3 of 13

Should a student voluntarily decline acceptance, fail to complete the terms of admission, withdraw or be dismissed from the University for any reason, this agreement will be terminated.   All refunds will be made according to the University refund policy which is attached to this agreement.

**Graduation Requirements:**

The following requirements must be met for a student to be eligible for graduation:

- Each student must satisfactorily complete all academic and clinical courses and be in good academic standing.
- All fiscal obligations to the University or its subsidiaries must be paid in full.
- The student must make application for graduation one trimester prior to the proposed date of graduation.
- Should a student be unable to successfully complete part of the final coursework but has successfully met all other degree requirements including the exit examination, the student may be allowed to walk at commencement with the respective cohort class.  The candidate will sign an acknowledgement regarding participation in the ceremony.  The candidate will be "hooded" during the ceremony, but will not receive a signed diploma. The signed diploma will be dated to reflect the subsequent graduation date of degree completion as will be denoted on the transcript. The graduate will have the option of participating in the commencement ceremony subsequent to degree completion to receive the signed diploma.

LN          1/2/16
Student Initials    Date

USA/Nguyen 000008



## UNIVERSITY OF ST. AUGUSTINE
### F O R   H E A L T H   S C I E N C E S

### Tuition Refund Policy for Florida and California Campuses

This refund policy follows the standards set out by the Accrediting Commission of the Distance Education and Training Council, and additionally for the California campus, the Bureau for Private and Post-Secondary Education (California).

If notification to withdraw from the University is submitted within the one (1) week (seven-day grace period) of acceptance and submission of the tuition deposit, a full refund of the tuition deposit will be returned to the student.

A partial refund of the deposit will be given if a student provides notification to withdraw from the University prior to the start of the trimester courses and after the initial seven-day grace period. This partial refund will be $400 (the University retains $100 as an administrative fee).

If a student submits notification to withdraw from a course (or the program) after the stated term start date, the following formula will be used to determine the tuition refund.

| Published Length of Course | Refundable Tuition Due After - | |
|---|---|---|
| 1-6 weeks | 1st week = 70% | 3rd week = 20% |
| | 2nd week = 40% | 4th week = 0% |
| 7-10 weeks | 1st week = 80% | 4th week = 20% |
| | 2nd week = 60% | 5th week = 0% |
| | 3rd week = 40% | |
| 11-15 weeks | 1st week = 80% | 6th week = 30% |
| | 2nd week = 70% | 7th week = 20% |
| | 3rd week = 60% | 8th week = 10% |
| | 4th week = 50% | 9th week = 0% |
| | 5th week = 40% | |

Trimester fees, sales tax and Student Activity Fee are 100% refundable if said notification is received up to three (3) weeks for a one to six week course, four (4) weeks for a seven to ten week course and eight (8) weeks for a eleven to fifteen week course after the first day of a trimester. There is a $100 administrative fee for all course and trimester withdrawals.

If notification to withdraw is received after the eighth week, there will be no refund of tuition.

For students who receive federal financial aid and who withdraw from a course on or before 60% of the term has elapsed, USA will calculate according to federal regulations, any disbursed amounts that must be returned to the Title IV programs.

If a student obtains a loan to pay for an educational program, the student will have the responsibility to repay the full amount of the loan plus interest, less the amount of any refund, and that, if the student has received federal student financial aid funds, the student is entitled to a refund of the monies not paid from federal student financial aid program funds.

*Rev. 2-2014*

LN            1/2/16

Student Initials   Date

USA/Nguyen 000009

# UNIVERSITY OF ST. AUGUSTINE
## FOR HEALTH SCIENCES

### Student Code of Conduct

Admittance to the University of St. Augustine for Health Sciences carries with it an obligation and responsibility to abide by federal, state and local law, respective county and city ordinances, as well as all University rules, regulations and procedures. Admission to the University is a privilege, not a right' and it extended to those individuals who meet all admission criteria. All students, faculty and staff of the University have a responsibility to report violations of the Student Code of Conduct to the appropriate officials. As a student, you must read and acknowledge this as part of the enrollment process.

The following behaviors are to be adhered to at all times while on University facilities or when associated with the University in any manner:

- The University of St. Augustine for Health Sciences is a smoke and tobacco free environment. The University maintains a drug-free policy.
- Profane language is not acceptable.
- Students should not be under the influence of any intoxicants.
- Firearms are not permitted.
- Violence, or the threat of violence in any form, is not tolerated.
- Sexual or other forms of harassment will not be tolerated.
- The Internet Acceptable Use Policy must be adhered to at all times.

As a student of a **Distance Education Accrediting Commission (DEAC)** accredited institution, I recognize that in the pursuit of my educational goals and aspirations I have certain responsibilities toward my fellow distance learners, my institution, and myself. To fulfill these responsibilities, I pledge adherence to this Code of Conduct.

I will observe fully the standards, rules, policies, and guidelines established by my institution, the Distance Education Accrediting Commission, the State Education Agency, and other appropriate organization(s) serving an oversight role for my instruction. The following behaviors are to be adhered to at all times while enrolled in a course or program, regardless of physical location:

I will adhere to high ethical standards in the pursuit of my education, and to the best of my ability will:

- Conduct myself with professionalism, courtesy and respect for others in all dealings with institution staff, faculty and other students.
- Present qualifications and background truthfully and accurately for admission to the institution.
- Observe the institutional policies and rules on submitting work, taking examinations, participating in online discussions and conducting research.
- Never turn in work, or present another person's ideas or scholarship as my own.
- Never ask for, receive, or give unauthorized help on graded assignments, quizzes and examinations.
- Never use outside books or papers that are unauthorized by a course instructor's assignments or examinations.
- Never divulge the content of or answers to quizzes or examinations to fellow students.
- Never improperly use, destroy, forge, or alter the institution's documents, transcripts or other records.
- Never divulge my online username and password.
- Always do my best to observe the recommended study schedule for program studies.

| LN | 1/2/16 |
|---|---|
| **Student Initials** | **Date** |

USA/Nguyen 000010

- Always report any violations of this Code of Conduct to the appropriate institution official, and report any evidence of cheating, plagiarism or improper conduct on the part of any student of the institution when there is direct knowledge of these activities.

**The following ethical behaviors are expected of all students:**

Students are expected to conduct themselves in a professional manner according to their respective profession's code of ethics. They should respect the dignity of each individual with whom they are associated. The following considerations are intended to supplement, not replace, any code of professional conduct that might exist.

- Confidentiality of a patient's medical/personal history must be fully maintained at all times.
- The behavior of a patient should be considered in the context of the patient's illness and be handled accordingly.
- Students should not upset patients by words, actions or demeanor.
- Students should not display a conflict of personality or opinion with other clinical personnel in the presence of patients.
- Students should be respectful of other health care professions.

The student should be respectful of and responsive to authorized University personnel and guests, and should observe the defined line of authority with respect to any activities including clinical assignments. Students should use appropriate titles and surnames when addressing authorized University personnel.

Failure to observe these and other basic principles of ethics is professionally unacceptable and could be potentially compromising (see "attitude" statement in the Student Handbook under Student Interpersonal Skills).

**The following interpersonal behaviors are expected at all times:**

Of paramount concern is that students and graduates of the University display and present a positive and respectful attitude to their patients, colleagues, supervisors, faculty, staff, community, and to the University. This "attitude" is a key ingredient to successful completion of studies at the University and to excel as health care professionals. Students will endeavor at all times to:

- Respect the worth and individuality of every person; e.g., listen/pay attention while others are speaking and promote constructive feedback.
- Refrain from disruptive behavior.
- Refrain from proselytization. Proselytization is defined as aggressively and/or harassingly trying to convert, recruit, or induce someone to join one's own political cause or to espouse one's own doctrine.
- Respect confidentiality.

LN        1/2/16
Student Initials     Date
USA/Nguyen 000011



# UNIVERSITY OF ST. AUGUSTINE
## FOR HEALTH SCIENCES

### New Student Information Form

**Please print or type all information. Please do not leave any areas of the form blank.**

Date __1/2/16__          Social Security Number _____

First Name ___Luke___          Middle Name ___Phuoc___

Last Name ___Nguyen___

Preferred First Name/Nickname ___Luke___
(This name will be used on class rosters, advisor assignments, student IDs, student mailboxes, etc.).

Hometown ___Tampa___                                        ___Florida___
                          City                                        State
Email Address ___ppfitness@live.com___

*REQUIRED*

Please check all that apply:
- ___ American Indian or Alaska Native          ___ Nonresident Alien
- _x_ Asian                                     ___ Two or more races
- ___ Black of African American                 ___ Unknown
- ___ Hispanic of any race                      ___ White
- ___ Native Hawaiian or Other Pacific Islander

Permanent Mailing Address (Note: **All official University correspondence will be sent to this address**):

___10420 Rosemount Drive___
                          Street Address or P.O. Box

___Tampa___                                    ___FL___          ___33624___
          City                                        State               Zip

Permanent Phone Number ___(813) 369-3953___          Cell phone ___(813) 369-3953___

*************************************************************************

You will receive a University t-shirt (approved for lab wear) at New Student Registration. Please indicate your t-shirt size (please circle):     S     M     L   [ XL ]     XXL

Please select one of the following regarding your tuition deposit:
☑ **Paid online**    □ **Enclosed a check**

Would you like to be included on the roommate list:
☑ **YES**    □ **NO**

Page 8 of 13

LN          1/2/16
Student Initials    Date

USA/Nguyen 000012



## UNIVERSITY OF ST. AUGUSTINE
### FOR HEALTH SCIENCES

### Essential Functions for Occupational and Physical Therapy

Set forth below are the Essential Functions that you must be able to meet in order to successfully complete the Occupational and Physical Therapy programs at the University of St. Augustine for Health Sciences.

We wish to facilitate your success. If you know of any reason that you cannot now, or after regular instruction, meet all of the functions set forth below, you are to inform the Student Services Office so you can be counseled regarding the process for requesting reasonable accommodations. The University of St. Augustine for Health Sciences wishes to make reasonable accommodations in areas in which it is able to do so.

There are certain physical requirements that this program cannot accommodate such as failure to meet the motor, tactile, visual, and hearing criteria as set forth below. In addition, there are standards of performance that cannot be accommodated such as in the areas of safety or judgment. The cognitive component of some of the Essential Functions, such as the ability to perform cardiopulmonary resuscitation (CPR) or transfer patients, is taught as part of the curriculum.

Read each function below and **check the corresponding box** to indicate you are able to meet the function now or after regular instruction. Contact the Chair of the Disability Awareness Committee if you feel you are unable to meet any of these functions or if you have any questions regarding Essential Functions.

### A. Critical Thinking Ability (Weigh pros and cons and logically make decisions)
1. Use sound judgment and apply safety precautions as appropriate.
2. Analyze and synthesize data from a variety of sources in a timely manner.
3. Ability to put research findings into practice.
4. Exhibit a positive, interactive response to feedback.

### B. Interpersonal Skills
1. Interact appropriately with individuals, families, and groups from a variety of social, emotional, cultural, and intellectual backgrounds.
2. Establish rapport with clients, patients and colleagues.
3. Use responsive, empathetic listening skills.
4. Direct/supervise support personnel.
5. Actively participate and contribute to group projects.

### C. Mobility Skills
1. Ability to move physically from room to room and maneuver in small places around patient/equipment.
2. Ability to administer CPR.
3. Ability to walk up and down stairs/ramps.
4. Travel to clinical education sites locally and nationally as assigned.

### D. Communication Skills
1. Communicate effectively with patients/clients, family members, faculty, other health care professionals, and community and professional groups in verbal and written form.
2. Elicit information from patients/clients in a timely manner.
3. Complete written work at a professional level in a timely manner.
4. Document patient/client assessment/evaluation, intervention plan and progress notation succinctly and in a time frame similar to clinical constraints.
5. Achieve basic competency in word processing, e-mail, and use of the Internet.

LN      1/2/16
Student Initials    Date

USA/Nguyen 000013

## E. Motor Skills

1. Ability to perform an assessment/evaluation and intervention through the execution of motor movements as defined below.
   - a. Ability to stand for thirty (30) minutes.
   - b. Ability to lift forty (40) pounds.
   - c. Ability to kneel, crawl, roll, and bend backward and forward.
   - d. Be able to assume prone, supine and side-lying positions.
   - e. Exhibit independent control of upper and lower extremity joints.
   - f. Independently climb on and off of a three-foot table.
   - g. Balance on one leg.
   - h. Grasp and release items of various sizes in both hands.
   - i. Have grip strength of twenty (20) pounds.
   - j. Open and close doors one-handed.
2. Demonstrate sufficient strength and balance to transfer, move, assist patients/clients in walking, and their daily occupations without injury to patient/client or self.
3. Demonstrate coordination of gross and fine motor upper extremity movement patterns to perform therapeutic activities, daily life occupations and use of a mouse and keyboard for computer input.
4. Ability to perform a technique with proper positioning, hand placement, direction of force, amount of force, etc., based upon visualization of a picture, video or live demonstration.
5. Ability to position oneself in front of a screen for typing, viewing, reading, and using the computer for up to 50 minute intervals.

## F. Visual Ability

1. Ability to observe and interpret patient/client movement or occupational performance.
2. Ability to observe a patient/client at a distance greater than twenty (20) feet and close-up noting verbal and nonverbal signals.
3. Ability to visually monitor and assess physical, emotional, and psychological responses, equipment settings, dials and instructions.
4. Ability to determine and comprehend dimensional and spatial relationships of structures, e.g. differentiating right and left, up and down, etc.
5. Ability to view video, graphics, and written word on the computer screen or a DVD monitor.

## G. Tactile Ability

1. Ability to perform a physical assessment through on-hands application that may include palpation of anatomical structures, noting surface characteristics, assessment of tone, temperature, depth, etc.

## H. Hearing

1. Auditory ability sufficient to monitor and interact with patients, other professionals and families.
2. Ability to hear and react appropriately to alarms, emergency signals, timers, and cries for help.
3. Auditory ability sufficient to hear verbal instructions, audio, video, DVD or computer media in the classroom, lab or clinic.

## I. Coping Skills

1. Ability to perform in stressful environments or during impending deadlines.
2. Complete timed written, oral, and laboratory practical examinations.
3. Follow the "Student Code of Conduct" and other policies as stated in the *Student Handbook* that include but are not limited to:
   - a. Maintain academic honesty at all times.
   - b. Exhibit dependability by arriving in class on time, attending all assigned classes, and following through with commitments and responsibilities.
   - c. Display professionalism through appropriate presentation of oneself, follow the University dress code, and display a positive attitude.
   - d. Obey University, local, state and federal laws, policies and procedures, and rules and regulations.



## UNIVERSITY OF ST. AUGUSTINE
### FOR HEALTH SCIENCES

### Essential Functions for Occupational and Physical Therapy

The check boxes above and my signature below indicate that I have read and understand the **Essential Functions.** I understand that I must either meet these Essential Functions upon entry to the University or with regular instruction in order to successfully complete the programs in Occupational and Physical Therapy at the University of St. Augustine for Health Sciences. I understand that I should contact the Admissions Office should I require further clarification about the Essential Functions. In addition, I understand that if I know of any reason why I would need reasonable accommodations to meet the Essential Functions I should request these accommodations from the Disability Awareness Committee *immediately after acceptance to the University*. Failure to meet the Essential Functions will lead to termination of my enrollment at the University of St. Augustine for Health Sciences.

Please check **one** of the following:

☑ I can meet all of the Essential Functions described in this document upon entry to the University or after regular instruction.

☐ I may have difficulty meeting one or more of the Essential Functions described in this document and plan to submit a request to the Disability Awareness Committee for a reasonable accommodation(s). **Please list the Essential Function(s) you feel you may have difficulty meeting and the type of accommodation(s) for which you will be submitting a request.**

Examples:
*C. 4. Travel to clinical education sites* – Need site near public transportation.
*I. 2. Complete timed written, oral, and laboratory practical examinations* – Need extended time on written exams.

_____

_____

_____

Print Name:_____Luke Nguyen_____

Signature: _____     Date: ___1/2/16_____

Witness: _____     Date: ___1/2/16_____
              (Notary not required)

Degree Program ____DPT_____     Term ___Summer___     Campus ___Saint Augustine

LN          1/2/16
**Student Initials    Date**
USA/Nguyen 000015



## UNIVERSITY OF ST. AUGUSTINE
### FOR HEALTH SCIENCES

**\*\*IMPORTANT\*\***
**Admissions Policies**

**Prerequisite coursework:**
You must complete all prerequisite coursework with a grade of 'C' or higher prior to your Orientation date at the University of St. Augustine. You must also provide evidence prior to the first day of classes to the Admissions Office that indicates prerequisite course completion. This may be: letter from course instructor, letter from Registrar's office, or copy of unofficial transcript (that shows the grade, not just registration). You have until the end of the fourth week of the trimester to provide official transcripts to the Admissions Office that document successful completion of all required coursework. You will not be eligible for any financial aid refunds until you meet this requirement. If you do not supply a final transcript by the due date noted above, you will be at risk of being asked to withdraw from the University. University tuition refund policies will apply in such cases.

**Undergraduate Degree:**
You must successfully complete your undergraduate degree/degree requirements prior to the first day of classes. You must also provide evidence to the Admissions Office that indicates degree completion. This can be done by getting a letter from your Registrar's Office stating you have completed all your degree requirements. You have until the end of the fourth week of the trimester to provide the official transcripts to the Admissions Office that document successful completion of your degree. You will not be eligible for any financial aid refunds until you meet this requirement. If you do not supply a final transcript by the due date noted above, you will be at risk of being asked to withdraw from the University. University tuition refund policies will apply in such cases.

**Criminal Background Check, Drug Screen and Fingerprint Report:**

On the Admission forms, a disclaimer will read: *"In general, the majority of field experience sites and employers require that students' and applicants' criminal background checks be clear of any significant incidents and require a negative drug screen. In the interest of ensuring that University students will be eligible to participate in required field experiences and eligible to apply for state licensure, all admissions to the University are considered contingent until the University has received the results of an approved criminal background check, 10 panel drug screen, and fingerprint report. A background check that includes any significant incidents, including a felony conviction, or any positive drug test will disqualify an applicant for admission to the University. All applicants are expected to disclose all arrest and or conviction histories on the admission application. Failure to report this information may lead to denial admission. Applicants will be provided a list of approved testing providers and all checks and screens will be completed at the student's expense."*
Students provisionally accepted into a first professional program will be required to obtain a criminal background check, 10 panel drug screen, and fingerprint report through an approved

Page 12 of 13

LN          1/2/16
**Student Initials    Date**

USA/Nguyen 000016

provider, and full admission will depend on satisfactory results. Students will also be required to obtain updated checks prior to participating in any of the required fieldwork/internship/rotation courses in the curricula. Costs associated with these updated checks are the responsibility of the student.

Admission will be denied to any student with a felony conviction reported on a criminal background check* and or fingerprint report. If a background check and or fingerprint report is returned with a misdemeanor, a meeting with the program director may be necessary to discuss the nature of the misdemeanor and its possible impact on clinical site placement, prior to full admission being granted.

Students must disclose arrest and or conviction histories on their application. Upon acceptance, the student will have a continued obligation to report any criminal arrests or convictions to the Department Head of Clinical Education within 30 days of its occurrence.

A 10 panel drug screen** is expected to be completed prior to full acceptance into the program. A failed drug screen or one not completed when scheduled will result in denial of admission. Students who are denied acceptance due to a failed drug screen may re-apply for the following available term.

The $500 deposit fee will be fully refunded if admission is denied due to an adverse report on the background check, drug screen or fingerprint report.

*List of background screens performed: County criminal search, nationwide sex offender search, Office of Inspection General (OIG) and US General Services Administration (GSA).

**List of tested substances: Amphetamines, barbiturates, benzodiazepines, cocaine, methadone, methaqualone, opiates, phencyclidine, propoxyphene and marijuana.

This policy will take effect for the January 2016 cohorts

Approved by Management Committee 7/16/2015

I have read and understand the above admissions policies.

Print Name: _____ Luke Nguyen _____

Signature: _____     Date: _____ 1/2/16 _____

Witness: _____     Date: _____ 1/2/16 _____
(Notary not required)

**Please return completed in one .pdf file by scan to:**
**Advising@usa.edu**

**or fax to 904.810.3819**

LN      1/2/16
Student Initials    Date

USA/Nguyen 000017

*University of St. Augustine for Health Sciences*

ID : 103891
Name : Luke Nguyen
Address

Print Date: 1/8/2019

## First Professional Division
*Advisors : Debra Lynn Gray*

| Course Number | Title | CR | Type | Gra | Rpt | Att | Ernd | HGpa | Q.Pts | GPA |
|---|---|---|---|---|---|---|---|---|---|---|
| **2015-2016 Academic Year : Pre Summer Start-Spring** | | | | | | | | | | |
| NSO 5000 | New Student Orientation | PF | NG | | | 0.00 | 0.00 | 0.00 | 0.00 | |
| | Term Totals : | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.0000 |
| | Career Totals : | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.0000 |
| **2015-2016 Academic Year : Summer** | | | | | | | | | | |
| HSC 5003 | Critical Thinking I | LT | A | | | 1.00 | 1.00 | 1.00 | 4.00 | |
| HSC 5010 | Scientific Inquiry | LT | B+ | | | 1.00 | 1.00 | 1.00 | 3.50 | |
| HSC 5100C | Applied Human Anatomy | LT | C+ | | | 4.00 | 4.00 | 4.00 | 10.00 | |
| HSC 5213C | Skills and Procedures | LT | B | | | 4.00 | 4.00 | 4.00 | 12.00 | |
| HSC 5741C | Applied Medical Physiology | LT | B+ | | | 4.00 | 4.00 | 4.00 | 14.00 | |
| PHT 5006C | Massage and Soft Tissue P | LT | B | | | 1.00 | 1.00 | 1.00 | 3.00 | |
| PHT 5802 | Physical Therapist Practice | LT | A | | | 2.00 | 2.00 | 2.00 | 8.00 | |
| | Term Totals : | | | | | 17.00 | 17.00 | 17.00 | 54.50 | 3.2058 |
| | Career Totals : | | | | | 17.00 | 17.00 | 17.00 | 54.50 | 3.2058 |
| **2016-2017 Academic Year : Fall** | | | | | | | | | | |
| HSC 5122C | Biomechanics | LT | W | | | 0.00 | 0.00 | 0.00 | 0.00 | |
| HSC 5416 | General Pathology | LT | W | | | 0.00 | 0.00 | 0.00 | 0.00 | |
| HSC 5700 | Wellness and Prevention in | LT | W | | | 0.00 | 0.00 | 0.00 | 0.00 | |
| PHT 5132C | Musculoskeletal I: Orthopa | LT | W | | | 0.00 | 0.00 | 0.00 | 0.00 | |
| PHT 5225C | Physical Modalities/Integum | LT | W | | | 0.00 | 0.00 | 0.00 | 0.00 | |
| PHT 5234C | General Therapeutic Exerci | LT | W | | | 0.00 | 0.00 | 0.00 | 0.00 | |
| | Term Totals : | | | | | 0.00 | 0.00 | 0.00 | 0.00 | 0.0000 |
| | Career Totals : | | | | | 17.00 | 17.00 | 17.00 | 54.50 | 3.2058 |

## First Professional Division
*Advisors : Debra Lynn Gray*

| Course Number | Title | CR | Type | Gra | Rpt | Att | Emd | HGpa | Q.Pts | GPA |
|---|---|---|---|---|---|---|---|---|---|---|
| **2016-2017 Academic Year : Spring** | | | | | | | | | | |
| HSC 5700 | Wellness and Prevention in | LT | B+ | R | | 3.00 | 3.00 | 3.00 | 10.50 | |
| HSC 5800 | Gerontology | LT | A | | | 3.00 | 3.00 | 3.00 | 12.00 | |
| | Term Totals : | | | | | 6.00 | 6.00 | 6.00 | 22.50 | 3.7500 |
| | Career Totals : | | | | | 23.00 | 23.00 | 23.00 | 77.00 | 3.3478 |
| **2016-2017 Academic Year : Summer** | | | | | | | | | | |
| HSC 5122C | Biomechanics | LT | B+ | R | | 4.00 | 4.00 | 4.00 | 14.00 | |
| HSC 5416 | General Pathology | LT | A | R | | 3.00 | 3.00 | 3.00 | 12.00 | |
| PHT 5405 | Psychosocial & Ethical Asp | LT | A | | | 3.00 | 3.00 | 3.00 | 12.00 | |
| | Term Totals : | | | | | 10.00 | 10.00 | 10.00 | 38.00 | 3.8000 |
| | Career Totals : | | | | | 33.00 | 33.00 | 33.00 | 115.00 | 3.4848 |
| **2017-2018 Academic Year : Fall** | | | | | | | | | | |
| HSC 5151C | Clinical Neurosciences | LT | C | | | 5.00 | 5.00 | 5.00 | 10.00 | |
| PHT 5225C | Physical Modalities/Integum | LT | B | R | | 4.00 | 4.00 | 4.00 | 12.00 | |
| | Term Totals : | | | | | 9.00 | 9.00 | 9.00 | 22.00 | 2.4444 |
| | Career Totals : | | | | | 42.00 | 42.00 | 42.00 | 137.00 | 3.2619 |
| **2017-2018 Academic Year : Spring** | | | | | | | | | | |
| PHT 5132C | Musculoskeletal I: Orthopa | LT | C+ | R | | 4.00 | 4.00 | 4.00 | 10.00 | |
| PHT 5234C | General Therapeutic Exerci | LT | C | R | | 4.00 | 4.00 | 4.00 | 8.00 | |
| | Term Totals : | | | | | 8.00 | 8.00 | 8.00 | 18.00 | 2.2500 |
| | Career Totals : | | | | | 50.00 | 50.00 | 50.00 | 155.00 | 3.1000 |



DEFENDANT'S
EXHIBIT NO.
FOR IDENTIFICATION
DATE: 5/19/22   RPTR: RF

USA/Nguyen 000034

University of St. Augustine for Health Sciences

ID : 103891
Name : Luke Nguyen
Address

Print Date: 1/8/2019

**First Professional Division**
Advisors : Debra Lynn Gray

| Course Number | Title | CR | Type | Gra | Rpt | Att | Ernd | HGpa | Q.Pts | GPA |
|---|---|---|---|---|---|---|---|---|---|---|
| **2017-2018 Academic Year : Summer** | | | | | | | | | | |
| HSC 5142 | Child Development | LT | | A | | 3.00 | 3.00 | 3.00 | 12.00 | |
| PHT 5143C | Neuromuscular I: Concepts | LT | | B | | 3.00 | 3.00 | 3.00 | 9.00 | |
| PHT 5236C | Therapeutic Exercise II | LT | | C+ | | 3.00 | 3.00 | 3.00 | 7.50 | |
| PHT 5805 | Physical Therapist Practice | LT | | B+ | | 2.00 | 2.00 | 2.00 | 7.00 | |
| | | Term Totals : | | | | 11.00 | 11.00 | 11.00 | 35.50 | 3.2272 |
| | | Career Totals : | | | | 61.00 | 61.00 | 61.00 | 190.50 | 3.1229 |
| **2018-2019 Academic Year : Fall** | | | | | | | | | | |
| HSC 5351 | Pharmacology | LT | | A | | 2.00 | 2.00 | 2.00 | 8.00 | |
| PHT 5133C | Musculoskeletal II: Mock C | LT | | F | | 3.00 | 0.00 | 3.00 | 0.00 | |
| PHT 5702C | Prosthetics | LT | | A | | 1.00 | 1.00 | 1.00 | 4.00 | |
| PHT 5713C | Cardiovascular & Pulmonar | LT | | B | | 2.00 | 2.00 | 2.00 | 6.00 | |
| | | Term Totals : | | | | 8.00 | 5.00 | 8.00 | 18.00 | 2.2500 |
| | | Career Totals : | | | | 69.00 | 66.00 | 69.00 | 208.50 | 3.0217 |
| | | Division Career Totals : | | | | 69.00 | 66.00 | 69.00 | 208.50 | 3.0217 |

**Degree Information :**
(1) 'Doctor of PhysicalTherapy'  Date Conferred :
Major(s)
    Physical Therapy
End of Academic Record

USA/Nguyen 000035



# UNIVERSITY OF ST. AUGUSTINE
## FOR HEALTH SCIENCES

### LEAVE OF ABSENCE REQUEST

To request for a Leave of Absence, complete the following form and forward it to your Program Director for approval. If you have a federal student loan, you should also contact the financial aid office as there may be an impact on your student loan status.

**Student ID:** 103891          **Program:** DPT          **Location:** St. Augustine

**Name:** Luke Nguyen                               **Date:** 9/20/16

**Current Trimester:** Fall 2016          **Effective Date of Leave:** 9/26/16

**Expected Date of Return:** 1/5/17          **Expires one year from approval term**
(within 1 year from date of approval by PD)

### REASON FOR LEAVE OF ABSENCE REQUEST:

Anxiety and scheduling issues.

**Expires one year from approval term**

Forwarding Address: ███████████

Tampa, FL          33624

**Telephone:** Home_____ LFN Cell ███████████

**Email: Correspondence will be through your USA Email Address**

_____          9/20/16
Student Signature                    Date

_____          09/20/2016
Faculty Advisor                       Date

_____          9/20/16
Program Director Signature       Date

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •
**For Registrar Office Use**

_____          09/20/2016
Registrar Signature                 Date
Departments Notified:
Bursar __XX__    Financial Aid __XX__    Clin Ed Office ___XX___    Academic Advisor _XX_



DEFENDANT'S
EXHIBIT NO. 3
FOR IDENTIFICATION
PENGAD 800-631-6989
5/19/22
DATE:          RPTR: RF

USA/Nguyen 000020



# UNIVERSITY OF ST. AUGUSTINE
FOR HEALTH SCIENCES

## Program Change Request Form

1. New students must submit a Program Change request to the Director of Admissions no later than six (6) weeks prior to first term registration. The request must be in writing (email acceptable).
2. Current students must submit the Program Change Request Form to their current program director by midterm of the trimester; requests received after the mid-term deadline will be considered during the subsequent trimester. All transfer requests will be considered on an individual basis.
3. **IMPORTANT:** Changes between degree programs may impact a student's ability to attend and complete clinical internships as originally scheduled.
4. The Director of Admissions will give transfer approval only if the student has successfully completed all of the prerequisites for the program to which they are requesting transfer. If a student does not have the required prerequisites, or an appropriate substitute for a prerequisite course, the student must successfully complete the prerequisite course(s) before the transfer request is completed.
5. Program Change requests are contingent on space availability.

*****************************************************************

Name: _Luke Nguyen_  Student ID # _10389_ Date of request: _11/1/16_

Current program/semester: _DPT / 2nd_  Proposed program: _DPT Flex_

 Proposed change date: _1/1/17_

Reasons for requesting transfer: _Change of personal schedule_

Current G.P.A.: _3.2098_ Signature: _____ Date: _11/1/16_
  (Required)   (Required)

*****************************************************************

☑ Approved ☐ Not approved  Comments: _Good academic standing & retaking for a LOA._

_____ 11/1/16
Director of current program   Date

 Professional or Academic Issues: Y or N (if yes- explain)

☑ Approved ☐ Not approved  Comments: _Entering @ 3rd term - not off track in spring. Will need attend curriculum plan._

_____ 11-2-16
Director of proposed program   Date

☑ Approved ☐ Not approved  Comments: _Per PD approval_

Adrianne L Jones
Digitally signed by Adrianne L Jones
DN: cn=Adrianne L Jones, o=University of St. Augustine for Health Sciences, ou=Admissions,
email=ajones@usa.edu, c=US
Date: 2016.11.28 18:07:25-05'00'
Director of Admissions   Date

☑ Approved ☐ Not approved  Comments: _____
_Ricard Lidwell_ 11/28/2016
**Clinical Education
(**If student is second term or above)   Date

☐ Approved ☑ Not approved  Comments: _____
_Amy Sauder_
Registrar   Date

☐ Recorded  ☐ Financial Assistance  ☐ Accounting

9/15

DEFENDANT'S
EXHIBIT NO. _6_
FOR IDENTIFICATION
DATE: _5/19/22_ RPTR: _RF_
PENGAD 800-631-6989

## Jessica Waters

| | |
|---|---|
| **From:** | Luke Nguyen <l.nguyen4@usa.edu> |
| **Sent:** | Saturday, April 14, 2018 3:40 PM |
| **To:** | David Kempfert; Margaret Wicinski |
| **Subject:** | Second Practical Retake Submission |
| **Attachments:** | Nguyen Ortho Second Retake Remediation.docx |

Dr. Kempfert and Dr. Wicinski,

Please find my second remediation plan submission attached. I used the same form as for my first remediation plan because I was unable to locate any special second remediation plan instructions either on the course website or within the student handbook. Please let me know if I am mistaken and I will be happy to resubmit.

Respectfully,

Luke Nguyen, SPT



DEFENDANT'S
EXHIBIT NO. 8
FOR IDENTIFICATION
DATE: 5/19/22   RPTR: RF

1

USA/Nguyen 000994

# Ortho First Retake Practical Examination Process

Please email both the lead faculty instructor (David Kempfert) and the instructor who tested you within 1-2 business days after failing the exam to submit a written plan of remediation that will effectively prepare you for the first retake practical examination. If you have questions about your exam feedback please direct those solely to the examiner you tested with.

The faculty instructors will review (via email) the student's remediation plan and when approved schedule the 1st retake practical examination.

The highest grade awarded for passing the 1st re-take practical examination will be 75%.

The below template is intended to assist in your development of the written plan for remediation.

## Student Written Plan of Remediation

**Student Name:** Luke Nguyen
**Date:** April 14th, 2018
**Name of Academic Advisor:** Dr. Debra Gray
**Remediation Course & Instructor:** PHT5312C001 Musculoskeletal I: Orthopaedics; Dr. David Kempfert

**Identify your area(s) of weakness/ challenges (provide detail and be comprehensive)**

Time Management: I was unable to perform the last skill due to not managing my time in an efficient manner, particularly with respect to manipulations which are more time intensive.

**Identify a strategy/remediation plan for academic success (provide a timeline with dates):**
I will address the weakness identified above by working to improve expediency of all skill demonstrations required for this practical, particularly with manipulations. I plan to specifically time each technique with the goal of completing each skill demonstration within one minute or less by replicating testing conditions during practice to include the random selection of 2 manipulations, 1 palpation, and 2 MSTT/Special skill demonstrations. I plan performing this self-assessment and refinement for a minimum of 2 hours every day (starting today on April 14th, 2018) to achieve this goal before the next retake attempt of this practical.

- Luke Nguyen, SPT
April 14th, 2018

USA/Nguyen 000995

## Jessica Waters

| | |
|---|---|
| **From:** | Margaret Wicinski |
| **Sent:** | Monday, April 23, 2018 7:47 PM |
| **To:** | Luke Nguyen |
| **Subject:** | RE: Check the TE1 gradebook |

Luke:

Thank you for your email and submitting your assignment. I would recommend to take a few days off over the break. After, I would recommend looking at units 1-6 in TherEx 1. These are foundational and maybe looking at them without pressures or deadlines may help.

As for your retake tomorrow – think , you have seven minutes.
If your palpations and MSTT/special tests are 30 seconds a piece, then you have 5m 30 seconds for the two manipulations…. By your calculations, plenty of time 😊

Prior to the practical, as Dr. Kempfert what order he will go in for the techniques so you can mentally prepare or request to do the manipulations first.

Have a great night!
Dr. Wicinski

Margaret Wicinski, PT, DPT, EdD
904.770.3594 (direct dial)
904.826.0084 x 1294

**From:** Luke Nguyen
**Sent:** Monday, April 23, 2018 1:30 PM
**To:** Margaret Wicinski <MWicinski@usa.edu>
**Subject:** Re: Check the TE1 gradebook

Dr. Wicinski,

I would like to again thank you for your kind words over the past few days to the cohort. I have submitted the assignment as requested. I understand no points will be awarded and I apologize for the tardy submission of an already past due assignment as we discussed in our last meeting.

I am disheartened that I was unable to "get over the hump" as we discussed regarding my test scores after exam #2. However, the small positive side is that I'm consistent? I have already made plans over this break to implement the feedback given to me on that same discussion to refine ortho and therex since they are "foundation courses" going further. I know you are very busy to tailor the needs of an individual student, but I would love to hear any feedback you have regarding my performance and how I can improve (hopefully not with a retake of Therex I).

1

DEFENDANT'S
EXHIBIT NO. 12
FOR IDENTIFICATION
DATE: 5/19/22   RPTR: RE

Regarding the 3rd practical (feedback requested)

I hope to do well tomorrow during the practical but I am admittedly apprehensive about it. I have been working towards the goals I have stated with the remediation plan,  but I am still unable to achieve the goal of completing manipulations under a minute (also I've come to realize I look terrible on camera). My average time of manipulation techniques is 1 minute and 20 seconds (with no deviations greater than 10 seconds; any corrections/readjustments made during manipulations added an average of 15-20 seconds). My palpations/MSTT/and special tests average at around 30 seconds each.

With that said, I wanted to ask if its possible to request doing the manipulations first since they require significantly more time compared to my other skill demonstrations or do I have to go in the order presented by the grader(s)?

Respectfully,

Luke Nguyen, SPT

**From:** Margaret Wicinski
**Sent:** Sunday, April 22, 2018 9:19:41 PM
**To:** Luke Nguyen
**Subject:** Check the TE1 gradebook

Hi Luke!
Hope you're having a great weekend. Please check the gradebook as I am missing an assignment. I need this in order to post the final grade. Please email me your completed assignment and upload it to the platform.

Have a great week!

Dr. Wicinski

Margaret Wicinski, PT, DPT
Assistant Professor – Florida Flex Program
University of St. Augustine for Health Science
904.770.3594 (direct dial)
904.826.0084 x 1294
mwicinski@usa.edu

USA/Nguyen 001023

**From:** Margaret Wicinski
**Sent:** Tuesday, May 8, 2018 8:04 PM
**To:** Luke Nguyen
**Subject:** Re: Reaching out

Luke:
Thank you for your receptive email. I hope your break was restful. As questions arise, please email me.

Dr. Wicinski

Margaret Wicinski, PT, DPT
Assistant Professor – Florida Flex Program
University of St. Augustine for Health Science
904.770.3594 (direct dial)
904.826.0084 x 1294
mwicinski@usa.edu

**From:** Luke Nguyen <l.nguyen4@usa.edu>
**Sent:** Thursday, April 26, 2018 7:32:16 PM
**To:** Margaret Wicinski
**Subject:** Re: Reaching out



DEFENDANT'S
EXHIBIT NO. 13
FOR IDENTIFICATION
5/19/22
DATE: RPTR: KF

Dr. Wicinski,

Thank you for reaching out to me and I agree with your assessment. I may have passed the class, but I am unsatisfied with how I performed on the written exams and on the written assignments. I will be taking your advice from an earlier e-mail to re-examine units 1-6 in regards to program design and exercise prescription (which is interesting since I walked into the term fearing that a lack of anatomy would be my main weakness).

I am looking forward to starting the next term with a running start and have already scheduled time in the next few weeks to address my weaknsses. If I have questions regarding anything, would it be appropriate to send during the break or would you prefer I hold my questions until the start of the next term?

Respectfully,

Luke Nguyen, SPT

Get Outlook for iOS

**From:** Margaret Wicinski
**Sent:** Thursday, April 26, 2018 5:47:57 PM
**To:** Luke Nguyen
**Subject:** Reaching out

Luke:
I just wanted to reach out to you at the end of TherEx 1 to express concern with your written exam performance.

1

USA/Nguyen 001052

While you passed the course based on the syllabus, I see that some foundational knowledge may be lacking. This may pose some difficulty in future terms.

I wanted to bring this to your attention so you can plan for success!

You may need to review the material from this course when applying it to future courses.

I encourage you to reach out at the beginning of next term with any questions or concerns.

Dr. Wicinski

**Margaret Wicinski, PT, DPT, EdD**
Board-Certified Clinical Specialist in Orthopaedic Physical Therapy
Fellow of the American Academy of Orthopaedic Manual Physical Therapists
*Assistant Professor – Florida Flex Program*
*University of St. Augustine for Health Science*
*904.770.3594 (direct dial)*
*904.826.0084 x 1294*
mwicinski@usa.edu



USA/Nguyen 001053

# UNIVERSITY OF ST. AUGUSTINE

## FOR HEALTH SCIENCES

# **FALL 2018**

**NAME OF COURSE:** MUSCULOSKELETAL II: MOCK CLINIC
**COURSE NUMBER:** 5133 C-001
**TOTAL CREDIT HOURS:** LECTURE/ONLINE CREDIT HOURS:1 LAB CREDIT HOURS: 2
**CREDIT HOURS:** 3
**CAMPUS:** FL
**DELIVERY METHOD:** BLENDED
**PROGRAM(S):** FLEX DPT
**START DATE:** THURSDAY, SEPTEMBER 6, 2018
**END DATES:** WEDNESDAY, DECEMBER 19, 2018

DEFENDANT'S
EXHIBIT NO. 14
FOR IDENTIFICATION
5/19/22
DATE: RPTR: RF
PENGAD 800-631-6989

**ONLINE FACULTY:**
Margaret Wicinski, PT, DPT, EdD, OCS, MTC, PCC, FAAOMPT
Email: mwicinski@usa.edu
Office phone: 904-826-0084 EXT 1294 – email is the BEST way to contact the instructor
Office Hours: Tuesdays 3:15 – 4:15pm; Fridays 12:00 noon – 1:00 pm
        Other times **are** available by appointment. Appointments are **strongly** recommended.

**LEAD LAB FACULTY:**
Paige Schreiner, PT, DPT
jschreiner@usa.edu

**LAB ASSISTANTS:**
Bryan Olson, PT, DPT
Jennifer Baringer PT, DPT

When contacting your faculty, be sure to use your usa.edu email address as faculty are not permitted to communicate with you through another email service.

## ABOUT YOUR INSTRUCTOR

Dr. Margaret Wicinski earned her BA in Biology in 2000 from University of Louisville in Kentucky. In 2002, she received her doctor of physical therapy degree from University of Saint Augustine for Health Sciences (USA). After graduating from physical therapy school, Dr. Wicinski returned to the Louisville area and began working in a private outpatient orthopaedic clinic and at a Level I Trauma Center. She completed her Manual Therapy Certification in 2003 and her Primary Care Certification in 2004 through the University of Saint Augustine. Dr. Wicinski also completed her Manual Therapy Fellowship through USA and in 2007 and became a Fellow of the American Academy of Orthopaedic Manual Physical Therapists. After 7 years of patient care, Dr. Wicinski moved to San Diego to teach at the University of Saint Augustine – San Marcos campus primarily focusing in the Musculoskeletal Curriculum.

In summer of 2012, Dr. Wicinski relocated to St. Augustine, FL to teach full time in the Physical Therapy Flex Program. In addition, Dr. Wicinski is an active member of the Florida Physical Therapy Association, American Physical Therapy Association and American Academy of Orthopaedic Manual Therapists. She has assumed roles within professional organizations, including By-Laws Chairperson for the Kentucky Physical Therapy Association as well as California Physical Therapy Association - San Diego District Representative.

1

USA/Nguyen 000953

## Course Information:

**COURSE DESCRIPTION:**
This course will integrate the theory and practice of examination of the physical therapy patients with a musculoskeletal diagnosis. Through the use of a "Mock Clinic", the student will learn and practice history taking during patient interviews and practice tests and measurements utilizing the 18 steps of a musculoskeletal examination.  This course will build upon examination techniques learned in Physical Therapy Skills & Procedures, Therapeutic Exercise I, and Musculoskeletal I. In addition, this course will include application of material taught in Anatomy, Biomechanics, Pathology, Massage, and Physical Modalities. From the information gathered in the interview and physical examination, the student will exercise diagnostic skills, practice prognostic and intervention prescribing skills, and document impairment lists, long-term and short-term goals, and intervention plans.

**COURSE PREREQUISITES:**
Practicum I, Biomechanics, Pathology, Musculoskeletal I, General Therapeutic Exercise I, Physical Modalities and Integumentary

**COURSE LEARNING OUTCOMES:**
At the completion of Musculoskeletal II, students will be able to demonstrate the ability to:
> **Course Learning Outcome #1:**
> Conduct themselves in a manner that shows respect towards patients, time management, preparedness and documentation timeliness.  (ILO#5/PLO#5)
> > 1.1  Display appropriate professional behavior inside and outside of the classroom experience
> > 1.2  Participate in peer assessment activities to include providing verbal and written feedback to classmates regarding their practical performance of a physical therapy examination.
>
> **Course Learning Outcome #2:**
> Self evaluate strengths and weaknesses that leads to formation of questions, evaluation of resources and independence in seeking answers. (ILO#7/PLO#7)
> > 2.1  Express emotions regarding self-assessment and ability to recall and apply practical knowledge from previous semesters to mock physical therapy examinations and evaluations.
> > 2.2  Express one's areas of strength and areas that need improvement regarding competence at performing and documenting a physical therapy examination and evaluation.
> > 2.3  Appreciate the value of constructive feedback in the development of professional skills.
>
> **Course Learning Outcome #3:**
> Adapt level of communication to meet the needs of the patient when completing a subject history. (ILO#4/PLO#4)
> > 3.1 Exhibit appropriate interpersonal and communication skills in performing the patient interview considering multicultural issues
>
> **Course Learning Outcome #4:**  Perform a comprehensive musculoskeletal examination. (ILO#3/PLO#3, ILO#7, PLO#7)
> > 4.1 Describe and perform the components of the patient interview.
> > 4.2 Demonstrate appropriate physical assessment techniques as determined by the interview findings.
> > 4.3 Modify an examination based upon physical assessment findings.
> > 4.4 Perform a safe and comprehensive patient examination in an organized and timely manner with 80% competency.
> > 4.5 Employ early hypothesis generation and hypothesis testing in a musculoskeletal patient examination.
> > 4.6 Demonstrate clinical decision making skills by providing rationale for clinical reasoning.
>
> **Course Learning Outcome #5:**  Determine clinical impression, rehab diagnosis, impairments and prognosis through the clinical decision making process. (ILO#3/PLO#3; ILO#2/PLO#2; ILO#7/PLO#7)
> > 5.1 Identify neuro-musculo-skeletal impairments (dysfunctions) and begin formulating a physical therapy diagnosis based on the information obtained from the history, signs, symptoms, and tests.
> > 5.2 Integrate the information gathered in the interview and physical examination to formulate a impairment list, functional limitations, diagnosis(es), prognosis, long term and short term goals, intervention plan, and discharge plan

2

5.3 Independently complete efficient and accurate documentation of the examination and evaluation with 80% competency.

5.4 Recognize basic signs and symptoms that are beyond the expertise of the physical therapist and make the appropriate referral.

5.5 Discuss valid and reliable outcome measures considering various practice setting's including, outpatient, acute care and extended care settings.

5.6 Select valid and reliable outcome measures considering various practice setting's including, outpatient, acute care and extended care settings

5.7 Analyze and interpret outcome measures as applied to selected patient cases, at various levels of the ICF model for assessment and measurement of patient progress.

**CREDIT HOUR DEFINED:** According to the US Department of Education's Definition of Credit Hour, one contact hour of instruction (academic engagement) and two additional hours of student work (preparatory work) must occur for every credit hour in a 15 week course. The following table is a guideline for anticipated hours for this laboratory class.

- Lecture/Online Credit Hours: 1          Lab Credit Hours: 2

| Activity | Assignments | Estimated hours for the average student for the entire course time |
|---|---|---|
| Online Academic Engagement | Asynchronous instruction (interacting with course materials such as accessing recorded lectures, videos, etc.) | 15 |
| | Asynchronous activities (forum discussions, etc.) | 5 |
| | Synchronous instruction (live chats, use of collaborate, skype) | 2 |
| | Assessment Activities (assignments, quizzes and exams) | 9 |
| Face-to-Face Academic Engagement | Faculty/student synchronous physical interaction | 0 |
| | **Total** | **31** |
| Lab Engagement | | |
| | Laboratory Attendance | 44 |
| | Mid-term and final exam | 7.5 |
| | **Total** | **51.5** |
| | **Total Academinc Engagement** | **82.5** |
| Student Preparation (outside of class) | Required reading: 30 pages per hour | 20 |
| | Required reading, difficult reading level: 25 pages per hour | 20 |
| | Preparing assignments | 30 |
| | Studying for quizzes, exams, practicals | 20 |
| | Reflection or journaling | |
| | Other [describe] | |
| | **Total Preparation** | **90** |
| **Overall Total** | | **172.5** |

## UNIVERSITY ASSESSMENT

With the goal of continuous improvement of the achievement of student learning outcomes, USAHS conducts assessments of achievement of program and institutional learning outcomes, in addition to course outcomes. Student work is used in aggregate and anonymously as the basis of these assessments, and the work you do in this course may be used in these assessment efforts.

3

**REQUIRED TEXT and RESOURCES:**
The required texts are listed below.  Each book listed was required for a previous course in the curriculum.

- APTA.  *Guide to Physical Therapist Practice 3.0*. 2014.  Available at http://guidetoptpractice.apta.org/.
- Kendall FP, McCreary EK, Provance PG, Rodgers MM, Romani WA. *Muscles Testing and Function*. 5th ed.  Baltimore, MD: Williams and Wilkins, 2005.
- Kisner C, Colby LA. *Therapeutic Exercise: Foundations and Techniques*. 7th Ed. Philadelphia, PA: FA Davis Co. 2018.
- Norkin CC, White DJ. Measurement of Joint Motion:  A Guide to Goniometry, 4th Ed. Philadelphia:  F. A. Davis Company, 2009.
- Patla CE, Paris SV, *E -1 Course Notes, Extremity Evaluation and Manipulation*. St. Augustine FL: IPT, 2002.
- Documentation Resource from Practicum I
- Lab assessment tools: Goniometers, wedge, tape measure, blood pressure cuff, stethoscope, reflex hammer, gait belt

Recommended Reference:
- Hertling D, Kessler RM. *Management of Common Musculoskeletal Disorders: Physical Therapy Principles and Methods*. 4th Ed. Philadelphia, PA: Lippincott. 2006.
- Magee DJ. *Orthopedic Physical Assessment*. 6th Ed. Philadelphia, PA: W.B. Saunders Co., 2014.


**PLEASE NOTE:** YOU ARE RESPONSIBLE FOR PURCHASING THE COURSE TEXT(S)

**TEACHING METHODS:**
This is a student-centered, active learning course.  Each week material will be presented online, and assignments will follow the completion of each unit.  During the term, lab sessions will be held for the purpose of reviewing and practicing examinations for the UE and LE joints, acute care, and spine. Your grade for this course will come from a variety of assessments. Assessments will include the submission of documentation, completion of quizzes, lab participation, professionalism, a mid-term exam, and a final practical and accompanying documentation.

**TO ACCESS YOUR ONLINE COURSE:**   After you login to the portal, go to the tab named *Blackboard*; which is the first tab to the right of the Home tab. This page will contain an area to log into Blackboard, a link to the Blackboard helpdesk, and important announcements and tutorials related to Blackboard.

**REQUIRED SOFTWARE:**
- Some courses include PDF files as part of the course materials. To open the PDF-files you need to download Acrobat Reader; this software is available free at www.adobe.com.
- Additional hardware and software requirements, as well as options, are available at: https://www.usa.edu/unit/technology/

- This website, http://whatbrowser.org/, will tell you if your browser is up-to-date

For general information about technical support and other requirements, please visit:
https://my.usa.edu/ICS/Student_IT_Support.jnz  (you need to be logged into *myUSA* for this to work).

For technical issues related to Blackboard, please contact the Blackboard Support (SST) at:
-Phone: 855-763-4653
-Email: USAsupport@USA.edu

4

USA/Nguyen 000956

**Course Grading:**

**See student handbook for policies on grading and test review processes.**
This is a professional clinical course with a passing requirement of a "C." Your grade will be determined as follows:

Overview of grading percentages:
| | |
|---|---|
| Unit assignments | 15% |
| Midterm Documentation | 25% |
| Final Examination | 30% |
| Final Documentation | 30% |
| | |
| Total: | 100% |

Per policy, no extra credit points will be awarded in this course.

Clinical practical examinations require an 80% passing score.  See practical retake policy in the student handbook.

**COURSE REQUIRMENTS:**

I. Class preparation and participation:
> You will partner with a classmate for each lab session. One of you will be assigned the role of student-therapist, and one of you will be assigned the role of pseudo-patient. Once the first student-therapist has finished his/her evaluation, then the roles will switch. It is your responsibility to come prepared to assume both roles with adequate research completed to understand the condition that you will be asked to simulate.

> With any role-playing scenario, it is necessary that there is a degree of realism, which is sometimes difficult to establish, especially when you, as classmates, are so familiar with each other.

As a student-therapist, prior to lab:
- The student must prepare an original, self-made examination form on 1 page of letter size paper (front and back) which will be used to record the examination findings (no evaluation information should be included). This will include the questions you will ask in your patient interview and the potential tests and measures you will perform.  Each form must be individually prepared by each student and two copies brought to class. One copy of the form will be handed in to the instructor prior to lab. Failure to have this form prepared, or any indication that the work was not done individually will lead to loss of points for professionalism. You will use the second copy of the exam form to record your data during the examination. You will be required to submit your completed documentation on the designated due date. The documentation will be typed.
- To help assist in establishing your role as a physical therapy clinician, all student-therapists should be in clinical attire (i.e. professional dress and lab coats) (i.e. professional dress) which includes for men:  being clean-shaven, dress shirt (tucked in), necktie done up properly, khakis or dress pants, belt, socks and comfortable shoes (not sandals or sneakers).  For ladies:  dress pants of appropriate length (not capris), professional blouse or sweater (tucked in), socks and comfortable, low heel shoes (closed-toe).  All students are expected to wear a lab coat with their name tag during the examination. Please refer to your student handbook for appropriate clinical attire.

> When acting as a pseudo-patient, you will be given a patient case with an in-depth history and abnormal findings to exhibit.  In addition to the information given, the student is expected to know about the impairments, functional limitations, and disabilities portrayed in the case and enhance the history with reasonable answers. Suggested references include textbooks you have from prior courses, faculty, and the library for additional research. The patient case that you mimic must be handed in at the end of lab. All "mock" patients are expected to be in standard lab attire as indicated in the student handbook.

II. Weekly Documentation:
> Every patient examination you perform will require proper documentation. You will be required to write your documentation and submit it for feedback and grading at the designated date and time.  Failure to hand

5

documentation in on time will lead to loss of credit for the weekly documentation criterion. **All weekly documentation must be completed to pass the course.**

Along with each weekly documentation, students will submit a reflective evaluation of one's strengths and areas of enhancement in relation to that week's lab performance. Plans to improve the areas of weakness will be listed, and if necessary, discussed with a faculty member. Failure to submit a self-reflection will lead to loss of credit for the professional behavior criterion. **All self-reflections must be complete to pass the course.**

III. Examinations:

There are three examinations in this course:

1. **The midterm**
   o The midterm mock case evaluation will be documented and the documentation will be submitted for grading according to your online instructor.
   o The midterm mock case examination will be documented and submitted for grading by 8:00am the following day. The note will be graded according to the Mid-term Note Assessment Criteria Form.
   o The grade will be rounded to the 10th of a percentage point (for example, 87.6%). A percentage grade will be calculated from this form. The mid-term note will count toward 25% of the final grade

2. **The final practical and plan of care**
   o The final practical examination and the final documentation are 2 separate grades. Please see the schedule for the approximate dates and times of these examinations. You must successfully pass the final examinations with an 80% overall score and a 100% with safety in order to pass this course.
   o The final practical examination will be cumulative.
      ▪ You will be presented with 6 cases consisting of 3 UE and 3 LE cases, and you will have to randomly choose one of the cases.
      ▪ You will have 45 minutes to perform a comprehensive examination of the pseudo-patient and explain the results of your examination to the patient.
      ▪ If you are not finished in 45 minutes, you will be permitted five minutes of extra time, but will lose the credit for completing the examination on time.
      ▪ Following the physical examination, the plan of care will be documented.
         • Students will be allotted 80 minutes for writing the plan of care.
            o If you have not finished the note in 80 minutes, you will be permitted five minutes of extra time, but will lose the credit for completing the plan of care on time.
            o Students may be required to bring their personal laptops for the Plan of Care portion of the examination
   o The FINAL ASSESSMENT CRITERIA FORM consists of 115 criteria, which will be used to assess your performance. Criteria achieved will be marked with a check. Areas that have not met the competency requirements will be marked "NI" (Needs improvement). If the student did not have the opportunity to demonstrate a certain criterion, the criterion will be marked "NA" (not applicable) and will not be considered for grading purposes.
      ▪ A percentage grade will be calculated from the Final Assessment Criteria Form. Both the practical and documentation portions of the final examination must be passed individually at an 80% competency level. The grade will be rounded to the 10th of a percentage point (for example, 84.3%).
         • A minimum of 80% proficiency is required on all clinically-related practical examinations. The practical examinations require the student to meet both safety and technical skill performance competencies.
         • Safety requirements must be met at a 100% competency level. If a student does not perform in a safe manner the student will receive an F grade for the practical examination.
         • Those scoring less than 80% will be required to repeat that portion of the final. If the student earns less than 80% on the technical skill performance the student will likewise receive an F grade for the practical examination.
         • Any student receiving an NI on a patient safety issue will be required to retake the practical regardless of his/her percentage score

6

USA/Nguyen 000958

- In either case, the student must retake the practical examination. The student must meet both safety (100%) and technical skill performance competencies (80%) to pass the practical re-take. The grade awarded for the 1st re-take practical examination will be 75%.

▪ <u>Each student must complete and demonstrate competency of at least 80% of the criteria observed on the final in both the examination and documentation portions.</u> **Any student unable to complete the practical exam up to and including "explains findings, diagnosis, prognosis, and patient responsibilities to the patient" will receive an automatic failure and be required to retake the practical regardless of his/her percentage score.**

▪ When necessary, a retake exam or note writing (retake) may need to be scheduled outside of class time, or prior to the following term.

- **The student must still reach the 80% competency to pass the retake, but the maximum value of the retake is 75%.** If the student still does not reach 80% competency on the retake or 100% safety, he/she will be required to petition the academic progression committee for approval for a second retake.

  o A student who receives an F on the retake practical exam may petition the Academic Progression and Retention Committee (APRC) for permission to take a second retake practical examination. The student's petition must provide written rationale supporting his/her request for a second retake examination. (See appendix 7 Academic Progression and Retention Committee Guidelines to submit a letter requesting exam retakes for written/practicals/orals).

  o The APRC will review the request and provide a written response to the Program Director who will render the final decision on the matter. Should the request for a second retake not be granted, or if it was granted and the student receives an F on this second retake, the student will receive a D or F for that clinical course.

  o If the student was granted permission for the second retake and the student passes (100% safety, 80% technical skill performance) the highest grade awarded on the 2nd retake practical examination is 70%.

    ▪ The second retake will graded by two instructors and videotaped.
    ▪ 80% competency for the final examination and documentation is <u>required</u> to pass the course.

  o If you do not meet the 80% competency on the final retake or the practical and/or plan of care, all other scores received during the semester are considered null and void. You will receive an "F" for the course. <u>A passing grade for the final examination AND documentation is required to pass the course</u>.

  o All practical exams must be completed by the date grades are due published on the academic calendar.

  o For all third attempts at the lab practical examination, there will be two graders. In addition, the examination will be video taped.

  o Both the final examination and final documentation will count toward 30% of the course grade each (30% / 30%).

  o Please review the retake policy in the Student Handbook. Communication with the course instructor and development of a plan is required for a second attempt at the final practical and/or plan of care. These activities are **time sensitive** and are **REQUIRED** to follow the time line outlined in the Student Handbook. If a third attempt is needed for the final practical and/or plan of care, additional communication with the course instructor, revision of your plan and approval from the APRC is required. Review the Student Handbook for the policy.

See practical retake policy in the student handbook.

7

USA/Nguyen 000959

You can access your final grade and unofficial transcript by logging into my.usa.edu on the home page of the website.   If you have misplaced your password that was assigned to you from the registrar's office, please click on 'forgot my password' a new password will be assigned and emailed to you.   No grades are mailed out.

**Proctored Exams:**
The Musculoskeletal II: Mock Clinic course has one proctored exam at the beginning of the term.

**All exams must be proctored.** Course instructors will provide ProctorU with the exam date and exam window(s) at the beginning of the term. There will not be any additional proctor fees for the student unless you register for your exam late or make changes that incur a cost.  Be sure to register for your exams early to avoid any out of pocket expense.

Visit the ProctorU website at www.proctorU.com to schedule your exam(s) and verify that your computer, testing environment and internet are compatible with this service.  We recommend doing this at the beginning of the term to allow students to make any adjustments to their computer, internet or testing environment.  To avoid delays with starting the exam with ProctorU, be sure your computer and testing area are prepared and ready to go. It is recommended that you schedule your exam appointment with ProctorU at least 15-30 minutes before you plan to start the exam to provide plenty of time to get set-up with your proctor. If your connection is completed early, you can use that time to review material in your head and/or perform some relaxation techniques

**Communication:** The instructor will visit his e-mail on a daily basis. As a general rule, a response by the instructor to a query from the learner will be generated in less than 48 hours, if not sooner. In most cases assignments will be graded within 48 hours, lengthier assignments may take up to 7 days to grade.

It is the student's responsibility to contact the primary course instructor within one week of the start date of the term to discuss conflicting dates with multiple other course exams, presentations, etc. and request changes to the course schedule.

**COURSE EVALUATIONS:** Course evaluations are due upon completion of your course. These evaluations will be available to you by the 7th week of the term. Please locate the course evaluation link(s) at MyUSA. All assigned course evaluations will be listed and each link will take you to the course evaluation of the corresponding course. You may enter your feedback at any time during the term after it is opened.  In fact, you can return to the course evaluation and pick up where you left off if you select "save progress & return". If you click on the "submit survey" button, you cannot return to the evaluation.  **Please do not submit until the last week of your course.**  All course evaluations may be completed on any mobile device.

Your anonymous feedback is valuable to this process as course evaluation and modification is dependent on your input. Make sure your comments are constructive; course modifications depend on your feedback.

**SPECIAL NEEDS AND CONSIDERATION:** The University of St. Augustine for Health Sciences is committed to providing students with disabilities equal access to all its programs and services. To register with Disability Services and request accommodations for a disability, contact staff at disability@usa.edu. Accommodations are determined, on a case-by-case basis, by the Director of Disability Services after review of medical documentation.

**MID-COURSE WARNING:** The mid-term deadline for this course is **October 26, 2018**.  On that date, the University Registrar will be notified of any students with a mid-term grade of less than 70%.  Students will receive a letter from the registrar outlining the responsibilities.  It is important that all students receiving these letters set up a meeting time with the course instructor.

**WITHDRAW DATE:** The final day students may withdraw from this course is **November 21, 2018.**  Students need to complete the Course Withdraw form found on the MyUSA Portal.

8

USA/Nguyen 000960

## Professional Behaviors:

A maximum 10% of the final course grade may be reduced for not meeting professional behavior expectations.

EXCUSED ABSENCES AND/OR INDIVIDUAL RESCHEDULING OF EXAMS
In addition to the policies provided in the Student Handbook, the following information outlines what is considered an excused absence from lab or a required synchronous class session, and an appropriate reason to request taking an exam at a time other than when it is scheduled:

1) A major life event for the student or a member of the student's immediate family.
   a. Major life events include weddings, funerals, graduations, significant religious events, or other major events as approved by the program director.
   b. Immediate family includes spouse, parent, child, sibling; spouse's parent, child, or sibling; grandparents, or grandchildren.
2) A required work event for the student that cannot be rescheduled and potentially impacts continued employment.

The student must request an excused absence or different exam time as soon as the conflict is known. Lab absence requests must go to the program director first. Synchronous class session absence requests or exam rescheduling requests should go directly to the course faculty. Documented evidence of the conflicting event may be required.
In the case of excused absences, faculty will assist in developing a plan to help the student make up what they missed. That may require the student to come to campus during the week. Unexcused absences are considered to be unprofessional behavior and grade penalties may be imposed. With any unexcused absence, students forfeit the right to review with the instructor all or any part of the material, including test reviews, covered during that class or lab session.

UNEXPECTED ABSENCES AND/OR CONFLICTS
In the event of significant illness or other unexpected and unavoidable conflict with lab attendance, required synchronous class session, and/or scheduled exam, the student should notify faculty ASAP by email or phone (see contact information on first page of syllabus). Students should not ask classmates to relay the message for them. Failure to communicate with faculty in a timely manner is considered unprofessional behavior and may result in grade penalties.

**NOTE:** If a student misses more than 20% of the total lab hours in a course, regardless of the reason, the student must repeat the course. If the accumulated absence occurs before the time to withdraw, the student may withdraw from the course.

## Student Responsibilities:

- Students are expected to be active learners, both as independent learners outside the classroom and as facilitators of questions and comments on the platform.

- Each class has objectives which are stated in the syllabus. For each unit, **the student is expected to prepare for the unit topic in advance of the online and lab sessions.** This may be best achieved by using the objectives as a study guide to extract the relevant information from the required readings during study outside of classroom hours.  Required readings (articles), outside of the required texts for this course, will be available on reserve in the File Library.

- Required viewing of video clips are available within each unit.  References may also be listed and suggested readings may be available in the library. The student may find these references useful in understanding the course material, or in the future, when the need arises for further information in a topic area. These references represent resources the instructors utilized to access information on the topic area. Students will not be examined on information that is specifically contained in this reference material. Students will be tested only on information available from the required readings and or video viewing, and classroom, lab, and online activities.

- We hope you find this course to be a rewarding learning experience.  We are here to help you become an outstanding PT and look forward to working with you throughout the semester.

9

USA/Nguyen 000961

Each week your assignments and performance regarding preparation and professional behavior will be assessed. The following apply:

| Criteria | Loss of point(s) each week for: |
|---|---|
| Weekly Quizzes | Incorrect answer |
| Production of an original exam form | Form is not original, is delinquent, or displays minimal effort in completing |
| Self-Reflection | Delinquent or Incomplete, displays minimal effort in completing |
| Weekly documentation | Delinquent submission of required assignment, displays minimal effort in completing |
| Lab preparedness, dress, professionalism | Improper lab attire; forgetting of exam tools; unfamiliar with exam tests; inappropriate dress (no lab coat or name tag, improper shoes, no socks, etc.); punctuality; uncooperative; inappropriate display of emotion or language; lacking professional approach to giving or receiving feedback |
| Punctuality/ Attendance | Being late for class or an unexcused absence. |

**An original examination form is not required for the spine examination**

You will receive feedback on documentation submitted. Feedback may be generalized feedback about each case may be posted on the notice board, personal written feedback, voice over powerpoint/voice thread or provided in a chat.

Quizzes will be graded based on the correct answers. Documentation will be graded based **on effort** (application of feedback previously given, documentation follows the template, documentation is complete, and documentation follows examples discussed in lab and online notes).

On the rare occasion that your online course is unavailable, please contact your instructor for further directions on access or extensions on testing and assignments. You will be e-mailed within 4 days of your unit assignment deadline if your assignment has not been received. If you do not hear from your instructor by four days, assume that your assignment was received. Physical attendance in a live classroom is not expected for this online course. It is expected, however, that the learner completes all designed learning experiences in both a timely and professional manner as identified in the course syllabus and as supported through asynchronous communications. In general, each unit is formatted to be completed in a weekly manner. The primary course interface will occur in an asynchronous manner through the use of course e-mail and discussion boards.

Physical attendance in a live classroom is not expected for the online portion of this asynchronous course. It is expected, however, that the learner completes all designed learning experiences in both a timely and professional manner as identified in the course syllabus and as supported through asynchronous communications. In general, we have formatted each unit to be completed in a weekly manner. The primary course interface will occur in an asynchronous manner through the use of online communication such as e-mail and discussion boards found on the course website [http://de.usa.edu]. As a courtesy to the learners enrolled in the class, the instructor will visit his e-mail on a daily basis during weekdays, except when Internet access is unavailable due to travel. As a general rule, a response by the instructor to a query from the learner will be generated in less than 24 hours, if not sooner.

Physical attendance will be required in the laboratory portion of this class. Please refer to the student handbook for the policy on attendance.

**PROFESSIONAL BEHAVIOR IS CONSIDERED AS FOLLOWS:**
Punctuality and preparedness are required to be an efficient health care provider. For lab sessions, it is expected that students arrive to the classroom 10 minutes before the scheduled start for lab so they are ready for a punctual start. Lab experiences may require students to set-up and clean-up the lab space. This may involve gathering/returning equipment from closets or another location, setting up/cleaning a treatment area or other tasks that would need to be performed to have a safe classroom environment. Students arriving at the published start time will be considered late. Students should not leave the lab at the end of the day until excused by the faculty after equipment is stored and the room is cleaned up. Up to 10% of the final course grade may be reduced for not meeting professional behavior expectations.

10

- Attendance is mandatory to all required course activities (mandatory chats, exams and on-campus lab sessions). Exceptions may be made ONLY with **prior** arrangement AND going through the appropriate chain of command. Please see the Student Handbook for policies and procedures. Tardiness is included in absent time.
- **Late Assignments:**
  - Learners are responsible for all missed or incomplete work. Late assignments are subject to a penalty. In certain cases an extension may be granted. Please contact your instructor with any extension requests.
- NO make-up exams will be given except in the case of death or extreme illness.
- Students MUST BE prepared for class and/or laboratory activities in all cases. See student handbook for acceptable attire.
- The Practical Exams must be passed with a minimum proficiency of 80%. Safety requirements must be met at a 100% competency level. If a re-take of the practical exam is deemed necessary, see the Student Handbook for details.
- Punctuality and preparedness are mandatory.
- NO CELL PHONES are allowed on (not on, nor on vibrate) in class.
- Cheating is not allowed. See the Student Handbook for definition. If you share information regarding a written and/or practical exam, you will be referred to the Professional Misconduct committee and/or receive an F in the course. *As students at the University of St. Augustine, you are required to uphold academic honesty in all aspects of this course. You are expected to be familiar with the letter and spirit of the standards of conduct outlined in the USA Honor Code."*
- If a student wants to meet to discuss an exam, it must be arranged within 1 week of the exam review. All requests for meetings, should be e-mailed to the Instructor.
- Laptop computer policy:
  - Laptop computers may be used in this course, if they are used appropriately in class. If the instructor deems that they are being used inappropriately or for the purposes of the course discussion, their use may be discontinued.
- It is expected that you will complete all assignments at the graduate school level.
- Students are expected to be active learners, both as independent learners outside the classroom and as facilitators of questions and comments on the platform.

**MANDATORY CHATS:**
- Dates and times are listed in the course schedule for Mandatory Chats for Mock Clinic
- You are expected to be present and participate in all chats. Missing a chat or being tardy will be deemed an unexcused absence unless prior arrangements are made. The first offense warrants a verbal reprimand, for a second offense the student will receive a warning letter (email) with a copy of that letter placed in his/her file. The second offense will result in referral to the professional misconduct committee and a FINAL grade reduction of 5%.
- The instructor may require you to use your web cam or speak during the chat.
- You are responsible for all information discussed in the chat.

**Late Assignments:** Learners are responsible for all missed or incomplete work. Late assignments are subject to a penalty. In certain cases an extension may be granted. Please contact your instructor with any extension requests.

**Audio/Video/Media Recording:** It is necessary that students receive written permission from the course instructor regarding the audio-visual recording, transmission, or distribution of classroom lectures and discussions or lab techniques. Any recording of lectures or class presentations should be authorized solely for the purpose of individual study or ADA accommodations. Such recording may not be reproduced or uploaded to publicly accessible web environments. Recordings of classes or of course materials may not be exchanged or distributed for commercial purposes, for compensation, or for any other purpose other than individual study.

**Attendance:**
- Attendance is mandatory to all required course activities (mandatory chats, exams and on-campus lab sessions). Exceptions may be made ONLY with **prior** arrangement AND going through the appropriate chain of command. Please see the Student Handbook for policies and procedures. Tardiness is included in absent time.

**Academic Integrity:**
The University recognizes the principles of honesty and truth as fundamental to ethical business dealings and to a vibrant academic community of faculty and students. All members of an academic community shall be confident that each person's work has been responsibly and honorably acquired, developed and presented. The work that a

11

student submits shall be a fair representation of his/her ability, knowledge and skill. The University expects students to respect and exhibit these principles as they form the basis of the quality of the institution and the quality of USAHS's graduates. The academic integrity policy is clearly defined in the student handbook. Penalties for not following this policy could range from a zero on an assignment to dismissal from the University.

Specifically related to this course, there is expected to be no sharing of information about the practical exams, no use of cell phone or other electronic device during the examinations, and no sharing of portfolios with future students. Any student found cheating on an examination would be referred to the professional misconduct committee.

**Plagiarism and Citation of Sources:** Academic honesty is expected of all students. It is expected that all student work will be that of the student's, or it will be cited with a source if it is the work of another author or scholar. Plagiarism occurs when a student uses another person's ideas or words without properly citing the source of that material. A graduate student it is expected to have to properly cite their sources and to know what constitutes plagiarism. If you are not absolutely sure what constitutes plagiarism, visit the websites:
http://sja.ucdavis.edu/files/plagiarism.pdf and http://bulletin.georgetown.edu/regulations/honor/

Most courses at the University of St. Augustine require students to follow the style guidelines of the American Psychological Association (APA) **EXCEPT DPT students,** who use American Medical Association (AMA). Both styles have publications available to assist the student in conforming to these styles. These manuals are available in print at each USA campus Library. Students can also access the full *AMA Manual of Style* publication and APA Style Central online through the USA Writing Center. The Writing Center also provides online style guides for both these citation styles: https://my.usa.edu/ICS/Student_Services/Writing_Center/Referencing.jnz.

**Self-Citation:** When students use their own work in current or subsequent course assignments, the citation must be formatted with the student as a primary author and previous coursework as unpublished papers.

**NOTE:** Instructors are trained to detect work that does not appear to be the original work of a student. This is done through the use of web search engines or library database tools as well as any number of plagiarism detection applications. If a student is found to have submitted a plagiarized work the result may be a failing mark for the assignment. Additionally, the faculty member may report the offense to university administration for further action as found in the universities policies on academic dishonesty.

It is expected in Musculoskeletal II: Mock Clinic that each student will turn in **their own work.** **ANY** sharing of Plan of Care assignments with students in past, present or future classes is considered cheating and will result in referral **OF BOTH STUDENTS** to the Professional Misconduct Committee.

**ONLINE COURSE WRITING:**
All writing for this course (bulletin board postings, emails and submitted assignments) should reflect the attributes of graduate-level academic writing, which include clarity, precision and power. Please check all work for errors in spelling, punctuation and mechanics before submission. Please bring all errors in the course, or in any communication, to the attention of the course instructor.

The voice of writings within discussion areas should be reflective and in the first person as if conducting a casual or scholarly conversation among colleagues and peers. Normally, first person present tense is not permitted in graduate writing for formal papers and other written assignments. In this course (unless advised otherwise), a first-person style of writing is permissible and preferred for discussion areas. To promote conversation, we would like to see phrases like, "I think", "I believe" and tense language like "today" or last semester." However, formal written papers and assignments should follow academic writing standards, which is typically in third-person, unless otherwise specified.

All assignments within the online course have specific due dates. You will be e-mailed within 4 days of your unit assignment deadline if your assignment has not been received. When submitting assignments online, you can check the Assignment Submission area or the Gradebook within Blackboard to confirm submission details. If you do not hear from your instructor within 4 days, assume that your assignment was received.

12

Physical attendance in a live classroom for lectures and other activities within Blackboard is not expected for this online course. It is expected, however, that the learner completes all required learning experiences in both a timely and professional manner as identified in the course syllabus and as supported through the online tools within Blackboard. In general, each unit is formatted to be completed within a weekly time period. The primary course activities are designed to be completed asynchronously, though some synchronous activities may be made available, but will generally be recorded for students who could not attend the live activities.

---

**Learning is not a top-down process. Each of us shares in the responsibility of educating and being educated. Students are expected to make positive contributions that foster a professional, analytic atmosphere.  Healthy debate is encouraged, but students must remain mindful that remarks that demean others and/or their opinions are not tolerated.**

---

13

USA/Nguyen 000965

**COURSE SCHEDULE/OUTLINE:**
All assignments are due as listed below. **The syllabus dates and times are considered correct and will over-ride any platform date issues.** This course begins on **September 6, 2018**. The Unit start and finish dates can be found below (assignment due dates are subject to change and students will be informed of any due date changes on the Message section of the platform.   LAB DATES WILL NOT CHANGE):

| September 2018 | | | | | | |
|---|---|---|---|---|---|---|
| **Sunday** | **M** | **Tuesday** | **W** | **Thurs** | **Friday** | **Saturday** |
| 2 | 3 | 4 | 5 | 6 Semester Begins | 7 | 8 Half Way Exam 8:00am on ProctorU |
| 9 | 10 | 11 Mock: due at 8:00am eastern time • Quiz #1 • Discussion #1 | 12 | 13 | 14 Mock : Quiz #2 due at 8:00am eastern time | 15 |
| 16 | 17 | 18 Mock : • Quiz #3 due at 8:00am eastern time • Mock Clinic Course goals due by 8:00am eastern (uploaded to platform | 19 | 20 | 21 Mock : Quiz #4 due at 8:00am eastern time Spine Quiz due at 11:55 pm eastern | 22 Mock 1:00pm – 5:00 pm **Neuro Lab** Paper copy of revised Mock Clinic course goals due in lab at 8:00am eastern. |
| 23 Mock 8:00-12noon Spine Lab Self-Reflection due at the end of lab. Bring your computer to lab to complete. 1:00pm- 5:00pm **Shoulder Examination Lab** • Original Lab Form due at the beginning of lab (uploaded and two paper copies) • Self-Reflection due at the end of lab. Bring your computer to lab to complete. | 24 | 25 Spine POC due at 8:00am eastern time | 26 | 27 | 28 | 29 |
| 30 | | | | | | |

14

USA/Nguyen 000966

# October 2018

| SU | M | T | W | TH | F | SA |
|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5<br>• Shoulder POC due at 8:00 am eastern time<br>• Upload final copy of mock goals to the platform by 8:00 am | 6 |
| 7 | 8 | 9<br>Mock:<br>Shoulder Assignment #2 due at 8:00am eastern | 10 | 11 | 12 | 13<br>Mock 8:00-12noon<br>**Elbow examination lab**<br>• Original Lab Form due at the beginning of lab (uploaded and two paper copies)<br>• Self-Reflection due at the end of lab. Bring your computer to lab to complete.<br>• Place a final paper copy of Mock Goals in Mock folder |
| 14<br>Mock 8:00-12noon<br>**Wrist/Hand Examination Lab**<br>• Original Lab Form due at the beginning of lab (uploaded and two paper copies)<br>• Self-Reflection due at the end of lab. Bring your computer to lab to complete. | 15 | 16<br>Mock<br>Elbow POC due at 8:00 am | 17 | 18 | 19<br>Mock:<br>Elbow Assignment #2 due at 11:55 pm | 20 |
| 21 | 22 | 23<br>• Wrist/Hand POC due at 8:00 am | 24<br>Mock Chat – 6:00 pm | 25 | 26 | 27<br>Mock Midterm<br>12noon – 5:00pm |
| 28<br>**Midterm POC due at 8:00am**<br>Mock 8:00-12noon<br>**Foot/Ankle Exam Lab**<br>• Original Lab Form due at the beginning of lab (uploaded and two paper copies)<br>• Self-Reflection due at the end of lab. Bring your computer to lab to complete. | 29 | 30<br>• Midterm Discussion Initial Post due at 8:00am eastern<br>• Midterm self-reflection due at 8:00am eastern time | 31 | | | |

15

USA/Nguyen 000967

# November 2018

| Sunday | M | Tuesday | W | TH | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | | **1**<br>Midterm Discussion Final Post due at 8:00am eastern | **2**<br>Foot/Ankle Assignment due at 8:00 am eastern time | **3** |
| **4** | **5** | **6**<br>Foot/Ankle POC due at 8:00 am eastern | **7** | **8** | **9** | **10**<br>Mock 8:00-12noon<br>Knee Examination Lab<br><ul><li>Original Lab Form due at the beginning of lab (uploaded and two paper copies)</li><li>Self-Reflection due at the end of lab. Bring your computer to lab to complete.</li></ul>1:00 – 5:00 pm<br>Hip Examination Lab<br><ul><li>Original Lab Form due at the beginning of lab (uploaded and two paper copies)</li><li>Self-Reflection due at the end of lab. Bring your computer to lab to complete.</li></ul> |
| **11**<br>Mock 8:00-12noon – Review Lab | **12** | **13**<br>Knee POC due at 8:00am eastern time | **14** | **15** | **16** | **17** |
| **18** | **19** | **20**<br>Hip POC due at 8:00am eastern time | **21** | **22** | **23** | **24** |
| **25** | **26**<br><br>Mock Chat 4:00 pm | **27** | **28** | **29** | **30**<br>Acute Care Quiz due at 11:55 pm eastern | |

16

USA/Nguyen 000968

| December 2018 | | | | | | |
|---|---|---|---|---|---|---|
| **Sunday** | **M** | **Tuesday** | **W** | **TH** | **Friday** | **Saturday** |
| | | | | | | **1** Mock Practicals and Plan of Care 7:00 am – 8:00pm (schedule to be published with specific examination time and patient time for each student. |
| **2** Mock 7:00-12noon (schedule to be published with specific examination time and patient time for each student.) Mock 1:00am – 5:00pm Acute Care Examination Lab • Original Lab Form due at the beginning of lab (uploaded and two paper copies) Self-Reflection • Due at the end of lab. Bring your computer to lab to complete. | **3** | **4** Acute Care POC due at 8:00am eastern time Mock: Practical: remediation plans due for any student that needs a practical retake by 8:00am eastern. See directions on the platform. | **5** | **6** | **7** | **8** Mock: Practical and Plan of Care Retakes – times will be determined based on instructor availability |
| **9** Mock Practical and plan of care retakes – times will be determined based on instructor availability | **10** | **11** Mock: Final Self Reflection due at 8:00am eastern | **12** | **13** Finals | **14** Finals | **15** Finals |
| **16** Finals | **17** Finals | **18** Finals | **19** Finals | **20** Mock Practical and plan of care retakes Third Attempts Grades | | |

17

USA/Nguyen 000969

## Jessica Waters

**From:**          Margaret Wicinski
**Sent:**          Friday, November 30, 2018 8:16 PM
**To:**            Jessica Schreiner
**Subject:**       FW: Follow up
**Attachments:**   PCP.jpg; Psychiatrist.jpg


**Margaret Wicinski, PT, DPT, EdD**
*904.770.3594 (direct dial)*
*904.826.0084 x 1294*
mwicinski@usa.edu

**From:** Luke Nguyen <l.nguyen4@usa.edu>
**Sent:** Friday, November 30, 2018 5:38 PM
**To:** Margaret Wicinski <MWicinski@usa.edu>
**Subject:** Follow up


Dr. Wicinski,

Thank you for your communication earlier today. I'm sorry for the delay of this documentation verifying my psychiatrist and primary care physician visits, the effects of the prescribed Avantia (Right here is when you called me at 5:30 PM). I cannot thank you enough for your understanding and follow up. As discussed over the phone, I have a follow up appointment with my primary care physician Dr. Sastre next week and requested that I take my exam afterwards. However, I was in error in stating it was at Tuesday but was in fact on Thursday, December 6th at 10AM. Please let me know what we can do going forward when you call tomorrow morning.

Respectfully,
Luke Nguyen, SPT
University of Saint Augustine, Flex DPT Program



DEFENDANT'S
EXHIBIT NO. *15*
FOR IDENTIFICATION
DATE: *2/19/22*   RPTR: *RF*
PENGAD 800-631-6989

1

USA/Nguyen 000987



**BAPTIST**
Primary Care

Tessa Ricci, M.D.
Maritere Rochet, M.D
Aristides Sastre, M.D.
Sara Chance, P.A.-C

Bartram Park
13720 Old St. Augustine Road
Suite #1
Jacksonville, FL 32258
Phone: 904.288.5550
Fax: 904.288.5565

**LUKE NGUYEN**

MRN:

11/30/2018

To whom it may concern,

LUKE NGUYEN was seen today and may return to school .

For any questions, call my office.

Sincerely,

Baptist Primary Care

Electronically signed by : Ame Keefe, ; Nov 30 2018 12:06PM EST (Author)

From the desk of: Aristides Sastre M.D.



**Baptist Behavioral Health**
841 Prudential Drive
10th Floor
Jacksonville, FL 32207
Phone: (904) 376-3800
Fax: (904) 396-8975

Patient Name: LUKE NGUYEN                    DOB: █████

To Whom It May Concern,

LUKE NGUYEN had an appointment with me on 11/30/2018. Please excuse them from work or school.

Sincerely,

Jennifer Davis

## Jessica Waters

| | |
|---|---|
| **From:** | Luke Nguyen <l.nguyen4@usa.edu> |
| **Sent:** | Thursday, December 6, 2018 2:13 PM |
| **To:** | Debra Gray |
| **Subject:** | Re: Missed Lab 12/2/18 |
| **Attachments:** | NguyenAbsence2018.jpeg |

Dr. Gray,
I apologize for the tardiness of this submission. Thank you for your time and consideration.

Respectfully,
Luke Nguyen SPT
University of Saint Augustine, Flex DPT Program

---

**From:** Debra Gray
**Sent:** Thursday, December 6, 2018 10:41:22 AM
**To:** Luke Nguyen
**Subject:** RE: Missed Lab 12/2/18

Luke:
Please remember to complete and submit the lab absence request form as requested 12/2.
Dr Gray

Debra L Gray, PT, DSHc, DPT, M Ed
Associate Professor
Manager, Flex DPT Programs
University of St Augustine for Health Sciences
904-770-2562

**From:** Debra Gray
**Sent:** Sunday, December 2, 2018 7:13 PM
**To:** Luke Nguyen <l.nguyen4@usa.edu>
**Subject:** RE: Missed Lab 12/2/18

Luke:
I'm sorry to hear of your problems. I'm glad you are getting help. James also missed the lab this morning and you both have to make up at least 2 hours to stay below the 20% absence level. It would be best to do the make-up before the 2nd exam as much of the material we went over in lab will be helpful for that exam. We'll need to find a day/time that works for you, James, and me. The form you need is located in the Florida Flex DPT portal.
Take care,
Dr Gray

Debra L Gray, PT, DSHc, DPT, M Ed
Associate Professor
Manager, Flex DPT Programs
University of St Augustine for Health Sciences
904-770-2562



DEFENDANT'S
EXHIBIT NO. _17_
FOR IDENTIFICATION
DATE: 5/19/22   RPTR: R F
PENGAD 800-631-6989

1

**From:** Luke Nguyen
**Sent:** Sunday, December 2, 2018 6:10 PM
**To:** Debra Gray <DGray@usa.edu>
**Subject:** Missed Lab 12/2/18

Dr. Gray,

As you may or may not have been aware, I have recently suffered a setback with mental health that required psychiatric and primary care physician evaluation on Friday morning (11/30/2018) which resulted in a short-term prescription of Ativan and follow up psychiatrist and PCP follow up on 12/6/2018. Given the severity, I was recommended by my health care providers to request a reschedule of my Mock Practical examination that was originally set at 9:15AM on 12/1/2018 and for the acute care lab session which was to follow today from 1-5PM with Dr. Wicinski (with a tentative meeting with her on 12/3/2018 at 11:00AM). Unfortunately I failed to also inform you of my likely absence for today's Cardiopulmonary Lab as is my responsibility according to the student handbook. I am also aware that this results in me missing 50% of the class' lab participation and would like to know if there are any options for making up this work. Per Dr. Wincinski's suggestion, I have looked through the my.usa.edu portal and was unable to find an "excused absence form". Please advise and let me know if there's anything I can do to expediate/resolve this issue.

Respectfully,
Luke Nguyen, SPT
University of Saint Augustine, Flex DPT Program

Sent from Mail for Windows 10

2

USA/Nguyen 000089



# UNIVERSITY OF ST. AUGUSTINE

## FOR HEALTH SCIENCES

## REQUEST FOR ABSENCE FROM WEEKEND LAB

Student Name: _Luke Phuoc Nguyen_

Program: Flex DPT ✓   Flex MOT _____

Course(s) Name(s)/Number(s): _Musculoskeletal II: Mock Clinic_
_(PHT5133C001) and Cardiovascular + Pulmonary Rehabilitation_
(PHT5713C001)

Date(s) of Absence: _12/1/18 – 12/2/18_ Total Hours of Absence:* _8_

Reason for Absence:

_Medical evaluation_

_____

Student Signature: _[signature]_          Date: _12/6/18_

|  | EXCUSED | UNEXCUSED |
|---|---|---|
| Program Director Signature: _____ | _____ | _____ |
| Date: _____ | | |

|  | HOURS MISSED | % of TOTAL HOURS* |
|---|---|---|
| Lead Lab Instructor Signature: _____ | _____ | _____ |
| Date: _____ | | |

|  | HOURS MISSED | % of TOTAL HOURS* |
|---|---|---|
| Lead Lab Instructor Signature: _____ | _____ | _____ |
| Date: _____ | | |

*If more than 20% of a course's total lab hours are missed, regardless of the reason, the student must withdraw from the course and retake it when next offered. For excused absences due to reasons beyond the student's control, the student may be able to make-up some missed hours depending on the lab content missed and faculty approval. Make-up sessions may require additional travel to campus on a weekday or unscheduled lab weekend, depending on faculty availability.

USA/Nguyen 000090

## Jessica Waters

| | |
|---|---|
| **From:** | Luke Nguyen |
| **Sent:** | Thursday, December 6, 2018 2:52 PM |
| **To:** | Margaret Wicinski |
| **Subject:** | Follow-up |

Dr. Wicinski,

As previously discussed I had follow ups with my PCP and psychiatrist today. While I did have a brief anxiety attack last night, its severity was mild and was alleviated with the previously described Atavan which convinced both professionals that I am okay to continue with school. My psychiatrist also recommends that I explore the option of time and a half for examination in the future (which I will research USA's requirements and get back to her with a scheduled appointment on 12/10/2018.)

I have submitted an absence form which has both Mock Clinic and Cardiopulmonary classes listed for the duration of the weekend of 12/1-12/3 to Dr. Gray. I can provide an additional copy to you by request.

I have been scheduled to make up the missed Cardiopulmonary lab session tomorrow at 2-4PM at Room 102. I have been checking the platform and have not seen specific scheduling for this weekend. If it has been posted, could you please direct me to it?

Again thank you for your time and consideration. Please let me know if there is anything else you inquire regarding the situation.

Respectfully,
Luke Nguyen, SPT
University of Saint Augustine, Flex DPT Program



DEFENDANT'S
EXHIBIT NO. 18
FOR IDENTIFICATION
5/19/22
DATE:          RPTR: PF
PENGAD 800-631-6989

1

| | |
|---|---|
| **From:** | Luke Nguyen |
| **Sent:** | Friday, December 7, 2018 11:08 AM |
| **To:** | Margaret Wicinski |
| **Cc:** | Jessica Schreiner |
| **Subject:** | Re: Practical |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Completed |

Confirmed Saturday 12:45 pm in Room 102 with SPT attire, evaluation equipment, and laptop for POC.

I would also like to request/reserve the following if possible:
- a grip dynanometer since I do not own one
- a goniometer with "crosshairs" for lateral malleoli placement for ankle dorsiflexion measurements (have misplaced my own)

Thank you and looking forward to seeing you both on Saturday.

Respectfully,
Luke Nguyen, SPT
University of Saint Augustine, Flex DPT Program

---

**From:** Margaret Wicinski
**Sent:** Thursday, December 6, 2018 7:56:37 PM
**To:** Luke Nguyen
**Cc:** Jessica Schreiner
**Subject:** Practical

Luke:
Your practical will be Saturday at 12:45 pm in room 102.  Please dress as the SPT and bring all your supplies.  You will write your plan of care after the practical so bring your laptop and power source.

Please reply all to this email to confirm.

Dr. Wicinski

Margaret Wicinski, PT, DPT
Assistant Professor – Florida Flex Program
University of St. Augustine for Health Science
904.770.3594 (direct dial)
904.826.0084 x 1294
mwicinski@usa.edu



DEFENDANT'S
EXHIBIT NO. *19*
FOR IDENTIFICATION
PENGAD 800-631-6989
DATE: 5/19/22   RPTR: RF

USA/Nguyen 001047



**Attachments:**           Professional Documentation Information.pdf; Reasonable Accommodations Request.pdf



**From:** Ryan Davis
**Sent:** Tuesday, December 11, 2018 2:55 PM
**To:** Luke Nguyen <l.nguyen4@usa.edu>
**Subject:** RE: Reaching out

PENGAD 800-631-6989   DEFENDANT'S
EXHIBIT NO. 22
FOR IDENTIFICATION
DATE: 5/19/22   RPTR: RF

Hello Luke,

The two documents are attached for your review. I apologize for the delay in getting those to you.

I am not sure what information you were looking for but I have attached some information from the handbook below:

**Dismissal and Academic Progression Appeals**
A student will be dismissed if
- an F is received in any course (a student receiving a failing grade during fieldwork/internship is also subject to this policy);
- two grades of D are received;or
- after the completion of 30 credits for MS-SLP, 52 credits for OT and 55 credits for PT, the student has a GPA below 2.5.

The Registrar notifies the APRC and the Program Director of any students who are being recommended for academic dismissal. The student will be notified of his or her dismissal by the Registrar.

A student may appeal the dismissal to the Academic Appeals Committee (AAC), who will make a recommendation to the Program Director. If an appeal is successful, a readmission agreement between the student and the Program Director (or Dean) is made to document any conditions for the student's continuation at the University. Readmission agreements can only be appealed if there are mitigating circumstances, and such appeals can only be made to the University President or designee. Please note: A student who is readmitted upon appeal must reapply to Disability Services for any reasonable accommodations that may have been previously granted.

**Academic Evaluation and Right of Appeal**
All students must sign an Acknowledgement of Appeals Procedure Form as part of the orientation process. An Acknowledgement of Appeals Procedure Form can be found on the MyUSA portal Admissions tab.

1

The responsibility for academic evaluation will rest with the instructor. For minor appeal issues, which are decisions that would not result in probation or dismissal, the student appeals to the faculty member involved in the particular issue. If the student is not satisfied with the faculty member's resolution of the issue, the student has the right to appeal the issue in writing to the Program Director within 3 business days of the instructor's decision.

The Program Director then has 5 business days to research the issue and render a decision. If the student is not satisfied with the Program Director's response, the student can appeal the issue to the President or designee in writing within 5 business days after the Program Director's response. After hearing the issue, the President has 2 business days to either render a verdict on the issue or redirect the issue to the Appeals Committee.

Any student who has been dismissed may formally appeal this decision in writing to the Registrar with a copy to the respective Program Director within 2 business days from receipt of the notification. If the student does not meet the stated deadline, the appeal may not be considered. In extenuating circumstances, the student may request an extension from his or her respective Program Director or designee (i.e., Registrar); however, this request must be made within the above-stated deadline.

Appeal letters should address
• the rationale behind the appeal and why the student believes the appeal is warranted, and
• future circumstances that will enable the student to rectify previous poor academic performance.

The Registrar will forward the student's appeal to the AAC within 2 business days. After discussion between the AAC and the Program Director, a decision is rendered. The Program Director will convey the AAC's decision to the student and the Registrar.

The AAC will meet six scheduled times per calendar year (See Academic Calendar). These meetings will convene 2 days prior to the first day of classes of each trimester and at midterm of each trimester.

Ryan W. Davis, M.A.
737.202.3373 (office) x3173


**From:** Luke Nguyen <l.nguyen4@usa.edu>
**Sent:** Tuesday, December 11, 2018 2:28 PM
**To:** Ryan Davis <RDavis@usa.edu>
**Subject:** Reaching out


Mr. Davis,

My name is Luke Nguyen, Flex student of the University of Saint Augustine (Saint Augustine campus. I have recently reached out to you on the phone concerning my recent complications with disabilities to which the following ideas were discussed:


- I would be e-mailed student disability documentation to be completed by me psychiatrist to my student e-mail at l.nguyen4@usa.edu. I have not received this documentation as of writing.

USA/Nguyen 001146

- Given the circumstances of Mock Clinic and how I could not pass the course unless passing the final exam on the first attempt, I was recommended by you to speak with my program director to "file an appeal" or something to that effect.

    **-** I was unable to find an "appeals form" on our portal or any relevant information in the student handbook. The soonest I can could meet with my program director/adviser (Dr. Gray) is on December 18th, 2018. Would this be too late and what can I do?

- I am in the process of focusing on my other classes with the intent to pass. I was also unable to find additional information regarding the committee

Please let me know if there's anything that I missed or should be made aware of. I look forward to working with you in the future.

Respectfully,

Luke Nguyen, SPT

University of Saint Augustine, Flex DPT Program

USA/Nguyen 001147



### Professional Documentation Information

Students requesting accommodations from the Disability Services at the University of St. Augustine for Health Sciences (USA) must provide professional documentation in addition to a personal description of how the disability impacts access to USA's programs and services. The type of documentation required depends on the type of disability. Licensed professionals from whom documentation may be accepted include a clinical or educational psychologist, school psychologist, neuropsychologist, medical doctor, educational diagnostician, or other qualified professional.

### Ideal documentation of disability might include the following information:

1. a statement from a professional that identifies the diagnosis and how it constitutes a disability
2. if appropriate, a description of the diagnostic tests, methods, and/or criteria used
3. a description of the impact of the disability on a major life activity and its functional limitations in our educational setting
4. recommendations for accommodations in the educational environment
5. prognosis information - if the condition is considered temporary or permanent
6. the credentials of the diagnosing professional

### While we understand the "ideal" documentation is often difficult to acquire, the types of documentation we can accept for most commonly requested accommodations include:

1. SSI confirmation
2. VA ratings letter
3. Confirmation of accommodations from previous school
4. Medical records (including Psychosocial Assessment)
5. Note from health professional with diagnosis/prognosis information on letterhead or with contact information

If you are unable to present professional documentation of disability but still feel you should qualify for accommodations, contact our office. We will consider your situation and do what we can to support you.

USA/Nguyen 001148



# UNIVERSITY OF ST. AUGUSTINE
## FOR HEALTH SCIENCES

### Reasonable Accommodation Request Form

The Occupational Therapy, Physical Therapy, Physician Assistant, and Speech Language Pathology programs at the University of St. Augustine for Health Sciences have academic and clinical components. When applying for reasonable accommodations, please consider that the clinical environment may have different requirements than the academic environment. If you have questions about the clinical requirements, please contact Disability Services at disability@usa.edu or your Student Success Advisor.

If you have a disability and are planning to request an accommodation, it is best to submit the application as soon as possible (It is best to submit the form no later than the first Friday after classes begin). This will allow for approved accommodations to be put in place as early as possible. Accommodation requests are reviewed throughout the term; however, a delay in submitting your request will result in you not having approved accommodations for previous assignments and/or exams.

### Instructions

The form that follows these instructions must be completed to request an accommodation for a physical/sensory disability, learning disability, or psychological disorder. **The request should be submitted with the appropriate documentation substantiating the nature of the disability**.

- **Physical/Sensory Disability:** Documentation should be submitted by a treatment provider who is qualified to diagnose a physical/sensory disability. The description should include the treatment provider's review of the effects of the disability on the student's ability to function in a university environment and a description of side effects that could result from any medication that is being used to treat the disability.

- **Learning Disability:** Documentation should be submitted by a treatment provider who is qualified to administer and interpret learning disability assessments. The description should include the names and results of tests used in the assessment and specify the effect of the learning disability on university-related endeavors. The diagnostic report should include the treatment provider's suggestions for reasonable accommodations.

- **Psychological Disorder:** Documentation should be submitted by a treatment provider who is qualified to administer and interpret psychological assessments. The description should include the names and results of tests used in the assessment and specify the effect of the psychological disorder on university-related endeavors. The diagnostic report should include the treatment provider's suggestions for reasonable accommodations.

If the substantiating documentation is incomplete or inadequate, the university may require supplemental assessment of the disability at the student's cost. If the substantiating documentation is complete and the university requests a second opinion, the university shall incur the cost. If you do not have documentation, please contact the Disability Services at disability@usa.edu or your Student Success Advisor for an alternate method of determining accommodation need.

Disability Services will review your request and notify you of approved accommodations. Students with a disability should expect to maintain the standards that apply to everyone else in the course and request only the accommodations/modifications approved by this process. Any discrepancy encountered by you or your faculty in the written accommodation plan should be brought to Disability Services at disability@usa.edu for review and action.



# UNIVERSITY OF ST. AUGUSTINE
## FOR HEALTH SCIENCES

### Reasonable Accommodation Request Form

Name: _____ Date: _____ Student ID: _____

Program: _____ Flex (check one): ☐ Yes  ☐ No

Campus Location: _____ Enrollment Term (month/year):_____/_____

Phone Number: _____ Email:_____

Request For: ☐ First Time Accommodations ☐ Accommodations After a LOA ☐ Update to Accommodations

**List the functions that you anticipate would require a reasonable accommodation:**

_____

_____

_____

_____

_____

**List the accommodations you are requesting for the academic portion of your program:**

_____

_____

_____

_____

**List the accommodations you are requesting for the clinical portion of your program:**
(Please Note: "See Above" is not an acceptable response. Traditional academic accommodations are not available during the clinical portion of your program due to the absence of traditional assignments and exams. Studnets needing additional consideration for the clinical portion of their program may also consider the hardship request process outlined in the Clinical Education Handbook on My.USA)

_____

_____

_____

_____

_____

**Please return this completed form and the required supporting documentation to: Disability@usa.edu**

| From: | Disability (USA) |
| To: | Luke Nguyen |
| Subject: | RE: Reaching out |
| Date: | Thursday, January 24, 2019 11:09:16 AM |
| Attachments: | Professional Documentation Information.pdf |
| | Reasonable Accommodations Request.pdf |

Luke,

I got your voice mail on 1/11 and attempted to call you back a few times with no luck. Please send your accommodation request and any documentation you have over so I can review it. Once I see it I can help. Also if you return to our last email the second attachment describes what information is needed (attached again here for you). I hope this helps.

Best,
Ryan W. Davis, M.A.
737.202.3373 (office) x3173

**From:** Luke Nguyen <l.nguyen4@usa.edu>
**Sent:** Tuesday, December 11, 2018 2:28 PM
**To:** Ryan Davis <RDavis@usa.edu>
**Subject:** Reaching out

**DEFENDANT'S**
EXHIBIT NO. 23
FOR IDENTIFICATION
DATE: 5/19/22   RPTR: R F-
PENGAD 800-631-6989

Mr. Davis,

My name is Luke Nguyen, Flex student of the University of Saint Augustine (Saint Augustine campus. I have recently reached out to you on the phone concerning my recent complications with disabilities to which the following ideas were discussed:

- I would be e-mailed student disability documentation to be completed by me psychiatrist to my student e-mail at l.nguyen4@usa.edu. I have not received this documentation as of writing.

- Given the circumstances of Mock Clinic and how I could not pass the course unless passing the final exam on the first attempt, I was recommended by you to speak with my program director to "file an appeal" or something to that effect.

    - I was unable to find an "appeals form" on our portal or any relevant information in the student handbook. The soonest I can could meet with my program director/adviser (Dr. Gray) is on December 18tb, 2018. Would this be too late and what can I do?

- I am in the process of focusing on my other classes with the intent to pass. I was also unable to find additional information regarding the committee

KAL000052

Please let me know if there's anything that I missed or should be made aware of. I look forward to working with you in the future.

Respectfully,

Luke Nguyen, SPT

University of Saint Augustine, Flex DPT Program

KAL000053

| | |
|---|---|
| **From:** | Margaret Wicinski |
| **Sent:** | Tuesday, December 18, 2018 3:30 PM |
| **To:** | Luke Nguyen; Jessica Schreiner |
| **Subject:** | RE: Request for grade appeal of Mock Clinic mid-term |

Luke:
I wanted to let you know this has been received. Once this has been reviewed, we will reply.

Margaret

**Margaret Wicinski, PT, DPT, EdD**
*904.770.3594 (direct dial)*
*904.826.0084 x 1294*
mwicinski@usa.edu



**From:** Luke Nguyen <l.nguyen4@usa.edu>
**Sent:** Tuesday, December 18, 2018 3:03 PM
**To:** Margaret Wicinski <MWicinski@usa.edu>; Jessica Schreiner <jschreiner@usa.edu>
**Subject:** Request for grade appeal of Mock Clinic mid-term

Dr. Wicinski and Dr. Schreiner,

After a discussion with my advisor today as of December 18th, 2018 concerning the issue which I have previously e-mailed both of you on December 13th, 2018, I would like to formally exercise my right to appeal my grade for the mid-term administered on October 27th, 2018 and for the ability to attempt completion of the class requirements of Musculoskeletal II Mock Clinic for the following reasons:

- During the mid-term, I erroneously deferred muscle length testing and subsequent elongation tissue stress due to painful findings with PROM classical forearm supination in a patient with median nerve entrapment at the pronator teres muscle. Therefore, I did not have enough data to adequately write an effective plan of care as reflected by my current mid-term grade which put me in a situation to where I could not pass the course if forced to re-take either the final patient evaluation or its subsequent documentation sections with enough points. I believe re-inspection of my midterm plan of care submission reflects this lack of data with continuous references to complete assessments and set goals accordingly.
- However, prior instruction of our class that we are prohibited to receive aid in the completion of our plan of care (further supplemented with signed waivers of acknowledgement upon assignment submission), I did not inquire my student patient during the midterm for their relevant information not assessed during testing for fear of violating such terms.
- I have reached out to both professors before grading of the mid-term with continued communication after this mid-term expressing my concern of not having enough data to sufficiently complete my plan of care to which they did not make clear I was permitted to obtain such data at the concluding 5 minutes allotted for examination until I was explained this

1

USA/Nguyen 001054

by Dr. Shriener on December 13th, 2018. She explained that in the last five minutes, we were instructed to "get data from your patient" to which my understanding was that I only had five more minutes to obtain data from patient tests. When I inquired Dr. Wicinski about the matter directly, her response was I "did the noble thing" rather than address why I did not have the data to reference in my plan of care.

- I conclude my mid-term plan of care grade as put me in an unfair situation for the University to assess my fitness as a student of physical therapy for the classroom, since the exact same grading format of the midterm is utilized in the final documentation format to where a similar error would have allotted retake possibilities. Furthermore, although examination was not graded in the mid-term, its identical nature to possible final practical examination has similar implications to where an error in deferring examinations and not obtaining enough data for client diagnosis justification, prognosis determination, goal discernment, and intervention selection would similarly result in retakes for either the practical and/or the documentation portions of the final exam.

- Similarly after immediately reaching out to Dr. Wicinski with documentation after the midterm grades were released, she even exclaimed that my writing was noticeably improved compared to the grade I had received for the mid-term. Also my first attempt at the final practical was slightly below par to which I believe a re-take opportunity would have resulted in improvement of my skills to demonstrate competency of course curriculum.

While I do thank Dr. Wicinski for her understanding and diligence in helping me resolve my issues this term I've had regarding my mental health with this term, I feel that this miscommunication of expectations and procedure show that my current mid-term grade is not reflective of both my comprehension and execution of the course requirements and has simultaneously denied me the same opportunity for remediation and reassessment should I have made the same error in those sections. I will do whatever I can to help resolve this issue and will maintain a flexible schedule to accommodate meetings or complete additional testing to complete this course.


Respectfully,

Luke Nguyen, SPT

University of Saint Augustine, Flex DPT Program

USA/Nguyen 001055

| From: | Jessica Schreiner |
|---|---|
| To: | Luke Nguyen |
| Cc: | Margaret Wicinski; Jessica Schreiner; Debra Gray |
| Subject: | Appeal for mid term |
| Date: | Friday, December 21, 2018 1:13:14 PM |

Hi Luke,

After evaluation of your lab sheet we concluded that you did have enough data to complete
the mid term examination/POC. Unfortunately, you deferred steps that were vital for passing
the examination. There seemed to have been an error in clinical reasoning, which is vital for
identifying which steps to defer. At this point we have decided to deny your request to appeal
the mid term POC.

-Dr. Schreiner and Dr. Wicinski



DEFENDANT'S
EXHIBIT NO. 27
FOR IDENTIFICATION
DATE: 5/19/22   RPTR: RF
PENGAD 800-631-6989



# UNIVERSITY OF ST. AUGUSTINE
### FOR HEALTH SCIENCES

December 21, 2018

Via Email
Lnguyen4@usa.edu

Student: Luke Nguyen
ID:        103891

Subject: Notice of Dismissal

Dear Luke,

The University of St. Augustine for Health Sciences holds every student to high standards. I regret to inform you that your academic performance has not met the requirements for continued progression in the degree program.

As stated in our student handbook, any student who receives two grades of a D in one trimester, an F in any course, or a second D in the program will be dismissed from USAHS. If you do not believe your grade is correct, you may appeal your grade to your instructor. Please refer to the process in the Student Handbook. Based on your final grade(s) for the following courses, you have been dismissed:

**PHT 5  133 C  001**

If you would like to appeal this decision, please refer to the Student Handbook to learn about the process. If you choose to appeal, you must email your appeal letter within 2 business days of this dismissal letter (01/03/2019). All appeal correspondence should be emailed to registrar@usa.edu. Should you choose to appeal, once I receive your letter and get confirmation from the academic appeal committee, I will email you the date and time of the appeal meeting. The next scheduled appeal meeting is 01/10/2019.

Sincerely,
Diane Rondinelli – Registrar
registrar@usa.edu
904-826-0084, ext. 1600

cc:      Program Director
         Financial Aid
         Bursar
         Student File
         Student Advisor
SA: Cynthia Edwards – cedwards1@usa.edu; MI: Juliet Henry-Pitter – jhenrypitter@usa.edu;
AU: Kailyn Cannata – kcannata@usa.edu: SM: David Schoenherr – dschoenherr@usa.edu
MHA/MHS: Sherrie Jensen – sjensen@usa.edu; PP OTD/DPT/EdD: Frank Bennett – fbennett@usa.edu



DEFENDANT'S
EXHIBIT NO. 30
FOR IDENTIFICATION
5/19/22
DATE:        RPTR: RF

USA/Nguyen 001065

| | |
|---|---|
| **From:** | Joanna Carter |
| **Sent:** | Monday, January 14, 2019 10:38 AM |
| **To:** | Luke Nguyen |
| **Cc:** | Diane Rondinelli; Rhonda James; Erica Kelly; Dionne DeGrande |
| **Subject:** | Response from the Academic Appeals Committee |
| **Attachments:** | Response from the Academic Appeals Committee.pdf |

**Importance:**      High

Good morning Mr. Nguyen,

Please find attached, for your records, the response letter from the Academic Appeals Committee.

Thank you.

Mrs. Carter

Mrs. Joanna Carter
Academic Program Assistant
Florida Flex DPT Program
University of St. Augustine
1 University Blvd.
St. Augustine, FL 32086
(904) 770-3548 Direct Line
(904) 826-0084 x 1248
jcarter@usa.edu



DEFENDANT'S
EXHIBIT NO. 33
FOR IDENTIFICATION
5/19/22
DATE:        RPTR: CF
PENGAD 800-631-6989

1

# UNIVERSITY OF ST. AUGUSTINE
### FOR HEALTH SCIENCES

January 14, 2019

To: Luke Nguyen,

Dear Luke:

The Academic Appeals Committee (AAC) met on January 10, 2019 to hear your appeal
of dismissal from the Flex DPT Program for academic reasons. The Committee reviewed
your academic record, information provided by MSK II faculty, your appeal letter and
your statements made during the meeting with them. The AAC has denied your appeal
based on concerns regarding your academic performance, professional behaviors, and
academic integrity. Your dismissal from the University stands.

You have the right to appeal to the University President. If you chose to appeal, your
appeal should be based on any relevant information or evidence demonstrating the
University did not follow its stated academic policies and procedures.

It is my hope that you will view this experience as an opportunity to learn more about
yourself to assist you in further personal and professional growth and development. I
wish you all the best in whatever educational or career paths you may choose.

Respectfully,

Debra L Gray, PT, DHSc, DPT, MEd
Flex DPT Programs Manager


Cc:     Registrar
        Financial Aid
        Clinical Education
        Student File

USA/Nguyen 001112

STUDENTS, FACULTY AND STAFF SHOULD REFER TO THE ONLINE VERSION OF THE
STUDENT HANDBOOK AS THIS PDF MAY NOT CONTAIN THE MOST CURRENT
INFORMATION.

THIS PDF WAS CURRENT ON AUGUST 14, 2018.



DEFENDANT'S
EXHIBIT NO. ____
FOR IDENTIFICATION
DATE: 5/19/22 RPTR: ____

# UNIVERSITY OF ST. AUGUSTINE
# FOR HEALTH SCIENCES
# 2018-2019
# FALL STUDENT HANDBOOK

Current on 08/09/2018

KAL000098

STUDENTS, FACULTY AND STAFF SHOULD REFER TO THE ONLINE VERSION OF THE
STUDENT HANDBOOK AS THIS PDF MAY NOT CONTAIN THE MOST CURRENT
INFORMATION.

THIS PDF WAS CURRENT ON AUGUST 14, 2018.



**DEFENDANT'S**
EXHIBIT NO. _____
FOR IDENTIFICATION
DATE: 5/19/22   RPTR: _____

# UNIVERSITY OF ST. AUGUSTINE
# FOR HEALTH SCIENCES
# 2018-2019
# FALL STUDENT HANDBOOK

Current on 08/09/2018

KAL000098

consensual romantic or sexual relationships with current students and will be subject to disciplinary action if found to be in contravention of this policy.

If a faculty or staff member has a preexisting consensual romantic/sexual relationship with a student, the faculty and staff member must immediately notify his or her supervisor and remove him or herself from the academic decisions concerning the student in direct collaboration with their Program Director or supervisor.

Faculty and staff must be cognizant that the professional relationship with students extends to off-campus interactions, including conference or seminar attendance and other social gatherings.

# Financial Aid Satisfactory Academic Progress Policy - First Professional

The Office of Financial Aid monitors the Registrar's reporting of academic progress at the end of every trimester (payment period).

### Qualitative Requirements

Prior to the completion of 59 credits for OT and 61 for DPT, it is expected that the student will meet the following minimum criteria:
At the completion of the first trimester (or 17 credit hours for OT and DPT) have a GPA of 2.0
At the completion of the second trimester (or 38 credit hours for OT and DPT) have a GPA of 2.3
The University requires that all students enrolled in the professional education programs have a 2.50 GPA after the completion of the third (full-time) trimester, or 59 credits for OT and 61 credits for DPT, in
the academic curriculum to continue in the respective program. If a student does not achieve this cumulative GPA he or she is dismissed from the program. Other reasons for dismissal include:

- An F is received in any course
- Two grade of D are received
- A student receiving a failing grade during fieldwork/internship (See the Clinical Education Handbooks - PT, OT )

KAL000128

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

**Quantitative Requirements**

- Complete at least 75% of all credits attempted each trimester

In addition to requirements set forth by above by the university's academic policy, the Office of Financial Aid enforces a maximum time frame for the receipt of federal financial aid as listed in the table below:

| Program Format | Maximum Time Frame to Receive Federal Financial Aid |
|---|---|
| Doctor of Physical Therapy - (new starts 1/1/17 or later) | 12 terms |
| Doctor of Physical Therapy - (students beginning before 1/1/17) | 11 terms |
| Flex Doctor of Physical Therapy | 18 terms |
| Doctor of Occupational Therapy | 12 terms |
| Master of Occupational Therapy | 9 terms |
| Flex Master of Occupational Therapy | 14 terms |
| Dual Full-Time Master of Occupational Therapy/Doctor of Physical Therapy | 15 terms |

At each term's financial aid SAP review, the Office of Financial Aid will monitor the student's earned credits in relation to the number of terms remaining toward the maximum time frame. Students will be placed on warning if in jeopardy of not completing within the maximum time frame to receive federal aid.

Financial Aid Warning - Students who are below the minimum cumulative GPA, other grade related requirements for the program, term completion rate, and/or are in jeopardy of not completing within the maximum time are placed on financial aid warning for one term. Students receive written notification to their university e-mail account if they are placed on financial aid warning status. If the student is not in compliance after one term of financial aid warning, federal financial aid eligibility is terminated. The student is given the option to appeal to financial aid to determine if the student is eligible to receive financial aid for a period of one term of probation or for more terms while on an academic plan.

Students who wish to appeal must provide the Office of Financial Aid with a written request and supporting documentation for review. Students must be able to document that unexpected, unusual, and temporary circumstances affected the student's ability to progress at the required rate and that their current situation will allow them to demonstrate satisfactory progress. Failure to provide supporting documentation will result in an automatic denial. All SAP decisions made by the Office of Financial Aid are final.

Students may regain eligibility for federal financial aid once all minimum academic standards are met.

A student is ineligible for federal financial aid when it becomes mathematically impossible to complete the program within the maximum timeframe established by the school. Students may appeal if federal aid is terminated due to this condition.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000129

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

**San Marcos Campus**
700 Windy Point Drive
San Marcos, CA 92069

**St. Augustine Campus**
1 University Boulevard
St. Augustine, FL 32086

**Austin Campus**
5401 La Crosse Avenue
Austin, TX 78739

**Miami Campus**
800 S Douglas Rd
Coral Gables (Miami), FL 33134

**800-241-1027**
www.usa.edu

**KAL000099**

# Contents

Introduction ........................................................................................................................ 8

University of St. Augustine for Health Sciences Mission ................................................. 8

Expectations for Students in Professional Programs ........................................................ 8

DEGREES OFFERED ....................................................................................................... 9

NURSING POST-GRADUATE CERTIFICATES OFFERED ......................................... 9

University of St. Augustine Teach-Out for Degree Programs ........................................ 10

2018-2019 Academic Calendar ...................................................................................... 10

    FALL 2018 TRIMESTER .......................................................................................... 10

    SPRING 2019 ............................................................................................................. 12

    SUMMER 2019 .......................................................................................................... 13

    FALL 2019 TRIMESTER .......................................................................................... 14

Student Services ............................................................................................................. 16

    Mission ...................................................................................................................... 16

    Academic Advisors ................................................................................................... 16

    Admissions Office ..................................................................................................... 17

    Bursar's Office .......................................................................................................... 17

    Career Services ......................................................................................................... 17

    Continuing Professional Education Office ............................................................... 18

    Enrollment Office ..................................................................................................... 18

    Financial Aid Office .................................................................................................. 18

    Information Resources/Library ................................................................................. 18

    Registrar's Office ...................................................................................................... 19

    Writing Center .......................................................................................................... 19

University Policies and Procedures ................................................................................ 20

    Academic Integrity Policy ........................................................................................ 20

        Academic Dishonesty ........................................................................................... 20

    Address Changes ....................................................................................................... 21

    Americans with Disabilities Act (ADA) ................................................................... 22

        Assistance for Students with Disabilities ............................................................ 22

        Disability Policy and Grievance Procedure .......................................................... 22

        Pets and Service Animals ..................................................................................... 23

    Building Hours .......................................................................................................... 24

    Business Days ........................................................................................................... 24

    Cell Phone Use on Campus ....................................................................................... 24

    Copyright Policy ....................................................................................................... 25

    Credit Hour Policy .................................................................................................... 27

        Definition of Credit Hour ..................................................................................... 27

KAL000100

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Diversity ............................................................................. 28

Email Account ..................................................................... 28

Enrollment Certifications..................................................... 29

Faculty/Staff – Student Relations ....................................... 29

Financial Aid Satisfactory Academic Progress Policy - First Professional ............. 30

Financial Aid Satisfactory Academic Progress Policy - Post Professional ............. 32

Financial Aid Verification Policy ........................................ 34

Grade Reports ...................................................................... 35

ID Badges ............................................................................ 35

    First Professional Students ............................................. 35

    Transitional and Post-Professional Students .................. 35

Internet Acceptable Use ...................................................... 35

    Guidelines for Internet Use ............................................ 36

    Use of File Transfer Between Home and Work Computers ........ 37

    Wireless Internet Access Policy ..................................... 37

    Social Networking—Acceptable Use.............................. 37

    Policy on Peer-to-Peer (P2P) File Sharing ..................... 38

Leave of Absence (Including Emergency Leave) ................ 38

myUSA Portal...................................................................... 40

Name Change....................................................................... 41

Nondiscrimination/Anti-Harassment Policy ....................... 41

Parking................................................................................. 41

    Commuter Alternatives Program .................................... 42

    St. Augustine Campus..................................................... 43

    San Marcos Campus ........................................................ 43

    Austin Campus................................................................. 44

    Miami Campus................................................................. 44

Photocopying/Printers......................................................... 45

Registration.......................................................................... 45

Release of Student Information............................................ 45

Replacement Diploma.......................................................... 45

Security Policy..................................................................... 45

    Reporting Emergency Situations and Security Concerns....... 45

    Emergency and Safety Procedures.................................. 46

    Safety on Campus ........................................................... 46

    Unlawful and Controlled Substances Policy .................. 47

    Alcohol Policy ................................................................ 47

    Drug and Alcohol Counseling......................................... 47

KAL000101

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Tobacco Policy ......................................................................................................................... 47
Prohibited Weapons Policy ...................................................................................................... 47
Title IX and Sexual Misconduct Grievance Reporting Policy and Procedures ......................... 48
Status Change—Withdrawal or Leave of Absence (LOA) ....................................................... 55
Student Loans ........................................................................................................................... 56
Termination of Enrollment (Texas) ......................................................................................... 56
Textbooks ................................................................................................................................. 56
Transcripts ................................................................................................................................ 56
Transferability of Course Credit .............................................................................................. 56
Tuition ...................................................................................................................................... 57
    Special Tuition Payment for Students Performing Clinical Internships ............................... 58
    Post Professional Student.................................................................................................... 58
Tuition Refund Policy for First Professional Programs ............................................................ 58
    Cancellation and Tuition Refund Policy .............................................................................. 58
    Notice of Cancellation ........................................................................................................ 58
    $500 Deposit Refund Policy First Professional Programs .................................................... 58
    Tuition Refund Policy First Professional Programs .............................................................. 59
    Tuition Refund Policy for First Professional Programs for Iowa Residents........................... 59
Tuition Refund Policy for Transitional and Post-Professional Programs................................... 60
    Tuition Refund Policy for Transitional and Post Professional Programs for Iowa Residents ...... 61
    Continuing Education Seminar Fee Refund Policy ............................................................... 62
    For Iowa National Guard or Reserve Forces Only ................................................................ 63
    Tuition Refund Policy for Maryland Residents (All programs) ............................................ 64
    Continuing Education Seminar Fee Refund Policy ............................................................... 64
Wellness Centers (St. Augustine, San Marcos, Austin) ........................................................... 65
    Mission Statement............................................................................................................... 65
Academic Policies and Procedures ........................................................................................... 65
Academic Freedom ................................................................................................................... 65
Attendance ................................................................................................................................ 66
    Class Attendance.................................................................................................................. 66
    Absences .............................................................................................................................. 66
    Online Education Attendance .............................................................................................. 66
    Flex Program Additional Information .................................................................................. 67
Audit of a Course ..................................................................................................................... 67
Clinical Education..................................................................................................................... 67
Complaints................................................................................................................................ 68
    Student Complaints ............................................................................................................. 68
    Unresolved Complaints ....................................................................................................... 69

KAL000102

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Course Withdrawal ............................................................................................................ 70

   First Professional ....................................................................................................... 70

   Transitional and Post-Professional .......................................................................... 70

Degree Completion/Graduation ....................................................................................... 70

Distance/Online Education ............................................................................................... 71

   Purpose of Distance/Online Education ..................................................................... 71

   Philosophy of Distance/Online Education ................................................................. 71

   Methods for Delivery of Online Education Courses .................................................. 71

Extra Credit ..................................................................................................................... 72

Grading System ............................................................................................................... 72

   Rounding of Grades ................................................................................................... 73

Grade Changes ................................................................................................................ 73

Grade Posting .................................................................................................................. 74

Institutional Review Board .............................................................................................. 74

Privacy Policy .................................................................................................................. 74

Professional Conference Attendance ............................................................................... 75

Professional Misconduct ................................................................................................. 75

   Disciplinary Action ................................................................................................... 75

   Professional Misconduct Committee Procedures ...................................................... 76

   Student's Right of Appeal .......................................................................................... 77

   Permanent Record ..................................................................................................... 77

Religious Accommodation ............................................................................................... 78

Repetition of a Course ..................................................................................................... 78

Student Code of Conduct ................................................................................................. 78

Student Conduct Policies (Specific) ................................................................................ 79

   Classroom and Laboratory Conduct and Standards ................................................. 79

   Professional Dress and Appearance Code ................................................................. 80

   Miami Campus Dress Code - NEW Fall 2018 ......................................................... 82

Student Information and Records ...................................................................................... 83

   Notification of Rights under FERPA ......................................................................... 83

Student Rights .................................................................................................................. 84

Student Responsibilities ................................................................................................... 85

Transfer Credit Policy—All Programs ............................................................................. 85

   Transfer of Credits from Another Accredited Institution .......................................... 85

   Transfer of Credits from One USAHS Program to Another USAHS Program ......... 86

Trimesters/Terms ............................................................................................................. 87

First Professional Programs Policies and Procedures ...................................................... 88

   Contact Information ................................................................................................... 88

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000103

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Academic Evaluation and Right of Appeal ............................................................................. 91
    Prior to Trimester Meetings .......................................................................................... 92
    Academic Progression During the Appeal Process ........................................................ 92
    Midterm Meetings ........................................................................................................ 92
Advanced Course Standing by Examination ........................................................................ 92
Advisors ............................................................................................................................... 93
Awards ................................................................................................................................. 93
    Outstanding OT, PT, MS-SLP and Flex Student Awards ............................................ 94
Campus Location Change .................................................................................................... 95
Campus Exchange Program .................................................................................................. 95
Continuing Education ........................................................................................................... 96
Counseling ........................................................................................................................... 96
Dual Degree Option ............................................................................................................. 96
Employment ......................................................................................................................... 97
Examination and Proctoring ................................................................................................. 97
Exit Examinations ................................................................................................................ 100
Expected and Maximum Completion Time Frames and Satisfactory Academic Progress (SAP) ............. 100
Fingerprints and Criminal Record ....................................................................................... 101
Good Academic Standing, Academic Progression Warning, Academic Progression Probation, Dismissal ............ 101
    Good Academic Standing ............................................................................................. 101
    Academic Progression Warning .................................................................................... 102
    Academic Progression Probation .................................................................................. 102
    Dismissal ...................................................................................................................... 102
Health Records .................................................................................................................... 103
Health Services .................................................................................................................... 103
Liability Release and Claim Waiver ..................................................................................... 104
Licensure Exams .................................................................................................................. 104
Lockers ................................................................................................................................ 104
Orientation .......................................................................................................................... 104
Program Change ................................................................................................................... 104
    Incoming Students ........................................................................................................ 105
    First Term Students ...................................................................................................... 105
    Second Term (and Beyond) Students ............................................................................ 105
    Program Change Request Process for Current Students .................................................. 105
Reenrollment Timelines ....................................................................................................... 105
Student Membership in Professional Associations ................................................................ 106
Student Associations ............................................................................................................ 106
Student Retention Program: Tutoring ................................................................................... 106

KAL000104

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Post-Professional Programs Policies and Procedures.................................................................................. 108
  Contact Information ................................................................................................................................. 108
    Correspondence.................................................................................................................................... 108
  Being Prepared........................................................................................................................................ 110
  Computer Equipment.............................................................................................................................. 110
  Course Availability (for Distance Learning and Electives)..................................................................... 110
  Course Schedules..................................................................................................................................... 110
  Good Academic Standing, Academic Progression, Retention, Warning, and Probation....................... 111
    Active Status ......................................................................................................................................... 111
    Leave of Absence................................................................................................................................. 111
    Inactive Status....................................................................................................................................... 111
    Good Academic Standing ..................................................................................................................... 112
    Probation............................................................................................................................................... 112
    Withdrawal of Acceptance into the Program ...................................................................................... 112
    Dismissal................................................................................................................................................ 113
    Right of Appeal..................................................................................................................................... 113
    The Right of Petition............................................................................................................................. 114
  Orientation .............................................................................................................................................. 114
  Registering for Coursework Online ....................................................................................................... 114
  Reinstatement.......................................................................................................................................... 114
  Time Limit ............................................................................................................................................... 114
  Non-Degree Seeking Students ............................................................................................................... 115
  Clinical Education Handbooks................................................................................................................. 117
  What's New This Term ............................................................................................................................ 117

KAL000105

# Introduction

This Student Handbook is designed to be a quick reference guide that is both informative and helpful. It is not a contract. It does not replace the official Catalog. It is a collection of information and policies, both general and specific, for the University of St. Augustine for Health Sciences' (USAHS; the University; the University of St. Augustine) degree programs. If any conflict appears to exist between this Handbook and statements in the Catalog, the Catalog takes precedence. The University reserves the right to make changes to the Student Handbook at any time. The Student Handbook and University Catalog can be found on the USAHS website, www.usa.edu, under the Admissions & Aid tab.

The University complies with and follows policies associated with the Americans with Disabilities Act, including the right of reasonable accommodation. It also does not discriminate by reason of race, religion, age, gender, sexual orientation, or ethnic creed.

Each student should carefully read the current issues of both the Student Handbook and the Catalog. Please complete and return the Student Handbook Acknowledgment Form to the Student Services Office.

# University of St. Augustine for Health Sciences Mission

The mission of the University of St. Augustine for Health Sciences is the development of professional health care practitioners through innovative, individualized, and quality classroom, clinical, and distance education.

# Expectations for Students in Professional Programs

Graduate health care education prepares students for the professional practice of their discipline and develops the skills necessary to become a self-directed, lifelong learner within the ever changing field of health care. This level of education requires a higher level of participation and commitment than is typically required of students in most undergraduate degree programs. In order to successfully progress through the academic program and transition into the role of a health care professional, it is important that students are self-directed in their learning and assume responsibility for their educational and professional growth and development. They should take the initiative to reflect on their own strengths and weaknesses, assess their own learning needs, identify available resources (human and material), and select and implement appropriate learning strategies. Students should relate prior academic or life experiences to new learning while recognizing that there is usually more than one answer or approach to most questions or problems. Students should exhibit high levels of self-reflection, self-motivation, engagement, intellectual curiosity, professionalism, and ethical standards. Students are expected to devote sufficient time to their studies and to be committed to learning activities both in and out of the academic setting in order to be successful.

KAL000106

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

# DEGREES OFFERED

Master of Occupational Therapy (MOT)

Master of Health Administration (MHA)

Master of Health Science (MHS)

Master of Science in Speech-Language Pathology (MS-SLP)

> The Master of Science in Speech-Language Pathology at the University of St. Augustine for Health Sciences is a Candidate for Accreditation by the Council on Academic Accreditation in Audiology and Speech-Language Pathology (CAA) of the American Speech-Language-Hearing Association, 2200 Research Boulevard, #310, Rockville, MD 20850, 800-498-2071 or 301-296-5700. This is a "pre-accreditation" status with the CAA, awarded to developing or emerging programs for a maximum period of five years.

Master of Science in Nursing (MSN)

Doctor of Physical Therapy (DPT)

Doctor of Occupational Therapy (OTD)

Doctor of Occupational Therapy Post-Professional (OTD)

Transitional Doctor of Physical Therapy (tDPT)

Doctor of Nursing Practice

Doctor of Education (EdD)

Doctor of Health Science (DHSc)

# NURSING POST-GRADUATE CERTIFICATES OFFERED

Family Nurse Practitioner

Nurse Educator

Nurse Executive

Nurse Informaticist

*See Catalog for full descriptions*

KAL000107

# University of St. Augustine Teach-Out for Degree Programs

If the University decides to halt enrollments in a program, the University is obligated to develop a plan to teach-out the remaining students in the program. If that occurs, the students will receive timely and complete information regarding individual course plans and a timeline for degree completion.

Dr. Divina Grossman, President/CAO
University of St. Augustine for Health Sciences
700 Windy Point Drive
San Marcos, CA 92069

# 2018-2019 Academic Calendar

# FALL 2018 TRIMESTER

| September 3 | Labor Day - Administrative offices closed |
| September 4 | Appeals committee meets - Time TBA |
| | Faculty retreat - Faculty return to campus |
| September 5 | New (Full-time) Student Orientation |
| | Tuition due for all students |
| September 6 | Fall trimester classes begin |
| | Session 1 online courses begin |
| September 14 | Grades due Fieldwork IIA - Flex MOT (old curriculum) |
| September 24 | Session 2 online courses begin |
| | Classes end for 7th term DPT |
| October 22 | 5th term DPT students return to campus (new curriculum) |
| October 26 | Mid-course grades due to Progression Committee for 15 week classes |
| | Classes end for Flex DPT beginning Internship I (old curriculum) |
| October 29-31 | Final Exams for Flex DPT beginning Internship I (old curriculum) |

KAL000108

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

| | |
|---|---|
| November 1 | Grades due for Flex DPT beginning Internship I (old curriculum) |
| November 6 | Mid-term Academic Appeals Committee meeting |
| November 12 | Veterans Day observed - no classes; administrative offices closed |
| November 21 | Thanksgiving holiday begins for student at noon; administrative offices close 3:00 p.m. |
| November 22-23 | Thanksgiving holiday break - no classes; administrative offices closed |
| November 16 | Classes resume |
| December 12 | Grade due for ALL graduating students |
| December 14 | Fall trimester classes end<br><br>Fall term Commencement Exercises - St. Augustine campus<br><br>Fall term Commencement Exercises - Austin campus<br><br>Fall term Commencement Exercises - San Marcos campus |
| December 14-19 | Final Examinations |
| December 19 | End of term - Graduate degrees conferred - all campuses<br><br>Practical Exam retakes |
| December 20 | Grades due by 5:00 pm local time for all students |
| December 24 | Administrative offices closed through January 1, 2019 |

KAL000109

# SPRING 2019

## NOTE: TRIMESTERS NOW BEGIN ON MONDAY INSTEAD OF THURSDAY

| | |
|---|---|
| January 2 | Administrative offices reopen |
| January 10 | Appeals committee meets - Time TBA |
| | Faculty Retreat - faculty return to campus |
| January 11 | New (full-time) student orientation |
| | Tuition due for all students |
| | Grades due for Fieldwork IIA - MOT |
| January 14 | Spring trimester classes begin |
| | Session 1 online classes begin |
| January 28 | Session 2 online classes begin |
| February 12 | Courses end for 5th term Flex MOT beginning Fieldwork IIA (old curriculum) |
| | Final practical exams for 5th term Flex MOT beginning Fieldwork IIA (old curriculum) |
| February 15-19 | President's Day holiday and Spring Break; no classes for students and faculty |
| February 18 | President's Day holiday - campuses closed; administrative offices closed |
| March 1 | Classes end for Flex DPT beginning Internship I (old curriculum) |
| March 4 | 5th term DPT student return to campus - Miami (new curriculum) |
| March 5-7 | Final exams for Flex DPT beginning Internship I (old curriculum) |
| March 6 | Mid-course grades due to Progression Committee - 15 week courses |
| March 8 | Grades due for Flex DPT beginning Internship I (old curriculum) by 5:00 p.m. local time |
| March 12 | Mid-term Academic Appeals Committee meeting |
| April 19 | Grades due for ALL graduating students |

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information                                        pg. 17

KAL000110

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

| | Spring trimester classes end |
|---|---|
| April 22-26 | Final examinations |
| April 24 | Practical exam retakes |
| April 26 | End of term - degrees conferred - all campuses |
| April 25-28 | Spring term commencement exercise weekend all campuses (date & time TBD) |
| April 29 | Grades due by 5:00 p.m. local time for all students |

# SUMMER 2019

| | |
|---|---|
| May 9 | Appeals committee meets - Time TBD |
| | Faculty retreat - faculty return to campus |
| May 10 | New (full-time) student orientation |
| | Tuition due for all students |
| May 13 | Summer trimester classes begin |
| | Session 1 online courses begin |
| May 17 | Fieldwork IIA grades due |
| May 27 | Memorial Day Holiday - no classes; administrative offices closed |
| May 28 | Session 2 online classes begin |
| June 7 | Courses end for Flex MOT beginning Fieldwork IIA (old curriculum) |
| June 27 | Courses end for Flex DPT beginning Internship I (old curriculum) |
| July 1 | 5th term DPT students return to campus (new curriculum) |
| July 1-3 | Final exams for Flex DPT beginning Internship I (old curriculum) |
| July 3 | Mid-course grades due to Progression Committee for 15 week classes |
| July 4 | Grades due for Flex DPT going on Internship I by 5:00 p.m. local time (old curriculum) |
| | Administrative offices closed |
| July 4-5 | Independence Day holiday for students - no classes |

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000111

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

| July 9 | Mid-term Academic Appeals Committee meeting |
| --- | --- |
| August 16 | Grades due for ALL graduating students |
| | Summer trimester classes end |
| August 19-23 | Final examinations |
| August 22 | Practical exam retakes |
| August 22-25 | Summer term Commencement Exercise weekend - all campuses (date & time TBD) |
| August 23 | End of term - Graduate degrees conferred - all campuses |
| August 26 | Grades due by 5:00 p.m. local time for |

# FALL 2019 TRIMESTER

| September 2 | Labor Day - Campuses closed |
| --- | --- |
| September 5 | Appeals Committee meets - Time TBD |
| | Faculty retreat - faculty return to campus |
| September 6 | New (full-time) student orientation |
| | Tuition due for all students |
| September 9 | Fall trimester classes begin |
| | Session 1 online courses begin |
| September 13 | Grades due Fieldwork IIA - Flex MOT (old curriculum) |
| September 30 | Session 2 online courses begin |
| | Classes end for 7th term DPT |
| October 25 | Last day of class for Flex DPT going on Internship I (old curriculum) |
| October 28 | 5th term DPT student return to campus (new curriculum) |
| October 28-30 | Final exams for Flex DPT beginning Internship I (old curriculum) |
| October 29 | Mid-term Academic Appeals Committee meeting |
| October 30 | Mid-course grades due to Progression Committee for 15 week classes |

KAL000112

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

| October 31 | Grades due for Flex DPT beginning Internship I (old curriculum) |
|---|---|
| November 11 | Veterans Day - no classes; administrative offices closed |
| November 27 | Thanksgiving holiday begins for students at noon; administrative offices close 3:00 p.m. |
| November 28-29 | Thanksgiving holiday break - no classes; administrative offices closed |
| December 2 | Classes resume |
| December 13 | Grades due for ALL graduating students<br><br>Fall trimester classes end |
| December 12-15 | Fall term Commencement Exercise weekend, all campuses (date & time TBD) |
| December 16 - 20 | Final Examinations |
| December 20 | End of term - graduate degrees conferred<br><br>Practical exam retakes<br><br>Grades due by 5:00 p.m. local time for all students |
| December 24 | Administrative offices closed through January 1, 2020 |

KAL000113

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

# Student Services

## Mission

The Student Services offices are responsible for providing pre-admission, admission, registration, and financial services to prospective students, current students, and alumni. The offices oversee, coordinate, and administer multifaceted activities and student-centered services that include recruitment programs, pre-admission advisement, admissions and registrar functions, and alumni services. The staff value excellent customer service, timely and accurate communication, professionalism, and teamwork.

# Academic Advisors

The University of St. Augustine for Health Sciences is committed to student success. With this in mind students are connected to an Academic Advisor. An Academic Advisor is available to support students in many ways during the days leading up to the first class and throughout the duration of the academic program.

Academic Advisors provide concierge support and help students navigate through the University. They assist students in completing required forms, understanding USAHS policies and procedures, adjusting schedules, and much more. Academic Advisors also have access to resources that can assist students with study strategies, time and stress management techniques, and organizational tips.

Academic Advisors partner with students to help them achieve their academic and professional goals and will check up on students from time to time just to see how they are progressing. Academic Advisors are on the front lines of student service and are always willing to answer questions and provide support.

Telephone: 800-241-1027

| | | |
|---|---|---|
| David Schoenherr, San Marcos Campus | ext. 2411 | dschoenherr@usa.edu |
| Walter Miska, St. Augustine Campus | ext. 1338 | wmiska@usa.edu |
| Kailynn Cannata, Austin Campus | ext. 3117 | kcannata@usa.edu |
| Juliette Henry-Pitter, Miami Campus | ext. 4135 | jhenrypitter@usa.edu |
| Sherrie Jensen, Post Professional Advisor | ext. 1354 | sjensen@usa.edu |
| Frank Bennett, Post Professional Advisor | ext. 1225 | fbennett@usa.edu |

KAL000114

# Admissions Office

The Admissions Office helps students move from applicant status to acceptance into the University. The office ensures that applicants meet the required guidelines for admissions and helps the Admissions Committee in selecting the most qualified students.

# Bursar's Office

The Bursar's Office handles all billing and refunds.

Telephone: 800-241-1027

| | | |
|---|---|---|
| Susan Jones, Bursar Team Leader, Business Office, St. Augustine | ext. 1240 | sjones@usa.edu |
| Candice Salazar, Business Office Bursar, Austin | ext. 3108 | csalazar@usa.edu |
| Kristin Hitchcock, Business Office Bursar, San Marcos | ext. 2456 | khitchcock@usa.edu |
| Tania McLaws, Business Office Bursar, Miami | ext. 4134 | tmclaws@usa.edu |

# Career Services

Career Services provides services to students online via the Optimal Resume and Handshake platforms, through on-campus career fairs twice yearly, and via online career coaching. Once logged into the student portal, the Career Services tab can be accessed under the Student Services dropdown menu.

In Optimal Resume, students can create a resume and cover letter and have them reviewed by a career coach, record a practice interview, create a career portfolio, and view informational videos on current career topics. Go to Optimal Resume to create an account.

In Handshake, students can create a career profile with a resume, post it for employers to view, and apply to job postings. Each semester, new students will be invited to join Handshake.

Career fairs are held twice a year on each campus.

Students may request individual career coaching via Skype by emailing Dr. Morris.

Dr. LaDonna Morris, Manager of Career Services          904-770-3539     lmorris@usa.edu

KAL000115

# Continuing Professional Education Office

The Office of Continuing Professional Education registers students for live seminars, online webinars/seminars and certification preparation and examination.

Telephone: 800-241-1027, ext. 1400

| | | |
|---|---|---|
| Lori Hankins, Director of Continuing Education | ext. 1203 | lhankins@usa.edu |
| Ouida Howell, Assistant Director of Continuing Education | ext. 1266 | ohowell@usa.edu |

# Enrollment Office

The Enrollment team assist prospective students from initial inquiry through the entire application completion process, including guidance on selecting the appropriate start date and modality, submitting required documents, and preparing the most competitive application. For questions or more information, please email enroll@usa.edu or, to speak to someone, please call 800-241-1027, ext. 2499.

# Financial Aid Office

For financial aid information, visit Financial Aid on the website at: Financial Aid Information. Any inquiries or requests for student information should be sent to the Department of Financial Services, University of St. Augustine for Health Sciences, 1 University Boulevard, St. Augustine, FL 32086, or email ContactFinancialAid@usa.edu.

| | | |
|---|---|---|
| Rhonda James, Director of Financial Aid/Financial Services | 904-770-3584 | rjames@usa.edu |
| Erica Kelly, Financial Aid Manager | 904-770-3541 | ekelly@usa.edu |
| Sonia Morris, Financial Aid Counselor - Miami Campus | 786-725-4039 | smorris@usa.edu |
| Eloisa Augustus, Financial Aid Counselor - Austin Campus | 737-202-3306 | eaugustus@usa.edu |
| Michael Thompson, Financial Aid Counselor - Austin Campus | 737-202-3353 | mthompson@usa.edu |
| Mary Grawl, Financial Aid Counselor - San Marcos Campus | 760-410-5341 | mgrawl@usa.edu |
| Jazmin Garcia, Financial Aid Counselor - San Marcos Campus | 760-410-5342 | jgarcia@usa.edu |

# Information Resources/Library

For full details regarding library services and resources (including library hours) please visit the myUSA portal Library tab. Please direct all questions to library@usa.edu.

KAL000116

# Registrar's Office

The main Registrar's Office for all degree programs is located on the St. Augustine campus with Registrar staff also located on the San Marcos campus. Any inquiries or requests for student information should be sent to the Registrar, University of St. Augustine for Health Sciences, 1 University Boulevard, St. Augustine, FL 32086, or email registrar@usa.edu.

The Registrar's Office is responsible for maintaining the official academic records for all students who enroll in academic degree programs. Holds may be placed on students' records, transcripts, grades, or registration because of financial or other obligations to the University. Satisfaction of the hold is required before a release can be given.

Telephone: 800-241-1027 ext. 1600

| | | |
|---|---|---|
| Diane Rondinelli, Registrar | ext. 1205 | drondinelli@usa.edu |
| Laura Sanders, Associate Registrar | ext. 1295 | lsanders@usa.edu |
| Cristina (Cris) Clark, Assistant Registrar | ext. 1305 | cclark@usa.edu |
| Brooke Nelson, Assistant Registrar | ext. 2485 | bnelson@usa.edu |

# Writing Center

The mission of the Writing Center at the University of St. Augustine for Health Sciences is to provide exceptional service to students across all modalities and programs by providing individualized instruction and resources to solidify their writing skills as practicing scholars and emerging professionals in the field of Health Sciences. The Writing Center is not a "drop off" editing service; rather than simply correcting or writing portions of varying projects, we seek to develop our students into strong writers and editors through continued engagement with the writing process. Coaching appointments are made online via the WCONLINE platform where students can upload a file for review in either a live Skype session with a coach or via asynchronous feedback.

Students can reserve an appointment with one of our writing coaches on the Writing Center Online schedule. First time users will need to register their account using their USA email.

Writing Center information and resources can be accessed in the MyUSA student portal. The Writing Center tab can be found in the Student Services dropdown menu.

Hideki Nakazono, Director, Writing Center    505-473-6445    hnakazono@usa.edu

KAL000117

# University Policies and Procedures

## Academic Integrity Policy

Academic integrity means that all academic work represents the individual work of the stated author. Input and assistance from others must always be appropriate and fully acknowledged. Any deviation from this policy will be considered Academic Dishonesty.

## Academic Dishonesty

Academic dishonesty can occur in many forms and variations. The following is a list of some academic dishonesty offenses:

- *Cheating* - a form of misrepresentation. Cheating can include, but is not limited to,
  - using another's work as your own;
  - utilizing a paper or assignment bought or taken from a website;
  - allowing someone else to turn in your work as his or her own;
  - several people writing one paper and turning in separate copies, all represented (implicitly or explicitly) as individual work;
  - stealing an examination or a solution from the instructor;
  - looking at another student's exam;
  - using notes or other aids in an exam when they are not permitted;
  - sharing exam questions with other students; or
  - sharing case scenarios from a practical with other students.
- *Fabrication* - the forgery or invention of information or citation in an academic exercise. This might include
  - the use of false results in a research study or fabricating a resource for a reference list.
- *Facilitating dishonesty* - assisting another to perform an act of academic dishonesty. This includes
  - someone taking an exam other than the appropriate student (it may also address misuse of a proctor); or
  - falsification of a required proctor.
- *Plagiarism* using another's work without crediting that individual or receiving authorization for use. Plagiarism is a serious academic offense. The University of St. Augustine for Health Sciences defines plagiarism as "knowingly using the words, ideas or language of another author without giving credit to the work." In its severest form, plagiarism is the theft of another's intellectual work.

The University does recognize that there are many colors and shades of plagiarism and that, at times, it may even be an inadvertent mistake, such as leaving off a reference from a bibliography.

Intentional violations are a much more serious offense. An example of this might be the use of a paragraph from a journal article without citation in a report or bulletin board response. It is with this in mind that the University has defined the following "levels of misconduct."

## Level One Academic Dishonesty

Level One violations typically occur as a result of students not familiarizing themselves with writing and course requirements. They may include the following.

- Lazy plagiarism-forgetting a citation or leaving a reference off of a reference list
- Failure to cite or acknowledge a source in a small or limited part of the paper

The instructor deals with Level One misconduct offenses and notifies the Program Director. Actions may include

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                          pg. 20

KAL000118

- resubmission of the assignment,
- an additional assignment, or
- reduction of grade per course syllabus and/or the Student Handbook.

## Level Two Academic Dishonesty

Level Two misconduct is more serious. These types of violations are more intentional in nature. The following are examples:

- Quoting directly or plagiarizing, to a moderate extent, without acknowledging the source
- Submitting the same work or major portions thereof to satisfy the requirements of more than one course, or the same course when repeated, without permission from the instructor
- Receiving assistance and failing to acknowledge this in a paper or research study

The instructor, in consultation with the appropriate Program Director, deals with most Level Two misconduct offenses. Actions may include:

- a zero grade for an assignment,
- writing a paper on academic ethics, or
- reduction of grade, per course syllabus and/or the Student Handbook.

Records of students who commit the above type of offense will be maintained in the student's file until the student completes the program.

## Level Three Academic Dishonesty

These violations are the most serious type of offense:

- Copying another's exam
- Plagiarizing a substantial amount of text in an assignment or assessment
- Enabling someone else to copy your material during an exam
- Using books, notes, or other forbidden aids during an examination
- Giving or receiving information about the content of an exam
- Stealing or distributing a copy of an examination
- Submitting the work of someone else as your own
- Using purchased or copied manuscripts
- Removing posted or reserved instructional material, or otherwise preventing access to it
- Inventing material (this includes citing artificial sources)
- Using illegal or unethical means of acquiring information
- Utilizing an instant messenger or phone while taking an online exam
- A repeat offender—one who has been caught more than once in an act of academic dishonesty

Students committing Level Three academic dishonesty offenses will be referred to the Professional Misconduct Committee. The Professional Misconduct Committee will make appropriate recommendations to the designated Program Director. Actions may include dismissal from the program.

# Address Changes

A student's legal home or permanent address (mailing address) is taken from the application for admission and subsequently from the student information form completed during orientation. It is the student's responsibility to

KAL000119

change their address. Address changes should be made through the *myUSA* portal. Students should provide a local address once enrolled for emergency purposes.

# Americans with Disabilities Act (ADA)

## Assistance for Students with Disabilities

In accordance with the American with Disabilities Act (ADA), the University of St. Augustine for Health Sciences is dedicated to providing reasonable accommodations to any student with a disability. The University has developed a list of essential functions that a student should possess in order to successfully complete some programs. This list is provided to prospective students as part of the application packet and to newly admitted students as part of the acceptance process. Each student must endorse that he or she has reviewed and understands the list of essential functions.

To request reasonable accommodations, a student must complete the Reasonable Accommodation Request Form available through *myUSA*. New First Professional full-time and flex students receive this form along with instructions for making a request once they have submitted their tuition deposits.

Students should submit the completed form and appropriate documentation to disability@usa.edu no later than the first Friday after classes begin so that approved accommodations may be put in place as early as possible. A delay in submitting the request may result in not having approved accommodations for the first assignments/tests of the term. Students may ask the Academic Advisor for clarification of the process. Disability Services will review the request and inform the student in writing of the decision. The student will be asked to sign a form indicating his or her understanding of and agreement to the accommodations.

Faculty are to adhere to the approved accommodations as provided by the student and are encouraged to seek clarification from Disability Services should there be a question about the provision of an accommodation. Should a student request something different than what is approved, the faculty member, advisor, and/or Program Director should inform the student that only the approved accommodations will be provided. Should the student wish to alter the accommodation, he or she should contact Disability Services via disability@usa.edu.

Students with a disability should expect to maintain the standards that apply to all University students and request only the accommodations approved by this process. Being penalized for having a disability is unacceptable as is expecting more than reasonable accommodations.

Any discrepancy encountered by the student or faculty in the written accommodation plan should be brought to Disability Services for review and action. Student progress may be reviewed as to their ability to perform safely and appropriately in a clinical situation. Students will be advised in writing of concerns regarding clinical performance.

# Disability Policy and Grievance Procedure

It is the policy of the University of St. Augustine for Health Sciences not to discriminate on the basis of disability. USAHS has adopted an internal grievance procedure providing for prompt and equitable resolution of complaints alleging any action prohibited by the Americans with Disability Act (ADA) and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794).

Any person who believes she or he has been subjected to discrimination on the basis of disability may file a grievance under this procedure. It is against the law for USAHS to retaliate against anyone who files a grievance or cooperates in the investigation of a grievance.

**Procedure:**

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information

KAL000120

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

1. Grievances must be submitted to Disability Services and/or the Executive Director of Student Administration within 30 days of the date the person filing the grievance becomes aware of the alleged discriminatory action.
2. A complaint must be in writing, containing the name and contact information (including address) of the person filing it. The complaint must state the problem or action alleged to be discriminatory and the remedy or relief sought.
3. The Disability Services (or designee) shall conduct an investigation of the complaint. This investigation may be informal, but it must be thorough, affording all interested persons an opportunity to submit evidence relevant to the complaint. Disability Services (or designee) will maintain the files and records of USAHS relating to such grievances. If the complaint is against another USAHS student and alleges a violation of the Student Code of Conduct, the matter will be referred to the Grievance Committee as outlined in the Student Handbook.
4. Disability Services (or designee) will issue a written decision on the grievance no later than 30 days after its filing, unless more time is needed. In cases where more time is needed, a written update of progress and actions taken will be provided no later than 30 days after its filing.
5. The person filing the grievance may appeal the decision of Disability Services (or designee) by writing to the President/Chief Academic Officer within 5 days of receiving the Disability Services' decision. The President/Chief Academic Officer shall issue a written decision in response to the appeal no later than 30 days after its filing.
6. The availability and use of this grievance procedure does not prevent a person from filing a complaint of discrimination on the basis of disability with the U.S. Department of Education Office for Civil Rights.

USAHS will make appropriate arrangements to ensure that disabled persons are provided other accommodations, if needed, to participate in this grievance process. Such arrangements may include, but are not limited to, providing interpreters for the deaf, providing taped cassettes of material for the blind, or assuring a barrier-free location for the proceedings. Disability Services (or designee) will be responsible for such arrangements.

# Pets and Service Animals

USAHS prohibits pets (including but not limited to dogs, cats, birds, pigs, rodents, and reptiles) from all campus buildings and grounds. When campus security or facility personnel observe or become aware of a dog or pet on campus, they will ask the owner to immediately remove the animal from the premises.

### Service Animals

USAHS's policy on service animals is written in compliance with ADA laws, regulations, and guidance provided by the Department of Justice.

* To learn more about service animals and the ADA see https://www.ada.gov/service_animals_2010.htm
* To review FAQs see https://www.ada.gov/regs2010/service_animal_qa.pdf

Service animals are welcome in USAHS buildings and on university grounds. Service animals may attend any class, meeting, or university event.

Service animals may be prohibited if the presence of the animal fundamentally alters the nature of a service or program or where the animal's presence may compromise a sterile environment. In addition, if a service animal is out of control and the handler does not take effective action to control it, or if it is not housebroken, that animal may be excluded.

USAHS has the authority to require that a service animal be removed from the premises if the service animal becomes unruly or disruptive, unclean, or unhealthy to the extent that the animal's behavior or condition poses a direct threat to the health and safety of others. If such behavior persists, the owner may be directed not to bring the animal onto USAHS grounds and facilities until the issue is resolved.

### Definition of Service Animal

Under the ADA, a service animal is defined as a dog that has been individually trained to do work or perform tasks for an individual with a disability. The task(s) performed by the dog must be directly related to the person's

Students, faculty, and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.  pg. 23

KAL000121

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

disability. Dogs whose sole function is to provide comfort or emotional support do not qualify as service animals under the ADA.

Examples of service animal work includes guiding people who are blind, alerting people who are deaf, pulling a wheelchair, alerting and protecting a person who is having a seizure, reminding a person with mental illness to take prescribed medications, or calming a person with Post Traumatic Stress Disorder during an anxiety attack. Service animals are working animals, not pets.

**Comfort Animals**

USAHS does not allow the use of emotional support, therapy, comfort, or companion animals. Exceptions to this rule may be handled on a case by case basis.

**Service Animals and Clinical Placement**

Students requiring a service animal may experience limitations in the number of clinical sites available to them and their desired geographic location.

**Responsibility of Service Animal Owners/Handlers**

The owner/handler is responsible for cleaning up after their service animal and is expected to properly dispose of all animal waste.

The owner/handler is responsible for the cleanliness of their service animal. Daily grooming and regular baths should be performed to keep animal odor to a minimum. Flea control is essential, and preventative measures should be taken. In the event a flea problem develops, it should be dealt with immediately and effectively. Consideration of others must be taken into account when providing maintenance and hygiene of service animals.

# Building Hours

Students may access campus buildings from 7:00 a.m. to 10:00 p.m. local time, except during holidays and term breaks as defined on the Academic Calendar. Business offices are open from 8:00 a.m. to 5:00 p.m. local time.

Austin campus weekend hours are 8:00 a.m. to 10:00 p.m. local time.

# Business Days

The University offers classes 7 days per week. Students should refer to the course syllabus regarding due dates.

A business day refers to Administrative Offices that operate Monday through Friday, 8:00 a.m. to 5:00 p.m. in each respective time zone.

# Cell Phone Use on Campus

- Ringer should be turned *off* during class or labs.
- No text messaging is allowed during class or labs.
- Cell phone/tablet camera, audio, or video recording may not be used during class or labs unless permission is given by the instructor.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                            pg. 24

KAL000122

- Cell phones and cameras are to be stored in book bags or other secure locations during exams or exam review sessions and should be either turned off or placed on vibrate. Cell phones are not allowed to be in pockets or attached to pants or lying on tables.
- If a student *must* make an important call or receive an important call during class or lab hours, the student should inform and get permission from the instructor. Phones should be either turned off or placed on vibrate.
- When talking on cell phones in hallways, students should be courteous and keep voices down or move to a quiet area.
- No cell phone conversations are permitted and phones should be placed on silent when in the library or quiet-study-zone areas.

# Copyright Policy

**Purposes:**

1. To enunciate the University's commitment to copyright compliance in the academic environment
2. To provide basic information on copyright protections and to offer clear examples of potential violations
3. To direct students to educational and legal resources for addressing copyright questions
4. To describe student disciplinary action to be taken when the University's copyright policy has been violated

**Statement on Copyright Compliance**

The University of St. Augustine for Health Sciences expects all students, faculty and staff to respect and adhere to U.S. copyright laws. Copyright laws govern the unauthorized copying, performance, licensing, modification and distribution of creative works, including textbooks, music, artwork, and other published and unpublished works. Only the creator or the legal copyright holder has a right to copy, perform, license, modify and distribute such works, even if there is no related profit motive.

The University works to educate its students and faculty on the ethical and legal use of copyrighted works and provides numerous resources to provide guidance on the use of these materials.

The University copyright policy will be provided to incoming students in the Student Handbook, and additional information on copyright is readily available through the University library webpage in the "Copyright" section.

Student violation of copyright laws or policy is considered academic misconduct and will be subject to disciplinary action through the Professional Misconduct Committee.

**What Copyright Laws Protect**

Copyright laws protect any work that requires creative effort, is original, and is set down in a tangible medium of expression. This ensures that the author of a creative intellectual work is rewarded for his or her effort and promotes creativity. Only the copyright holder of a work may sell or transfer his or her rights, including copying, performing, licensing, creating derivative works from and distributing the work.

While certain very limited exceptions are made under the law for educational purposes, any copying and distribution of creative works without the permission of the copyright holder may be illegal. Educational exceptions are briefly outlined under Fair Use below.

*A work does not need to be registered with the copyright office to be protected by the law; it needs only to be recorded or set down in a tangible medium of expression. That means that even if it does not contain the © symbol, it remains protected and cannot be copied or distributed without permission of the creator.*

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000123

*A work does not have to be published in order to be protected by copyright,* it needs only to be recorded or set down in a tangible format. Copyright protection is instant upon creation. For example, a professor's course pack assembled and shared with a class would be protected by law, since it was created by the professor. That professor may have given permission by sharing the course pack or distributing copies her/himself, but further duplication without permission would violate copyright protections. While the course pack might later be published, it would not need to be published in order to be protected.

*Digital scanning is a form of copying,* even though it does not create a physical copy of the work. For example, scanning copies of a textbook for another student to use would be a violation of the law, even if the original textbook were purchased, since it creates a copy without the copyright holder's consent. Placing a copy on a shared drive service like Dropbox would also be illegal, since this effectively distributes copies to those who download the item. Making copies of an eBook version of the book would also violate copyright law. Even piecemeal copying of chapters in this situation, either by photocopy or electronic copy, would violate copyright laws.

These are clear cases of copyright violations, but many cases are very complex and may require review or consultation with legal counsel. In order to ensure continuing good faith and to remain in compliance with copyright law, we encourage students to be cautious in their use of protected materials, to take advantage of resources for evaluation of use, and to consult legal counsel when necessary.

Detailed information and links to additional copyright education resources are made available on the "Copyright" section of the University library webpage.

## Fair Use in Education

The University of St. Augustine recognizes that U.S. copyright law does make limited exceptions for use of copyrighted materials for educational purposes. In situations where the copying is done for the purposes of teaching, research, learning, comment or criticism, fair use exceptions may be made to the exclusive rights of copyright. *Simply because copying is motivated by educational purposes does not mean it is exempt from penalty; other factors are critical to determining whether fair use applies under the law.*

The general criteria are applied by the courts on a case by case basis, but include evaluation of the following four factors:

1. The purpose and nature of the work, including whether use is of a commercial nature or for educational or critical purposes.
2. The nature of the copyrighted work, including whether it is fictional or factual and the creative effort required to produce it.
3. The amount of the original work copied and whether this includes a substantial portion of the original or an important component that forms the heart of the work.
4. The effect upon the potential market for the original work or upon its value. Even if a work is unpublished, its potential value is a factor.

It is important to be aware that the nature of The University of St. Augustine as a private corporation could weigh heavily as providing a "commercial nature" to campus work. Thus, resources are provided for the careful evaluation of fair use by students, including fair use evaluation tools which can be found through the "Copyright" section of the University library's website.

The University encourages the use of fair use evaluation forms for all educational use of copyrighted works in order to ensure compliance with laws and to provide a record of good faith attempts to evaluate fair use.

## Student Disciplinary Action

The University of St. Augustine takes compliance with federal copyright laws very seriously and has formulated this copyright policy to ensure adherence to the law by all students.

A copy of this policy is provided to each incoming student as a part of the Student Handbook. Students are therefore expected to aware of and to comply with these policies. Students are encouraged to report unlawful copying of

KAL000124

materials by contacting their librarian, a faculty member, or initiate a report directly to the Professional Misconduct Committee.

*Students found to have engaged in the unauthorized distribution of copyrighted materials will be referred to the Professional Misconduct Committee for disciplinary action and could be expelled from the University.*

**Additional Information and Assistance**

Copyright is a very complex area of the law, even for experts, so if you have questions, consult the many resources available or consider contacting legal counsel. Useful information on the basics of copyright and educational exceptions can be found on the "Copyright" section of the University library webpage.

All members of the University of St. Augustine are encouraged to familiarize themselves with copyright basics and to utilize resources for Fair Use evaluation regularly in conjunction with this policy when making copyright judgements.

# Credit Hour Policy

## Definition of Credit Hour

It is the policy of the University of St. Augustine for Health Sciences to establish credit hour definitions and policies for calculation. Guidelines by the Department of Education and WASC Senior College and University Commission (WSCUC) suggest that a school measure credit hours in terms of the amount of time in which a student is engaged in academic activity. A credit hour should be defined as an *amount of work represented in intended learning outcomes and verified by evidence of student achievement* that is an institutionally established equivalency and reasonably approximates the following criteria:

1. One hour of classroom or direct faculty instruction or student engagement and a minimum of two hours of out of class student work (preparation) each week for approximately 15 weeks for 1 semester or trimester of credit, or at least an equivalent amount of work over a different amount of time [Note: For example, a 2 credit hour course over a 15-week term would require at least 30 hours of direct academic engagement (2 hours/week) and 60 hours of student preparation time (4 hours/week) for the average student. If this same course was offered over 8 weeks, the same number of hours would be required for the term, but the weekly hours would change to 4 hours/week of academic engagement and 8 hours/week of out of class (preparation) work.

2. Formal laboratory instruction is also direct faculty instruction and equates to 2–3 contact hours per week per credit over a 15-week term, with documentation maintained on lab experiences and supported by the course outline/syllabus.

3. When determining online and/or face-to-face academic engagement time (excluding student preparation time), the courses should fall within certain allowable contact hours over the semester according to the number of credit hours. Courses with labs will have larger contact hours than non-lab courses.

4. A credit hour may also be an equivalent amount of work (measured in contact hours) for other academic activities established by the institution, including internships, fieldwork, practice, and other academic work leading to the award of credit hours.

5. Fieldwork/Internships and Clinical Rotations are calculated at 45 hours = 1 credit hour.

Per the above, the University of St. Augustine for Health Sciences further defines "other academic activities" as practice of lab techniques (usually a range of 2-3 contact hours per credit), practicum, shadowing, studying, reading, preparing for assignments, group work, service learning, or other academic activities related to a specific course.

- An institution should be able to demonstrate its measurements of time allocated for learning experiences and that the learning outcomes are accomplished.
- Review of course credit content will be performed on a regular basis by way of student course evaluations, time studies within a course and curriculum, annual reports and programmatic reviews.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                        pg. 27

KAL000125

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- All new courses should be reviewed for the above as part of the curriculum review process
- All courses should have a descriptive table of how contact hours are spent in both instruction and academic activities in the course syllabus

Certain types of courses cannot and will not be measured in this manner, primarily due to the subjective nature of personal study/work time of each student. These types of courses include exit exams, practicums, clinical rotation, clinical integration, independent study, directed reading, capstone courses, products demonstrating excellence, scholarly projects, comprehensive project and dissertation.

# Diversity

Diversity at the University of St. Augustine for Health Sciences is defined in three ways:

1. Representation of the student, faculty, and staff across all campuses
2. Allowing for diverse thought, leadership styles, and work environments
3. Encouraging diverse ways to teach, to promote student cultural awareness, and to engage in scholarly pursuits

*Representation of the student, faculty, and staff across all campuses:* The University aims to support diversity by recruiting and retaining students and employees at all levels by

- recognizing that continued success in meeting the needs of our students requires the full and active participation of talented and committed employees who represent a variety of religions, disabilities, ages, ethnicities, races, sexual orientations, and genders. Diversity of employees also includes personal and work history, education, functional ability, personality, lifestyle, socioeconomic status, geographic origin, longevity with the organization, degree-program matriculation, and level of employment within the organization;
- supporting admission to students regardless of gender, race, ethnic origin, age, disability, or sexual orientation; and
- offering educational support to all students, but especially to those with identified special needs.

*Diverse thought, leadership styles, and work environment.* The University believes that diversity encompasses the way we work, the work environment, and respect for people and ideas. It also encompasses varying management styles and ways of thinking, leadership abilities, skill levels, experiences, viewpoints, expression of thoughts, and differing ways of delivering services, provided there is consistency in the values we share. By fostering an atmosphere of acceptance and support, we value and appreciate the strengths afforded by the differences, styles, ideas, and organizational contributions of each person. For it is through diversity that our institutional core values and mission can best be met.

*Encouraging diverse ways to teach, to promote student cultural awareness, and to engage in scholarly pursuits.* The University supports faculty who offer diverse clinical expertise and approaches to patient management as a way to promote health science professional curricula that allows graduates to work with a diverse client population. Efforts are made to support cultural competence throughout the curricula and meet expected student learning outcomes in this area. Faculty are encouraged to promote diverse scholarly endeavors that involve various clinical, patient management, health promotion, and education research topics, with careful attention to the safety, confidentiality, and privacy of all research subjects.

Diversity is inclusion. It stresses equal opportunity, recognizes and respects the multitude of differences that employees and students bring to our workplace and classrooms, and acknowledges the changing face of the community we serve. The affirmation of diversity and full cooperation by all managers, supervisors, employees, and students is expected.

# Email Account

Each USAHS student will be provided a University email address. Students will use email to stay connected with faculty, support staff, and other students at USAHS. Students should begin monitoring the account as soon as possible

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information                                    pg. 28

KAL000126

but no later than the first day of classes. The University will frequently use email to send important announcements and information. Students will be expected to be able to reply and interact in a timely manner. Students must use USAHS email for all school related business. USAHS departments will only communicate with students using the USAHS email address.

All students should identify the program in which they are enrolled in their email signature. Students who are enrolled in a first-professional program should use only the appropriate designator for a student (SPT, OTS, etc.) as determined by their profession and program in their USAHS related communications. Students should not use the student designator in work situations and should not use other designations (licensure, certification, advanced degrees, etc.) in their USAHS signature. For example:

> Jane Doe, SPT
> Austin TX, Flex DPT Program
> John Doe, OTS
> San Marcos CA, MOT Program
> Jane Doe, RN, MSN
> EdD Program

Students may wish to use the organizational features of the email software (folders, contacts, etc.) to facilitate email management. Plan on checking email frequently and set up an electronic filing system for messages. Delete messages that have already been dealt with and save attachments to a designated area on a hard drive.

Remember to frequently check the spam or junk mailboxes. Sometimes University emails (.edu addresses) are identified as spam and important information is missed because the email message is not in the usual inbox.

# Enrollment Certifications

The National Student Clearinghouse is the University's authorized agent for providing enrollment verifications through its Student Self-Service program. Students can print enrollment verification certificates free of charge by logging onto the *myUSA* portal and opening the My Info tab, under My Verification. There is a link to Clearinghouse Self-Service. Questions regarding loan deferments should be directed to a team member from the Registrar office.

# Faculty/Staff - Student Relations

The University is concerned that faculty and staff–student consensual romantic/sexual relations may be perceived to negatively affect the integrity of the institution. Those who supervise or evaluate the work of students must be perceived to be making their decisions fairly and without favoritism.

Faculty and staff are cautioned that consensual romantic/sexual relationships with students can prove to be unwise and problematic and must be avoided. When consensual relationships occur any of the following may arise:

- Such relationships may undermine the real or perceived integrity of the supervision provided and the particular trust inherent in the student–faculty and staff relationship.
- Relationships in which one party is in a position to review work or influence the academic career of the other may provide grounds for a complaint when that relationship appears to give undue access or advantage, restricts opportunities, or creates a hostile or unacceptable environment for others.
- Such relationships may, moreover, be less consensual than the individual whose position confers power believes. The relationship is likely to be perceived in different ways by each of the parties in it, especially in retrospect. While some relationships may begin and remain harmonious, they are susceptible to being characterized as unprofessional and disrespectful to others.

Additionally, any of the situations above have the potential to create charges of harassment, which could lead to legal problems for a faculty and/or staff member and the University. Therefore, faculty and staff must not engage in

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                    pg. 29

KAL000127

consensual romantic or sexual relationships with current students and will be subject to disciplinary action if found to be in contravention of this policy.

If a faculty or staff member has a preexisting consensual romantic/sexual relationship with a student, the faculty and staff member must immediately notify his or her supervisor and remove him or herself from the academic decisions concerning the student in direct collaboration with their Program Director or supervisor.

Faculty and staff must be cognizant that the professional relationship with students extends to off-campus interactions, including conference or seminar attendance and other social gatherings.

# Financial Aid Satisfactory Academic Progress Policy - First Professional

The Office of Financial Aid monitors the Registrar's reporting of academic progress at the end of every trimester (payment period).

**Qualitative Requirements**

Prior to the completion of 59 credits for OT and 61 for DPT, it is expected that the student will meet the following minimum criteria:

At the completion of the first trimester (or 17 credit hours for OT and DPT) have a GPA of 2.0

At the completion of the second trimester (or 38 credit hours for OT and DPT) have a GPA of 2.3

The University requires that all students enrolled in the professional education programs have a 2.50 GPA after the completion of the third (full-time) trimester, or 59 credits for OT and 61 credits for DPT, in

the academic curriculum to continue in the respective program. If a student does not achieve this cumulative GPA he or she is dismissed from the program. Other reasons for dismissal include:

- An F is received in any course
- Two grade of D are received
- A student receiving a failing grade during fieldwork/internship (See the Clinical Education Handbooks - PT, OT )

KAL000128

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

**Quantitative Requirements**

- Complete at least 75% of all credits attempted each trimester

In addition to requirements set forth by above by the university's academic policy, the Office of Financial Aid enforces a maximum time frame for the receipt of federal financial aid as listed in the table below:

| Program Format | Maximum Time Frame to Receive Federal Financial Aid |
|---|---|
| Doctor of Physical Therapy - (new starts 1/1/17 or later) | 12 terms |
| Doctor of Physical Therapy - (students beginning before 1/1/17) | 11 terms |
| Flex Doctor of Physical Therapy | 18 terms |
| Doctor of Occupational Therapy | 12 terms |
| Master of Occupational Therapy | 9 terms |
| Flex Master of Occupational Therapy | 14 terms |
| Dual Full-Time Master of Occupational Therapy/Doctor of Physical Therapy | 15 terms |

At each term's financial aid SAP review, the Office of Financial Aid will monitor the student's earned credits in relation to the number of terms remaining toward the maximum time frame. Students will be placed on warning if in jeopardy of not completing within the maximum time frame to receive federal aid.

Financial Aid Warning - Students who are below the minimum cumulative GPA, other grade related requirements for the program, term completion rate, and/or are in jeopardy of not completing within the maximum time are placed on financial aid warning for one term. Students receive written notification to their university e-mail account if they are placed on financial aid warning status. If the student is not in compliance after one term of financial aid warning, federal financial aid eligibility is terminated. The student is given the option to appeal to financial aid to determine if the student is eligible to receive financial aid for a period of one term of probation or for more terms while on an academic plan.

Students who wish to appeal must provide the Office of Financial Aid with a written request and supporting documentation for review. Students must be able to document that unexpected, unusual, and temporary circumstances affected the student's ability to progress at the required rate and that their current situation will allow them to demonstrate satisfactory progress. Failure to provide supporting documentation will result in an automatic denial. All SAP decisions made by the Office of Financial Aid are final.

Students may regain eligibility for federal financial aid once all minimum academic standards are met.

A student is ineligible for federal financial aid when it becomes mathematically impossible to complete the program within the maximum timeframe established by the school. Students may appeal if federal aid is terminated due to this condition.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information                                pg. 31

KAL000129

The additional policies will apply:

- Minimum financial aid GPA is cumulative for the current program of study.
- Financial aid attempted and completed credits are for the current program attempted at USAHS.
- The following grades adversely impact the measure of student pace toward the maximum time frame: I (incomplete), F (fail), U (unsatisfactory), W (withdrawal).
- Repeated courses: For course repetitions, only the most recent grade is counted in the cumulative GPA and the most recent credits are counted in the completed credits; course repetitions adversely affect the pace of a student's program completion.
- Incompletes: Incomplete grades at the time of SAP evaluation adversely impacts the pace of the program completion, but not the GPA. The final grade of the incomplete course is factored into the student's SAP calculations at the time of the next formal evaluation.
- Withdrawals: When a student withdrawal from a course, it has no effect on the GPA for the end of that term, it will, however, be factored into the student's Pace and Timeframe
- Leave of Absence: Periods of Official Leave of Absence are counted toward the maximum time frame and adversely affects the pace of a student's program completion
- Students must meet both the GPA and pace requirements within the defined maximum timeframe.
- Transfer credits are included in the earned and attempted credits but not calculated in the USAHS GPA.
- Financial aid attempted credits include all registered courses with the exception of courses dropped before the start of the term or during the drop period.
- For course repetitions, only the most recent grade is counted in the cumulative GPA and the most recent credits are counted in the completed credits
- The maximum timeframe will be reset for students completing a second or further degree at USAHS or changing from a non-degree to a degree-seeking status.
- The maximum timeframe for students who change programs without earning a degree is cumulative for all programs attempted and is measured against the maximum timeframe for the current program.
- The maximum timeframe excludes courses that are dropped before the start of the term or during the drop period.
- Financial aid progress requirements include all terms of enrollment, including periods in which the student did not receive federal aid.
- Courses that adversely impact financial aid academic progress cannot be removed from the academic transcript.

# Financial Aid Satisfactory Academic Progress Policy - Post Professional

The Office of Financial Aid monitors the Registrar's reporting of academic progress at the end of every trimester (payment period).

### Qualitative Requirements

Students in the Post-Professional programs must maintain a cumulative 3.0 GPA and not earn a grade below a C to be considered in good standing. Students who receive a grade of F in any course or receive a grade below C when retaking a course are dismissed from the university.

### Quantitative Requirements

The university requires students to complete within a maximum timeframe and students who do not maintain a pace of at least 9 credits per year are dismissed from the university.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000130

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Students who fall below academic requirements are placed on academic probation by the university with an academic plan by the Academic Studies Progression Committee.

In addition to requirements set forth by above by the university's academic policy, the Office of Financial Aid monitors the students pace towards the maximum timeframe established by the university by comparing the credits earned to the maximum time remaining. Note that students are dismissed if they do not complete at least 9 credits per year but completing 9 credits may not necessarily put them on a pace to graduate within the maximum timeframe. Additional credits per trimester/year may be needed to be back on pace.

**Financial Aid Warning**

Students who are below the minimum cumulative GPA or other grade related requirements for the program and/or are in jeopardy of not completing within the maximum time are placed on financial aid warning for one term. Students receive written notification to their university e- mail account if they are placed on financial aid warning status. If the student is not in compliance after one term of financial aid warning, federal financial aid eligibility is terminated. The student is given the option to appeal to financial aid determine if the student is eligible to receive financial aid for a period of on term of probation or for more terms while on an academic plan that has been determined by the Academic Studies Progression Committee.

Students who wish to appeal must provide the Office of Financial Aid with a written request and supporting documentation for review. Students must be able to document that unexpected, unusual, and temporary circumstances affected the student's ability to progress at the required rate and that their current situation will allow them to demonstrate satisfactory progress. Failure to provide supporting documentation will result in an automatic denial. All SAP decisions made by the Office of Financial Aid are final.

Students may regain eligibility for federal financial aid once all minimum academic standards are met.

A student is ineligible for federal financial aid when it becomes mathematically impossible to complete the program within the maximum timeframe established by the school. Students may appeal if federal aid is terminated due to this condition.

The additional policies will apply:

- Minimum financial aid GPA is cumulative for the current program of study.
- Financial aid attempted and completed credits are for the current program attempted at USAHS.
- The following grades adversely impact the measure of student pace toward the maximum time frame: I (incomplete), F (fail), U (unsatisfactory), W (withdrawal).
- Repeated courses: For course repetitions, only the most recent grade is counted in the cumulative GPA and the most recent credits are counted in the completed credits; course repetitions adversely affect the pace of a student's program completion.
- Incompletes: Incomplete grades at the time of SAP evaluation adversely impacts the pace of the program completion, but not the GPA. The final grade of the incomplete course is factored into the student's SAP calculations at the time of the next formal evaluation.
- Withdrawals: When a student withdrawal from a course, it has no effect on the GPA for the end of that term, it will, however, be factored into the student's Pace and Timeframe
- Leave of Absence: Periods of Official Leave of Absence are counted toward the maximum time frame and adversely affects the pace of a student's program completion
- Students must meet both the GPA and pace requirements within the defined maximum timeframe.
- Transfer credits are included in the earned and attempted credits but not calculated in the USAHS GPA.
- Financial aid attempted credits include all registered courses with the exception of courses dropped before the start of the term or during the drop period.
- For course repetitions, only the most recent grade is counted in the cumulative GPA and the most recent credits are counted in the completed credits

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000131

- The maximum timeframe will be reset for students completing a second or further degree at USAHS or changing from a non-degree to a degree-seeking status.
- The maximum timeframe for students who change programs without earning a degree is cumulative for all programs attempted and is measured against the maximum timeframe for the current program.
- The maximum timeframe excludes courses that are dropped before the start of the term or during the drop period.
- Financial aid progress requirements include all terms of enrollment, including periods in which the student did not receive federal aid.
- Courses that adversely impact financial aid academic progress cannot be removed from the academic transcript.

# Financial Aid Verification Policy

In accordance with U.S. Department of Education regulations, USAHS is required to verify the accuracy of financial aid application information for selected students. Since USAHS does not offer undergraduate programs, the school is not required to perform full verification for students who are receiving unsubsidized Direct Loan funds and/or Graduate PLUS Loan funds. However, students applying for Federal Work Study (FWS), who are selected by the Department of Education for verification, are required to submit additional information prior to receiving FWS funds. This information may include, but is not limited to: IRS tax return transcripts, W-2s, official proof of High School Completion Status, identification documents, and a signed Statement of Educational Purpose.

Graduate students selected for verification by the Department of Education who are assigned to the V4 or V5 verification tracking group are required to submit official proof of their High School Completion Status, identification documents, and a signed Statement of Educational Purpose.

If a student is selected for verification as a FWS recipient, the documents that he or she will need to submit to the Office of Financial Aid will be scheduled on the myFinAid page. If students are required to submit their tax information, he or she is required to submit an official IRS tax return transcript. Students can obtain an IRS Tax Return Transcript, free of charge, by: (1) ordering a transcript online at www.irs.gov, Get a Transcript ONLINE; (2) ordering a transcript online at www.irs.gov, Get Transcript by MAIL; (3) calling 1-800-908-9946; or (4) filling out IRS Form 4506T- EZ and submitting it to the IRS.

Once the required documents are received in the Office of Financial Aid, the normal processing time is 10 business days. Participation in the verification process is not optional. If students do not complete the verification process by the end of the enrollment period, they will not be able to receive federal financial assistance for that award year.

Students will be notified by email if, as a result of completing the verification process, their expected family contribution (EFC) changes and results in a change to their award amount.

A student whose FAFSA information is selected for verification by the Department of Education must complete the verification process before the Office of Financial Aid can make any changes to their cost of attendance (COA) or to the values of the data items required to calculate their (EFC).

Please be aware that if students intentionally misreport information and/or alter documentation for the purpose of increasing aid eligibility or fraudulently obtaining federal funds, they will be reported to the U.S. Department of Education Office of the Inspector General or to local law enforcement officials.

KAL000132

# Grade Reports

Grades and unofficial transcripts may be obtained online through the *myUSA* portal, My Info.

# ID Badges

## First Professional Students

Students will receive a student identification badge that includes the student's photograph, name, and year of enrollment. Photographs may be taken on interview day or during new student orientation. Identification badges must be worn where it is visible while on University property or while engaged in any University related event. The University charges a fee for all replacement badges. All badges will remain active for 30 days after degrees are conferred to enable students to utilize the library and the Wellness Center.

## Transitional and Post-Professional Students

Students on campus for a seminar/residency will receive a temporary name badge on the first day of the seminar/residency that will provide access to the campus for those days only. Transitional and Post-Professional students may request a student identification badge that includes the student's photograph and name. To request a badge, please email the program Administrative Assistant along with a passport-type photo. Please note: badges for Transitional and Post-Professional students will only enable students to access the University's library. When the badge is complete and ready for pick up, the program Administrative Assistant will contact the student by email. Once complete, the badge will be available in the Wellness Center during business hours. The student must provide a photo ID for verification. Identification badges must be worn while on University property or while engaged in any University-related event. There is a fee for a replacement badge. The badge will remain active for 30 days after degrees are conferred to enable students to utilize the library and the Wellness Center. Students visiting a campus that are not attending a seminar/residency or do not have a student identification badge will need to stop at the lobby and sign in as a visitor.

# Internet Acceptable Use

The University is required to have a policy that explains fair use of the network (Internet/computers/phone) and to hold it harmless should a virus or other event occur as a result of using the network. This is normal and customary and protects the University, employees, and the student against frivolous litigation and claims. Computer viruses and other events are unfortunately all too common.

The University of St. Augustine reserves the right to modify its Acceptable Use Policy (AUP) at any time, effective upon either the posting of the modified AUP to www.usa.edu or notification of the modified AUP via the Student Handbook or written notice. By using the services, and thereby accepting the terms and conditions of the AUP, you agree to abide by the AUP as modified from time to time. Any violation of the AUP may result in the suspension or termination of your account.

The user (defined as anyone using computers, hardware, phones, wireless access, or Internet services) is responsible for any breaches of security affecting servers, routers, workstations, or other systems under user control. If a user's system is involved in an attack on another network or system, it will be shut down and an immediate investigation will be launched to determine the cause/source of the attack. In such event, the user is responsible for the cost to rectify any damage done to their computer and any other requirement affected by the security breach.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000133

If the user is accessing the wireless Internet via a personally owned computer, it is the user's responsibility to maintain current virus definitions, operating system updates, and a firewall on his or her computer. The university takes no responsibility in any type of damage that may occur to a user's computer, while accessing university services (wireless or other).

All users of the Internet at the University of St. Augustine are expected to use this resource in a responsible and courteous manner, consistent with the purposes for which it is provided, and to follow all Internet-related rules, regulations, and procedures established for its use.

The University provides users with access to the Internet. The Internet offers access to many valuable local, national, and international sources of information. However, not all sources provide accurate, complete, or current information.

The University makes no warranty, expressed or implied, for the timeliness, accuracy, or usefulness for a particular purpose of information accessed via the Internet. The University cannot regulate the nature or content of the information accessed nor the availability of any given Internet site. The University network/services may only be used for lawful purposes. Transmission, distribution, or storage of any information, data, or material in violation of United States or state regulation or law, or by the common law, is prohibited. This includes, but is not limited to, material protected by copyright, trademark, trade secret, or other intellectual property rights.

Storage of personal items (items that are not work-related) such as music, videos, pictures, emails, and documents on the University server or individual computers is not acceptable use of University resources.

Responsible use of the Internet at the University of St. Augustine for Health Sciences includes:

- Using the University's Internet resources for educational and informational purposes only.
- Respecting intellectual property rights by making only authorized copies of copyrighted or licensed software or data residing on the Internet.
- Refraining from attempts to codify or gain access to files, passwords, or data belonging to others, and by not seeking disallowed access to any computer system via the Internet.
- Refraining from illegal or unethical use of the Internet.
- Refraining from damaging or altering the configuration of the equipment used to access the Internet at the University.
- Refraining from altering or damaging software or data residing on the Internet.
- Refraining from the deliberate propagation of computer worms and viruses.

# Guidelines for Internet Use

The University provides individual Internet email accounts for all degree seeking students. All University communication will be through the University email address.

Failure to use the Internet appropriately, legally and responsibly will result in

- suspension or termination of a student's University account,
- a hearing before the Professional Misconduct Committee or Human Resources for harassment, or
- referral to the respective Program Director for further disciplinary action.

KAL000134

# Use of File Transfer Between Home and Work Computers

The Internet has become more dangerous than ever. Virus applications and malware are now easily hidden on commonly used web pages. Internet criminals have devised methods for infecting computers when users visit a URL they may have found to be safe previously. For this reason, it has become necessary to require those who transfer files from home to work (via email, USB drive, CD, etc.) to have a good anti-virus/antimalware application installed on their home computers. That software must be kept up-to-date.

The IT department also strongly recommends students allow Windows updates to occur on a regular basis, turn on their firewall, and check frequently to insure all anti-virus updates are occurring on a regular basis.

# Wireless Internet Access Policy

Wireless access is available in certain areas of the campus, though coverage and up-time is not guaranteed. If students have a laptop computer, tablet, or smart phone with a mobile-ready processor, they will be able to access the Internet while on campus. The university wireless network operates in the same fashion as any commercial wireless access point; it is not secure.

It is a user's responsibility to keep his or her operating system up to date with all security patches and service packs. Firewall software is also recommended. Prevention is better than cure, and by following these simple guidelines, the wireless network can remain safe for fellow users.

When users sign on to the wireless network, they are accepting the rules and regulations of the University AUP. Additionally, they are accepting responsibility for all security breaches or virus damage that may occur to their computer while accessing the University wireless network. The technical help desk and personnel at the University are not available to evaluate or fix student computers.

# Social Networking—Acceptable Use

Social networking online tools and services, as defined below, make it very easy to create accounts for these services, upload content, and then tag the content. The tagging makes the networking possibilities very powerful, which may draw many viewers.

Many students, educators, employees, and administrators are aware of the great potential these social networking services may provide; however, they also recognize the potential dangers of such services. The following are guidelines for use of social networking tools.

Students should limit use of social networking to their personal computers as most sites are known to have malicious software associated with at least part of the website.

**NOTE:** Please be sure to review Privacy Settings for Facebook accounts to make sure that personal and private information is not shared with the general public. To get to privacy settings, click the account menu at the top right of the Facebook page, and choose Privacy Settings. This page contains a group of general controls for the Facebook account, such as who can send friend requests and messages. For everything else that is shared on Facebook, the audience can be chosen when posting. Use this link for more information: http://www.facebook.com/help/privacy

KAL000135

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

# Definition

For the purpose of this policy, social media can take many different forms, including Internet forums, blogs and microblogs, online profiles, wikis, podcasts, pictures and videos, email, instant messaging, music-sharing, and voice over IP, to name just a few. Examples of social media applications are LinkedIn, Facebook, Myspace, Wikipedia, YouTube, Twitter, Yelp, Flickr, Second Life, Yahoo groups, WordPress, ZoomInfo—the list is endlessly growing.

# Policy on Peer-to-Peer (P2P) File Sharing

The University of St. Augustine is committed to avoiding misuse of its computer network, including use of the computer network to violate the Copyright Law of the United States. All students, faculty, and staff should have a basic understanding of the Copyright Law. Please refer to employee, faculty, and student handbooks for more information on the University copyright policy.

Campus computer networks have been popular sources of reproduction and distribution of illegal music, movies, television shows, pictures, and software through the use of peer-to-peer (P2P) networks. When the University of St. Augustine for Health Sciences receives a formal complaint from a copyright holder, the University notifies the individual involved and passes along any information received from the copyright holder to that individual. The University does not supply any information to the copyright holder about the individual involved unless a valid subpoena is presented.

Active efforts are in place to prohibit the use of illegal file sharing and the University of St. Augustine employs Open DNS filtering, which blocks access to all known file distributions sites.

# Leave of Absence (Including Emergency Leave)

USAHS expects its students to maintain continuous registration in an academic program. However, the University understands situations may arise during a student's time at USAHS that may warrant a break in registration.  To accommodate these situations, the University has developed the following LOA policy.

**Emergency LOA:**

To request an Emergency LOA, a student must complete the LOA Request Form, located on the myUSA portal Students tab, and forward the completed form to an Advisor for approval.  A student should apply in advance for an Emergency LOA. If a student fails to provide documentation, or does not receive approval for an Emergency LOA, the student may receive failing grades for all courses for that term which may result in dismissal from the program.

If a student is unable to apply in advance for an Emergency LOA due to unforeseen circumstances, the University may grant the request if the LOA Request Form and sufficient documentation is submitted upon the student's return.

An Emergency Leave of Absence will be considered for review only if the request meets the following criteria:

1.  The request is for a medical emergency (student or immediate family member) or bereavement (death of an immediate family member.) Immediate family member is defined as spouse, parent, child, sibling, grandparent, grandchild; a spouse's parent, child, sibling, grand parent, grandchild; and a child's spouse.
2.  The request is for a financial hardship (job relocation, job termination, loss of housing).
3.  The LOA Request Form includes the student's signature, date of request, and any supporting documentation for the request (i.e. medical documentation, obituary, eviction notice, etc.)

An Emergency LOA is limited to 180 days in one calendar year. Students requesting an Emergency LOA should keep in mind the following:

KAL000136

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- 2 weeks or less
  - If the Emergency LOA is shorter than or equal to two weeks (14 calendar days) the student has the option to come back within the current trimester. However, it is the student's responsibility to stay in communication with the instructor(s) and to make-up any work during the Emergency LOA.
- More than 2 weeks
  - Students taking more than two weeks will be withdrawn from all courses and will be required to repeat the courses in a subsequent term. Students cannot return from an LOA longer than 2 weeks in the middle of a term.
  - The student must return at the start of a subsequent term within 180 days. Students who are unable to return within 180 days are subject to withdrawal from the program.

## Planned Educational LOA:

The Planned Educational LOA is intended to provide students with an opportunity to pursue other activities outside the University related to their educational or professional goals. Students requesting a Planned Educational LOA must have a definitive objective that contributes to their educational goals. To request a Planned Educational LOA, a student must complete the LOA Request Form, located on the myUSA portal Students tab, and forward the completed form to an Advisor for Approval. Approval of a Planned Educational LOA is contingent on the following:

1. The student must be in good academic standing.
2. The student must submit the request at least one week prior to the start of the trimester. A Planned Educational LOA will not be granted if the request is submitted once the trimester has begun.
3. The student has support from the Program Director to take a Planned Educational LOA.
4. The Planned Educational LOA request is no longer than one full trimester (105 days).
5. The student includes a statement describing how the Planned Educational LOA will contribute to their educational goals.

Students who have been approved for a Planned Educational LOA must notify the Registrar in writing of their intention to return to the program as soon as possible and no later than 1 week prior to their scheduled return date for scheduling purposes. Please note: Financial aid may be delayed depending on the time frame in which the student notifies the Registrar's office of their return.

## Military LOA:

Current students called to active military service will be required to follow the same procedures for requesting any other LOA. Acceptable supporting documentation for this type of request is military orders. Students who begin Military LOA during a term will be refunded their tuition for that term. A Military LOA may be for the duration of military service and is not limited to the leave time frame set forth in the Emergency LOA and Planned Educational LOA guidelines.

## Administrative LOA:

The University reserves the right to place students on Administrative LOA. The student must return at the start of a subsequent term within 180 days. Students who are unable to return within 180 days are subject to withdrawal from the program.

## Issues to Consider Prior to Requesting a LOA

### Scholarship students:

Depending on the specific scholarship guidelines, students on a Planned Educational LOA may have to forfeit their scholarship funds upon their return. Scholarships will not be affected for students who are on an Emergency LOA.

### Students with private education loans:

Students with private education loans requesting an LOA of any type, must consider how it will impact their loan status. Specifically, students should consider how this will impact the grace period for repayment of the loan. Prior to

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                    pg. 39

KAL000137

requesting an LOA of any type, the University recommends students receiving private education loans contact their lender.

Students receiving Title IV Funds:

Students receiving Title IV Funds (Federal Student Loans) should be aware that an LOA from the University may impact their financial aid. A university-approved LOA may not qualify a student for a loan payment deferral as it relates to federal financial aid. The student must consult with the Financial Aid Office prior to submitting the LOA request form. If a student receiving Title IV funds is considering taking a Planned Educational LOA or an Emergency LOA lasting longer than 14 calendar days (two weeks), they must be aware of the following:

- In accordance with Federal Financial Aid regulations, the total amount of leave taken by the student must not exceed 180 days in any 12-month period. The 12-month period begins on the first day of the initial Leave of Absence.
- If a Title IV student is withdrawn from the University due to failure to return from an LOA this may affect the student's loan repayment terms, including the expiration of the student's grace period.
- Students approved for an LOA are required to complete exit counseling prior to the beginning of the leave.

International Students:

International students must meet with an Advisor before submitting an LOA Request Form to ensure compliance with their visa status.

**General Notice to Students Considering an LOA:**

- If a student fails to return from an LOA, the student will be withdrawn from the University. The student's withdrawal date will be the date the student began the leave.
- Students who are withdrawn or dismissed for failure to return from an LOA, may reapply as a prospective student to the University of St. Augustine for Health Sciences.
- A student cannot exceed 180 days in any 12-month period. (This excludes Military LOA). The 12-month period begins on the first day of the initial LOA.
- The University reserves the right to reassess the "Essential Functions for Occupational Therapy and Physical Therapy" of any student returning from any LOA and to decline or conditionally approve his or her resumption of classes if he or she is unable to meet the essential functions with reasonable accommodations.
- Upon returning from an LOA, a student who has been receiving reasonable accommodations must reapply to the Director of Disability Services to have accommodations reinstated.

# myUSA Portal

*myUSA* is a web portal for the University of St. Augustine for Health Sciences community. It is accessible through the home page of the University website, www.usa.edu. Click on *myUSA* in the upper right hand corner of the home page. Certain tabs (sections) of the portal are accessible to all, while some require a username (student ID #) and password.

Students will use the *myUSA* portal to access grades and forms, update personal information, view schedules and financial account information, utilize library resources, register for distance education courses, order transcripts, and much more.

If a student has *forgotten his or her password* (he or she will need to know the username) he or she must follow the instructions below:

1. Click on *myUSA* (upper left hand corner of www.usa.edu).
2. Enter the username and click the "I forgot my password" link.
3. Click on "Send new password."

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000138

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

    a.   A new password will be sent to the email address the University has on file. If the student does not receive the password, he or she will need to verify the email address with the Registrar's Office.

4.   After receiving the new password, log on to the *myUSA* portal and click on "Personal Info." Click on the Password tab and then reset the password to something secure that is easily remembered.

5.   Log in one more time to verify that the new password is working.

## Please note that students should have two sets of usernames and passwords:

1.   Student information *myUSA* (portal) username and password allow students to access their online courses, printable financial information for tax purposes, grade reports, unofficial transcripts, etc.

2.   University of St. Augustine online library catalog username and password enables access to the library catalog only, not the online resources like full text journal articles, eBooks, and databases. Please see the information about these resources on the *myUSA* portal Library tab for details on how to access them.

If a student has misplaced his or her library catalog username and password that was issued by the library, please email library@usa.edu for assistance.

# Name Change

Requests for a change in the name as it appears on the student's academic record must be made in writing and accompanied by a copy of one of the following: social security card, drivers' license, passport, military ID, divorce decree, or professional license. The name change form may be found on the *myUSA* portal, Student Services tab, under Forms.

# Nondiscrimination/Anti-Harassment Policy

It is the policy of the University of St. Augustine for Health Sciences that each member of the University community be permitted to work or attend class in an environment free from any form of discrimination, including race, creed, color, age, disability, gender, marital status, national origin, veteran status, religion, sexual orientation, and sexual harassment, as prohibited by state and federal statutes. This policy applies to students, faculty, employees, and applicants for admission or employment.

For sexual discrimination concerns, refer to the Sexual Misconduct and Relationship Violence Prevention Policy in this handbook.

For disability discrimination concerns, refer to the Americans with Disabilities Act (ADA) policy in this handbook.

For all other concerns under this policy, refer to the Academic Policies and Procedures in this handbook.

# Parking

The University is an independent organization, and as such, the property and parking lots are private property. The operation and/or parking of any vehicle on University of St. Augustine property is a privilege, not a right. The University has the right to regulate the use of motor vehicles on its property for the good and safety of everyone. Carpooling is strongly encouraged whenever possible.

All students complete a parking registration form at registration and must keep this information up-to-date with the University. All cars must have a University parking sticker, and it must be displayed at all times.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000139

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

This decal is valid while a student is enrolled at the University. The decal must be used only by the student to whom it was issued. Replacement or additional decals can be purchased in the University Gear Store for $10.00.

Students must provide a copy of their vehicle registration as part of the new student registration and when purchasing a replacement decal. Students are responsible for updating the University whenever any changes occur to their vehicle type or license tag. This can be done through the myUSA portal. Students are required to permanently affix the decal to the back window on the driver's side of the vehicle; motorcycle decals must be permanently affixed to the front screen. If a valid decal is not displayed, the automobile will be subject to ticketing, booting, or towing, and any subsequent charges will be the student's responsibility.

The University is not liable for break-ins or other damage to any vehicle, including student vehicles. Every effort will be made by University staff and personnel to ensure student safety whenever possible. Reports of damage to vehicles should be filed with local authorities, with a copy to the University Student Services Office.

Vehicles parked in violation of University regulations are subject to being booted or towed without notice by the University. The student is required to pay the boot fee or to contact the towing company to make arrangements for retrieving his or her vehicle and paying the towing fee.

Flex St. Augustine, Florida Campus

Flex students may use the permanent University student parking lot on weekends. (Note: After 5:00 p.m. students may park in the west and south visitor/staff/faculty parking lots).

Flex Austin, Texas Campus

Students are permitted to park in any of the parking spots on the perimeter of the three buildings, excluding designated visitor or handicapped spots, unless the appropriate parking permit is displayed.

# Commuter Alternatives Program

USAHS is focused on providing its students, staff and faculty with options to enhance the experiences on campus. USAHS is conscious of the carbon footprint and the impact the university has on the local environment. In an effort to balance both, the university offers the Commuter Alternatives Program (CAP).

Through CAP, the university will provide participants with incentives for carpooling, bicycling, walking or taking public transportation to and from campus.

Students, faculty and staff can participate in one of the following options:

1. **Carpooling** - Two or more participants who wish to ride together may enroll in CAP under the carpool option. Participants who choose this option will each receive a $50 Amazon gift card each term and one CAP Parking Permit hang tag to be shared among the carpool team members. Carpool teams must register together and complete the CAP form with the carpool box checked. Participants who choose to sign up for this option for the first time will be required to turn in the originally issued USAHS Student or Staff/Faculty parking permit at the time of registration. Participants who were signed up under the previous term will be required to exchange their expired CAP Parking Permit for a current permit.

2. **Bike, Public Transportation or Walk** - Participants who rely on alternate methods of transportation may enroll in CAP under the Bike, Public Transportation or Walk option. Participants who choose this option will receive a $50 Amazon gift card each term, in lieu of a parking permit to park on campus. Participants who choose to sign up for this option for the first time will be required to turn in the originally issued USAHS Student or Staff/Faculty parking permit at the time of registration. Participants who were signed up under this option from the previous term will be required to confirms their enrollment for the current period. In addition to the $50 gift card, participants will be entered into a drawing each month to receive a $100 gift card.

Due to demand, CAP Permits are limited and will be handed out on a first come - first serve basis. CAP registration for incoming students will take place during orientation. CAP enrollment and re-enrollment will take place at the front reception desk Monday - Friday from 9:00 a.m. to 5:00 p.m.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000140

As a reminder, only vehicles that display a USAHS Student Parking Permit, a CAP Parking Permit or a USAHS Staff/Faculty Permit are authorized to park on campus property. Please note, at most campuses, local ordinances restrict off-campus parking on local city streets, at local businesses and in residential neighborhoods. Vehicles that fail to properly display the required permit will be subject to citation and/or impound.

For questions about the CAP, contact Luis James at ljames@usa.edu.

# St. Augustine Campus

Students are not permitted to park in the north, west, and south patient/visitor/staff/faculty parking lots from 8:00 a.m. to 5:00 p.m. EST. Students who are parked in these lots will be issued a parking citation of $25.00. The parking citation money will go to the students' professional organization. (Note: After 5:00 p.m. students may park in the west and south visitor/staff/faculty parking lots). Students may park in front of the main entrance for a maximum of 15 minutes to deliver items to faculty/staff or pick up items. This policy is subject to change.

When resident classes are not in session but the University is otherwise open, students are required to use only the student parking lot so as not to interfere with regular business operations of the University.

Additional provisions of the University parking policy are as follows:

- No parking is permitted along the curbs of the student parking lot.
- No parking is permitted adjacent to University property—that is, access and side roads and other business' parking lots.
- No parking is permitted on the extreme northern facing parking spots "carved" into the Orthopaedic Associates space.
- No double-parking is permitted.
- Excessive speed in the student parking lot or in accessing University roadways is prohibited.
- All automobiles must be locked while on University property.
- All stop signs and stop bars are to be observed.
- Parking in the gravel lot is permitted but may be limited due to other University functions.
- Students are not permitted to park in the parking spots on the driveway entering and exiting the University.
- Access to the student parking lot is via San Bartolo Avenue. Access through the Flagler Hospital Emergency Room entrance road is prohibited.

# San Marcos Campus

Students are not permitted to park in any of the parking spots on the perimeter of the two buildings excluding designated visitor, handicapped, or car pool spots unless the appropriate parking permit is displayed.

Currently there is no charge for parking, but the University reserves the right to begin charging for parking in the future if it is deemed necessary.

Students are responsible for any parking tickets received from the city for improperly parking on the street.

Any students who are parked in unapproved spots in the parking lot will be issued a parking citation of $50.00 by the University. The parking citation money will go to the respective student professional association.

Additional provisions of the University parking policy include the following:

- No parking is permitted along the curbs of Windy Point Drive, Borden Road, or streets within defined neighborhoods.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000141

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- No parking is permitted at the red curbs or in handicapped or visitor spots (unless you have the necessary designation).
- No double-parking is permitted.
- Excessive speed in the parking lot is prohibited.
- All automobiles must be locked while on University property.
- All stop signs are to be observed.
- No overnight parking is allowed.

Because of city ordinances and traffic plans, alternative transportation is encouraged. These options include the following:

- *Carpooling.* Carpooling is strongly encouraged whenever possible. To encourage this activity, premium parking spots between the two buildings are reserved for registered carpoolers. Registration for carpooling will be announced, and a special sticker must be displayed on all vehicles used on campus. Car pool groups must re-register at the beginning of each term with the University receptionist.
- *Bike to school.* Bike racks are available for individuals biking to school. Always secure your bike with an appropriately applied chain and lock.
- *Public transportation.* North County Transit offers a public transportation system called the Sprinter. The closest station to the campus is San Marcos Civic Center Station (#12). It is about three quarters of a mile from this station to the campus. There are currently no public bus options to the campus. Students can ride the Sprinter and bike/walk to the campus. For more information about light rail visit http://www.goncid.com/sprinter-stations.htm.

# Austin Campus

Students are not permitted to park in any of the parking spots on the perimeter of the two buildings, excluding designated visitor, handicapped, or car pool spots unless the appropriate parking permit is displayed. All University of St. Augustine for Health Sciences students are responsible for any parking tickets received for improperly parking on the street. Any students who are parked in unapproved spots in the parking lot will be issued a parking citation of $25.00 by the University. The parking citation money will go to the respective student professional association.

Additional provisions of the University parking policy are as follows:

- No parking is permitted at any time along the curbs of the student parking lot.
- No parking is permitted in handicapped or visitor spots without the appropriate designation.
- Students should not park on the streets surrounding the campus. It is important to be considerate and avoid causing problems for surrounding neighborhoods and businesses.
- No parking is permitted behind construction areas.
- No double-parking is permitted.
- Excessive speed in the student parking lot or in accessing University roadways is prohibited.
- All automobiles must be locked while on University property.
- All stop signs are to be observed.

# Miami Campus

Ample parking is available.

Parking policies may differ by program. For more information, students should refer to their program section of the Handbook.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                    pg. 44

KAL000142

# Photocopying/Printers

All campuses of the University of St. Augustine Library offer photocopiers, scanners, and printers for student use at a cost of $0.10 per black and white page and $0.35 per color page. Scanning is free. For the specific rules and procedures at your campus, please ask in the library or see the Campus Resources page on the *myUSA* portal Library tab. Refer to the University's copyright policy to avoid printing materials inappropriately.

# Registration

All First Professional students will be "block" registered by the Registrar's Office prior to each term for the regularly scheduled courses. Any student not following the planned curriculum should work with his or her advisor and submit an advisor approved schedule to the Registrar's Office as early as possible for next term registration. Delay in submission of the alternate schedule may delay Financial Aid packaging.

Transitional and Post-Professional students register for coursework online. Log into the *myUSA* portal, select the Student Services tab, and then select Registrar tab, and choose Post Professional Registration. From there, students will be able to register for coursework and step-by-step instructions are provided. If assistance is required regarding registration, consult the program's Administrative Assistant.

To register for Continuing Education seminars, please go to the Continuing Education link on the University's website at www.usa.edu. If assistance is needed please call 1-800-241-1027 x1400.

# Release of Student Information

The University of St. Augustine for Health Sciences complies with the provisions of Public Law 93-380, the Family Educational Rights and Privacy Act (FERPA) of 1974, in reference to student records.

Students must consent to the release of any student information other than directory information to any person or agency. This consent must be in writing, signed, and dated. The consent must specify the information to be released, the reason for release, and the names of the individual or agency to whom the information is to be released. The Registrar's Office is responsible for fulfilling requests for student information.

# Replacement Diploma

Replacement diplomas may be obtained by contacting the Registrar's Office. The fee is $25.00 plus $5.00 for shipping.

# Security Policy

## Reporting Emergency Situations and Security Concerns

Emergency situations involving a threat to life or property should be reported to the police (911) and communicated immediately thereafter to the University by calling 800-241-1027. The University of St. Augustine encourages all students, faculty, and staff to be involved in campus crime prevention.

For instances of rape/sexual misconduct, please see the Sexual Misconduct and Relationship Violence Prevention Policy in this Handbook.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000143

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

If other types of improprieties occur, these should be reported immediately to the University by calling 800-241-1027. At that time, a report of the incident will be written and statements taken.

# Emergency and Safety Procedures

The Emergency Operations Plan is available on the main website: https://www.usa.edu/safety-security/

## Medical Emergency

Call 911 immediately and render first aid as able. Stay with the individual until emergency services arrive. When a student is injured, he or she should complete a Student Incident Report Form found on the *myUSA* portal Students tab, and file this form, together with any other forms required, with his or her health insurance provider. A copy of the report form should also be provided to the University via fax, 904-826-0085.

## Structural Emergency

Upon hearing an alarm, students will follow the posted evacuation procedures, following exit signs that are displayed. Stay a safe distance from the building until emergency services arrive.

## Weather Emergency

In the event of a weather emergency—such as a hurricane or tornado—students, faculty, and staff will be alerted of any campus cancellations or delays via email, text message, and phone calls to their cell phones. "All Clear" messages will alert the community when it is safe to return to campus.

## Natural Disaster Emergency

In the event of a natural disaster—such as a wildfire or earthquake evacuation—students (and family members) are asked to monitor the University website for any cancellation or restart dates and times. Further information will be given by faculty and/or staff at the time of the emergency. Information about reopening will also be given via the University voice mail system by calling the main number: 800-241-1027.

# Safety on Campus

Certain safeguards are in place to ensure as safe of an environment as possible. These safety features include the following:

- In case of an emergency, all students will be notified via the emergency communication system.
- Exterior building doors are locked and access is available only to those with appropriate card access.
- Talk-A-Phones are located throughout the parking lots and University grounds with emergency phones.
- A security guard is available on campus after 5:00 p.m. and designated weekends when the campus is open for student access.
- All faculty, staff, and students are expected to wear name tags at all times.
- All visitors must report to the administration building (or the security guard desk after hours) for permission to enter the campus, to receive a visitor's badge, and to be escorted as appropriate by a campus employee/security guard.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000144

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- Emergency contacts and evacuation plans are posted in all classrooms and student/employee meeting areas. Telephones are available in all classrooms.
- To ensure your safety on campus, be personally responsible by
    - being alert to unsafe situations and reporting them immediately to University employees;
    - keeping the exterior doors closed and/or locked (do not prop open);
    - not allowing non-University individuals to enter the building with you;
    - reporting lost/stolen card access name badges immediately to the University receptionist;
    - not walking to your car alone in the dark. Use the "buddy system," especially when you feel your personal safety may be threatened. Do not enter any situation or location where you feel threatened or unsafe; and
    - not leaving valuables in plain sight in your car. Lock these items in your trunk or remove them.

# Unlawful and Controlled Substances Policy

It is unlawful for any person to sell, manufacture, deliver, or possess with intent to sell, manufacture, or deliver a controlled substance. Any person violating the provisions of respective state, county, or federal law may be guilty of a felony, or, in some cases, a misdemeanor of the first degree, and may be subject to punishment as provided in the municipal codes. This punishment can include imprisonment, fines, forfeiture of property, and, in some cases, loss of business licenses. It should be noted that under state sentencing guidelines, punishment may become successively more severe for second and third violations.

USAHS will impose sanctions on students and/or employees for violation of the standards of conduct consistent with local, state, and federal laws. Sanctions may include disciplinary action up to and including termination of employment, expulsion, and referral for prosecution.

# Alcohol Policy

USAHS complies with appropriate state statutes and city ordinances dealing with the consumption of alcoholic beverages on USAHS premises and at any function in which USAHS's name is involved. Students and their guests who consume any alcoholic beverage on campus or at an event sponsored by USAHS or any entity of USAHS must be at least 21 years of age and must be able to furnish proof of age at the event. USAHS and its agents reserve the right to refuse to serve alcoholic beverages to anyone who is visibly intoxicated or whose behavior, at the sole discretion of USAHS and its agents, warrants the refusal of service. Any individual who arrives at a USAHS function either on or off campus in a visibly intoxicated state may, at the sole discretion of USAHS or its agents, be denied entrance to the event.

# Drug and Alcohol Counseling

Students who desire drug and alcohol abuse counseling should contact the Dean or Program Director so that a referral to the appropriate agency may be made. Students may also refer to the Drug and Alcohol Abuse Prevention Policy located on the *myUSA* portal, Student Services tab.

# Tobacco Policy

USAHS is a smoke- and tobacco-free environment. Smoking is not permitted on any University campus. Smokeless tobacco and e-cigarettes are not permitted in any University building.

# Prohibited Weapons Policy

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000145

The University of St. Augustine for Health Sciences desires to maintain a safe environment for all of its students, faculty members, staff members, contractors, and visitors. This policy seeks to reduce the risk of injury or death associated with the intentional or accidental use of weapons.

The possession, transfer, sale, or use of weapons, dangerous instruments, or paraphernalia associated with a weapon is prohibited on University premises. This includes those licensed to carry a weapon, except as provided by the law of the state in which the USAHS campus is located (please refer to local state law as these vary from state to state). This restriction includes, but is not limited to, University grounds, offices, classrooms, University-sponsored events, and vehicles being used to conduct University business. Possession of weapons is prohibited at all times while conducting University business. This policy applies to all students, faculty, and staff of the University, and violation may result in discipline up to and including termination of employment or expulsion. Where appropriate, University officials will report the transfer, sale, or use of weapons or dangerous instruments to local law enforcement authorities.

## Definitions

The University prohibits any weapon, including:

- firearms (including concealed handguns and BB guns, whether loaded or unloaded);
- knives (including switchblades, stilettos, swords, etc.);
- police batons or nightsticks;
- all martial arts weapons;
- electronic defense weapons, except as provided by law; and
- any other dangerous instrument

A "dangerous instrument" is defined as any instrument, article, or substance that, under immediate circumstances, is capable of causing death or physical injury. Any member of the campus community who has a question as to whether an instrument, article, or substance is considered a weapon in violation of this policy should ask for clarification from appropriate University officials (supervisors, academic department heads, etc.) prior to bringing the instrument, article, or substance on to University premises. Exceptions to the prohibited weapons policy must be approved beforehand by a representative of the President's Office. Any weapon on University premises may be confiscated. There is no reasonable expectation of privacy with respect to weapons on campus, and desks, workstations, offices, lockers, bags, briefcases, files, etc. may be subject to reasonable security searches.

If you observe suspicious behavior, report this immediately to your supervisor, program director, or campus security.

# Title IX and Sexual Misconduct Grievance Reporting Policy and Procedures

The United States Department of Education (DOE) mandates that institutions comply with specific requirements under Title IX of the Educational Amendments of 1972. Title IX is a federal civil rights law that prohibits discrimination on the basis of sex. University of St. Augustine is committed to providing a safe educational and working environment for its students, faculty, staff, and other members of the university community.

University of St. Augustine believes that all members of the University community should be free from all acts of sexual misconduct, including sexual assault, sexual harassment and discrimination, sexual exploitation, relationship violence, and stalking. All members of the University community and all visitors, regardless of sex, gender, sexual orientation, gender identity, or gender expression are advised that any sexual misconduct by any student, employee, or third party is prohibited. Any attempt to commit sexual misconduct, or to assist or willfully encourage any such act, is a violation of this Policy. Sexual misconduct is contrary to the basic values of University of St. Augustine, which include promoting a sense of community, fostering learning, instilling integrity, and achieving excellence. University of St. Augustine is committed to providing for the prompt and equitable resolution of all complaints of sexual misconduct

KAL000146

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

This Policy applies to all complaints of sexual misconduct in University of St. Augustine's education programs and activities. It prohibits conduct that: occurs on campus or other University property; occurs in connection with University educational programs or activities, whether on or off-campus; or otherwise affects the University community. This Policy prohibits sexual misconduct by all third parties (including but not limited to visitors, guests, volunteers and contractors) on University of St. Augustine campuses and during university activities. It also applies to applicants for admission to, or employment with, the University of St. Augustine.

Violations of this policy may result in disciplinary action up to and including removal from the University for students and termination of employment for faculty and staff. When used in this Policy the term "complainant" refers to a person claiming that a violation of this Policy occurred, and the term "respondent" refers to a person accused of violating this Policy.

1. Definitions

   **Consent:** Consent is defined at University St. Augustine as a clear and unambiguous agreement expressed in mutually understandable words or actions to voluntarily engage in specific sexual or intimate activity or conduct. Conduct will be considered "without consent" if no clear affirmative consent, verbal or otherwise, is given. Consent is not present (1) if obtained through the use of force, threat, coercion, or intimidation; or (2) when an individual is incapacitated, such as by consumption of drugs or alcohol or being unconscious or asleep; or (3) if given by someone who is not able to effectively communicate or to understand the nature of the conduct being engaged in. Silence or an absence of resistance on the part of the individual does not imply or constitute consent. Past consent does not imply future consent. Consent can be withdrawn at any time. Consent to engage in sexual activity with one person does not imply consent to engage in sexual activity with another.

   **Relationship violence:** Relationship violence means a violent act committed by a person who is or has been in a social relationship of a romantic nature or intimate nature with the complainant, as determined by the length of the relationship, the type of relationship, and the frequency of interaction between the persons involved in the relationship. Relationship violence includes dating violence and domestic violence.

   **Retaliation:** Retaliation means intimidating, threatening, coercing, or in any way discriminating against an individual because the individual made a report of a claim of sexual misconduct or participated in any way in the investigation or resolution of such a report or complaint, or exercised any right or responsibility under this Policy.

   **Sexual Discrimination:** Sexual discrimination for the purpose of this policy is defined as including, but not limited to, treating individuals differently because of their gender or sexual orientation, in connection with the terms and conditions of employment or educational opportunities. Discrimination does not occur, however, when an individual is treated differently than another individual for legitimate reasons.

   **Sexual Assault:** Sexual assault is non-consensual physical contact of a sexual nature. Sexual assault includes rape and any other acts using force, threat, intimidation, or coercion, or taking advantage of a victim's inability to make reasoned decisions about sexual activity. This includes:

   a. *Non-Consensual Sexual Intercourse:* Non-consensual sexual intercourse is any sexual intercourse, however slight, with any object, by one person upon another, which is without consent and/or by force. It includes vaginal penetration by a penis, object, tongue or finger, anal penetration by a penis, object, tongue, or finger, and oral copulation (mouth to genital contact or genital to mouth contact), no matter how slight the penetration or contact.

   b. *Non-Consensual Sexual Contact:* Non-consensual sexual contact is any intentional sexual touching, however slight, with any object by a person upon another person that is without consent and/or by force, threat or intimidation. It includes intentional contact with the genitals, breasts, thighs, buttocks, anus, or groin, touching another with any of these body parts, or making another touch you or themselves with or on any of these body parts, any intentional bodily contact in a sexual manner, though not involving contact with/of/by genitals, breasts, thighs, buttock, anus, groin, mouth or other orifice. It also includes attempted non-consensual intercourse.

KAL000147

c.  *Statutory rape:* Sexual intercourse with a person who is under the statutory age of consent in the applicable jurisdiction.

**Sexual Exploitation:** Sexual exploitation occurs when an individual takes non-consensual or abusive sexual advantage of another for his/her own advantage or benefit, or to benefit or advantage anyone other than the one being exploited. Examples include but are not limited to: invasion of sexual privacy, prostituting another student, non-consensual video or audio-taping or photography of sexual activity, distributing sexual or intimate information, images or recordings of another without that individual's consent, going beyond the boundaries of consent (such as allowing friends to hide in the closet watching consensual sex), voyeurism, knowingly transmitting an STD or HIV to another student, exposing one's genitals in non-consensual circumstances or inducing another to expose his/her genitals, and sexually-based bullying, including, but not limited to, through social media.

**Sexual Harassment:** Sexual harassment can include, but is not limited to, unwelcome sexual advances, requests for sexual favors, unwelcome physical contact of a sexual nature; e-mails containing inappropriate sexual content; obscene or harassing phone calls or jokes of a sexual nature; suggestive gestures, sounds, stares, or other verbal or physical conduct of a sexual nature when:

> a. Submission to such conduct is made, either explicitly or implicitly, a term or condition of a student's academic progress;

> b. Submission to or rejection of such conduct by an individual is used as a basis for decisions affecting assessment of academic progress; or

> c. Such conduct, by instructors, staff, or students, including between students, has the purpose or effect of interfering with     academic performance or creating an intimidating, hostile, or offensive environment.

**Sexual Misconduct:** Sexual misconduct includes, but is not limited to, sexual discrimination, sexual exploitation, sexual harassment, sexual assault, relationship violence, and stalking. While the University of St. Augustine School may use different standards and definitions than state criminal codes, sexual misconduct often overlaps with crimes under applicable criminal codes.

**Stalking:** Stalking is engaging in a course of conduct that would cause a reasonable person to suffer substantial emotional distress or to fear for his or her safety or the safety of others. A course of conduct means two or more acts in which a person follows, monitors, observes, surveils, communicates with another person, threatens, intimidates or communicates with or about another person, or vandalizes another person's property.

2.  Reporting Violations of This Policy

    Students, faculty, or staff members who believe that they are a victim of sexual misconduct should contact the Title IX Coordinator. The Title IX Coordinator is responsible for receiving and processing, in a timely manner, reports from students, faculty, staff, and administrators regarding rights and responsibilities concerning sexual misconduct in violation of Title IX.

    Any questions or complaints regarding Title IX may be referred to the University of St. Augustine's Title IX Coordinator and Title IX Deputy Coordinators or to the Department of Education's Office of Civil Rights – Regional Division Offices listed below.

    **Filing a Criminal Complaint:** Students, faculty, and staff members have the right to file both a criminal complaint and a Title IX complaint simultaneously.

    To file a criminal complaint please contact the local police department for your campus listed below.

    University of St. Augustine's Florida Campuses

    Title IX Coordinator                                    U.S. Department of Education - Regional Office IV

KAL000148

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

| | |
|---|---|
| Ryan Davis | 61 Forsyth St. SW, Suite 19T40 |
| Office: 737-202-3373 | Atlanta, GA 30303 |
| Email: rdavis@usa.edu | Telephone: (404) 974-9450 |
| | Email: OCR@ed.gov |

| | |
|---|---|
| Local Police, St. Augustine Campus: | Local Police, Miami Campus: |
| St. Augustine Police Department | Miami Police Department |
| 151 King St. | 400 NW 2nd Avenue |
| St. Augustine, FL 32084 | Miami, Florida 33128 |
| Phone: (904) 825-1074 | Phone: (305) 603-6640 |

University of St. Augustine California Campus

| | |
|---|---|
| Deputy Title IX Coordinator | U.S. Department of Education - Regional Office IX |
| Ryan Davis | 50 Beale Street, Room 9700 |
| Office: 737-202-3373 | San Francisco, CA 94105 |
| Email: rdavis@usa.edu | Telephone: (415) 486-5700 Email: OCR@ed.gov |

Local Police:
San Marcos Police Department
182 Santar Pl, San Marcos, CA 92069
Phone: (760) 510-5200

University of St. Augustine Texas Campus

| | |
|---|---|
| Deputy Title IX Coordinator | U.S. Department of Education - Regional Office VI |
| Ryan Davis | 1999 Bryan Street, Suite 1620 |
| Office: 737-202-3373 | Dallas, Texas 75201-6810 |
| Email: rdavis@usa.edu | Telephone: (404) 974-9450 Email: OCR@ed.gov |

Local Police: Austin Police Department
Telephone: 512-974-5037

Students, faculty, and staff members must report an incident of alleged discrimination to a "Responsible Employee." For the purposes of this policy, the "Responsible Employees" are the Title IX Coordinator, Deputy Title IX Coordinator, the Executive Director of Student Affairs, and the Program Director. For complaints where both the complainant and respondent are employees, "Responsible Employees" is the Human Resources Campus Manager.

University of St. Augustine takes all reports of sexual misconduct seriously and, upon receiving notice of any alleged violation of this Policy, shall take immediate steps to conduct a thorough, prompt, and appropriate investigation of the complaint.

A complainant who contacts the Title IX Coordinator or Responsible Employee with an allegation of Sexual Misconduct will be notified of his or her right to confidentiality and his or her right to remain anonymous and how that may affect the University's ability to conduct an investigation. Please note that there are certain situations where the University may not be able to guarantee confidentiality or anonymity. If the complainant wishes to move forward with the process, he or she will be asked a series of questions to provide information. If the complainant prefers, he or she may complete the information from the form and submit it to the Title IX Coordinator. The *Sexual Misconduct or Discrimination Complaint Incident Report* is available from the Title IX Coordinator or by downloading here: Sexual Misconduct or Discrimination Complaint Incident Report. In certain circumstances, it may be necessary for the complaint to go forward even if the complainant does not consent to that course of action.

KAL000149

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

University of St. Augustine strongly supports the complainant's right to confidentiality in cases involving sexual misconduct. Complainants have the right to ask that their names not be disclosed to the alleged perpetrators. However, there are limited situations in which the university must override a complainant's request for confidentiality in order to meet the institution's legal obligations under Title IX. In these situations, the information will only be shared with individuals who are responsible for handling the University's response to incidents of sexual violence. Given the sensitive nature of reports of sexual violence, the University shall ensure that the information is maintained in a secure manner. If the complainant requests that his or her name not be revealed to the alleged perpetrator or if complainant asks the university not to investigate or seek action against the alleged perpetrator, the University of St. Augustine will be limited in its ability to respond fully to the incident, including taking disciplinary action against the alleged perpetrator. If the complainant still requests that his or her name not be disclosed to the alleged perpetrator, or that the university not investigate or seek action against the alleges perpetrator, the Title IX Coordinator will need to determine whether or not the institution can honor such a request while providing a safe and nondiscriminatory environment for all students, faculty, and staff.

3. Determination of interim measures

Upon notification of an incident of sexual misconduct, University of St. Augustine shall take steps to ensure equal access to its education programs and activities and protect the complainant as necessary, including taking interim measures before the final outcome of an investigation. These measures are designed to protect the Complainant and provide the Complainant with options to avoid contact with the alleged perpetrator. These measures may include a change in academic activities, living, transportation, dining, and working situation as appropriate. After the initial report of alleged sexual misconduct, possible immediate interim suspension can be invoked on the accused ("Respondent") if there is a reasonable cause to believe the Respondent's behavior is of such a nature as to pose a threat of harm or injury to the Complainant or any other member of the campus community. The Title IX Coordinator shall work with the Complainant to determine what, if any, interim measures shall be implemented.

4. Student Amnesty Policy and Bystander Intervention

University of St. Augustine encourages the reporting of sexual misconduct. Sometimes, students may be reluctant to come forward and report an incident of sexual misconduct, or serve as a witness, because they are concerned that they may be charged with violating other campus polices, such as University of St. Augustine's alcohol or drug policy. In order to encourage reporting of sexual misconduct, students who report an incident of sexual misconduct, or who serve as witnesses to an incident of sexual misconduct, will not face disciplinary sanctions for their own personal consumption of drugs or alcohol related to the incident as long as any such violations did not place the health or safety of any other person at risk.

5. Advisors

For complaints of sexual misconduct where the complainant or respondent is a student, the complainant and the respondent may be accompanied throughout the investigation and appeal process by an advisor of their choice. Advisors should be from the University community, unless otherwise approved, and must agree to keep the matter confidential. However, the advisor may not be a witness or possible witness in the case, a person involved in the University's disciplinary process, or a complainant or a respondent in the case. The purpose of the advisor is to provide advice to the student in a manner that is not disruptive to the proceedings. The advisor may accompany the party to any meeting or hearing held pursuant to this Policy. The advisor may not provide verbal, written, or other input during the investigation or appeal process other than to the student being advised; the advisor may not speak on the party's behalf or otherwise participate or address or question the investigator, Resolution Officer, or other parties or witnesses.

6. Informal Resolution

If the complainant and respondent agree, certain cases may be resolved informally, including through mediation in appropriate cases. Cases involving allegations of sexual assault are not suitable for mediation. The Title IX Coordinator may also determine that informal resolution is not appropriate based on the facts and circumstances of the particular case. All informal resolutions will be conducted or overseen by the Title IX Coordinator or designee. Under no circumstances will a complainant be required to resolve a matter directly with the respondent.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

pg. 52

KAL000150

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

If both parties are satisfied with a proposed informal resolution, and the Title IX Coordinator considers the resolution to satisfy University of St. Augustine's obligations to provide a safe and non-discriminatory environment, the resolution will be implemented and the informal resolution process will be concluded. If informal resolution does not resolve the matter, the resolution process will proceed to formal investigation. At any point in the process, either the complainant or the respondent may elect to end the informal process in favor of proceeding with a formal investigation.

7. Investigations

If informal resolution is inappropriate, unsuccessful, or not desired by the complainant and the respondent, a formal investigation will be conducted. The investigation of a report of sexual misconduct will begin promptly. Notice will be provided simultaneously to the complainant and the respondent in writing that a complaint has been received by University of St. Augustine and will be investigated under this Policy. The notice shall specify any interim measures that have been implemented.

University of St. Augustine shall determine, given the circumstances surrounding the complaint, the proper party to conduct the investigation. The proper party may or may not be the Title IX Coordinator and shall be the person best able to conduct an impartial and fair review of the complaint. The investigation will normally include interviewing the complainant(s), respondent(s), witnesses, and other relevant parties and will include a review of any relevant documents and other information. It may include reviewing law enforcement investigation documents (if applicable) and reviewing student and personnel files. Both the complainant and the respondent may provide the investigator(s) with the names of witnesses, documents, and other information. The investigator(s) will exercise their discretion in deciding which individuals identified as witnesses during the investigation should be interviewed and which documents or other information should be reviewed. The interviews, meetings, and other proceedings are not recorded by University of St. Augustine and may not be recorded by others. The complainant and the respondent are afforded equal procedural rights during the investigation. No expert witnesses shall be permitted.

The complainant's prior sexual relationships or conduct are neither relevant nor admissible during the investigation and will not be considered, other than the prior sexual relationship or conduct with the respondent if the respondent alleges consent. The fact that a complainant may currently have or had in the past a dating or sexual relationship with the respondent that was consensual is not sufficient by itself to constitute consent and does not preclude a determination that sexual misconduct occurred.

At any time prior to or during an investigation, the respondent may accept responsibility for some or all of the alleged violations. The matter will then proceed to the sanctioning phase and any appeal of the sanctioning decision.

8. Preparation of Investigation Report

Upon completion of the investigation, the investigator(s) will prepare a report summarizing the interviews conducted and the evidence reviewed. The report will include the investigator's finding of fact, an assessment of the credibility of the parties and witnesses when appropriate, and a recommended determination as to whether a violation of this Policy has occurred. In reaching this conclusion, the investigator shall use the preponderance of evidence standard.

9. Resolution Procedures

　　1. **Cases involving allegations of employee violations**

　　　　If the Respondent is a non-student employee, the Title IX Coordinator or designee will report his or her findings to University Human Resources and Leadership. If Leadership determines, based on the contents of the report, that no violation of University Policy has occurred, the incident will be closed.

　　　　If Leadership determines, based on the contents of the report that a violation of University Policy has or may have occurred, University Leadership will determine an appropriate resolution including remedial and/or disciplinary action up to and including termination of the employee. University Leadership will determine if a hearing is appropriate prior to the determination of the sanctions based on the particular facts presented, including but not limited to the identity of the complainant (student or

KAL000151

employee), the nature and/or severity of the offense, and the evidence presented by the investigative report. Resolution, sanctions and appeals will be governed by the procedures in University's personnel policies or Faculty Handbook, if applicable, in accordance with the requirements of Title IX.

II. **Cases involving allegations of student violations**

Sexual misconduct complaints involving student respondents will be governed by the following process. Upon the completion of the investigation, the Title IX Coordinator shall present the investigative report to University leadership which may include, as appropriate, the Executive Director of Student Services, the Chief Academic Officer, or the Student Life Manager. The individual or individuals charged with making a determination as to the resolution of the complaint, and sanction, and any remedies for the complainant shall be referred to herein as the "Resolution Officer," although more than one individual may be charged with resolving the complaint. The Resolution Officer shall then determine the appropriate resolution to the complaint, considering factors including but not limited to the identity of the complainant (student or employee), the nature and/or severity of the offense, and the evidence presented by the investigative report. The Resolution Officer shall determine whether any hearing is appropriate prior to imposition of any sanction. Generally, a hearing will be provided if the probable sanction to be imposed is suspension or expulsion if the respondent is a student, or termination of employment if the respondent is an employee.

The Resolution Officer shall provide written notice to both the complainant and the respondent of the process to be used to resolve the complaint. If no hearing is to be held, both complainant and respondent may make a written submission to the Resolution Officer if they choose. If a hearing is held, the proceedings shall be closed. The complainant and respondent and their respective advisors may be present for all or any portion of the hearing. Either the complainant or respondent may request, or be asked, to hear or view the proceedings via audio or video transmission from a separate room. Any witnesses may only be present in the hearing room when being questioned by the Resolution Officer.

Neither party shall be permitted to ask questions at the hearing, although either party may submit to the Resolution Officer requested questions for the other party or witnesses. It shall be in the discretion of the Resolution Officer whether or not to ask the submitted questions, in whole or in part.

The Resolution Officer shall provide both parties with written notice of its findings and the reasons for such findings. The Resolution Officer shall use the preponderance of evidence standard in making his or her findings. If a violation of this Policy is found, the notice shall provide the sanctions to the respondent and to the complainant, as appropriate under Title IX.

The notice shall set forth either party's right to appeal, the identity of the Appeal Officer, and the process and time limit for such an appeal.

In addition to discipline against the respondent, resolutions may include remedies for the complainant, which may include steps such as reassignment of a course section or residency, counseling services, medical services, academic support services, or changes to the school's overall services or policies, including altering withdrawal penalties within courses. Any remedies offered would be separate from, and in addition to, any interim measure that may have been provided prior to the conclusion of any investigation. Resolutions may also include remedies for the broader University population, such as training or changes to policies or services.

10. Appeals

Appeals for sexual misconduct complaints involving non-student employee respondents will be governed by the procedures in University personnel policies or Faculty Handbook, as applicable. If any right of appeal is granted through those policies, both the complainant and the respondent shall have equal rights of appeal.

In cases involving student respondents, both parties have the right to appeal the Resolution Officer's finding of responsibility and/or imposition of sanctions. Any appeal must be filed in writing within five (5) days from the

KAL000152

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

notice of resolution. The University will determine the appropriate individual in University leadership to hear any appeal ("Appeal Officer"), depending on the circumstances of the case, including the identity of the respondent. There is a presumption that the decision, and any sanction or discipline, was made properly, and the Appeal Officer may not substitute his or her judgment for that of the Resolution Officer. The sole grounds for appeal are: (1) a procedural error that substantially impacted the determination or sanction; (2) new information that was not available at the time of the investigation or hearing and that could reasonably have had had a substantial impact on the determination or sanction; and (3) excessiveness or insufficiency of the sanction. The sanction may be increased only if the complainant appeals on the ground that the sanction was insufficient and may only be decreased if the respondent appeals on the ground that the sanction was excessive.

The Appeal Officer shall give both parties timely notice of the receipt of an appeal. Both parties shall be provided the opportunity to make a written submission to the Appeal Officer. The Appeal Officer shall be limited to the record below, including any information that was part of the investigation or the resolution hearing. The Appeal Officer shall not conduct another hearing but may conduct interviews with the complainant, respondent, or witnesses in his or her discretion. The party appealing shall have the burden of proof in any appeal. The Appeal Officer shall use the preponderance of evidence standard in the determination of any appeal.

The Appeal Officer shall give written notice to both parties of the outcome of the appeal and the reasons for his or her decision. The decision of the Appeal Officer is final.

**Retaliation:** Title IX includes protections against retaliation. The University of St. Augustine will take immediate and appropriate steps to investigate or otherwise determine if retaliation due to the reporting of sexual misconduct or discrimination occurs.

**Training:** All individuals with responsibilities under this Policy shall have appropriate training in this Policy and in the requirements of Title IX and related laws. Training shall include training relating to sexual misconduct, including sexual assault, relationship violence, and stalking as defined in this Policy.

**Time Frames for Process:** While each situation is different and there can be no way to determine how long an investigation will take, the Title IX Coordinator shall use her best efforts to reach resolution within 60 days from the time the complaint is reported to notice of resolution, exclusive of any appeals.

Sources of Counseling, Advocacy, and Support: Victims of Sexual Misconduct can receive assistance immediately by calling the local police department (911, if emergency) and local counseling resources listed by campus below. University of St. Augustine employees may contact the Employee Assistance Program (EAP) by contacting Business Health Services (BHS) at 800-765-3277 or online: at www.bhsonline.com (user name: Laureate). EAP is free, "Confidential Resources" at University of St. Augustine which means that all conversations will remain confidential and will not initiate any type of investigation into the incident. Sexual assault reports must be made by contacting the University's Title IX Coordinator or Deputy Coordinators, who are the appropriate University Officials for receiving reports of sexual assault. University of St. Augustine students can contact the following off-campus resources for counseling services: The National Domestic Violence Hotline, 1-800-799-SAFE (7233), or 1-800-787-3224 (TTY). For students at the University of St. Augustine Florida Campuses: The Betty Griffin House 24-hour crisis hotlines. Telephone: (904) 824-1555. For students at the University St. Augustine California Campus: North County Family Violence Center Prevention Services, 330 Rancheros Dr. San Marcos, CA. Telephone: (760) 798-2835. For students at the University of St. Augustine Texas Campus: Victim Services Resources; 24-hour crisis hotlines. Telephone: 512-472-4357.

# Status Change—Withdrawal or Leave of Absence (LOA)

KAL000153

Students who find it necessary to withdraw from the program or take an LOA must notify the Advisor in writing and complete the required documentation. Withdrawal or Leave of Absence forms are available on the *myUSA* portal Student Services tab under Forms.

# Student Loans

The University is concerned about the financial well-being of its students. The cost of attendance varies per program and possible accumulation of student loan debt could exceed $150,000 to complete the program. Program cost details and financial counseling is available through the Financial Aid department and on the website under each academic program listing. The university strongly recommends student counseling prior to applying for loans. The purpose of this counseling is to speak about financial management principles and how best to utilize loan options for students.

# Termination of Enrollment (Texas)

The school shall terminate the enrollment of a student who accumulates the lesser of the following amounts of absences:

- More than 10 consecutive school days
- More than 20% of the total course-time hours in a program with course time of more than 200 hours
- More than 25% of the total course-time hours in a program or individual class with course time of 41 to 200 hours
- More than 25% of the total course-time hours for seminars, individual classes, or programs with course time of 40 hours or less
- Any number of days if the student fails to return as scheduled from an approved leave of absence

# Textbooks

Textbooks are the responsibility of the learner. Not all courses require textbooks (refer to the course syllabus). To access book lists, students should sign into *myUSA*, click on the Campus tab, then on the appropriate campus. Student Services provides a booklist to incoming, first-term First Professional students prior to the start of classes.

# Transcripts

To ensure confidentiality of student records, the University issues official transcripts of academic information only by written or electronic signature by the student or graduate using TranscriptsPlus. Students will pay a $3.00 convenience fee for each request submitted and an additional $2.25 fee for each paper transcript requested. For electronic transcript delivery only, the $3.00 convenience fee is charged. Transcripts as well as grade reports will not be issued for any student with an outstanding obligation to the University, financial or otherwise. For more information on ordering transcripts please visit the *myUSA* portal My Info tab.

# Transferability of Course Credit

The transferability of credits students earn at the University of St. Augustine for Health Sciences is at the complete discretion of an institution to which the student may seek to transfer. Acceptance of the degree earned at the University of St. Augustine for Health Sciences is also at the complete discretion of the institution to which the student may seek to transfer. If the degree earned at this institution is not accepted at the institution to which the student seeks to transfer,

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information                                        pg 56

KAL000154

the student may be required to repeat some or all of his or her coursework at that institution. For this reason, the student should make certain that his or her attendance at this institution will meet his or her educational goals. This may include contacting an institution to which the student may seek transfer after attending the University of St. Augustine for Health Sciences to determine if the degree will transfer. The University actively pursues a policy of requesting other graduate programs to accept our credits for transfer. However, the University has not entered into an articulation or transfer agreement with any other college or university.

# Tuition

Students may pay tuition and fees for each trimester either by personal check, cash, or major credit card (VISA and/or MasterCard). Checks can either be mailed to the attention of the student's campus Bursar or brought in to the Bursar's Office in person. For credit card payments, students should always attempt online payment first before contacting the Bursar. Log into the student portal at *myUSA*, My Info tab, Select Student Accounting, then "My Account Balances," then "Make a Payment." Only if the online payment attempt does not work should the student contact the Business Office Bursar. Questions regarding the student's account, where to remit payment, Higher One cards, etc., should be directed to the student's campus Business Office Bursar.

San Marcos CA Campus: Checks can be made payable to University of St. Augustine and sent to 700 Windy Point Dr, San Marcos CA 92069, Attn: Kristin Hitchcock, Business Office Bursar. The San Marcos CA bursar can be reached at 760-591-3012, ext. 2456, or khitchcock@usa.edu.

Saint Augustine FL Campus: Checks can be made payable to University of St. Augustine and sent to 1 University Blvd, St. Augustine FL 32086, Attn: Susan Jones, Business Office Bursar. The St. Augustine FL bursar can be reached at 904-826-0084, ext. 1240, or sjones@usa.edu.

Miami FL Campus: Checks can be made payable to University of St. Augustine and sent to 1 University Blvd, St. Augustine FL 32086, Attn: Susan Jones, Business Office Bursar. The Miami FL bursar can be reached at 904-826-0084, ext. 1240, or sjones@usa.edu.

Austin TX Campus: Check can be made payable to University of St. Augustine and sent to 5401 La Crosse Ave, Austin TX 78739, Attn: Candice Salazar, Business Office Bursar. The Austin TX bursar can be reached at 512-394-9766, ext. 3108, or csalazar@usa.edu.

Loan disbursements for existing loan programs are also accepted. The use of credit cards to pay for tuition while receiving loans will only be accepted when a current loan disbursement does not pay the account in full. All tuition is payable in full on the registration date established for the applicable trimester. If the student has a loan coming that won't pay what is owed to the school in full, then subtract the amount of the loan from the total balance, and pay that self-pay portion by the registration date established for the applicable trimester. If the student has loan(s) pending that will pay the balance in full, then students do not have to pay anything themselves.

Late accounts can be assessed a 10% late fee. When the account becomes past due the student will be "blocked." If the account is blocked, students are unable to register for the next term, unable to request transcripts, and unable to graduate. Removal from classes can also occur. Reminder: if there are loans pending that will pay the tuition in full, the account won't be considered past due or receive a block. If students have a loan pending that will partially pay the account, the student is responsible for paying the self-pay portion by the registration date established for the applicable trimester or risk receiving a late fee and/or block.

One more important item for new students—if the student hasn't already, he or she should be receiving by U.S. mail enrollment information for Higher One. Higher One processes USAHS's student refunds. It will arrive in a bright green envelope. As soon as the information is received students should enroll and choose the method for future refunds. Students may use a Higher One account or receive direct deposit to his or her own bank. Even if the student does not anticipate a refund, he or she should enroll to direct a refund from a dropped course.

KAL000155

All personal checks accepted in payment of tuition may be processed twice, once upon receipt, and, if not cleared, once more. If such check is not approved for payment by the bank because of insufficient funds or other circumstances that do not allow clearance, it will be returned to the issuer along with a $30.00 service charge imposed by the University to cover handling and service fees. This service charge will be imposed each time the check is not approved for payment by the bank. *There are no exceptions to this policy.* Any subsequent tuition payments made by the student for the trimester/term in question must be made in the form of a certified check or bank money order before acceptance by the University.

# Special Tuition Payment for Students Performing Clinical Internships

A special tuition payment policy applies for those students who will be performing clinical internships for the immediately upcoming trimester. These students are required to remit tuition and fee payments no later than a period of 2 weeks prior to the beginning date of their clinical internship. In the case of those students receiving loans, a letter from the servicing agency indicating actual disbursement date is required on or before a period of 3 weeks prior to the beginning date of their clinical internship. (Note: The tuition payment date for those students who will be pursuing clinical internships in any given trimester will be provided in a separate memorandum to students as well as listed on the Academic Calendar). Students may direct questions regarding payment of tuition to the Bursar's Office.

## Post Professional Student

Students may pay tuition for each trimester/term either by personal check or major credit card. All tuition is payable in full by the registration date established for the applicable trimester/term. Students will not be allowed to begin a course without paying for it in full, even though a loan might be disbursing at some future point. Any loan disbursements received will then be refunded to the student.

# Tuition Refund Policy for First Professional Programs

## Cancellation and Tuition Refund Policy

University of Saint Augustine for Health Sciences institutional refund policy has been established in accordance with current state and federal regulations and applicable accrediting standards. A refund to the student or fund source may result from the application of the University's institutional refund policy.

## Notice of Cancellation

Students must notify the University in writing of cancellation. All monies paid by an applicant other than books, supplies, materials, and kits that are not returnable from use are refunded if cancellation occurs within 1 week (7 days) after signing the University's Enrollment Agreement and making an initial payment. If cancellation occurs after 1 week (7 days) from the signing of the University's Enrollment Agreement, all application and registration fees in excess of $100 are refunded.

## $500 Deposit Refund Policy First Professional Programs

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                          pg. 58

KAL000156

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Refund of Tuition Deposit for Withdrawal Within the First Seven Days: If notification of withdrawal from the University is submitted within seven days of submission of the tuition deposit, a full refund of the tuition deposit will be returned to the student.

Refund of Tuition Deposit for Withdrawal After the First Seven Days But Before the Start of the Trimester: If notification of withdrawal from the University is submitted after seven days of submission of the tuition deposit up to the start of the trimester courses, a partial refund of $400 (the University retains $100 as an admissions fee) will be returned to the student.

# Tuition Refund Policy First Professional Programs

The University of Saint Augustine for Health Sciences has an established add/drop period that is the first week (7 days) of each semester. All tuition and fees will be refunded to students or to student loans who withdraw from a program or a course within the add/drop period.

If a student withdraws from the program or a course after the add/drop period but prior to completion, the student may be eligible for a tuition refund in accordance with the following policy:

Withdrawing from a Program - Refund of Tuition after the Start of Trimester Courses: For students who withdraw from ALL classes during days 1-7 of the trimester (Add/Drop period), 100% of tuition/fees will be refunded to the student and/or to the loan. For students who withdraw from ALL classes after day 7 but before 60% of the term has elapsed, USAHS will calculate the refund using a percentage formula and return the refund to the student and/or to the loan. If more than 60% of the term has elapsed, there will be no refund.

Withdrawing from a Course - Students withdrawing from 1 or more course(s), but not the program, will have their refund calculated under the same percentage formula as those withdrawing from a program.

>Step 1: Determine the percentage of the enrollment period the student attended before withdrawing (days attended divided by total days in the period).If over 60%, then no refund is due.

>Step 2: Determine the amount of tuition earned by school by multiplying the total tuition/fee charged by the percentage of time enrolled.

>Step 3: Compare the amount of tuition earned by school to the amount received by the school. If more funds were received by the school than tuition earned by school, determine the amount of funds that must be returned by subtracting the tuition earned by school amount from the amount received by the school.

>Step 4: Distribute this calculated amount as a refund to the student or to student loan.

Refunds are made within 30 days of the date the University determines that the student has withdrawn.

For students who receive federal financial aid who withdraw (including transfers and leaves of absence) from ALL classes on or before 60% of the term has elapsed, a portion of your tuition will be returned to your lender. Please see the University's R2T4 policy for further information.

# Tuition Refund Policy for First Professional Programs for Iowa Residents

**Cancellation and Tuition Refund Policy First Professional Programs**

KAL000157

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

University of Saint Augustine for Health Sciences' institutional refund policy has been established in accordance with current state and federal regulations and applicable accrediting standards. A refund to the student or fund source may result from the application of the University's Institutional Refund Policy.

**Notice of Cancellation First Professional Programs**

Students must notify the University in writing of cancellation. All monies paid by an applicant other than books, supplies, materials and kits which are not returnable from use are refunded if cancellation occurs after signing the University's Enrollment Agreement and making an initial payment. All monies Iowa residents pre-pay to the University for tuition including the $500 tuition deposit are fully refunded to Iowa residents if the student never begins attendance in the term or course for which the student was charged.

**Tuition Refund Policy First Professional Programs**

The University of St. Augustine for Health Sciences has an established add/drop period that is the first week (seven days) of each semester. All tuition and fees will be refunded to students or to the source of their student loans, if students withdraw from a program or a course within the add/drop period.

If a student withdraws from the program or a course after the add/drop period but prior to completion, the student may be eligible for a tuition refund in accordance with the following policy:

Withdrawing from a Program-Refund of Tuition after the Start of Trimester Courses: For students who withdraw from ALL classes during day 1 – 7 of the trimester (Add/Drop period), 100% of tuition/fees will be refunded to student and/or to their loan. After day 7 for students who withdraw from ALL classes but before 60% of the term has elapsed, USAHS will calculate the refund using a percentage formula and return the refund to the student and/or to the student loan. If more than 60% of the term has elapsed, there will be no refund.

Withdrawing from a Course-Students withdrawing from 1 or more course(s), but not the program, will have their refund calculated under the same percentage formula as those withdrawing from a program.

> Step 1: Determine the percentage of the enrollment period (calendar days) the student failed to complete as the date of withdrawal (incomplete days divided by total days in the period). If over 60%, then no refund is due.

> Step 2: Determine the amount of tuition charges to be refunded by multiplying the total tuition/fee charged by the percentage of time (calendar days) the student failed to complete.

> Step 3: Distribute this calculated amount as a refund to the student or to student loan.

For Iowa resident distance education students who withdrawal due to physical incapacity and have provided official documentation that physical incapacity is the reason he or she is not able to complete the course, the student will be refunded by the amount of tuition earned by school by multiplying the total tuition/fee charged by the percentage of time (calendar days) the student failed to complete in the period for which he/she was charged.

Refunds are made within 30 days of the date the University determines that the student has withdrawn.

For students who receive federal financial aid who withdraw (including transfers and leaves of absence) from ALL classes on or before 60% of the term has elapsed, a portion of your tuition will be returned to your lender. Please see the University's R2T4 policy for further information.

# Tuition Refund Policy for Transitional and Post-Professional Programs

**Student's Right to Cancel**

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                          pg. 60

KAL000158

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Students may withdraw from a degree program at any time. Contact the director of the degree program to request withdrawal from the program. To withdraw from an individual seminar, contact the Continuing Education Office by phone at 1-800-241-1027, ext. 1400.

### Cancellation and Tuition Refund Policy for Post-Professional Programs

University of Saint Augustine for Health Sciences institutional refund policy has been established in accordance with current state and federal regulations and applicable accrediting standards. A refund to the student or fund source may result from the application of the University's institutional refund policy.

### Notice of Cancellation for Post-Professional Programs

Students must notify the University in writing of cancellation. All monies paid by an applicant other than books, supplies, materials, and kits that are not returnable from use are refunded if cancellation occurs within 1 week (7 days) after signing the University's Enrollment Agreement and making an initial payment.

### Tuition Refund Policy

The University of Saint Augustine for Health Sciences has an established add/drop period that is the first week (7 days) of each semester. All tuition, excluding the application fee, will be refunded to students who withdraw within the add/drop period.

If a student withdraws from the program or a course after the 7 day add/drop period but prior to completion, the student may be eligible for a tuition refund in accordance with the following policy:

Refund of Tuition After the Start of Trimester Courses. For self-pay students who withdraw (including transfers and leaves of absence) from ALL classes on or before 60% of the term has elapsed, USAHS will calculate the refund using a percentage formula and return the refund to the student. Students dropping form coursework (not the program) will be calculated under the same percentage formula. If more than 60% of the term has elapsed, there will be no refund.

> Step 1: Determine the percentage of the enrollment period the student attended before withdrawing (days attended divided by total days in the period).

> Step 2: Determine the amount of tuition earned by school by multiplying the total tuition/fee charged by the percentage of time enrolled.

> Step 3: Compare the amount of tuition earned by school to the amount received by the school. If more funds were received by the school than tuition earned by school, determine the amount of funds that must be                returned by subtracting the tuition earned by school amount from the amount received by the school.

> Step 4: Distribute this calculated amount as a refund to the student.

Refunds are made within 30 days of the date the University determines that the student has withdrawn.

For students who receive federal financial aid who withdraw (including transfers and leaves of absence) from ALL classes on or before 60% of the term has elapsed, a portion of the tuition will be returned to the student's lender. Please see the University's R2T4 policy for further information.

# Tuition Refund Policy for Transitional and Post Professional Programs for Iowa Residents

### Student's Right to Cancel Post-Professional Programs

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information                     pg. 61

KAL000159

Students may withdraw from a degree program at any time. Contact the director of the degree program to request withdrawal from the program. To withdraw from an individual seminar contact the Continuing Education Office by phone at 904-826-0084, ext. 1400.

### Cancellation and Tuition Refund Policy for Post-Professional Programs

University of Saint Augustine for Health Sciences institutional refund policy has been established in accordance with current state and federal regulations and applicable accrediting standards. A refund to the student or fund source may result from the application of the University's Institutional Refund Policy.

### Notice of Cancellation for Post-Professional Programs

Students must notify the University in writing of cancellation. All monies paid by an applicant other than books, supplies, materials and kits which are not returnable from use are refunded if cancellation occurs within one week (seven-days) after signing the University's Enrollment Agreement and making an initial payment. All monies Iowa residents pre-pay to the University for tuition are fully refunded to Iowa residents if the student never begins attendance in the term or course for which the student was charged.

### Tuition Refund Policy for Post-Professional Programs

The University of St. Augustine for Health Sciences has an established add/drop period that is the first week (seven days) of each semester. All tuition and fees will be refunded to student who withdraw within the add/drop period.

If a student withdraws from the program or a course after the 7 day add/drop period but prior to completion, the student may be eligible for a tuition refund in accordance with the following policy:

Refund of Tuition Charges after the Start of Trimester Courses: For students who withdraw (including transfers and leaves of absence) from ALL classes on or before 60% of the term has elapsed, USAHS will calculate the refund using a percentage formula and reduce the student's tuition charges accordingly. Students dropping from coursework (not the program) will be calculated under the same percentage formula. If more than 60% of the term has elapsed, there will be no refund.

> Step 1: Determine the percentage of the enrollment period (calendar days) the student failed to complete as the date of withdrawal (incomplete days divided by total days in the period). If over 60%, then no refund is due.

> Step 2: Determine the amount of tuition charges to be refunded by multiplying the total tuition/fee charged by the percentage of time (calendar days) the student failed to complete.

> Step 3: Distribute this calculated amount as a refund to the student.

For Iowa resident distance education students who withdrawal due to physical incapacity and have provided official documentation that physical incapacity is the reason he or she is not able to complete the course, the student will be refund by the amount of tuition earned by school by multiplying the total tuition/fee charged by the percentage of time (calendar days) the student failed to complete in the period for which he/she was charged

Refunds are made within 30 days of the date the University determines that the student has withdrawn.

For students who receive federal financial aid who withdraw (including transfers and leaves of absence) from ALL classes on or before 60% of the term has elapsed, a portion of your tuition will be returned to your lender. Please see the University's R2T4 policy for further information.

# Continuing Education Seminar Fee Refund Policy

KAL000160

# Tuition Refund Policy for Maryland Residents (All programs)

For students residing in Maryland, USAHS complies with the state of Maryland's refund policy. This policy will supersede USAHS's refund policy, unless USAHS's policy is more beneficial for the Maryland student. The minimum refund that USAHS shall pay to a Maryland student who withdraws or is terminated after completing only a portion of a course, program, or term with the applicable billing period is as follows.

| Proportion of Total Course, Program, or Term Completed as of Date of Withdrawal or Termination | Tuition Refund |
|---|---|
| Less than 10% | 90% refund |
| 10% up to but not including 20% | 80% refund |
| 20% up to but not including 30% | 60% refund |
| 30% up to but not including 40% | 40% refund |
| 40% up to and including 60% | 20% refund |
| More than 60% | No refund |

# Continuing Education Seminar Fee Refund Policy

A $100 non-refundable deposit must accompany the registration form. The balance of the fee is due 30 days prior to the starting date of the seminar; unpaid balances may be subject to forfeited registration. The balance may be transferred or refunded with a two-week notice prior to the start date of the seminar. Cancellation up to three working days prior to the start of the seminar will result in 50% of the balance being refunded. With three working days' notice, no portion of the seminar fee will be refunded; however, the fee may be transferred to another seminar of the student's choosing or placed in a "funds on hold" account. Transfer of funds is limited to two seminars. After the seminar begins, no refunds are issued or transfer of funds permitted. If a student misses any portion of a seminar, a certificate of completion will not be issued until such portion is made up. A student can attend a subsequently scheduled seminar at no cost to make up the time and then receive his or her certificate upon successful completion. For online continuing education unit (CEU) seminars please refer to the Academic Credit Refund policy.

In the event of employer paid registrations, the employer has the right to cancel the registration under the above policy. The therapist will be contacted and may be given the option to remain registered for the seminar and become the responsible party for the fee.

KAL000162

# Wellness Centers (St. Augustine, San Marcos, Austin)

## Mission Statement

The mission of the University of St. Augustine for Health Sciences Wellness Center is to provide an environment that promotes and facilitates a healthy and productive lifestyle in our students, faculty, staff, and ultimately our clients and local community. This will be achieved by (a) development of programs that will allow the University philosophy on health and wellness to become a reality and (b) providing a state of the art wellness facility that will include wellness-related testing/screening and quality instruction in the various domains of wellness.

Students must complete a liability waiver prior to utilizing the Wellness Center and must complete a mandatory orientation prior to utilizing the Obstacle Course on the St. Augustine Campus.

For more information, including access and policies, go to *myUSA*, Student Services tab and then Wellness Center.

# Academic Policies and Procedures

## Academic Freedom

Academic freedom is a cherished principle in higher education. At the University, academic freedom is the right of faculty members to express their professional opinions regarding the content of the courses they are teaching, as long as they are measured against the intellectual standards of relevant professional disciplines. It should be remembered that the content of courses often builds upon itself and this course content is coordinated to achieve the desired goal of meeting professional accreditation and national licensure subject matter. Faculty have the freedom in the classroom to discuss academic subjects, selecting instructional materials, and determining grades. Likewise, students should have the opportunity to study a wide spectrum of ideas so they may acquire critical thinking skills. We must never lose sight that our students are seeking guidance, not confusion. While they wish to know what to do in every single circumstance, we know they are better prepared if we teach them the skills and give them the content that will enable them to personally find answers. In the development of knowledge and creative activities, the faculty and student body are free to cultivate a spirit of inquiry and scholarly criticism and to examine ideas in an atmosphere of freedom and confidence.

However, there are limits to academic freedom. The courts have decided that free speech does not extend to shouting "fire" in a crowded theater. Likewise, academic freedom, the right to express ones personal views, has its limits and carries with it a measure of responsibility. By all means, faculty may express a different viewpoint about a professional topic, but it should be clearly expressed as a personal viewpoint. Faculty may not subject students to personal views and opinions concerning matters not related to the course of instruction itself. It is necessary that faculty conduct themselves accordingly, with due respect to the welfare of this University and the professions we represent. It is also necessary to ensure consistency within an integrated curriculum and when teaching various sections of the same course/seminar. The philosophy, programs, faculty, and administration of the University are not perfect, and helpful suggestions and constructive criticism can assist all; but public displeasure of University philosophies or practices has no place in our organization.

If a faculty member, staff, or student perceives an infringement on his or her academic freedom, the individual should follow the complaint policy and refer the issue to the appropriate Program Director, supervisor, and/or Dean. If the issue is not resolved in a satisfactory manner, the individual may submit a written grievance to the University's Grievance Committee at 1 University Blvd., St. Augustine, FL 32086, where the issue will be handled according to established time lines and processes.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                    pg. 65

KAL000163

# Attendance

## Class Attendance

Students are expected to be (1) in the classroom or lab on time, (2) prepared to begin class/lab, and (3) wearing the appropriate attire by the designated starting time for that instructional period.

Students who are going to be late or absent from class/lab due to an unexpected situation should call their course instructor; see course syllabus for contact information.

Occasionally, students may be required as part of a course to attend an evening lecture by a distinguished person in the field. Such an event will be considered mandatory as if it were a regularly scheduled class.

## Absences

In the event of a planned absence, the student must speak to each faculty member whose course will be missed and request that the absence be excused.

- *Excused Absences*
  Excused absences include (but may not be limited to) the following:
    - Illness (after 3 days must be supported by physician's note)
    - Attendance at a professional conference approved by the Program Director
    - Attendance at special services for a member of the immediate family (spouse, parent, child, sibling; spouse's parent, child, or sibling; child's spouse, grandparents, or grandchildren).
- *Unexcused Absences*
  Unexcused absences are considered to be unprofessional behavior. With any unexcused absence, students forfeit the right to review with the instructor all or any part of the material, including test reviews, covered during that class or lab session. A first offense will result in a warning letter issued to the student with a copy of that letter placed in the student's file. A second offense and each subsequent offense will result in a 5% reduction per offense from a final course grade. This represents the University's minimal standard; individual faculty may outline additional consequences in their course syllabi.
- *Tardiness*
  Tardiness is considered to be unprofessional behavior. It is expected that if a student is tardy for any class, the student will apologize to the instructor immediately after that class. If a student is tardy twice (two times), the student will receive a warning letter with a copy of that letter placed in his or her file. After the second time, each subsequent event will result in a 5% reduction per tardiness from a final course grade. This represents the University's minimal standard; individual faculty may outline additional consequences in their course syllabi.
- Clinical fieldwork/internship students should refer to the Clinical Education Handbook.

## Online Education Attendance

If enrolled in a course that is purely online (no face-to-face lab associated with it) then a student may be moving through his or her coursework with a cohort group. This means the student will have weekly attendance and assignments due along with fellow classmates. Check the syllabus for a schedule of due dates or refer to the course map within the course platform for specific information on each assignment.

KAL000164

In the online environment, attendance equates to signing into the course and interacting in some meaningful way, either via an assignment, bulletin board discussion, or test. No other student/course facilitator contact (e.g., telephone calls, faxes, email) satisfies the attendance requirement.

Course faculty are required to report student absences (lack of online course interaction) in an online course. However, it is the prerogative of the faculty member to determine if work submitted after the day of deadline will or will not receive any points or credit. Be advised that course facilitators are discouraged from awarding points for late student work that is designed to contribute to the overall class community (e.g., bulletin board threads, group work).

# Flex Program Additional Information

- *Laboratory Attendance*
  - Because of the amount of material covered in each lab session, absences from even 2 hours of any lab session can be very detrimental to the understanding and application of the course material and the course grade. Students are strongly encouraged not to miss any portion of any lab. If a student misses more than 20% of the total lab hours in a course, the student must repeat the course. If the accumulated absence occurs before the time to withdraw, the student may withdraw from the course.
- *Excused Absences*
  - *Planned absences must be approved in advance by the Program Administrator*
  - In the event of an occurrence or emergency that necessitates missing any part of a Flex weekend lab, the procedure is as follows:
    - First contact should be the Program Director, coordinator, or manager. If the director, coordinator, or manager gives approval to proceed, the student next contacts the course online instructor to seek permission for an excused absence. If the course online instructor approves, the student must then contact the lab instructor to request approval for the absence. If all three (program coordinator/manager, online instructor, and lab instructor) agree, the student will be granted an excused absence. Failure to follow this sequence will result in an unexcused absence, which results in forfeiture of the right to review with the instructor all or any part of the material. This also includes taking written or practical exams. Unexcused absences are considered to be unprofessional behavior which could result in the final course grade being reduced by 5% to 10% and/or a referral to the Professional Misconduct Committee.
- *Unexcused Absences*
  - Students are expected to make travel arrangements that permit them to attend the full lab sessions on each scheduled lab weekend. Arriving late or leaving early for travel is considered an unexcused absence except in cases of unavoidable conflicts or when approved in advance by the program coordinator.

# Audit of a Course

Auditing of a class is permitted, with approval of the Program Director. Auditing of a class requires payment of full tuition for that course. The student who is auditing may not take practical exams and may not sit for written exams or quizzes.

# Clinical Education

Please refer to the Clinical Education Handbook on myUSA.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information                                    pg. 67

KAL000165

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

# Complaints

The University of St. Augustine is committed to providing a learning and working environment in which complaints are addressed fairly and resolved promptly. All complaints are taken seriously. The procedure for handling complaints encourages informal conciliation, facilitates early resolution, and maintains individual privacy and confidentiality.

This policy *covers* general types of complaints.

This policy *does not* cover complaints about incidents related to harassment. Complaints of this nature should be directed to the Director of Human Resources. Students with complaints regarding Sexual Misconduct should refer to the Title IX and Sexual Misconduct Grievance Reporting Policy and Procedures in this handbook.

# Student Complaints

- Types of Student Complaints
  Students should utilize the following procedure for complaints about service, support, or assistance provided by academic, administrative, or support departments of the University. Student complaints include academic issues such as instruction methodology, grading, testing, assignments, or nonacademic matters such as IT support, University services, facilities, policies, financial matters, etc. The following procedure is not for complaints regarding academic or nonacademic appeals policies and procedures. Please refer to the Academic Evaluation and Right of Appeal section of this Handbook for information on the appeals processes.
- Confidentiality
  All information submitted as part of a student complaint will be treated as confidential and will only be available to the appropriate/involved parties. The student should also respect the need for confidentiality throughout the complaint process. A student who submits a complaint should be aware that complete confidentiality cannot always be guaranteed if effective action is to be taken. Where a complaint is in reference to a specific individual, the complaint cannot be investigated if the student does not wish the allegation to be made known to that individual. Anonymous complaints will not be considered.
- USAHS will provide for the Student Services Director or a designee, not directly involved in the area of the complaint, who will serve as in impartial representative of the institution in the complaint process.
- No adverse action will be taken against a complainant as the result of the submission of a complaint through the USAHS complaint procedure.
- Student Complaints Procedures
  A student should discuss his or her concerns with the person(s) who is directly responsible (course instructor, staff member, etc.) in order to resolve the issue. Depending on the severity of the issue, a written record may or may not be drafted and placed in the student's permanent record.
  1. If the complaint cannot be resolved to the satisfaction of the student, the student should discuss the issue with his or her Program Director. The Program Director will consider the complaint and attempt to bring the issue to a satisfactory resolution.
     a. In certain situations, the Program Director may refer the complaint to an appropriate University committee. The respective committee will consider the complaint and provide a written recommendation to the Program Director.
     b. The Program Director will consider the committee recommendation and notify the student in writing of the decision.
     c. Written documentation regarding the resolution will be placed in the student's file and maintained for 6 years past the student's last date of attendance.
  2. After following the steps above, the student may submit a formal written complaint to the Grievance Committee.
     a. The complaint will be investigated by the Grievance Committee and a written response will be provided to the student.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.          pg. 68

KAL000166

b.   The original written complaint, a copy of the response, and a description of any actions taken as a result of the complaint will be maintained on file for 6 years past the student's last date of attendance

# Unresolved Complaints

If a complaint cannot be resolved after following the procedures above, the following agencies can be contacted directly. This information will be posted and kept current on the University website.

- WASC Senior College and University Commission (WSCUC)
  - ○ Complaints may be filed with the University's institutional accrediting body by contacting the WSCUC at www.wscuc.org by reviewing the Policy on Complaints and Third-Party Comments to ascertain the appropriate means to communicate complaints and complaints.
- Commission on Accreditation in Physical Therapy Education (CAPTE)
  - ○ Complaints about the Physical Therapy program can be submitted to CAPTE by requesting the Procedures for Handling Complaints about an Accredited or Developing Physical Therapy Program.
  - ○ This document can be obtained by writing to CAPTE at 1111 N. Fairfax Street, Alexandria, VA 22314, by telephone 703-706-3245, or visit http://www.capteonline.org/Complaints/.
- American Occupational Therapy Association (AOTA)
  - ○ Complaints against the Occupational Therapy program must be submitted in writing to the ACOTE Chairperson, c/o the AOTA Accreditation Department. The complaint must be submitted as an attachment to an e-mail addressed to accred@aota.org and must include a signed complaint form, "Complaint Against a Program Subject to ACOTE Accreditation." This form can be accessed at www.aota.org/-/media/Corporate/Files/EducationCareers/Accredit/Policies/Procedures/VB1%20Complaint%20Form Program.doc
  - ○ For more information on this process please visit https://www.aota.org/Education-Careers/Accreditation/Policies.aspx and review Complaints Against Education Programs.
- American Speech-Language Hearing Association
  - ○ **Council on Academic Accreditation in Audiology and Speech-Language Pathology:** In addition to opportunities for providing public comment regarding a program's accreditation status, the CAA has separate procedures for filing a formal complaint about a CAA-accredited program or one seeking a CAA accreditation status. Individuals who wish to file a formal complaint should contact the Accreditation Office to obtain a copy of the complaint procedures, or refer to the Procedures for Complaints Against Graduate Education Programs on the CAA website.
- In California
  - ○ A student or any member of the public may file a complaint about this institution with the Bureau for Private Postsecondary Education by calling 888-370-7589 or by completing a complaint form at http://www.bppe.ca.gov/enforcement/complaint.shtml.
- In Florida
  - ○ For information on the Commission for Independent Education's complaint process go to http://www.fldoe.org/cie/complaint.asp.
- In Texas
  - ○ For more information on making a complaint to the Texas Higher Education Coordinating Board go to http://www.thecb.state.tx.us/index.cfm?objectid=051F93F5-03D4-9CCE-40FA9F46F2CD3C9D
- Additional States

In District of Columbia contact the District of Columbia Higher Education Licensure Commission, 1050 First St., NE, Fifth Floor, Washington, DC 20002, (202) 727-6436, https://osse.dc.gov/service/higher-education-licensure-commission-hele-public-complaints

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information                                                                                pg. 59

KAL000167

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- In Georgia contact the Georgia Nonpublic Postsecondary Education Commission's complaint process go to https://gnpec.org/gnpec-authorized-school-complaint-form/.
- In Iowa contact the Iowa College Student Aid Commission, 430 East Grand Avenue, FL 3, Des Moines, IA 50309-1920, (877) 272-4456 option 4
- In Maryland contact the Maryland Attorney General, Consumer Protection Division, 200 St. Paul St., Baltimore, MD 21202, 410-528-8662/888-743-0823 (toll free)
- In New Mexico contact the New Mexico Higher Education Department, 2044 Galisteo Street, Suite 4, Santa Fe, NM 87505-2100, http://www.hed.state.nm.us/institutions/complaints.aspx.
- In Utah contact the Utah Division of Consumer Protection, 160 East 300 South, 2nd Floor, PO Box 146704, Salt Lake City, UT 84114-6704, http://www.dcp.utah.gov/complaints/index.html

The University of St. Augustine has taken the necessary steps to apply and/or receive authorization to deliver education, to market, and to affiliate with clinical education sites in all fifty (50) states. For information on a specific state, or to file a complaint go to: http://www.usa.edu/p54-226-Complaints.aspx

# Course Withdrawal

## First Professional

Students wishing to withdraw from a course should submit the Course Withdrawal Form available on *myUSA*, Student Services tab, under Forms. The withdrawal period is 1 week after classes begin until 3 weeks before the last day of class (not to include finals). A student may not have more than one W in any course. After two program Ws the student will be notified by the Registrar. A third program W must be approved by the instructor and the Faculty Advisor. A student requesting a fourth W will only be approved under extenuating circumstances by the Academic Progression and Retention Committee (APRC) and the Program Director. Students need to be in contact with the Financial Aid Office when withdrawing from a course. All appeals throughout the course withdrawal process will be heard by the Academic Appeals Committee (AAC).

## Transitional and Post-Professional

Students wishing to withdraw from a course should submit the Course Withdrawal Form available on *myUSA*, Student Services tab, under Forms. A student may drop a course up until the first complete week. The withdrawal date is 1 week after the course has started. A student cannot have more than one W in any course, after three program W's a student will be referred to the Academic Progression and Retention Committee.

# Degree Completion/Graduation

The following requirements must be met for a student to be eligible for graduation:

- Each student must satisfactorily complete all courses and be in academic good standing;
- All fiscal obligations to the University or its subsidiaries must be paid in full;
- The student must submit an application for graduation by the deadline for the term in which he/she wishes to graduate;
- The student must attend at least one approved professional conference (first professional programs only).

Should a student be unable to successfully complete one of the final courses but has successfully met all other degree requirements, the student may be allowed to walk at commencement with the respective cohort class. The candidate will sign an acknowledgment regarding participation in the ceremony. The candidate will be "hooded" during the

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                    pg. 70

KAL000168

ceremony but will not receive a diploma. If the coursework is completed within the first 7 days of the subsequent term, the diploma and transcript notation will reflect the cohort's conferral date. Should the coursework be completed after the first 7 days of the subsequent term, the diplomas will be issued and the transcript notation will be dated to reflect the subsequent conferral date upon degree completion.

All degree requirements must be completed before approval to graduate is given by the respective Program Director. Formal commencement ceremonies take place three times per year at the conclusion of each trimester on each campus.

Confirmation of a degree is posted to the official academic record on the last day of the term. Degrees will not be conferred until all academic and financial obligations have been successfully met. The graduation fee is paid at the time the student submits the Application to Graduate Form as noted on the Academic Calendar.

Honors designation is given to students who have earned a cumulative GPA of 3.50–3.64. High Honors designation is given to students who have earned a cumulative GPA of 3.65–4.0. The cumulative GPA is calculated through the final trimester of coursework and is not rounded.

Note: Acceptance into the University and payment of tuition (on a trimester-by-trimester or course-by-course basis) is not a contract assuring that the student will graduate with the degree.

# Distance/Online Education

## Purpose of Distance/Online Education

It is the intention of this University to offer online coursework that will parallel the mission and philosophies of the University's programs. USAHS aims to provide a program that is unique to the health care education while at the same time maintaining uniformity in content and presentation.

## Philosophy of Distance/Online Education

The University intends to provide a delivery method of education that not only excels in quality but is unique in performance. USAHS aims to provide an education that facilitates rich learning environments and that includes opportunities for acquiring basic and advanced skills, knowledge, conceptual understanding, and relevance to the health and clinical sciences. The education provided should not function as an isolated dimension of intellectual activity but as a contribution to learners' development of strong identities as individual learners and participants in meaningful social and educational practice.

## Methods for Delivery of Online Education Courses

The University will offer a variety of formats in educational delivery. Below is a summary of such offerings:

- *Pure Online Course* - This course format offers content that is delivered purely online. Most often the student will have scheduled interaction with an experienced faculty member as well as other classmates. Occasionally a pure online course may offer the opportunity to work self-paced and interact only with the assigned faculty member.
- *Combination Laboratory Online Course* - This course format offers lecture-type materials in an online format with weekend laboratory sessions in a face-to-face (traditional) format. In many cases the online course materials will be reviewed prior to attending the weekend laboratory sessions.
- *Traditional Lecture Laboratory* - A course may be delivered in an exclusively live format (not online).

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                    pg. 71

KAL000169

- *Seminar Online* - The student will need to first attend a seminar. The most up-to-date seminar calendar is available under Continuing Education on the University's website, www.usa.edu. Students will be able to see when and where seminars are being provided. After attending the seminar, students will need to complete the online course that corresponds with the seminar attended. These courses are 10 weeks long.
- *Residency* - These courses require the student to be on site.
- *Blended Learning* - This format offers materials in both online and face to face (traditional) format.

# Extra Credit

As a graduate-level institution preparing health care professionals, the University is opposed to faculty offering extra credit or bonus points in courses. Student grades should accurately reflect their performance on the criteria determined by faculty as demonstrating student achievement of the course learning outcomes. Awarding extra credit / bonus points may imply that points/grades are more important than learning and can create inequities between students and courses across campuses and delivery methods.

# Grading System

Academic degree programs use a 4.0 scale to calculate grade point averages (GPAs).

| Letter Grade | Grading Scale | Quality Points |
|--------------|---------------|----------------|
| A | 90–100 | 4.0 |
| B+ | 85–89 | 3.5 |
| B | 80–84 | 3.0 |
| C+ | 75–79 | 2.5 |
| C | 70–74 | 2.0 |
| D+ | 65–69 | 1.5 |
| D | 60–64 | 1.0 |
| F | < 60 | 0.0 |

The First Professional curriculum is divided into Foundational Sciences Courses (anatomy, neuroscience, and pharmacology), and Professional Courses (all other courses).

The written portion of all courses (both Foundational and Professional) in the First Professional programs use the same scale for grading.

The laboratory portions of the First Professional courses are graded on the same scale from a minimum of 80% to a maximum of 100%.

A First Professional student must earn at least an 80% on the laboratory practical and 100% on all safety issues to pass the practical examination in professional courses. Refer to each course syllabus for additional information on grading criteria.

First Professional MS-SLP

KAL000170

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- Clinical I:  Clinical skills assessment is included in the Clinical I course grade (SimuCase simulation cases). A minimum grade of  90% on all virtual therapy cases is required. If clinical experiences are provided a minimum of 80% must be achieved on evaluation tools to pass.
- Clinicals II-V:  Students must earn 80% minimum on a combination of mid-term and final evaluations of clinical skills  to pass each course.

The actual weighting of the percent of the final course grade based upon the written and practical portions is at the discretion of the instructor in the First Professional programs. The weighting of the written and practical portions will be printed in the course syllabus.

Some courses in the First Professional programs (for example, internships, practicum, and seminars) are given Pass/Fail designations as determined by the instructor.

The quality of work done by students is indicated on the transcript by the letter of the alphabet as follows:

| AU | Audit | NG | No Grade Reported |
| F | Fail | P | Pass |
| I | Incomplete | W | Withdraw |

The grade of I (Incomplete) is used if, for reasons acceptable to the instructor(s), a student has not completed required work within a course by the end of a term. The length of time granted for the completion of the requirements of the course is one additional trimester (15 weeks) after which the I grade will be changed to an F if the coursework has not been completed. Upon successful completion of the requirements, the student will be assigned a letter grade by the instructor. If the I is assigned a grade of D or F the appropriate action will be taken per present written policy on academic standing.

The grade of W (Withdraw) is used only to denote that a student withdrew (or was withdrawn) from a course. Refer to the Repetition of a Course Policy in this handbook for more information.

The grade of NG (No Grade) is used only in the case of internship/fieldwork/rotation not completed. If a student is removed from internship/fieldwork/rotation after the final withdraw date, the grade of NG may be applied at the discretion of the Academic Coordinator of Clinical Education (ACCE) / Academic Fieldwork Coordinator (AFWC), in place of a grade of F.

# Rounding of Grades

No grades are to be rounded until the final grade.

If the final percentage is less than a whole number, the following rules are applied to determine the score by a whole number:

- When a number is .50 or greater, the score is rounded to the next highest whole number (e.g., 79.50 = 80%).
- When the number is .49 or less, the score is rounded to the next lowest whole number (e.g., 84.49 = 84%)

# Grade Changes

A student has the right to appeal a final grade received for a course within the first week of the subsequent term. The request must be made in writing to the course instructor. If the course instructor approves a grade correction, a Grade Change Form must be completed by the instructor and submitted to the respective Program Director. Upon the Program Director's approval, the Registrar will record the corrected grade in the student's academic record and a revised copy can be viewed by the student on the myUSA portal, My Info tab.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                        pg. 73

KAL000171

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

If the instructor denies an appeal for a grade change, the student may make an appeal to the Program Director within 2 business days of the instructor's decision. The Program Director will research and render a decision within 5 business days.

If the student is not satisfied with the Program Director's response, he or she may appeal to the President or designee within 2 business days of the Program Director's decision. After investigating the issue, the President (or designee) has 10 business days to either render a verdict on the issue or redirect the issue to the Academic Appeals Committee (AAC). (See Academic Evaluation and Right of Appeal).

If a grade change is initiated due to an administrative error in posting of the grade, a Grade Change Form must be completed with documentation as to the nature of the error and submitted to the respective Program Director. Upon the Program Director's approval, the Registrar will record the corrected grade in the student's academic record and a revised copy can be viewed by the student on the *myUSA* portal, My Info tab.

# Grade Posting

Grades are not publicly posted. Students will have access to grades online as faculty members make them available.

All grades including course assignments, exams and other assessments will appear in the online grade book located in the course platform. Many grades may be recorded automatically (such as completion of an online examination) and be visible before the instructor has an opportunity to review the assessment; therefore, such grades are subject to revision. Students should consult with their instructor or review the course announcement page for information about any changes that may occur to a grade after posting.

At the time of course completion, the final course grade will be transferred to the University record system and become a permanent part of the student's transcript. Grades cannot be given out via email or telephone. This posting of grades follows the Family Educational Rights and Privacy Act (FERPA). Students are responsible for monitoring their final grades through the myUSA portal, My Info tab and not the online grade book in the course platform.

**Accessing Grades**

Through the myUSA portal, My Info tab, students may access grades, print unofficial transcripts of grades, access/change personal student information, and keep track of all of their current course information. Students are required to keep this information safe and secure and personal information up to date.

# Institutional Review Board

The Institutional Review Board (IRB) is a University committee that reviews all research proposals involving the use of human subjects. The purpose of the IRB is to protect the human rights of those subjects and keep them from harmful procedures. All students participating in research projects that involve human subjects (including Case Reports) are required to submit the appropriate IRB documentation. The IRB committee meets once each month. Dates are posted on the USAHS website for each campus. For IRB policies, procedures, and forms see the Student Services tab on *myUSA*.

# Privacy Policy

The University of St. Augustine for Health Sciences is committed to respecting students' privacy. The Privacy Policy located at http://www.usa.edu/privacy.aspx describes what information we collect from students and how USAHS uses this information. The University reserves the right to change this privacy policy at any time and without notice by posting such changes to the university website. Any such change will be effective immediately upon posting.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000172

Questions regarding this policy, or comments concerning the website, should be directed to the University by sending an email to marketing@usa.edu.

# Professional Conference Attendance

All First Professional program students are required to attend a minimum of 2 full days of one professional conference or 1 full day of two professional conferences during their program enrollment. The value of this required attendance is greater if full-time students wait until they are in the third trimester or later, and if Flex students wait until they are in the fifth trimester or later. Dual-degree seeking students are required to attend one physical therapy (PT) and one occupational therapy (OT) professional conference during their curriculum: an OT conference while in the MOT or OTD program and a PT conference while in the DPT program. Full-time DPT students should complete the conference requirement before the seventh trimester due to full time attendance required while on internships. Flex students should attend conferences that do not conflict with weekend lab schedules. Program Directors may modify the conference attendance requirements as necessary.

Students will notify their Program Director or an assigned Faculty Advisor of their intent to attend a particular conference. The student will then be granted an excused absence for the date(s) missed. This will not exceed 2 days (usually a Friday or a Thursday and Friday excused absence). It is at the discretion of each faculty member on how to disseminate the information from the missed class session(s). The student is responsible for all missed class material and assignments. Students are also responsible for conference costs, including registration, hotel, and transportation expenses. Upon their return, students are required to provide proof of attendance at the conference to the Program Director or the assigned Faculty Advisor.

Students attending a conference located more than 400 miles one way from campus may speak with their Program Director to request an excused absence for travel time. Program Directors will make the decision about additional excused time for conference attendance on a case-by-case basis and inform faculty of the decision. The student is responsible for all missed class material and assignments.

Professional conferences may include state or national meetings or others as approved by the Program Director.

# Professional Misconduct

## Disciplinary Action

A student, faculty member, or any other member of the community of interest may initiate complaints against a student possibly warranting disciplinary action for professional misconduct. Referrals for student misconduct are sent to the Professional Misconduct Committee (PMC). The PMC is comprised of Program Directors who handle complaints where students may be dismissed or their academic progression affected.

Professional behavior is expected at all times. At the faculty's discretion an incidence of professional misconduct may result in a final grade course reduction of 10%. Repeated or egregious incidences of professional misconduct should be referred to the Professional Misconduct Committee (PMC).

Although not inclusive, the following list of misconduct behaviors provides examples of acts that may be subject to disciplinary action:

- Level III academic dishonesty, such as Cheating, plagiarism, falsification of records, unauthorized possession of examinations or parts of examinations, intimidation, and any other actions that may affect the evaluation of a student's academic performance or achievement.
- Repeated Level I or II academic dishonesty

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000173

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- Disruption of teaching, research, administration, and disciplinary proceedings or other institutional activities
- Physical and/or mental abuse of any person or any form of harassment as defined under the Nondiscrimination and Anti-Harassment Policy
- Failure to follow directives of authorized University personnel acting in the performance of their duties
- Destruction, misuse, damage, or defacement of any University property, or property leased or controlled by the University
- Violation of the Internet Acceptable Use Policy
- Violence, hazing, or the threat of violence including possession or use of firearms, fireworks, explosives, incendiary devices, or other weapons of any description, including air rifles and pistols, on the University campus
- Unauthorized participation in, agitation of, or instigation of any activity that interferes with ingress or egress from University facilities and/or that interrupts any activities of the University community in its normal functioning
- The use, possession, sale, or distribution of nonprescription and prescription controlled substances
- Permitting or engaging in unauthorized possession, duplication, or use of keys, passwords, or access cards to any University premises, hardware, software, or services
- Any action without authorization from the University that modifies, destroys, discloses, or takes data, programs, or supporting documents residing in or relating in any way to a University computer, computer system, or computer network, or causes the denial of computer system service to an authorized user of such a system
- Repetitive violation of any University policy
- Commission of an act that would constitute a crime under federal, state, or local law
- Unprofessional behavior while on internship, fieldwork, clinical rotation, or practicum, or any off-campus activity when representing the University

# Professional Misconduct Committee Procedures

The University has established a Professional Misconduct Committee (PMC) to hear each complaint. A student may be required to appear before the PMC or in certain circumstances be allowed to speak to the committee via telephone or webinar conference.

At least 5 business days in advance of the hearing, a student shall be given written notice of the allegations against him or her and of the opportunity to respond. Hearings before the PMC shall be informal. The allegations and evidence against a student shall be presented by the chair of the PMC. The student then will be given an opportunity to present his or her version of events, facts, and evidence in his or her defense. Formal rules of evidence do not apply. Documentary evidence and hearsay shall be admissible, but the PMC shall determine the proper weight to be accorded to hearsay evidence.

1. If the PMC finds that the facts do not support the allegation(s), a recommendation to dismiss charges will be made. The chair of the PMC will transmit the committee's recommendation that charges be dismissed and as applicable, any preventative recommendation(s) in writing to the student's Program Director within 4 business days following the conclusion of the hearing. The Program Director will review the PMC recommendations and provide a written response to the student within 2 business days outlining his or her decision on the matter.
2. If the PMC finds that the facts support the allegation(s) against the student, the student shall be found guilty, and the PMC will recommend disciplinary action(s), which can range from a written warning to dismissal from the program.
3. A student referred to the PMC may not withdraw from the University until the findings of the PMC have been made and the student has been informed of the decision.

The PMC record of the case shall be maintained by the Program Director's Administrative Assistant apart from the student's academic record for 5 years following the student's last date of attendance.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000174

# Student's Right of Appeal

Each student has the right to appeal the decisions of the Program Director. The student may continue to participate in academic and co-curricular activities until a final determination is made, including any appeal, except where immediate suspension is reasonably required for the safety and welfare of students, faculty, staff, or University property. If the decision the student is appealing includes program dismissal, the student may continue to attend classes (excluding internship or fieldwork courses) during the appeal process, but he or she is not considered an enrolled student and is therefore not eligible for financial aid.

To request an appeal, the student must provide to the Registrar a completed PMC Appeal Request Form (available with procedures on *myUSA*, Students tab) along with a written statement of the basis for his or her appeal within 10 business days from the date the decision letter is emailed or mailed to the student's last known address.

An appeal may be based only on the grounds that:

1. the PMC failed to comply with the procedural requirements outlined herein and/or elsewhere in this handbook;
2. there is relevant and material evidence which, in the exercise of reasonable diligence, could not have been produced or which was improperly excluded at the hearing before the PMC; or
3. the evidence presented at the PMC hearing was not sufficiently substantial to justify the final decision.

If the Registrar has not received the completed form and written statement (email or letter is acceptable) within the specified time frame, the decision of the Program Director will be final and no further appeals are available to the student.

If an appeal is filed, the Registrar will, within 10 business days, forward to the Dean of the division in which the student is enrolled, or the Dean's designee, the student's completed PMC Appeal Request Form and written statement, along with copies of all materials provided to the PMC, and the written decisions of the Program Director.

The Dean has 10 business days* to consider the appeal request. The Dean may deny the appeal for failure to allege facts that, if true, would be sufficient to constitute grounds for appeal. The Dean may also modify the decision or approve the appeal request. Should the Dean deny the appeal, the decision of the PMC and Program Director will stand affirmed. The student will be notified in writing of the Dean's decision regarding the appeal.

The student can appeal the decision of the Dean to the University President. The appeal must be submitted in writing to the President within 5 business days from the date of mailing of the Dean's decision letter. If the decision of the President includes suspension or dismissal, the student will no longer be permitted to remain in any course. The decision of the President shall be final.

Refer to the Forms list on the Student Services tab of *myUSA* for procedures associated with the nonacademic appeal process.

The Program Director's Administrative Assistant will maintain all records included in an appeal apart from the student's academic record for 5 years following the student's last date of attendance.

*Should the Dean, or the Dean's designee, receive an appeal request during the last 15 days of the term or during the semester break, as indicated on the Academic Calendar, it will be considered during the first 10 business days following the first day of class of the subsequent term.

# Permanent Record

Records of the following will be maintained:

1. Records of the sanctions of the Academic Appeals Committee and the Professional Misconduct Committee will be maintained permanently.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000175

2. Records of all other sanctions will be maintained for 5 years from the last day of the academic year in which the incident occurred.

3. A copy of any warning or disciplinary action that is placed on a student's record will be given to the student.

# Religious Accommodation

It is the policy of the University of St. Augustine for Health Sciences that an instructor will make a reasonable attempt to accommodate student needs in the case of serious incompatibility between a student's religious creed and a scheduled test or examination. This requirement will not apply in the event that administering the test or examination at an alternate time would impose an undue hardship which could not reasonably have been avoided. Undue hardship occurs when granting a requested accommodation would require significant expense or difficulty for the University or other students in the class or would result in the inability of the student to perform the essential functions of his or her course/program of study. The determination of undue hardship is dependent on the facts of each individual situation.

Accommodation for alternative examination dates will be worked out directly and on an individual basis between the student and the instructor involved.

Students must provide reasonable notice of their need for an accommodation by making such requests of the instructor during the first 2 weeks of an academic term, or as soon as possible after a particular examination date is announced by the instructor. The timing of the request may be considered in determining whether the accommodation would create an undue hardship.

For all degree programs, there will be times when students will be required to attend weekend and/or evening activities. A student should contact the instructor to request a religious accommodation if testing will occur during these times.

If the student and instructor are unable to come to a resolution, the student should bring the matter to the Program Director, who will make a final determination.

# Repetition of a Course

On occasion, a student may be required to repeat a course. Under such circumstances, the highest grade achieved is counted toward the cumulative GPA.

A student who receives a D in any course (or an F and has been readmitted), must repeat that course in its entirety. The student will be permitted to take additional courses as long as there are no schedule conflicts and all prerequisite conditions are met, up to a maximum of 12 credit hours (full-time) and 8 credit hours (Flex Program).

A student who takes a leave of absence incurring grades of W, will be registered in the same courses upon return from leave (providing courses are offered).

Students who must repeat a course should not expect to graduate with their entering cohort.

Please note, course schedules that are considered less than half time in the program may affect a student's eligibility for federal student loans. Students should contact the Financial Aid Office with any questions.

# Student Code of Conduct

Admittance to the University of St. Augustine for Health Sciences carries with it an obligation and responsibility to abide by federal, state, and local law, respective county and city ordinances, as well as all University rules, regulations, and procedures. Admission to the University is a privilege, not a right, and is extended to those individuals who meet all admission criteria. All students, faculty, guests, patients, and staff of the University have a responsibility to report

KAL000176

violations of the Student Code of Conduct to the appropriate officials. As a student you will be asked to read and acknowledge this as part of the enrollment process

The following behaviors are to be adhered to at all times while on University facilities or when associated with the University in any manner:

- The University is a tobacco and e-cigarette free, drug free, and alcohol free environment, therefore no smoking or being under the influence of banned substances or intoxicants is permitted.
- Use of profane language is not acceptable.
- Weapons are not permitted.
- Violence, or the threat of violence in any form, is not tolerated.
- Sexual or other forms of harassment will not be tolerated.
- The Internet Acceptable Use Policy must be adhered to at all times.
- It is expected that students will
  - conduct themselves with professionalism, courtesy, and respect for others in all dealings with institution staff, faculty, and other students;
  - present qualifications and background truthfully and accurately for admission and other academic-related documentation to the institution;
  - observe the institutional policies and rules on submitting work, taking examinations, participating in online discussions, and conducting research;
  - never turn in work or present another person's ideas or scholarship as ones own;
  - never ask for, receive, or give unauthorized help on graded assignments, quizzes, or examinations;
  - never divulge the content of or answers to quizzes or examinations to fellow students;
  - never improperly use, destroy, forge, or alter the institution's documents, transcripts, or other records; and
  - never divulge ones online username and password.

The following interpersonal behaviors are expected at all times:

Of paramount concern is that students and graduates of the University display and present a positive and respectful attitude to their patients/clients, colleagues, supervisors, faculty, staff, community, and to the University. This attitude is a key ingredient to successful completion of studies at the University and to excel as health care professionals. Students will endeavor at all times to

- Utilize titles and surnames when addressing authorized University personnel
- respect the worth and individuality of every person (e.g., listen/pay attention while others are speaking and promote constructive feedback);
- refrain from disruptive behavior;
- refrain from proselytization (proselytization is defined as aggressively and/or harassingly trying to convert, recruit, or induce someone to join ones own political cause or to espouse ones own doctrine); and
- respect confidentiality.

Always report any violations of the Code of Conduct to the appropriate institution official, and report any evidence of cheating, plagiarism, or improper conduct on the part of any student of the institution when there is direct knowledge of these activities. Failure to observe the Student Code of Conduct is professionally unacceptable and could negatively impact academic progression.

# Student Conduct Policies (Specific)

# Classroom and Laboratory Conduct and Standards

Students are expected to arrive to lecture and lab sessions on time and with the appropriate clothing and equipment. The following behaviors are also expected in all lecture and lab session:

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                   pg. 79

KAL000177

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- No food or drinks (except in spill-proof containers) are permitted in the lecture or lab areas. Gum chewing is only allowed during written examinations. No bubbles may be blown.
- Students are expected to assist the instructors in the pre- and post-lab organization of equipment.
- Students will operate lab equipment in a safe and respectful manner.
- Shoes must be removed while on the lab tables or mats.

Flex courses may include labs for learning hands-on skills. Lab sessions are typically scheduled for Saturday and Sunday; however, some PT coursework requires weekday attendance. Students are notified of the next term's lab schedule approximately 2 months before the start of the term.

# Professional Dress and Appearance Code

University of St. Augustine for Health Sciences students are highly visible to the public and should be sensitive to this fact. The following guidelines will be interpreted and enforced in a manner determined by the faculty and administration to be in the best interest of both the University and the professions of physical therapy and occupational therapy. Further, the University is free to change these guidelines without prior notice to students, although every effort will be made to provide such notice.

It is intended that daily appearance on campus be analogous to daily appearance in the future as a health professional and as an ambassador for our University and profession. A high level of professionalism comes naturally when practiced at a high level daily.

Students *must* abide by the following policies regarding professional dress and appearance while on the University campus. The University's campus consists of the entire physical plant, which includes the student parking lot, faculty and staff parking lots, all classrooms, laboratories, lounges, hallways, lobby, and library. The University is a 7-day-a-week campus and a professional environment. This dress code is in effect during scheduled classroom and lab hours.

- *University ID:* The University ID *must* be properly exposed above the waist on your front collar or on a lanyard at *all* times.
- *Grooming:* Students will portray the well-groomed appearance of a responsible health professional. Hair will be clean, neat, of natural color, and, in the case of both men and women, will not be excessively long. Nails *must* be groomed to ¼" or less with neutral polish only (no artificial nails). Men *must* be cleanly shaven or well groomed; beards or mustaches are acceptable. No heavy makeup, perfume, cologne, or aftershave.
- *Accessories, Jewelry, Body Piercing, and Tattoos:* All accessories and jewelry shall be free of writing, pictures, symbols, or any other insignia that are crude, vulgar, profane, obscene, libelous, slanderous, or sexually suggestive. Any accessory or jewelry that creates a safety or health concern, or causes or threatens to cause a disruption to the educational process, is prohibited. Dark glasses, sunglasses, hats, caps, visors, and other head coverings shall not be worn indoors. No tattoos may be visible.
    - *Unacceptable for men:* Earrings or other body piercing jewelry are prohibited on campus.
    - *Unacceptable for women:* Body piercing jewelry other than lobe earrings (maximum of two earrings per lobe) is prohibited on campus.
- *Swimsuit:* Recreational and instructional swimsuit attire must not be disruptive or distracting. For women, one-piece swimsuits are preferred. Suits *must* fully cover the chest and buttocks. For men, mid-thigh swimsuits are preferred. All swimsuits must remain nontransparent when wet. Any swimsuit not appropriate will require shorts and shirt.

All students must maintain high standards as individuals in order to uphold the reputation of our University and professions. Being neatly dressed, well-groomed, and avoiding faddish modes of dress is required. It is University policy that students maintain University dress code while on the University's campus or while participating in any coursework outside the University's campus. The following outlines the required Professional Dress and Appearance Code for scheduled events.

KAL000178

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

## Lecture Attire

- Acceptable attire for men: Collared shirts only (button-down oxford or polo-type) are permitted. Shirts *must* be of a length that can be tucked into and remain in the pants. If you can do three full-extension jumping jacks without your shirt becoming untucked, your shirt is acceptable. Dress or walking shorts (just above the knee) or casual dress pants are preferred. Jeans are acceptable provided they are in good condition. Dress sandals (Teva or Birkenstocks), clean tennis or running shoes, or any other closed-toed shoe with socks are acceptable.

  Unacceptable attire for men: Shirts without collars, t-shirts, tank tops, sleeveless tops, low-cut shirts, "grunge look" pants, and bib overalls, are not acceptable; nor are thong-type, "beach casual," or flip-flop sandals. Underwear is not permitted to show outside or through the clothing. No exposure of gluteal fold is permitted.

- Acceptable attire for women: Shirts should have sleeves; however, a "professional-looking" sleeveless blouse is acceptable. Shirts *must* be of a length that can be tucked into and remain in the pants. If you can do three full-extension jumping jacks without your shirt becoming untucked, your shirt is acceptable. Dress or walking shorts (just above the knee) or casual dress pants are preferred. Jeans are acceptable provided they are in good condition. Skirts and dresses may not be unreasonably short for a practicing health professional. Dress sandals, clean tennis or running shoes, or any other closed-toed shoe with socks/stockings are acceptable.

  Unacceptable attire for women: T-shirts, tank tops, low-cut shirts, yoga, "hip-hugger" pants, "grunge look" pants, bib overalls, and "beach casual" or flip-flop sandals are not acceptable. Underwear is not permitted to show outside or through the clothing. No exposure of midriffs, cleavage, or gluteal fold is permitted.

## Guest Lecture Attire

On occasion, students are required to wear business attire on days when guest lecturers and/or others are visiting the University. Students may also be required to wear business attire when giving formal presentations or case presentations as a part of their coursework. Appropriate business attire for men is a business suit including jacket, dress shirt, and a tie, or a blazer and dress pants with a dress shirt and tie. Appropriate business attire for women is a business suit (skirt or pants) including jacket and blouse. Skirts may not be unreasonably short for this professional health care environment (skirt hems should be no higher than three inches from the top of the patella). Shoes are to be closed toe and closed heel. Course instructors reserve the right to modify or further specify required dress for guest lectures or presentations. Refer to individual course syllabi for further requirements.

## Laboratory Attire

Certain labs require laboratory dress and some require special dress for physical assessment or manual techniques inducing perspiration or for the handling of special materials. Unless otherwise noted in the class syllabus, students may arrive on campus in laboratory attire if lab is their first scheduled class of the day. However, students must change from laboratory attire into lecture attire for the remainder of their scheduled classes. Students without lab as their first scheduled class *must* arrive on campus in lecture attire and change into laboratory attire immediately prior to a lab session.

- Solid color gym shorts that allow for modesty and free movement and a plain solid-colored T-shirt are acceptable. T-shirts should be devoid of any print or pictures with the exception of official University of St. Augustine logo which is permissible. T-shirts MUST be clean, properly sized, and be of a length that can be tucked into and remain in the pants.

KAL000179

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- When t-shirts are approved for University sponsored activities, students will be notified if they are also approved as lab wear. Athletic shoes with socks are required. Nails must be groomed to ¼" or less with neutral polish only (no artificial nails).
  - ○ Scrubs, to include matching tops and bottoms, are acceptable for certain labs (Anatomy dissection and Neuroscience for example) as defined by class syllabi.
  - ○ For many labs, women will need to wear a sports bra, halter-top, or a bathing suit top that exposes the scapulae and may be unfastened at the back.
- Unacceptable attire for both men and women: Jean shorts, cargo-style, cutoffs, or bright neon shorts are not acceptable. Underwear is not permitted to show outside or through the clothing. No exposure of midriffs, cleavage, or gluteal fold is permitted.

Students requiring medical or cultural allowances for certain policies, including dress and appearance code, must have the approval of their respective Program Director.

## Clinical Affiliation Attire

Please refer the Clinical Education Handbook.

# Miami Campus Dress Code - NEW Fall 2018

## Acceptable attire for men and women:

Solid color polo-type shirts are permitted. The shirts must be tucked into and remain in the pants/shorts. If you can do three full-extension jumping jacks without your shirt becoming untucked, your shirt is acceptable. Dress or walking shorts (Chino style and above the knee) or casual dress pants are required. Acceptable color for pants and shorts are brown, black and shades of brown and black. A belt must be worn.

Shoes: Must be clean tennis or running shoes, or any other closed-toed shoe is acceptable. Socks are required and must be a solid colored and ankle length.

*Unacceptable attire for men:* Shirts without collars, t-shirts, tank tops, sleeveless tops, low-cut shirts, "grunge look" pants, cargo pants and bib overalls, are not acceptable; nor are thong-type, "beach casual," or flip-flop sandals. Underwear is not permitted to show outside or through the clothing. No exposure of gluteal fold is permitted.

*Unacceptable attire for women:* T-shirts, tank tops, low-cut shirts, "hip-hugger" pants, "grunge look" pants, cargo pants, leggings (yoga pants), bib overalls, and "beach casual" or flip-flop sandals are not acceptable. Underwear is not permitted to show outside or through the clothing. No exposure of midriffs, cleavage, or gluteal fold is permitted.

## Guest Lecture Attire

On occasion, students are required to wear business attire on days when guest lecturers and/or others are visiting the University. Students may also be required to wear business attire when giving formal presentations or case presentations as a part of their coursework. Appropriate business attire for men is a business suit including jacket, dress shirt, and a tie, or a blazer and dress pants with a dress shirt and tie. Appropriate business attire for women is a business suit (skirt or pants) including jacket and blouse. Skirts may not be unreasonably short for this professional health care environment (skirt hems should be no higher than three inches from the top of the patella). Shoes are to be closed toe and closed heel. Course instructors reserve the right to modify or further specify required dress for guest lectures or presentations. Refer to individual course syllabi for further requirements.

KAL000180

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

## Laboratory Attire

Certain labs require laboratory dress. These are scrubs. Scrubs for labs must be solid color, with matching tops and bottoms (also considered Rehab Professional).

## Alternate Lab Attire

Some labs require special dress for physical assessment or manual techniques inducing perspiration or for the handling of special materials. Students are required to change to and from lecture and laboratory attire immediately preceding and after laboratory class.

Specifications for Alternate Dress lab attire as defined in the course syllabi.

Above knee gym shorts (2"- 6" above knee) must be a solid color that allows for modesty and free movement and a plain solid -colored T-shirt are acceptable. T-shirts should be devoid of any print or pictures with the exception of official University of St. Augustine logo which is permissible. T-shirts MUST be clean, properly sized, and be of a length that can be tucked into and remain in the pants.

When t-shirts are approved for University sponsored activities, students will be notified if they are also approved as lab wear. Athletic shoes with ankle socks are required. Nails must be groomed to ¼" or less with neutral polish only (no artificial nails).

Shoes: Must be clean tennis or running shoes. Socks are required and must be a solid colored and ankle length.

Jewelry must be removed.

For many exercise and manual therapy labs, women will be required to wear a sports bra, halter-top, or a bathing suit top that exposes the scapulae and may be unfastened at the back. Please note an appropriate T-shirt or polo shirt must be worn over this until asked to remove.

*Unacceptable attire for both men and women:* Jean shorts, cutoffs, or bright neon shorts are not acceptable. Underwear is not permitted to show outside or through the clothing. No exposure of midriffs, cleavage, or gluteal fold is permitted. Students requiring medical or cultural allowances for certain policies, including dress and appearance code, must have the approval of their respective Program Director.

## Clinical Affiliation Attire

Please refer the Clinical Education Handbook.

# Student Information and Records

## Notification of Rights under FERPA

Student educational records at the University of St. Augustine for Health Sciences are governed by the Family Educational Rights and Privacy Act (FERPA).

FERPA affords eligible students certain rights with respect to their education records. (An "eligible student" under FERPA is a student who is 18 years of age or older or who attends a postsecondary institution.) These rights include the following:

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                          pg. 83

KAL000181

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- The right to inspect and review the student's education records within 45 days after the day the University receives a request for access. A student should submit to the Registrar, Dean, head of the academic department, or other appropriate official, a written request that identifies the record(s) the student wishes to inspect. The school official will make arrangements for access and notify the student of the time and place where the records may be inspected. If the records are not maintained by the school official to whom the request was submitted, that official shall advise the student of the correct official to whom the request should be addressed.
- The right to request the amendment of the student's education records that the student believes are inaccurate, misleading, or otherwise in violation of the student's privacy rights under FERPA.
  A student who wishes to ask the school to amend a record should write the school official responsible for the record, clearly identify the part of the record the student wants changed, and specify why it should be changed.
  If the school decides not to amend the record as requested, the school will notify the student in writing of the decision and the student's right to a hearing regarding the request for amendment. Additional information regarding the hearing procedures will be provided to the student when notified of the right to a hearing.
- The right to provide written consent before the University discloses personally identifiable information (PII) from the student's education records, except to the extent that FERPA authorizes disclosure without consent.
- The school discloses education records without a student's prior written consent under the FERPA exception for disclosure to school officials with legitimate educational interests. A school official is a person employed by the University in an administrative, supervisory, academic, research, or support staff position; a person serving on the board of directors; or a student serving on an official committee, such as a disciplinary or grievance committee. A school official also may include a volunteer or contractor outside of the University of St. Augustine who performs an institutional service or function for which the school would otherwise use its own employees and who is under the direct control of the school with respect to the use and maintenance of PII from education records, such as an attorney, auditor, or collection agent, or a student volunteering to assist another school official in performing his or her tasks. A school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibilities for the University.

The right to file a complaint with the U.S. Department of Education concerning alleged failures by the University to comply with the requirements of FERPA. The name and address of the office that administers FERPA is:

Family Policy Compliance Office
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

# Student Rights

All students enrolled at the University are accorded the basic rights as set forth by the Board of Directors Student rights are as follows:

- The right of respect for personal feelings.
- The right of freedom from indignity of any type.
- The right to expect an education of the highest quality.
- The right to make the best use of one's talents and time toward the objectives which brought him or her to the University.
- The right to inquire about and to recommend improvements in policies, regulations, and procedures affecting the welfare of students.

KAL000182

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- The right for students and/or their representatives to meet with the appropriate Program Director, Chair, Dean, and the President.
- The right of freedom of expression and peaceful assembly as defined by the Constitution of the United States and laws of the States of Florida, California, and Texas.
- The right to participate in dialog during public discussions that provide a diversity of opinion.
- The right to join organizations for educational, political, social, religious, and cultural purposes within the limits imposed by their responsibilities to each other and to the student life of the University.
- The right of due process.
- The right of freedom of the press and media (newspaper, radio, television, etc.) to publish and distribute materials will be granted when identified by authorship and sponsorship.

# Student Responsibilities

The University expects its students to be responsible for helping to maintain a healthy academic climate where students can grow and develop as mature individuals with a commitment to lifelong learning. Student responsibilities include the following:

- The responsibility of assuming the consequences of ones own actions and of avoiding conduct detrimental to fellow students and University employees.
- The responsibility of taking the initiative to volunteer for service on committees.
- The responsibility for ensuring that the essential order of the University is maintained.
- The responsibility for academic work and clinical education requirements.
- The responsibility to be fully acquainted with and to adhere to the University's Catalog, Student Handbook, and other published policies and procedures.

# Transfer Credit Policy—All Programs

Transfer of graduate credits previously earned from another accredited, degree-granting institution is limited to 25% of the total number of academic credits for the degree. Transfer of credits within the University is determined on a case by case basis. Transfer credit will in most cases be approved for graduate coursework awarded by schools, colleges, or universities that have recognition from the Council for Higher Education Accreditation (CHEA), and the U.S. Department of Education.

# Transfer of Credits from Another Accredited Institution

Acceptance or rejection of transfer credits is subject to the following provisions:

- The course(s) should have been completed within 5 years* preceding admission to the program, but the applicant may petition to the Program Director for an exception to this time limit.
  *Some programs may be more restrictive than others and will expect a maximum of 3 years preceding admission (see First Professional Division re-enrollment timelines below.)

- The course should have been completed with a grade of B or better. Courses having a B- or below will not be transferred.
- The course must be listed on an official transcript sent directly to the Registrar by the issuing institution.

KAL000183

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- Graduate-level courses taken at accredited institutions can be used for credit transfer provided that the course work meets the corresponding requirements of the program and the course being substituted by transfer.
- The course number and name of the course requested for transfer should reflect the content of the course it is replacing. Additionally, if the course requested for transfer will replace an elective, the content should be closely aligned with that of the curriculum and its potential electives.
- Undergraduate work is not accepted for transfer.
- In general, credit can be transferred if the requested substitute course is at the same course level or lower than the course being substituted (e.g., 7000 level courses would transfer for a 7000-level course or 5000 or 6000 level). In cases where a course from a master's program is being requested for transfer into a doctoral program, consideration will be given to rigor and content and further documentation may be requested.
- Final approval for a transfer request is based upon review and authorization by the Program Director and will be based on assessment of whether a transfer of credit will allow the student to meet all program and course learning outcomes.
- If students are utilizing a variety of methods in transferring credits (from outside institutions, from another USAHS program, or from advanced standing), a maximum of 50% of the degree program total credits can be awarded. The remaining 50% of the total credits needs to be completed within the desired USAHS program.
- The Registrar is responsible for ensuring consistency of transfer credit practice and procedure between the different campus locations.

The process for requesting transfer credits is as follows:

- The student completes a Request for Acceptance of Transfer Credit Form found on the *myUSA* portal, Student Services tab and submits this to the Registrar. A course syllabus is required. It is the responsibility of the student to provide sufficient documentation to show equivalency to USAHS coursework.
- Requests for approval of transfer credits may be submitted within the first 4 months after acceptance into the program or at least 2 months before the start of classes for the trimester.
- The Program Director, in consultation with the appropriate course instructor(s), will review the transfer course syllabus to verify that its contents match those of the program's course, considering the nature, content, quality, appropriateness, and applicability of the credit earned. The Program Director will then notify the Registrar of the decision.
- The Registrar will notify the student if the request for transfer credit is approved and will post any transferred credit to the permanent academic record at that time.
- Students have a right to appeal the Program Director's decision to deny a course transfer. Such appeals will be forwarded to the Dean of the division who has final authority in the transfer determination.

# Transfer of Credits from One USAHS Program to Another USAHS Program

Transfer of credits may take place from one USAHS program to another. Should a student wish to transfer credits from one program to another, the following guidelines will apply:

- Students may request transfer of credits from another program for up to 50% of the total credits in the program toward which the credits will be applied.
- If electives are to be transferred, the Program Director will determine if those credits meet the program learning outcomes for the intended degree.
- Courses taught in a master's level program that include outcomes and assessment measures designed for the doctoral level may be considered for transfer into doctoral-level programs if they have been approved for such and according to Program Director approval.
- The Program Director, in conjunction with the Registrar, will give final approval to the transfer plan.

The process for requesting transfer credits is as follows:

KAL000184

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- The student completes a Request for Acceptance of Transfer Credit Form found on the *myUSA* portal Student Services tab and submits this to the Registrar.
- Requests for approval of transfer credits should be submitted 2 months before the start of classes for the trimester.
- The Registrar will notify the student if the request for transfer credit is approved and will post any transferred credit to the permanent academic record at that time.

# Trimesters/Terms

University coursework is posted in student records according to the term (usually a trimester) in which all requirements for the course are completed. Academic-credit coursework (cohort based) is generally scheduled on a trimester basis. Trimester periods consist of approximately 8–15 weeks (based on the course) and begin the first part of January, May, and September.

KAL000185

# First Professional Programs Policies and Procedures

## Contact Information

Regular meetings will be scheduled with student body representatives, but if you have any questions regarding our Student Handbook, Catalog, or any other activities, please do not hesitate to email, call, or make an appointment to stop by our offices.

St. Augustine, Florida Campus

Anne Hull, EdD, OT/L

Chair, Institute of Occupational Therapy

ahull@usa.edu ext. 1258

Jodi Liphart, PT, DHSc, NCS

Chair, Institute of Physical Therapy

jliphart@usa.edu ext. 1230


Anne Hull, EdD, OT/L

Program Director, OT Programs

ahull@usa.edu ext. 1258

Laura Broussard

Administrative Assistant, MOT Program

lbroussard@usa.edu ext. 1224

Sue Nordlund

Administrative Assistant, OT Program

snordlund@usa.edu ext. 1253


Jackie Crossen-Sills, PT, PhD

Program Director, DPT Program

jcrossensills@usa.edu ext. 1256

Cindy Kingry

Sr. Administrative Assistant, DPT Program

ckingry@usa.edu ext. 1234


Debra Gray, PT, DHSc, DPT, MEd

Flex DPT Program Manager

dgray@usa.edu ext. 1262

Joanna Carter

Administrative Assistant, Flex DPT Program

jcarter@usa.edu ext. 1248

KAL000186

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

San Marcos, California Campus

Anne Hull, EdD, OT/L

Chair, Institute of Occupational Therapy

ahull@usa.edu ext. 1258

Jodi Liphart, PT, DHSc, NCS

Chair, Institute of Physical Therapy

jliphart@usa.edu ext. 1230

Erin Schwier, OTD, OTR/L

Program Director, OT Programs

Co-Director, Dual Degree Option Program

eschwier@usa.edu

Jess Mowry

Program Assistant, OT Program

jmowrey@usa.edu ext. 2454

Dionte'e Reese

Administrative Assistant, OT Program

dreese@usa.edu ext. 2490

Cherie Peters-Brinkerhoff, PT, EdD, MHA

Director, DPT Program

epeters-brinkerhoff@usa.edu ext. 2414

Alexander Castanada

Program Assistant DPT Program

acastanada@usa.edu ext. 2486

Kristen Van Horn

Office Assistant DPT Program

kvanhorn@usa.edu ext. 2486

Christine Childers, PT, MS

Assistant Director, Flex DPT Program

cchilders@usa.edu ext. 2439

Alexander Castaneda

Administrative Assistant, Flex DPT Program

acastaneda@usa.edu ext. 2438

Austin, Texas Campus

KAL000187

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Anne Hull, EdD, OT/L

Chair, Institute of Occupational Therapy

ahull@usa.edu ext. 1258

Jodi Liphart, PT, DHSc, NCS

Chair, Institute of Physical Therapy

jliphart@usa.edu ext. 1230

Mary Zadnik, ScD, MEd, OTR/L

Program Director, OT Programs

mzadnik@usa.edu ext. 3136

Midge Beard

Administrative Assistant, OT Programs

mbeard@usa.edu ext. 3146

Manuel (Tony) Domenech, PT, DPT, EdD

Program Director, DPT Program

tdomenech@usa.edu ext. 3147

Abby Gomez

Administrative Assistant, DPT Program

agomez@usa.edu ext. 3148

Thomas Werner, PT, MA, PhD

Flex DPT Program Administrator

twerner@usa.edu ext. 3140

Edie Holmes

Administrative Assistant, Flex DPT Program

eholmes@usa.edu ext. 3151

Tricia Nguyen

Academic Program Assistant, Flex DPT Program

tnguyen@usa.edu ext. 2423

Kathy Wheat, PhD., CCC-SLP, ASHA Fellow

MS-SLP Program Director

kwheat@usa.edu ext. 3164

Blanche Underwood

Administrative Assistant, MS-SLP Program

bunderwood@usa.edu ext 3120

Miami, Florida Campus

Anne Hull, EdD, OT/L

Jodi Liphart, PT, DHSc, NCS

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

pg 90

KAL000188

Chair, Institute of Occupational Therapy

ahull@usa.edu ext. 1258

Chair, Institute of Physical Therapy

jliphart@usa.edu ext. 1230

Jose Rafols, OTD, MHSA, OTR/L, CEAS

Program Director, OT Programs

jrafols@usa.edu ext. 4111

Helen Castro

Administrative Assistant, OT Programs

hcastro@usa.edu ext. 4116

Jackie Crossen-Sills, PT, PhD

Program Director, DPT Program

jcrossensills@usa.edu ext. 1256

Ysela Bravo

Administrative Assistant, DPT Program

ybravo@usa.edu ext. 4145

# Academic Evaluation and Right of Appeal

Students sign an acknowledgment of the appeals procedure as part of the orientation process.

The responsibility for academic evaluation will rest with the instructor. For minor appeal issues, which are decisions that would not result in probation or dismissal, the student appeals to the faculty member involved in the particular issue. If the student is not satisfied with the faculty member's resolution of the issue, the student has the right to appeal the issue in writing to the Program Director within 3 business days of the instructor's decision. The Program Director then has 5 business days to research the issue and render a decision.

If the student is not satisfied with the Program Director's response, the student can appeal the issue to the President in writing within 5 business days after the Program Director's response. After hearing the issue, the President or designee has 2 business days to either render a verdict on the issue or redirect the issue at that point to the Academic Appeals Committee (AAC).

Any student who has been dismissed must formally appeal this decision in writing to the Registrar with a copy to the respective Program Director within 2 business days from receipt of the notification. If the student does not meet the stated deadline, the appeal may not be considered. In extenuating circumstances, the student may request an extension from his or her respective Program Director or Program Director designee (i.e., Registrar); however, this request must be made within the above stated deadline.

Appeal letters should address

- the rationale behind the appeal and why he or she believes the appeal is warranted, and
- future circumstances that will permit the student to rectify previous poor academic performance.

The Program Director will forward the student's appeal to the AAC within 2 business days. After discussion between the AAC and the Program Director, a decision is rendered. The Program Director will convey the AAC's decision to the student.

The AAC will meet six scheduled times per calendar year (see Academic Calendar). These meetings will convene 2 days prior to the first day of classes of each trimester and at midterm of each trimester. Procedures for the meetings are as follows:

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information

KAL000189

# Prior to Trimester Meetings

The AAC will convene within 2 days prior to the first day of classes of the next trimester or at the earliest convenience for both the student and the committee members. The student must appear personally before the AAC at its convenience. A written decision will be given to the Program Director within 2 business days of adjourning the meeting with the student.

# Academic Progression During the Appeal Process

The First Professional student will be allowed to attend scheduled classes throughout the entire appeal process.

In the best interest of the student and clinical site, a student will not be allowed to progress to a clinical education experience when appealing a University dismissal. If the appeal process reverses the dismissal from the University, the student will be placed on a re-admittance contract and be required to remediate to meet all course requirements before entering a clinical education experience.

# Midterm Meetings

The AAC will convene on or about midterm of each trimester or at the earliest convenient time for both the committee and the student. The student must appear personally before the AAC. The AAC will give a written decision to the Program Director within 2 business days of adjourning the meeting with the student.

In the event of extenuating circumstances, if a student is unable to meet at the University's designated AAC meeting times, the student may request an alternate meeting time. This request must be submitted to the chair of the AAC in writing with detailed rationale supporting the need for an alternate time.

Students geographically distant from the University campus may be allowed to appear before the AAC meeting via phone conference solely at the discretion of the AAC.

Should the student not agree to the decision of the Program Director, the student has the right of an appeal to the President or appointed designee. The appeal must be submitted, in writing, within 5 business days to the President. Upon request, the President or designee will review pertinent records, including a review of the process to ensure that it was correctly followed, and may meet with the AAC and the student. The President or designee will follow the process as established in this Handbook. If the final decision by the President results in dismissal, the student will no longer be permitted to remain in any course.

Dismissal policies will be implemented as fairly and equitably as possible considering all extenuating circumstances.

Once a final appeal decision on academic dismissal has been rendered, the student does not have access to the appeal process for this same issue again.

# Advanced Course Standing by Examination

Based on previous academic coursework earned from another accredited degree granting institution or another program within the University and/or work experiences, a student may be granted advanced standing for a particular course after passing an examination on the contents of the course. The examination may be written or practical or both and there is a cost associated with each exam. A maximum of 25% of the total number of credits for the degree may be granted for advanced standing. The granting of advance standing by examination is independent of the granting of transfer credit.

Approval for advanced course standing is subject to the following provisions:

KAL000190

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- Documentation supporting the reason for requesting advance course standing by examination. Supporting documentation may include transcripts showing applicable courses for credit, course descriptions, syllabi, continuing education courses/seminar descriptions and proof of completion, and work experience.
- Passing a challenge examination to verify competency in the particular subject matter. A student has only one attempt per course to pass the challenge exam. If the student fails the exam, the student must take the course in its entirety. The passing grade will be the same as the passing grade stated in the syllabus for the course in which advance standing is being requested.

The process for requesting Advanced Course Standing by Examination is as follows:

- The student obtains a request form for Approval of Advanced Course Standing by Examination found on the myUSA portal, Student Services tab under Forms and submits it to the respective Program Director with appropriate documentation.
- Requests for approval of Advanced Course Standing by Examination must be submitted at least 2 months before the start of classes for the trimester.
- In consultation with course instructors, the Program Director will review the request. If approved, the Program Director will notify the Registrar and a test time and date will be set up for each challenge exam. If the Program Director with consultation of the course instructor(s) concludes that the student's previous coursework and experience are inadequate for passing the challenge exam, they may encourage the student not to seek advanced course standing or to take some type of remediation before taking the challenge exam.
- The Registrar will notify the student if the challenge exam has been passed and will post the course and its credits to the permanent academic record at that time.

# Advisors

### Academic Advisors

The University of St. Augustine for Health Sciences is committed to student success. With this in mind students are connected to an Academic Advisor. An Academic Advisor is available to support students in many ways during the days leading up to the first class and throughout the duration of the academic program.

Academic Advisors are on the front lines of student services and are always willing to answer questions and provide support. They provide concierge support and help students navigate through the University. They assist students in completing required forms, understanding USAHS policies and procedures, adjusting schedules, and much more. Academic Advisors also have access to resources that can assist students with study strategies, time and stress management techniques, and organizational tips.

### Faculty Advisors

A Faculty Advisor will be appointed for each student. Faculty Advisors are core faculty from the student's program who work with students to help them achieve their academic and professional goals. This advisor will serve in two primary capacities. The first is to advise the student on academic matters as they progress through their program, and the second is to guide the student in their professional development. Faculty advisors are available to students during their schedule office hours or by appointment. Students may request a change in faculty advisor by contacting their Program Director.

# Awards

KAL000191

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

# Outstanding OT, PT, MS-SLP and Flex Student Awards

Each of the First Professional degree programs recognizes an outstanding student of the respective graduating class. This award is based upon the criteria listed below and is given to the graduating student whose characteristics most support either the OT, PT, or MS-SLP program mission statement. The outstanding OT or MS-SLP student award is chosen by a combined vote of his or her fellow classmates and program faculty. The PT student award is chosen by a vote of the program faculty.

## Outstanding Student Awards Criteria

| | |
|---|---|
| Professionalism | Demonstrates the ability to act as a member of the health care team and to be involved in the advancement of occupational therapy, physical therapy, or orthopaedic assistant. |
| Clinical Reasoning | Applies logic and critical thinking skills for the improvement of a patient's welfare as well as to enhance the recipient's own career |
| Ethical Standards | Demonstrates appropriate principles and values. |
| Commitment to Continued Professional Growth | Possesses a continuing desire to acquire knowledge and advance the occupational therapy, physical therapy, or orthopaedic assistant profession. |
| Responsibility | Is dependable and assumes responsibility for ones own actions. |
| Leadership | Is willing to be involved in student and/or professional activities. |
| Initiative | Is resourceful and self-directed. |
| Constructive Skills | Maintains a positive attitude and demonstrates creative qualities |

*Stanley V. Paris and Catherine E. Patla Award*

The Paris and Patla Award is presented in recognition of excellence in spinal and extremity manual therapy in professional physical therapy education to a First Professional PT graduate.

*Scholastic Achievement Award*

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information

pg. 94

KAL000192

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

The Scholastic Achievement Award—named for the founding Program Director on each campus—is presented to the First Professional PT, OT, and MS-SLP graduate who has achieved the highest cumulative grade point average (GPA). Grades from both foundational science courses and professional courses are included in the cumulative grade point computation.

*Recognition for the Fellowship in Manual Physical Therapy*

The University's Fellowship in Manual Physical Therapy is credentialed by the American Physical Therapy Association and recognized by the American Academy of Manual Physical Therapists. This postgraduate program includes a minimum of 1 year of clinical mentoring as well as didactic learning.

# Campus Location Change

Students who wish to change to another campus location must submit a Campus Location Change Request Form, available on the myUSA portal, Student Services tab under Forms, to their current Program Director by midterm of the trimester prior to the requested change. Such requests will be considered on an individual basis and are contingent on space availability and student must be in good academic standing. The student will be notified of the outcome of the location change request via email by the Registrar's Office. Please note: Program completion dates of students who change campus locations may be extended.

# Campus Exchange Program

Students who wish to study at a USAHS campus other than their home campus for one trimester may apply to do so, provided their program is available at another campus and they meet qualifications described below.

At this time Dual students in the DPT program, OTD and MS-SLP students are not able to participate.

A student who wishes to exchange must meet the following criteria:

- A student must be in good academic standing.
- A student must not have any misconduct issues in his or her record.
- A student must receive his or her Program Director's approval.
- A DPT student must be willing to exchange in Term 3, 4, 6 (due to internships, scheduling, graduation, and other factors). Flex DPT students should consult with the Program Manager to discuss options.
- An OT student must be willing to exchange in Term 3, 4, or 5 (due to fieldwork experiences, scheduling, graduation and other factors). Flex OT students do not currently have this opportunity unless they are requesting a transfer to a campus based program.
- A student must be willing to guarantee his or her own travel and lodging arrangements (students may want to consider contacting the other campus's student association leaders to see which students at the other campus may have room occupancies due to internships or other factors).

A student who believes he or she meets the criteria must follow the following process in order to become an exchange student:

1. Fill out the Campus Exchange Application found on the myUSA portal, Student Services tab under Forms.
2. Submit the completed application (and application fee) to the student's home campus Program Director no later than the end of the fourth week of the trimester preceding the trimester the student wishes to exchange.
3. Await Program Director approval (students should note that just because they meet the criteria, they may not be approved based on classroom seat availability or other factors).

For students who do exchange, the following apply:

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                                pg. 95

KAL000193

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- If a student receives a grade while on exchange that requires repeating a course, the student will be expected to repeat the course at his or her home campus in the following trimester.
- A temporary advisor on the host campus will be assigned to the exchanging student during the trimester in which the student is exchanging.
- Academic progression for the student will occur on the host campus on which the student exchanges for the trimester the student is on that campus.
- Professional misconduct issues will be handled on the campus at which the incident took place.
- The appeal process will be handled through the student's home campus appeals committee.
- Tuition remains at the home campus rate.

# Continuing Education

Students will not be excused from campus-based classes or Internship I/Level I Fieldwork to attend Continuing Education classes. Students participating in Level II Fieldwork or Internships II and III may request to participate in continuing education approved by the facility, the Academic Coordinator of Clinical Education or Academic Fieldwork Coordinator, and the Program Director.

# Counseling

In partnership with ComPsych (a Student Assistance Program provider), USAHS offers free counseling services and online resources whenever and wherever needed.

### 24/7 Confidential Support

Students (and members of the same household) may call **844-819-4777** (toll free) and be connected to a free and confidential highly trained master's or doctoral level clinician via phone. This licensed counselor can help with anxiety, depression, stress, grief, relationship conflict, substance abuse, or any other personal issue students may be experiencing. If needed, the counselor will also be able to refer students to meet with an in-person counselor for up to three complimentary sessions.

### Online Resources

Student and household members will also have unlimited access to guidanceresources.com. Students will need to use "USAHS" as the Web ID to create a free account. This website provides information, tools, and support on a wide variety of subjects including wellness, legal, financial, and relationship topics. Students can view articles, podcasts, videos, or slideshows and can "Ask the Expert" to receive personal responses to questions.

# Dual Degree Option

Dual-degree-option students who elect not to return to the University to pursue the DPT portion of the program immediately after earning the MOT degree must submit a Program Withdrawal Form to the Registrar's Office by midterm of the last trimester of the MOT program.

Dual-degree-option students who want to complete the DPT portion of the program through the Flex DPT program must submit a Program Change Request Form to the Registrar's Office by midterm of the last trimester of the MOT program. This form is located on the myUSA portal, Student Services tab under Forms.

KAL000194

# Employment

Outside employment is strongly discouraged for full-time First Professional students.

Students wishing to be employed in on-campus student employee positions must meet the following requirements:

- Minimum 3.0 USAHS GPA
- In good standing at USAHS
- Second term or more (some exceptions may apply)

Students should refer to www.usa.edu, Employment Opportunities, for more information and application

# Examination and Proctoring

Each course syllabus describes the types of exams given, exam dates, and how exams are used to calculate the final course grade. Each course will have a learning assessment (final examination, lab practical, project, paper, etc.) during the 15th (final) week of the term unless approved by the Program Director.

*For First Professional students:* Special early examinations given to individual students or groups of students as substitutes for final examinations are prohibited. Final examinations are to be given on the day and time scheduled during the final exam period (week 15), unless there is prior approval from the Program Director. When a final examination is given, each student is required to take the examination.

- All Examinations that are a significant contribution to the final grade calculation will be proctored.
  - If an exam is given solely for the purpose of helping the student determine their comprehension and is not weighted toward the course grade, they do not need to be proctored.
- Examinations will begin and end promptly as scheduled.

Campus Program:

- For face-to-face exams, after the start of the examination, any student who wishes to leave the examination room will turn in his or her examination and will not be permitted to reenter unless there are extenuating circumstances. In the online environment, if a student leaves the exam window the exam will be closed and will not be reopened unless the student can verify, in writing, that there was an interruption in online service.
- If the faculty member permits work paper to be used, it will be distributed during the examination period with face-to-face exams. All work paper will be returned with the examination.
- Books, other study material, book bags, and purses must be placed at the perimeter of the examination room or left outside of the examination room except in the case of an open book exam designated by the faculty. In the online environment, the room will be visually scanned and no materials will be allowed in the testing room, unless previously designated by the faculty and noted on the proctoring form.
- No electronic devices are allowed. Students are not permitted to use cell phones, Apple watches, Google glasses, etc. and should turn any ringers or alerts off.

Flex and MS-SLP Program:

- Dates for Online proctored exams in the Flex or MS-SLP Program will be identified in the syllabus so students can schedule the proctoring service in time to avoid late scheduling fees. Faculty will also schedule all online proctored exams for Flex or MS-SLP students with ProctorU (the exclusive proctoring service). Flex or MS-SLP students who are uncertain how to schedule, should request assistance from the program administrative assistant. All Flex or MS-SLP students should complete the tutorial provided by

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                      pg. 97

KAL000195

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

ProctorU before scheduling an online exam using ProctorU services. Effective Fall 2017 trimester, all online proctoring will be conducted utilizing ProctorU.

- In the online environment for Flex or MS-SLP students, the exam window will be approximately twice as long as the length allowed for the examination. For example – if the exam is two hours long, the window to take the exam should be 4 hours. This allows students a period of time to verify their identity with the proctoring service and log into the exam. The exam window will only be open during the scheduled time period.
- Faculty will be available for student issues during the time period that the exam window is open.
- As a general practice faculty will alter the day and time of the examinations in a course so that students who have conflicts are not unduly penalized for exams always falling on the same day and time.
- Faculty will be conscious of lab weekends for Flex or MS-SLP students and avoid giving an exam on a weekend they are on campus or on the days immediately before and after lab weekends.
- In the online environment, work paper will be scanned by the proctor before the test begins and will be destroyed at conclusion - and verified by the proctor. Faculty may provide laminated USAHS letter head to use as scratch paper, or require the use of a white board that is erased at the end of the exam – and verified by the proctor.
- No electronic devices are allowed. Students are not permitted to use cell phones, Apple watches, Google glasses, etc. and should turn any ringers or alerts off.
- ProctorU provides a post-exam report including any incidents that may have occurred. The administrative assistant for the program receives post exam reports on all exams and notifies faculty if anything is flagged as suspicious.

EXAMINATION REVIEWS

- As a general rule, students will not be allowed access to review an exam upon its completion. An exception to this rule would be in the case where the examination will not be used a second time – on any campus or any program.
- Best practice suggests a follow up exam review, in person, as a chat room, SKYPE, discussion board, or other method of interaction with the students to review frequently missed topics/content – with further instruction in areas of weak class performance. Specific questions will not be discussed in these review sessions, unless it is understood by all course faculty that those questions reviewed are omitted from future exams – on all campuses, in all programs.
- If a student requests to review an exam question(s) they should make an office appointment and review the exam with the faculty present.
- Policy for Changing an Exam Date
  Every attempt should be made to adhere to the exam dates as listed in the syllabus, course schedule, or stated as a class announcement. In the event that a faculty member needs to change an exam date, he or she should give an explanation to the students and provide at least two options for rescheduling the exam. The class votes on the best option and majority rules. If the students request an exam change and the course instructor approves the request, then the proposed change is voted on anonymously by the class and 100% of the class must agree before a change is allowed.

- Review of Examinations During the Trimester
  A review is to advance learning and is not a mechanism to obtain a higher grade. All written examinations will be reviewed at the earliest possible opportunity with the review mechanism at the discretion of the course instructor.

- Final Examination Review
  An opportunity to review a final examination is up to the course instructor. The course syllabus should state whether the final exam can be reviewed. The mechanism used to review final exams will be determined by the course instructor. The review of final exams must be completed prior to the second Friday of the following new trimester. Review of final exams is to advance learning. It is not a mechanism to obtain a higher grade.

- Practical Examination Policy for University Courses

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                            pg. 98

KAL000196

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

A minimum of 80% proficiency is required on all clinically related practical examinations. Safety requirements must be met at a 100% competency level. The practical examinations require the student to meet both safety and technical skill performance competencies. If a student does not perform in a safe manner, the student will receive an F grade for the practical examination; if the student earns less than 80% on the technical skill performance, the student will likewise receive an F grade for the practical examination. In either case, the student must retake the practical examination. The student must meet both safety (100%) and technical skill performance competencies (80%) to pass the practical retake.

*First Retake Practical Examination Process*

1. It is the student's responsibility to contact the faculty instructor within 1 to 2 business days of failing the exam to receive instructions on how to write a plan of remediation.
2. The student is required to submit a written plan of remediation to the faculty instructor that will effectively prepare the student for their first retake practical examination.
3. The faculty instructor will review and approve (via email or written signature) the student's remediation plan and administer the first retake practical examination.
4. The highest grade awarded for passing the first retake practical examination will be 75%. The faculty instructor will notify the student's advisor regarding his or her current status and academic remediation plan.
5. A student who receives an F on the first retake practical examination is required to follow the second retake practical examination process below.
   *Second Retake Practical Examination*

1. The student will contact the faculty instructor within 1 to 2 business days of failing the first retake practical exam to determine a revised remediation plan.
2. The student is required to submit to the faculty instructor a written revised remediation plan that will effectively prepare the student for their second retake practical examination.
3. If the student remediation plan is not approved by the faculty instructor and the student's progress could affect the Clinical Education Office, the faculty instructor will notify the Clinical Education Office.
4. The faculty instructor will review and approve (via email or written signature) the student's revised remediation plan.
5. The student will then submit the approved remediation plans (both the original remediation plan and the new revised remediation plan) to the Academic Progression and Retention Committee (APRC). (FL campus students submit to Sue Nordlund, Administrative Assistant, snordlund@usa.edu; CA and TX campuses students should submit their material to the chair of the APRC.)
6. The APRC will gather appropriate past academic data that could help provide insight for the approval process.
7. The APRC will review and approve that the student's remediation process (following steps 1, 2, 3, and 4 above for both retakes) has been met.
8. The APRC will review and approve that the faculty's remediation process (following steps 1, 2, 3, and 4, above for both retakes) has been met.
9. If the APRC approves the remediation process, the APRC chairperson will send an approved email to the student, faculty instructor, and Faculty Advisor for progressing forward with the second practical exam retake.
10. When the remediation plan and process have been approved, the practical retake exam is required to be taken before the next scheduled exam of the course or before the last day of final exams (unless otherwise permitted by the faculty instructor).
11. If the APRC does not approve the remediation process, the APRC chairperson will send a rejection email to the student, faculty instructor, Faculty Advisor, and Program Director. This rejection email will include the APRC criteria for disapproval, and the APRC requirements for remediation process approval. The student should resubmit his or her remediation plan to the APRC recorder, respective Program Director, Faculty Advisor, and faculty instructor after the remediation process has been met.
12. The second retake exam will not be allowed until the remediation plan is approved by the faculty and the remediation process is approved by the APRC.
13. If the student takes the second retake practical examination and receives an F on this second retake, the student will receive a D or F for that course.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000197

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

14. If the student passes the second retake practical exam (100% safety, 80% technical skill performance), the highest grade awarded on the second retake practical examination is 70%. All practical exams must be completed by the date grades are due as published on the First Professional Programs Academic Calendar.
15. If the student has any concerns about the remediation process or plan, he or she can contact the chairperson of the Academic Progression and Retention Committee for counsel.
This policy does not apply to DPT Exit Exam Courses. Please see individual syllabi regarding retake policies for the Exit Exam.

- Make-Up Examination Policy
  o Absences from an examination as a result of a medical condition and supported by a physician's letter will be adjudicated by the faculty member(s) responsible for the course. Faculty may either schedule a make-up examination or excuse the student from the examination without penalty.
  o Absences from an examination due to non-medical circumstances will also be adjudicated by the faculty member(s) responsible for the course. Faculty may allow a make-up examination, excuse the student from the exam without penalty, or give the student a zero grade for the examination. This zero will be averaged with the grades obtained for all other examinations for this course.

# Exit Examinations

All students in programs requiring exit exams are required to pass the exit examinations. These exams are designed to test the retention and integration of cognitive and clinical skills. They are given prior to a student's scheduled graduation.

# Expected and Maximum Completion Time Frames and Satisfactory Academic Progress (SAP)

There are three program options with expected completion time frames for First Professional students.

- Full-time DPT/MOT/OTD/MS-SLP
  o DPT (old curriculum) expected completion is 7 trimesters.
  o DPT (new curriculum beginning 2016-17) expected completion is 8 trimesters.
  o MOT expected completion is 6 trimesters.
  o OTD expected completion is 8 trimesters.
  o MS-SLP expected completion is 5 trimesters.
- Flex DPT/MOT
  o DPT expected completion is 12 trimesters.
  o MOT expected completion is 9 trimesters.
- Dual Full-time MOT/DPT
  o Expected completion is 10 trimesters.

When a student's regular completion time frame changes due to academic or personal reasons, the following maximum time frames for completion apply:

- Full-time DPT maximum completion is 11 trimesters.
- Full-time DPT new curriculum beginning 2016-17 maximum completion is 12 trimesters.
- Flex DPT maximum completion is 18 trimesters.
- Full-time MOT maximum completion is 9 trimesters.
- Flex MOT maximum completion is 14 trimesters.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                    pg  100

KAL000198

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- Full-time OTD maximum completion is 13 trimesters.
- Dual MOT/DPT maximum completion is 15 trimesters.
- Full-time MS-SLP maximum completion is 8 trimesters.

Note: Only under extenuating circumstances approved by the Program Director will a student be allowed to transition to reduced credit load status in which the following maximum time frames to complete the graduation requirements apply:

- Reduced credit load DPT maximum completion is 14 trimesters.
- Reduced credit load MOT maximum completion is 12 trimesters.
- Reduced credit load OTD maximum completion is 16 trimesters.
- Reduced credit load MS-SLP maximum completion is 10 trimesters.

# Fingerprints and Criminal Record

Students acknowledge that their fingerprint results and criminal arrest/conviction record may limit internship placement availability and that internship placement is a requirement for graduation from USAHS. In addition, graduation from USAHS does not guarantee licensure or employment. A student's arrest/conviction record may also affect eligibility for licensure as requirements vary from state to state. It is the student's responsibility for understanding the licensure requirements for the state(s) in which he or she intends to seek licensure.

Enrollment at USAHS is at the student's own risk and is not a guarantee of graduation, licensure, or employment.

# Good Academic Standing, Academic Progression Warning, Academic Progression Probation, Dismissal

## Good Academic Standing

Prior to completion of 30 credits for MS-SLP, 59 credits for OT and 61 for DPT, it is expected that a student will meet the following minimum criteria:

- Complete at least 75% of all credits attempted each trimester
- At the completion of the first trimester (or 10 credits for MS-SLP, 17 credit hours for OT and DPT) have a GPA of 2.0
- At the completion of the second trimester (or 20 credits for MS-SLP, 38 credit hours for OT and DPT) have a GPA of 2.3

Failure to meet any of the above criteria will result in the following actions:

- Students will be issued an Academic Warning and will be required to meet with their Faculty Advisors to develop a plan to improve their academic study. If a student fails to meet the satisfactory academic progress criteria for 2 consecutive trimesters, they will be placed on Academic Progress Probation and will be required to meet with the Academic Progression and Retention Committee (APRC).

The University requires that all students enrolled in the professional education programs have a 2.50 GPA after the completion of the third (full-time) trimester, or 30 credits for MS-SLP, 59 credits for OT and 61 credits for DPT, in the academic curriculum to continue in the respective program. If a student does not achieve this cumulative GPA he or she is dismissed from the program.

KAL000199

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

# Academic Progression Warning

- An emailed letter of academic concern will be issued to any student who has a grade at midterm below a C level. The intent of the concern letter is to notify the student of less than satisfactory academic progress and the potential for course failure. A student receiving an academic concern email letter at midterm must first contact—by phone, email, or in person—the instructor(s) for the course(s) within 1 week of receipt of the concern letter. The student and course instructor(s) will discuss the student's performance, and the student will develop a plan, approved by the instructor, to improve future performance. The student must then inform his or her Faculty Advisor of the plan. If a student does not contact his or her course instructor and advisor, a note will be placed in the student's academic file noting the failure to comply with this policy.
- An Academic Warning will be given to any student who is not in academic good standing at the conclusion of any trimester. The intent of the academic warning is to notify the student of less than satisfactory academic progress. A student receiving an academic warning at the end of the trimester must contact his or her Faculty Advisor during the first week of the subsequent trimester and develop a plan, approved by the student's advisor, to improve future performance.

# Academic Progression Probation

- A student who makes a grade below a C in any course will be placed on Academic Progress Probation and must undergo remediation and repeat the course for credit. Such students will be made aware in writing that they are at risk for failure to complete the program.
  - A student who is no longer in good academic standing must meet with the instructor and his or her Faculty Advisor to develop a plan for remediation and monitoring. The plan may allow him or her to take additional coursework with the approval of the Program Director.
  - The student must receive a grade of C or better on the course retake to progress academically.
  - If the student receives a grade of C or better, the student will be taken off academic probation.
  - If the student receives a grade below C when retaking a course, the student will be dismissed.
- Any student who is on probation may not participate in any work-study program unless approved by the Program Director. Students placed on probation are at risk of not graduating from the University and not passing the national board exams.
- Any student who does not successfully complete the coursework necessary to exit probation may be at risk of being denied federal financial aid due to not maintaining satisfactory academic progress.

# Dismissal

- A student will be dismissed from the program if
  - an F is received in any course;
  - two grades of D are received;
  - a student receiving a failing grade during fieldwork/internship is also subject to this policy (See the Clinical Education Handbook); or
  - after the completion of 30 credits for MS-SLP, 58 credits, the student has a grade point average below 2.5.
- The Registrar notifies the APRC and the Program Director of any students who are being recommended for academic dismissal. The student will be notified of his or her dismissal by the Registrar.
- A student may appeal the dismissal to the Academic Appeals Committee/Program Director (see Academic Evaluation and Right of Appeal). If an appeal is successful, a readmission agreement between the student and the Program Director (or Dean) is made that documents the conditions for continuation at the University. Readmission agreements can only be appealed if there are mitigating circumstances and an appeal can be made only to the University President.

KAL000200

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

- When a student is suspended for academic probation or for professional misconduct he or she will turn in his or her student ID badge to the Registrar and remain off campus. Students may visit a campus if they have made an appointment by phone with their Faculty Advisor or Registrar and restrict their activities to that appointment.

# Health Records

Each student is required to provide a completed Student Medical Record Form to be kept on file by the Clinical Education Office. Failure to submit the Student Medical Record Form will prevent the student's participation in practicum, internship, and fieldwork clinical experiences. Detailed instructions regarding required medical records are sent to new students prior to registration. Required medical forms are due to the Clinical Education Office by the date provided each term.

# Health Services

All students are required to carry health insurance. Proof of health insurance must be provided to the Clinical Education Office each trimester.
The University is not licensed to provide health care services.

- St. Augustine campus
  Flagler Hospital has a 24-hour emergency service. For non-emergency care, the University contracts with a family practice physician to provide services:

  Dr. James Connor
  1851 Old Moultrie Road
  St. Augustine, FL 32086
  904-824-8088

  Additionally, there are local walk-in clinics that are equipped to provide emergency and non-emergency care.

- San Marcos campus
  Emergency services are available at the following locations:

  Palomar Medical Center
  555 E. Valley Parkway
  Escondido, CA 92025

  Tri-City Medical Center
  4002 Vista Way
  Oceanside, CA 92056

- Austin campus
  Emergency and non-emergency medical services are available at the following Austin locations:

  St. David's Urgent Care
  5700 West Slaughter Lane
  Austin, TX 78749
  512-394-0020

  Nexteare Urgent Care
  6001 West William Cannon Drive #302
  Austin, TX 78749
  512-288-3627

  Austin Immediate Care
  5000 West Slaughter Lane #100
  Austin, TX 78749
  512-282-2273

  St. Davis South Austin Medical Center
  901 West Ben White Boulevard
  Austin, TX 78704
  512-447-2211

KAL000201

| | |
|---|---|
| Seton Southwest Hospital<br>7900 Farm to Market 1826<br>Austin, TX 78737<br>512-324-9000 | University Medical Center at Brackenridge<br>601 East 15th Street<br>Austin, TX 78701<br>512-324-7000 |

- Miami campus
  Emergency and non-emergency medical services are available at the following Miami locations:

| | |
|---|---|
| Kendall Regional Medical Center<br>11750 SW 40Th St<br>Miami FL 33175<br>305-223-3000 | Baptist Health Medical Plaza at Doral Urgent Care<br>9915 NW 41st St<br>Doral FL 33178<br>786-586-3830 |

# Liability Release and Claim Waiver

Upon acceptance, students are asked to sign a general Waiver of Liability Form on behalf of the University prior to their participation in any athletic or extracurricular event while in residence. A copy of this form is located on the myUSA portal Students tab. These forms are placed in the student's file for record keeping purposes.

# Licensure Exams

DPT students will not be given permission to sit for a licensure exam that is scheduled prior to all degree requirements being met.

# Lockers

On the St. Augustine, San Marcos, and Austin campuses, lockers are not assigned and are therefore on a first-come, first-served basis. Students must supply their own locks and remove these locks at the end of each term. All lockers are subject to search at any time as they are considered University property.

Lockers are located in the following locations:

- San Marcos campus: Hallway by the library and first floor of Building C
- St. Augustine campus: Academic building in the first floor lavatories
- Austin campus: Buildings A and B on the upper level near the amphitheater classroom

# Orientation

All new First Professional students are required to attend in-person orientation as well as complete an online orientation. Orientation activities include payment of tuition, submission of vehicle registration information required for parking decals, introduction to University departments, and a review of the Student Handbook.

# Program Change

All program change requests will be considered on an individual basis and are contingent upon space availability.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                    pg  104

KAL000202

# Incoming Students

Incoming (new) students who want to request a change of their admission to another degree program must make a request in writing (email is acceptable) to the Director of Admissions at least 6 weeks prior to the start of the trimester. To be considered, the student must have successfully completed all of the required prerequisites for the program to which he or she is requesting change. The Director of Admissions will notify the student via email of the outcome of the request. Please note: The start and completion dates of students who change degree programs may be extended.

# First Term Students

Program Change Request Forms must be submitted to the student's current Program Director by midterm of the first trimester. Program change requests not received by the midterm deadline will be considered during the subsequent trimester. To be considered, the student must have successfully completed all of the required prerequisites for the program to which he or she is requesting to change.

# Second Term (and Beyond) Students

Program Change Request Forms must be submitted to the student's current Program Director by midterm of the current trimester.

# Program Change Request Process for Current Students

In order to be considered for a program change, a student must

- be in good academic standing at the time of the request; program change requests will not be considered from students who are currently remediating or retaking coursework, who are under review for appeal or professional misconduct, or who are on academic probation; program change requests from students who are on approved leave of absence will be considered;
- complete the Program Change Request Form located on the myUSA portal, Student Services tab under Forms and submit the completed form to:
  - ○ his or her Program Director,
  - ○ the Program Director of the degree program to which the student is seeking to change, and
  - ○ the Director of Admissions (The Director of Admissions will approve only if the student has successfully completed all of the required prerequisites for the program to which he or she is requesting to change);

Once the Program Change Request Form has been considered by all applicable administrators, the student will be notified of the outcome via email by the University Registrar. **USAHS scholarships are not transferable from one program to another.** Changing programs may extend the degree completion date.

# Reenrollment Timelines

A USAHS First Professional program graduate who decides to seek admission to another USAHS First Professional degree program must enroll within 3 years of his or her graduation date or he or she may be required to retake foundational (HSC) coursework and complete additional internship/fieldwork experiences. To be considered for admission to another First Professional degree program, a USAHS graduate must submit to the Admissions Office a completed application for admission; however, transcripts and GRE score reports do not need to be resubmitted with the new application.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                   pg. 105

KAL000203

Dual-degree students who delay beginning the DPT portion of the program after receiving the MOT degree must re-enroll in the DPT program within ~3 calendar years or they may be required to complete additional foundational coursework and/or internships in order to complete the second degree. To re-enroll, a returning Dual student must notify the University Registrar in writing (email is acceptable) of his or her intent to resume classes at least 6 weeks before the start of the trimester.

# Student Membership in Professional Associations

All University of St. Augustine students must be members of their respective national professional associations (American Physical Therapy Association [APTA], American Occupational Therapy Association [AOTA], National Student Speech Language Hearing Association [NSSLHA]). Dual students will be members of both professional associations (MOT during first 6 trimesters; DPT during last 4 trimesters). Current students will be asked to show proof of membership as part of the practicum or physical therapist practice courses. OT students will also need to provide evidence of a state membership.

# Student Associations

The first trimester students will be assessed a one-time mandatory student activity fee of $20.00. This fee is subject to change.

Examples of activities covered by the student association fee include but are not limited to

- authorized University functions,
- community awareness programs, and
- miscellaneous preapproved events.

This fee is allocated for campus-based student professional associations. Physical therapy students will be members in SPTA. Occupational therapy students will be members in SOTA. Speech-Language Pathology students will be members of SSLPA. Dual degree students will be members of SOTA in the first half of the Dual Degree program and SPTA in the second half. Student representatives from all classes and programs meet monthly with Program Directors to share information and discuss concerns.

All student events are to be coordinated through these associations with all allocated monies to be controlled by the SPTA, SOTA, and SSLPA organizations. All functions/events involving the University or the use of its name require prior review and written approval by (1) the respective Program Director and (2) the University's Director of Marketing. Possible examples of University-sanctioned events might include community/charitable events such as the annual 5K run and University or departmental picnics/celebrations. A student-organized off-site baseball team would be an example of a non-University event that could be supported by the student associations but would need approval if the University name was used. Any requests to use the University logo on clothing, etc. requires the same approval as listed above.

The SPTA, SOTA, and SSLPA organizations operate independently; however, financial support may be provided upon agreement of the supporting organization. Any use of funds requires two signatures from current officers of the respective organizations.

# Student Retention Program: Tutoring

Based on availability, students who have a documented need (course average below 75%) for assistance in a class may request tutoring. This request for a tutor needs to be signed by the student's instructor who verifies the at-risk need by signing the Tutor Request Form. Students obtain the form and return it signed by the instructor to the Faculty Advisor, Administrative Assistant, or Academic Advisor in charge of the Tutor Program. Availability of tutors is not guaranteed.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000204

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

The Tutor Program Manager will indicate the name and phone number of a recommended tutor on the bottom of the form and explain that it is the responsibility of the student to contact the tutor directly to arrange a mutually convenient schedule.

If the student is requesting a tutor before there is a grade to verify a course average below 75%, the student may receive tutoring with faculty permission until midterm. At midterm, the tutoring need will be reevaluated.

KAL000205

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

# Post-Professional Programs Policies and Procedures

## Contact Information

A student should contact the University when he or she requires guidance or assistance with the online education degree programs, but only after consulting this Handbook.

Students may receive information about their degree program from staff, faculty, administration or by utilizing the myUSA portal. Official letters will be sent to students after any review of academic progress or other actions critical to the progression in the academic program. Students will be able to access course grades and final grades online through Blackboard Learning Management System (for course grades) or through myUSA for overall grades and unofficial transcripts. Each student is issued a user name and password to access grade information on the myUSA portal, My Info tab. Post-professional students are encouraged to review the Post-Professional tab on myUSA for forms, program updates or staff contact information.

## Correspondence

All correspondence should be emailed to the Academic Program Coordinator or Program Director listed below.

> Telephone—Please have the Student Handbook available when calling:
> Main Number: 904-826-0084 or 800-241-1027

- Ask for the Academic Program Coordinator
- If the coordinator is unable to answer the question, the student may be directed to contact the Program Director or Academic Advisor

### Master of Health Science

Jordan Utley, PhD, LAT, ATC
MHS Program Director
jutley@usa.edu 214-250-0349

Elinora (Nori) Formica, Academic Program Coordinator
eformica@usa.edu 904-770-3629

Sherrie Jensen, Academic Program Advisor

sjensen@usa.edu 904-770-3654

### Master of Health Administration

Jeremy Howell, DHA, FACHE

MHA Interim Program Director
jhowell@usa.edu

Elinora (Nori) Formica, Academic Program Coordinator
eformica@usa.edu 904-770-3629

Sherrie Jensen, Academic Program Advisor

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information. pg. 108

KAL000206

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

sjensen@usa.edu  904-770-3654

# Master of Science in Nursing/Doctor of Nursing Practice

Robin Dennison, DNP, APRN, CCNS, CNE, NEA-BC

MSN and DNP Program Director

rdennison@usa.edu  ext.1310

Ivonne Colon, Academic Program Coordinator

icolon@usa.edu  904-770-3611

Sherrie Jensen, Academic Program Advisor

sjensen@usa.edu  904-770-3654

# Transitional Doctor of Physical Therapy

M.Elaine Lonnemann, PT, DPT, MSc, FAAOMPT
t-DPT Program Director
elonnemann@usa.edu

Chris Brownworth, Academic Program Coordinator

cbrownworth@usa.edu  904-770-3597

Frank Bennett, Academic Program Advisor

fbennett@usa.edu  904-770-3525

# Post Professional Doctor of Occupational Therapy

Karen Snyder, PhD, OTR/L
PPOTD Program Director
ksnyder@usa.edu  ext. 1343

Chris Brownworth, Academic Program Coodinator

icbrownworth@usa.edu  904-770-3597

Frank Bennett, Academic Program Advisor

fbennett@usa.edu  904-770-3525

# Doctor of Health Science and Doctor of Education

Cindy Mathena, PhD, OTR/L
DHSc and EdD interim Program Director
cmathena@usa.edu

Gloria Doherty, Sr. Academic Program Coordinator

gdoherty@usa.edu  904-770-3583

Sunddip Aguilar, Ed.D

EdD Assistant Program Director

Frank Bennett, Academic Program Advisor

fbennett@usa.edu  904-770-3525

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                    pg  109

KAL000207

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

saguilar@usa.edu

## Dean of Post-Professional Programs

Cindy Mathena, PhD, OTR/L                      cmathena@usa.edu

Dean of Post-Professional Studies

# Being Prepared

A student's success in this program is partially based on his or her ability to use technology. If at any time a student finds him or herself lost or with questions, try one of the following options:

- Check the myUSA portal Blackboard tab for problem-solving advice.
- Technical Support  techhelp@usa.edu

# Computer Equipment

Online students will be required to have their own computer or have access to a computer. Check the myUSA portal, Tech Support tab, under IT Document Library for the most updated software requirements. Some software is provided at no charge to the student as a part of the technology fee paid every term. This software may include End Note, SPSS, Neehr Perfect, Learnscapes and other applications.

# Course Availability (for Distance Learning and Electives)

It is the student's responsibility to work with an Academic Advisor to verify the availability of a course and to make scheduling adjustments if he or she finds he or she must take the course during a particular trimester to continue on a path to completion.

# Course Schedules

It is the student's responsibility to check the syllabus for due dates for assignments or dates for examinations. If an online course is self-paced (accelerated), a student may complete assignments as he or she is ready. However, the student will be provided with a time frame or due date for completion of the course. It is the student's responsibility to check the syllabus (and confer with faculty) for complete information on schedules, assignments, and due dates.

Degree Completion

Once all coursework has been completed, the Academic Program Coordinator will provide the student with a link to the graduation application. The application must be completed by the established date for the term.

The Program Director, in conjunction with the Registrar, will perform a degree audit to verify completion of the minimum number of credits and the overall GPA as follows:

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                      ag  110

KAL000208

- MHA – 3.0
- MHS – 3.0
- MSN – 3.0
- tDPT – 3.0 (or 2.50 for students admitted into the program prior to January 1, 2018)
- DHSc – 3.0
- EdD – 3.0
- PPOTD – 3.0
- DNP – 3.0

The Bursar's Office will assure that all fiscal obligations to the University or its subsidiaries have been met in full.

Commencement ceremonies are held three times per year in April, August, and December. See the Academic Calendar in this Handbook or the myUSA Student Services tab for exact dates.

For more information on completion requirements, refer to Academic Policies and Procedures in this Handbook.

# Good Academic Standing, Academic Progression, Retention, Warning, and Probation

The role of the Post-Professional Progression Committee (PPPC), in conjunction with the Registrar's Office, is to monitor each student's academic progress throughout the curriculum. At the end of each trimester, grades are submitted to the Registrar. The Registrar will notify students who are placed on probation or are dismissed from the respective academic program of their status.

To remain enrolled in the MHA, MHS, PPOTD, tDPT, DHSc, EdD, MSN, or DNP programs, the student must maintain

- active status or approved leave of absence status; and
- good academic standing.

## Active Status

A student is in active status if the student

- registers and begins a course within 12 weeks after official acceptance into the program; and
- completes a course within 6 months of acceptance into the program; and
- maintains timely and effective communication with the program representatives.

## Leave of Absence

See Leave of Absence Policy under University Policies and Procedures.

## Inactive Status

A student will be placed on inactive status when failing to complete the minimum number of program credits within a 12-month period based on the date of admission to the program. The student will receive a letter from the Registrar notifying him or her of this status change.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000209

When the student completes the minimum number of program credits within 1 calendar year, he or she will be placed back on active status. (Note: seminars alone do not count toward academic credit and meeting this requirement.)

If the student does not complete at least the minimum number of program credits within 1 year of being placed on inactive status, he or she will be referred to the Progression Committee for possible dismissal from the program. A student may be placed on inactive status only once during enrollment in DE programs. The student will be dismissed from the program if he or she fails to meet the yearly requirements for coursework progression a second time.

# Good Academic Standing

To remain in good academic standing a student must

- maintain 3.0 GPA (see Probation information below);
- not earn a grade below a C (see Dismissal section); and
- comply with the University Academic Integrity Policy, which stipulates that all academic work represents the individual work of the stated author. Input and assistance from others must always be appropriate and fully acknowledged.

# Probation

A student who receives a D in any course (or an F and has been readmitted), must repeat that course in its entirety and will be placed on Academic Probation. A remediation plan must be developed by the student and will be monitored by the Advisor.

- When retaking the course, the student must receive a grade of C or above in order to progress academically.
- If the student receives a grade below a C on retake, the student will be dismissed.
- When the grade of C or above is achieved on retake, the student will be taken off academic probation if his or her GPA is above his or her program level.

If the GPA of a student falls below the acceptable program level, the student will be placed on academic probation by the Program Director.

Following being placed on probation, the student will be required to submit an academic study plan to the Academic Advisor to explain how he or she plans to elevate the GPA to the program's acceptable level. The Post-Professional Progression Committee will review all study plans. The student will be expected to elevate his or her GPA to the acceptable program level or above within 1 calendar year. If a student fails to elevate his or her GPA, the student's record will be referred to the Post-Professional Progression Committee for review and possible dismissal from the program.

A student will not be permitted to progress to the final stage of the program while on probation. Remedial coursework may be necessary to increase the GPA prior to starting the final project.

# Withdrawal of Acceptance into the Program

If a student does not register for one course within 12 weeks after official acceptance into the program, the Program Director will notify the Registrar to send the student a notice of withdrawal of program acceptance.

KAL000210

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

# Dismissal

Based on recommendations of the Post-Professional Progression Committee, the student may be dismissed from a Post-Professional Program when a student

- fails to maintain active status;
- does not return to active status after an approved leave of absence period;
- receives a grade of F in any course;
- receives a grade below a C when retaking any course;
- while on probation, a student does not improve academic performance to program-level GPA within the prescribed calendar year;
- does not complete the minimum program credit hours within 1 year after being placed on inactive status;
- has more than one "W" in any course or three withdrawals total during the program;
- fails to comply with the University Academic Integrity Policy; or
- fails to complete the program requirements within the prescribed timeframe. Failure to complete the program within the prescribed enrollment period may result in dismissal by the Post-Professional Progression Committee. An extension of the program enrollment timeline for extenuating circumstances may be requested in writing to the Program Director who will present the request to the Post-Professional Progression Committee for review. If the Progression Committee approves the extension, the student will pay the prescribed trimester extension fee by the due date upon being billed by the accounting department. If the extension fee is delinquent by 2 weeks, the student may be dismissed.

Upon dismissal, the student will receive a letter from the University's Registrar via USA email.

# Right of Appeal

Any student who has been dismissed from the program may formally appeal this decision in writing to the director within 2 business days from receipt of the notification. If the student does not meet the stated deadline, the appeal may not be considered. In extenuating circumstances, the student may request an extension from the Program Director; however, this request must be made within the above stated deadline.

The appeal letter should address the following:

- The rationale behind the appeal and why the student believes the appeal is warranted.
- Future circumstances that will permit the student to rectify previous poor academic performance or deficient course activity.

The Program Director will notify the Academic Appeals Committee (AAC) of the appeal within 2 working days. The AAC will convene at the earliest convenient time.

The AAC will provide a recommendation to the Program Director within 2 business days following their meeting.

The Program Director will inform the student, the AAC, the Post-Professional Progression Committee, and the Registrar in writing of his or her decision regarding the appeal at the earliest convenient time for all parties involved.

Should a student not agree to the decision of the AAC, the student has the right of an appeal to the President or his or her appointed designee. The appeal must be submitted, in writing, within 5 business days to the President. Upon request, the President or his or her designee will review pertinent records, at his or her discretion, including a review of the process to ensure that it was correctly followed, and may meet with the AAC and the student. The President or his or her designee will follow the process as established in this Handbook and ensure that the process was followed.

Dismissal policies will be implemented as fairly and equitably as possible considering all extenuating circumstances.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                pg  113

KAL000211

# The Right of Petition

A student may petition the University for an exception, exemption, waiver, or special consideration of any policy. All petitions must be submitted in writing, preferably limited to one page, and accompanied by supporting documentation. Petitions should be addressed to the Program Director who, in consultation with appropriate administration and faculty, will decide the outcome. Petitions are accepted for purposes such as

- reconsideration of a rejected applicant for admission to the University,
- extending the course of study to complete the program,
- transfer of credit when the initial transfer request was denied,
- permission to continue in the program after being counseled out, or
- appealing a grade or dismissal from the program.

The Program Director's decision may be appealed to an arbitration committee, whose decision is final. Each petition is a case unto itself and does not create a precedent for any cases to follow.

# Orientation

Prior to beginning online courses, each student will receive a username, password, and directions for logging into the course platform. Students should sign into the myUSA portal Post Professional tab and view a short tutorial on navigating the Blackboard learning portal. This will provide the student with some general information about online learning and assist in navigating the platform software used to complete online courses. Information about the Student Readiness Orientation and preparatory materials will be sent to the student by the Academic Advisor.

# Registering for Coursework Online

To register, a student must sign into his or her myUSA portal account, click on the Student Services tab, then Registrar and select the Post Professional Registration link located on the left menu column.

If a student is registering for a seminar or certification they should call the Continuing Education Office at 1-800-241-1027, ext. 1400.

# Reinstatement

Students that voluntarily withdraw from the program in good standing may be reinstated into the program. These students will be permitted to bypass the normal application process and submit a one-page re-admittance application if it has been no more than 1 year since withdrawal from the program. Any student seeking reacceptance after the 1-year period must follow the normal application process.

# Time Limit

## MHA

It is required that MHA students complete all program requirements within 6 trimesters or 2 years. An extension of up to 1 year may be requested. If the Program Director approves the extension, there is an extension fee of $333.00 per trimester.

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.                                pg. 114

KAL000212

## MHS

It is required that MHS students complete all program requirements within 6 trimesters or 2 years. An extension of up to 1 year may be requested. If the Program Director approves the extension, there is an extension fee of $333.00 per trimester.

## MSN

It is required that MSN students in Nurse Educator, Nurse Executive, or Nurse Informaticist role specialties complete all program requirements within two (2) years (6 terms). It is required that MSN students in Family Nurse Practioner role specialty complete all program requirements within 2 years and 8 months (8 terms). An extension of up to 1 year may be requested. If the Program Director approves the extension, there is an extension fee of $333.00 per trimester.

## DNP

It is required that BSN-entry DNP students complete all program requirements within 3 years,4 months (10 terms). It is required that MSN-entry DNP students complete all program requirements within 2 years,4 months (7 terms).   An extension of up to 2 years may be requested. If the Program Director approves the extension, there is an extension fee of $333.00 per trimester.

## PPOTD

It is required that PPOTD students complete all program requirements within 4 years. An extension of up to 2 years may be requested. If the Program Director approves the extension, there is an extension fee of $333.00 per trimester.

## tDPT

Students are expected to complete the transitional DPT program in 4 years. An extension of up to 2 years may be requested. If the Program Director approves the extension, there is an extension fee of $333.00 per trimester. The maximum time to complete the degree is 6 years.

## DHSc

It is required that students complete all degree requirements within 5 years. An extension of up to 2 1/2 years may be requested. If approved by the Program Director, there is an extension fee of $333.00 per trimester.

## EdD

It is required that students complete all degree requirements within 4 years. An extension of up to 2 years may be requested. If approved by the Program Director, there is an extension fee of $333.00 per trimester.

# Non-Degree Seeking Students

USAHS offers a range of courses for individuals who wish to apply as a non-degree seeking (NDS) student.

**Admissions**

Students, faculty and staff should refer to the online version of the Student Handbook as this PDF may not contain the most updated information.

KAL000213

Fall 2018 Student Handbook for University of St. Augustine for Health Sciences

Students in NDS status must have a bachelor's degree and where indicated they may need to be a properly credentialed professional and meet the appropriate pre-requisite requirements. When credentialing/licensure is required, it will be noted as a pre-requisite requirement in the course catalog.

Students in NDS status are required to submit an application to take courses at USAHS. The NDS application can be received by contacting nondegree@usa.edu or found on our website. International students in NDS status are subject to the same TOEFL requirements as degree seeking students.

The ability to take courses as a student in NDS status does not indicate acceptance into the University. Furthermore, the successful completion of one or more courses does not indicate acceptance into the University or guarantee a more favorable review of an applicant seeking acceptance into a degree program. Students in NDS status who want to undertake a degree program are required to apply and be admitted to a specific degree program.

## Registration

Students in NDS status cannot register for more than 15 credits per term.* Students in NDS status will register for classes on a space available basis and regular degree-seeking students will receive registration priority. Students in NDS status are not permitted to enroll into courses that involve clinical or internship experiences.

Students in NDS status are given grades and may request academic records. Students in NDS status will be prohibited from enrolling in additional courses if they receive 2 unsuccessful grades. An unsuccessful grade is a D+, D, F, or W. Students are also subject to all policies governing student conduct as found in the Student Handbook.

Credits earned by students in NDS status at USAHS may be transferred into a degree program at USAHS and are subject to the rules outlined by the University credit transfer requirements. Please note that no more than 25% of an academic degree may be transferred in from courses completed as a student in NDS status.

*Exception - students taking SLP levelling courses or foreign-trained PT's seeking licensure may take up to 21 credits per term*

## Financial Aid/Bursar

Students in NDS status are not eligible to receive Title IV federal financial aid and tuition must be paid prior to the course beginning. Students in NDS status may be eligible for private loans.

## Licensure

The successful completion of courses taken by foreign and domestic trained therapists does not guarantee licensure in the United States. Individuals must meet the entry level requirements of the respective state to be licensed in that state.

## University Student Services

Access to the following student services are included as part of the per credit tuition rate for students in NDS status:

- Academic Advising
- Writing Center
- Registrar
- Counseling
- Library
- New Student Orientation portal and materials
- Technology services and support

Students in NDS status are also eligible to secure access to on-campus Wellness Centers by paying the term-based fee.

KAL000214

# Clinical Education Handbooks

Please refer to the Clinical Education tab of myUSA.

# What's New This Term

Miami Campus Dress Code located in Academic Policies and Procedures under Student Code of Conduct (Specific)

KAL000215